UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
GUCCI AMERICA, INC.,

                Plaintiff,

-against-

JENNIFER GUCCI, JENCO DESIGNS, LLC,
JENNICOR, LLC, JENNY GUCCI COFFEE AND
GELATO COMPANY, INC., VERATEX, INC.,
COLLEZIONE DI CASA, INC., E.L. ERMAN-
DEAD SEA COSMETICS CORP., ELE BRANDS
ENTERPRISE, INC., GBN WATCH
COLLECTION, INC., GBN GLOBAL BUSINESS
NETWORK, EDWARD LITWAK d/b/a ED
LITWAK & ASSOCIATES, GEMMA GUCCI,
GEMMA GUCCI COFFEE AND GELATO
COMPANY, INC., ABC CORPORATIONS 1-10,
and JOHN DOES 1-10,

                Defendants.
--------------------------------------------------------X

Civil Action No. 07 CV 6820
(RMB)(JCF)

**DECLARATION OF
JENNIFER GUCCI**

      I, JENNIFER GUCCI, a Defendant in the above-captioned matter, do declare and say under penalty of perjury, under the laws of the United States, that the following is true and accurate:

      1.     I am a named Defendant in the above-captioned matter. I make this Declaration based on my personal knowledge, except as indicated otherwise, and if called as a witness could competently testify thereto.

      2.     I was married to Paolo Gucci from December 2, 1977 until 1991 when I served Paolo Gucci with divorce papers.

      3.     Prior to and during the period of our marriage, Paolo Gucci was Chief Designer for Gucci S.p.A. ("Gucci") and supervised a Gucci factory in Italy, as well as being involved

with Gucci merchandising in the United States and at Gucci's Boutique in New York City. Paolo Gucci never obtained any formal education as a fashion designer before or during his employment by Gucci as a designer. Part of Paolo Gucci's responsibilities while working at Gucci was to oversee and review the designs and fashion concepts of other designers employed by Gucci, although he was often credited with creating those designs by the press.

4. Prior to my marriage to Paolo Gucci in 1977, I was classically trained as an opera singer in both the United Kingdom and Italy. I performed singing concerts in Italy, the United Kingdom and the United States before and during my marriage to Paolo Gucci. Often my concert performances were written about in various newspapers in the United States and abroad.

5. During my marriage to Paolo Gucci, I was involved in various aspects of Paolo Gucci's business involvement with Gucci, including but not limited to, attending meetings with both officers and employees of Gucci, and suppliers of various materials to the Gucci business. I also met with and discussed issues with suppliers and buyers, and learned about the design and manufacturing process for various Gucci materials and products. I also assisted in the public relations aspect of Gucci, including fashion shows and other aspects of Gucci's marketing efforts in the United States and around the world.

6. While I was married to Paolo Gucci, we maintained residences in the United Kingdom, Italy and New York City. I played a significant role in decorating and maintaining our residences in the United Kingdom, Italy and New York City while I was married to Paolo Gucci.

7. During my marriage to Paolo Gucci, we were routinely interviewed and had articles written about various aspects of our lives, including the larger Gucci family, our lifestyle, clothing, fashions, and the decorum and style of our residences. Articles about us, as well as our

interviews were published in newspapers and magazines throughout the world, including in the United States.

8. In or about 1980, Paolo Gucci was terminated from Gucci. In June 1983, while I was still married to him, Paolo Gucci commenced an action in Federal Court in the Southern District of New York against Gucci Shops, Inc., now Gucci America, Inc., which was a New York corporation with its principal place of business on Fifth Avenue in New York City. Paolo Gucci sued Gucci Shops, Inc. in this action for a Declaration that he was entitled to use his name "Paolo Gucci" in designing and developing products, and that such use of his name did not infringe upon the trademark or trade name of "Gucci". Paolo Gucci intended to use his name on leather goods and clothing that competed directly against market niches already occupied by fashion products traditionally sold and marketed by Gucci. Defendant in that action, formerly known as Gucci Shops, Inc., counterclaimed for trademark infringement.

9. On June 17, 1988, after a trial, Judge Conner issued an Order in that action in which he held: (1) that Paolo Gucci was entitled to identify himself as the designer of products so long as he did so in a manner which will not lead an appreciable number of consumers to believe that his products are Gucci products; (2) Paolo was entitled to use his name to identify himself as the designer of products sold under a separate trademark, which does not include the name "Gucci"; (3) to avoid confusion, Paolo was allowed by the Court to use the name "Paolo Gucci" which must always appear after the trademark in advertisements and on labels; (4) that his name "Paolo Gucci" must be no more prominent than the trademark to which it is associated; and (5) Paolo was allowed to use his name along with a disclaimer which notified consumers that Paolo was no longer affiliated with any of the Gucci entities. A subsequent Court Order issued by Judge Conner on July 13, 1988 indicated that Paolo Gucci could use the letters "PG" but only

in conjunction with the prominently displayed phrase "Designed by Paolo Gucci" and could never be placed in a repeating pattern on the product itself.

10. Subsequent to Judge Conner's Order, Paolo Gucci placed a paid advertisement in Women's Wear Daily on November 30, 1988 in which he announced his debut as an independent designer, separate and apart from Gucci, utilizing the name "Paolo Gucci" according to Judge Conner's Order.

11. During the period in which Paolo Gucci attempted to use his own name in order to promote products designed by him, he engaged Edward Litwak to act as his agent in promoting himself, his boutique and his products.

12. In 1987, Gerald McKnight published a book entitled "Gucci: A House Divided" in which he chronicled the history of the Gucci family and businesses. The book highlighted the various legal battles between Paolo Gucci and his relatives regarding the Gucci business, and described my marriage to Paolo and the circumstances of our marriage. The book was sold in the United States in hardcover, and in other countries.

13. In or about 1988, in conjunction with using his own name to market and advertise his designs, Paolo Gucci entered into an agreement by which his new company was to be involved with opening a luxury hotel line, and designing various furnishings for those luxury hotels. In conjunction with Paolo Gucci developing, designing and furnishing the luxury hotels; as his wife, I was involved with various aspects of that endeavor, including discussions and meeting with Paolo Gucci and others regarding the design development, licensing and marketing of the luxury hotel and its furnishings. I was also involved in meetings between Paolo Gucci and his Design Coordinator, Joseph Oliveri, as well as Edward Litwak regarding the luxury hotel

concepts. The design concepts I discussed with Paolo Gucci for the hotels included bedding, furnishings, and flatware as well as bathroom accessories.

14. When I served Paolo Gucci with divorce papers in 1991, our divorce proceedings became public knowledge and were described in detail in numerous newspapers and magazine articles in the United States and in Europe. In or about March of 1993, the newspapers and magazines also published multiple articles regarding the fact that Paolo Gucci was jailed briefly for failure to pay to me some $350,000 in back alimony and child support. These articles described our residences and the décor in those residences, as well as my part in decorating the residences.

15. Paolo Gucci died in 1995. Subsequently, I was interviewed on British TV regarding my marriage to Paola Gucci. A TV series entitled "The Guccis" later ran on British TV about the Gucci family, and my marriage to Paolo Gucci was a prominent part of that series.

16. After Paolo Gucci's tragic and untimely death in 1995, I engaged Mr. Litwak to act as my agent with regard to promoting my design talents, and lifestyle and fashion tastes to various businesses enterprises. I also engaged Mr. Litwak to market and promote my story regarding being a member of the famous jet-setting Gucci family.

17. In the mid-1990's, I marketed and sold a brand of shoes under my name in the United States through the Home Shopping Network. During a 38 minute TV spot, HSN sold out the entire inventory of shoes being sold under my name, producing revenues of approximately $180,000.

18. In March 2000, Flitch & Bendayan GmbH licensed the rights to utilize my name "Jennifer Gucci" in conjunction with the design and sale of jewelry through the Home Shopping Network in Europe. In conjunction with that licensing agreement, I helped design and promote

the jewelry which was manufactured on behalf of Flitsch & Bendayan. Prior to the manufacture of the jewelry, I met with representatives of Flitsch & Bendayan in order to describe to them what sorts of things and design qualities I wanted to see in the proposed jewelry. During that process, I showed them pieces of jewelry from my personal jewelry collection in order to stimulate design ideas for jewelry which would be sold under my name. In licensing my name to Flitsch & Bendayan with regard to jewelry, it was my understanding that the company would put a disclaimer on each piece of jewelry specifically indicating that I was not associated with "Gucci S.p.A." This jewelry was sold in Europe, and I participated as a spokesperson for my line of jewelry during various TV spots on the Home Shopping Network in Europe, including Belgium, Germany, and Italy. During each TV spot I personally participated in for the sale of the jewelry, I issued a disclaimer indicating that I was not associated or affiliated with Gucci S.p.A., but that this line of jewelry was my own.

19. I also sold jewelry under my name in Japan through TV, and during each TV spot I issued a disclaimer that I was not associated with or affiliated with Gucci.

20. In conjunction with the sale of jewelry in Germany by Flitsch & Bendayan GmbH, a legal proceeding was conducted in Germany between Flitsch & Bendayan and "Gucci S.p.A." The parties reached a settlement in that matter with regard to the sale of jewelry by my daughter, Gemma Gucci. The parties in that legal action agreed that Flitch & Bendayan was entitled to associate the name of my daughter, Gemma Gucci with jewelry products as long as the words "designed" or "styled" preceded the name Gemma Gucci.

21. In 2000, Sara G. Borden released her book "The House of Gucci". The book provided a detailed description of the history of the Gucci family and business, as well as describing the circumstances surrounding the murder of Paolo Gucci's cousin, Maurizio Gucci,

by his wife, Patricia. The book describes in detail my former husband, Paolo Gucci's design and business activities at Gucci, his legal battles with Gucci, as well as my marriage to Paolo Gucci, and my activities relating to the Gucci business, and divorce proceedings from Paolo Gucci. The book has been published in hardcover and paperback editions in the United States and other countries. The book was reviewed in *Women's Wear Daily*, *The Wall Street Journal*, *The Economist* and *Cosmopolitan*.

22. In or about March 2000, Showtime approached my agent, Edward Litwak, regarding the rights to a motion picture entitled "The Gucci Wars". The picture was to be about my life with Paolo Gucci and the Gucci business and Gucci family. During this same period, I entered into an agreement with my agent, Edward Litwak, regarding a possible miniseries television series, as well as a motion picture and/or a book or other literary vehicle. I entered into this agreement with Mr. Litwak as there appeared to be interest by various large media outlets in obtaining my story regarding my marriage to Paolo Gucci and my life with the Gucci family, and my experiences with the Gucci family.

23. On January 14, 2002, in conjunction with the application by Jenco Designs, LLC for a trademark, "Jennifer Designed by Jennifer Gucci", I executed an Affidavit in support of such application. In my Affidavit for Application No. 76/228,124, I indicated my intention to follow all of the guidelines described in the 1988 Judgment and Decision of Judge Conner in the *Gucci v. Gucci Shops* action which was initiated by my former husband, Paolo Gucci, against Gucci Shops, Inc. The application for that registration was for housewares, including bed covers, bed sheets and towels in International Class 24, as well as for jewelry in International Class 14, and women's wear in International Class 25. I made the sworn statements in that Affidavit about the use of the proposed trademark because it was my understanding through

discussions with my agent, Edward Litwak, that I would be permitted to use my name "Jennifer Gucci" in conjunction with the marketing, licensing and sale of certain goods, as long as I, or any company I licensed my name to, abided by the strictures of Judge Conner's 1988 Decision relating to my husband Paolo Gucci's use of his name. As provided for in the Affidavit, I expressly indicated that Jenco would use a prominently displayed disclaimer which unambiguously stated that I was not affiliated or associated with Gucci or its products.

24.   It is my understanding that Dominick Dunne also televised an episode on his TV show on Court TV (n/k/a Tru TV), "Power, Privilege and Justice", entitled "Crime of Fashion" about the Gucci family and the murder of Paolo's cousin Maurizio Gucci by his wife. The show included details about my marriage to Paolo Gucci. A&E also broadcast a show regarding the Gucci family in which my marriage to Paolo Gucci was described.

25.   In or about 2004, I entered into a license agreement with my agent, Edward Litwak, and his corporation, Ed Litwak & Associates, regarding the use of my name and trademark "Jennifer designed by Jennifer Gucci".

26.   In late 2006, my agent, Edward Litwak, approached me about my designing and being involved with the sale of home décor products, such as bedding, covers, pillow cases and sheets, among other things.

27.   In January of 2007, I met with Mr. Litwak and individuals from a company by the name of Veratex regarding such bedding products.

28.   During the January 2007 meeting at Veratex, I sat down with various individuals at Veratex regarding designs for bedding products. I discussed with those individuals the types of things that I wanted to see in the designs and proposed bedding products, as well as the quality of the products and the materials. I reviewed color schemes for the various products. It was my

understanding that I would make personal appearances regarding the marketing and promotion of the bedding products.

29. Subsequently, in or about February 2007, Veratex personnel sent me pictures and exemplars regarding the proposed bedding products which I reviewed and commented on. I informed these Veratex personnel what things I liked about the designs and proposed products I reviewed.

30. In or about June 2007, Veratex personnel provided me with samples of possible packaging for the bedding line of products that would be sold under my name. Some of the packaging provided to me by Veratex for review did not follow the guidelines or license agreement with Veratex for use of my name as I understood them, and which guidelines are in accord with Judge Conner's decision in the Paolo Gucci case; it is my understanding that my agent, Edward Litwak, provided a copy of Judge Conner's Decision regarding my former husband, Paolo Gucci's use of his name. I was concerned about the prominence of the name "Jennifer Gucci", which was in different font and size than the mark "Collezione di Casa". I was concerned about other aspects of the packaging and expressed those concerns to Mr. Litwak, and personnel from Veratex. It is my understanding my agent, Edward Litwak, informed Mr. Avi Cohen of Veratex of my concerns about the packaging. I was not responsible for any of the elements contained on the proposed Veratex packaging. It was my understanding that the proposed Veratex packaging using my name was still in the process of being revised when Plaintiff initiated this action.

31. In or about June 2007, it was my understanding that Veratex sent invitations to various entities regarding an industry show for Veratex's proposed line of Jennifer Gucci

bedding products. I had no involvement in the design of those invitations, and did not review the invitations before they were sent out by Veratex to various industry buyers.

32.  In or about June or July of 2007, I met with individuals from a company, E.L. Erman, regarding a line of skincare products which would be sold under my name. I met with these individuals in conjunction with a show set up by Veratex regarding proposed bedding and household furnishing products to be sold under my name. I was concerned about the packaging for these skincare products, in particular, the use of my name in its size and font. I expressed these concerns to Mr. Litwak, and he informed me that he would inform the individuals at E.L. Erman, the company proposing the skincare line, that they would have to comply with the aspects of Judge Conner's Order.

33.  In early 2008, I co-authored and had published a book entitled "Gucci Wars". This book provides a detailed account of my marriage and high profile divorce from Paolo Gucci, as well as my life after our divorce and Paolo Gucci's death. In the book, I describe in detail my collaboration with Paolo Gucci during our marriage with regard to designing and decorating our various residences. In the book I also describe my participation in the Gucci fashion business while I was married to Paolo Gucci, as well as my interaction with my then-husband Paolo Gucci, about his designs. The book is available for purchase in the United States, in approximately October of 2008, although individuals can order it through the internet from the United Kingdom.

34.  I was interviewed by ITN (International Television News) in September 2007 regarding the Gucci family.

_____
JENNIFER GUCCI

Sworn to before me this
16th day of June, 2008

_____
Notary Public

SHIRLEY B. THORNTON
Notary Public, State of New York
No. 01TH6029394
Qualified in Westchester County
Commission Expires August 16, 20 09

11