UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――X

| | |
|---|---|
| GUCCI AMERICA, INC., | Civil Action No. 07 CV 6820 (RMB)(JCF) |
| Plaintiff, | |
| -against- | |
| JENNIFER GUCCI, JENCO DESIGNS, LLC, JENNICOR, LLC, JENNY GUCCI COFFEE AND GELATO COMPANY, INC., VERATEX, INC., COLLEZIONE DI CASA, INC., E.L. ERMAN-DEAD SEA COSMETICS CORP., ELE BRANDS ENTERPRISE, INC., GBN WATCH COLLECTION, INC., GBN GLOBAL BUSINESS NETWORK, EDWARD LITWAK d/b/a ED LITWAK & ASSOCIATES, GEMMA GUCCI, GEMMA GUCCI COFFEE AND GELATO COMPANY, INC., ABC CORPORATIONS 1-10, and JOHN DOES 1-10, | **DECLARATION OF EDWARD LITWAK** |
| Defendants. | |

―――――――――――――――――――――――X

I, EDWARD LITWAK, a Defendant in the above-captioned matter, do declare and say under penalty of perjury, under the laws of the United States, that the following is true and accurate:

1. I am a named Defendant in the above-captioned matter. I make this Declaration based on my personal knowledge, except as indicated otherwise, and if called as a witness could competently testify thereto. I am the owner and sole shareholder of Edward Litwak & Associates, also a named defendant in this action.

### JENNIFER AND GEMMA GUCCI ARE FAMOUS MEMBERS OF THE GUCCI FASHION FAMILY

2. As of 1980, I began acting as Paolo Gucci's licensing agent. I acted in such a capacity for Paolo Gucci after he left Guccio Gucci, Spa ("Gucci") to open his own fashion

business, and design, market and sell his own line of leather and fashion goods using his name, Paolo Gucci. I acted in this capacity for Paolo Gucci until he filed for bankruptcy in or about 1993. I met Paolo Gucci's then wife, Jennifer Gucci during that period.

3. After Paolo Gucci's death in 1995, I began to act as Jennifer Gucci's licensing agent. In my capacity as Jennifer Gucci's licensing agent, I conduct public relations, and marketing, and arrange for the licensing of Jennifer Gucci's name and fashion/design expertise to companies around the world.

4. I am also the licensing agent for Gemma Gucci, the only daughter of Jennifer and Paolo Gucci. In my capacity as licensing agent for Gemma Gucci, I conduct public relations, and marketing, and arrange for the licensing of Gemma Gucci's name and fashion/design expertise to companies around the world. I have no signed agreement with Gemma Gucci to act as her licensing agent.

5. Through various companies in which I was involved, including Harrow, Inc., Pacificap Entertainment Holdings, Inc., and Gemma Global, Inc., Jennifer Gucci licensed her name in conjunction with the design, marketing, distribution and sales of goods, such as shoes, jewelry and coffee related services and products.

6. In or about 1996-97, Gemma Global, entered into an agreement with a manufacturer to manufacture and sell shoes in the United States. The label used for these shows stated: "Jennifer Designed by Jennifer Gucci". We obtained orders for shoes amounting to approximately $9 million, in the first selling season.

7. During the course of my acting as an agent for Jennifer Gucci, there have only been 3-4 agreements executed with various companies to allow those companies to use her name in conjunction with the products of those companies.

8. To my knowledge, no company has ever refused to enter into a licensing agreement to use Jennifer Gucci's name in the manner I proposed because that company thought there might be a conflict with the various Gucci companies.

9. As Jennifer and Gemma Gucci's agent, each time I enter in to discussions with a company regarding the right to use Jennifer or Gemma Gucci's name on a product or service, I inform that company that it must use such names in accordance with the guidelines provided for in Judge Connor's decision that allowed Paolo Gucci to use his name in a certain manner to promote, market and sell goods and/or services offered by Paolo Gucci.

**JENNIFER GUCCI ENTERS INTO A LICENSING AGREEMENT TO SELL JEWELRY**

10. In or about April 2000, Jennifer Gucci, through Harrow, Inc., entered in to an agreement with the German company Flitsch & Bendayan GmbH ("Flitsch"). The agreement related to the design and sale of jewelry using the labels "The Collections of Jennifer Gucci" and "Jennifer by Jennifer Gucci." Under the agreement sales were to take place in Europe and Asia.

11. Pursuant to that agreement, Jennifer Gucci appeared on the Home Shopping Network in Germany, Belgium, Italy, and Japan to market and sell the jewelry manufactured by Flitsch bearing her name; the jewelry was sold in a silver and blue box with the label "Collezione of Jennifer Gucci" and with a disclaimer indicating that Jennifer Gucci is not affiliated with the Gucci companies.

12. Flitsch paid royalties relating to jewelry sold using the "Jennifer Gucci" name, pursuant to the agreement.

13. During this period, Gucci never brought claims, suit or legal action against Flitsch or Jennifer Gucci regarding her sale of jewelry in Europe using her name and the label "Collection of Jennifer Gucci", although Flitsch was selling jewelry in Europe under the Jennifer

3

Gucci name at the same time it was selling jewelry under the Gemma Gucci name. The Flitsch jewelry sold under the Jennifer Gucci label and name always contained the appropriate disclaimers indicating that Jennifer Gucci was not affiliated with Gucci.

14. It is my understanding that Flitsch exhibited jewelry at the Basel, Switzerland jewelry exhibition under the "Gemma by Gemma Gucci" and "Collection of Jennifer Gucci" labels. It is my understanding, that individuals from Gucci were present at the exhibit, saw the jewelry, and commented on the fact that the jewelry met the criteria of how jewelry bearing the names "Gemma Gucci" or Jennifer Gucci" could be marketed and sold.

## JENNIFER GUCCI ENTERS INTO A MASTER LICENSE AGREEMENT WITH EDWARD LITWAK & ASSOCIATES

15. In or about February 2004, Jennifer Gucci entered in to a Master License Agreement with my company Edward Litwak & Associates. The Master License Agreement provides that my company can license the use of the trade name "Jennifer Designed by Jennifer Gucci" worldwide on soft goods, hard goods, foods and specialty locations.

16. Subsequently, in August 2006, Ed Litwak & Associates entered in to a license agreement with Jenny Gucci Coffee and Gelato, Inc. to license the rights to use Jennifer Gucci's name with respect to coffee products and services; such agreement was approved by Jennifer Gucci.

17. There has never been a signed license agreement between myself, my company or Gemma Gucci, on the one hand, and any other entity on the other hand, regarding coffee, gelato or ice cream, and neither I, my company, nor Gemma Gucci authorized the sale of ice cream, or gelato products.

## TWO TELEVISION NETWORKS AGREE TO HELP PRODUCE A TV MOVIE ABOUT JENNIFER GUCCI

18. In the Spring of 2000, Jennifer Gucci entered in to an option agreement with me to authorize me to enter into a production agreement with Showtime regarding the production of a movie and/or TV mini-series about the Gucci family and businesses, and Jennifer's marriage to Paolo Gucci.

19. In 2001, Showtime entered into a second option agreement for the same project, but ultimately Showtime did not exercise its option to do a movie and/or mini-series and the option agreement was allowed to expire.

20. In late 2006/early 2007, I entered into discussions with Canadian Television Network and Italian Television Network to have them produce a made-for-TV movie about Jennifer Gucci's life and marriage to Paolo Gucci.

21. In August 2006, Capri Films and Television and Film Capital Partners entered in to a joint venture agreement to make a for TV mini-series based upon Jennifer Gucci's marriage and life with Paolo Gucci. This mini-series TV project is still being actively pursued.

22. In late 2007, I entered in to negotiations and discussions with the Lifetime Network to produce a four (4) hour made for TV movie/mini-series about Jennifer Gucci and her life with Paolo Gucci and the Gucci family.

23. Lifetime plans on shooting scenes for the show in the spring of 2009, and will probably air the show in August of 2009.

**THE WE NETWORK EXPRESSES INTEREST IN A
TV REALITY SHOW ABOUT GEMMA GUCCI**

24. In or about mid-2005, I entered into discussions and negotiations with the WE Network and others regarding a proposed reality TV show about Gemma Gucci and her aspirations to become a designer in New York City; Gemma Gucci is the daughter of Jennifer and Paolo Gucci's daughter.

25. The WE Network published an announcement regarding the proposed show.

26. I spent approximately $250,000 in efforts to get the show produced and placed on the air.

27. Ultimately, the show was never produced.

**BUSINESSES EXPRESS INTEREST IN A GEMMA GUCCI WINE/FOOD PROJECT**

28. In or about mid-2005, several businesses expressed an interest in creating and marketing gourmet food and wine under the name "Gemma by Gemma Gucci"; I have a license from Gemma Gucci to license use of her name on her behalf with regard to various projects.

29. In conjunction with the interest of certain businesses to make, market and sell wine and gourmet foods, I participated in the process of establishing samples of the proposed gourmet foods and wines. Gemma Gucci tasted samples of the proposed wines. Samples of a proposed gelato were also created.

30. An initial license agreement regarding licensing the "Gemma by Gemma Gucci" name for wine and other foods by Renaissance Corp. was canceled for non-payment. A subsequent license arrangement for wines using the "Gemma by Gemma Gucci" name never got to the point of actual product production and sale, and the license was canceled with Gemma Gucci Wines. I lost about $25,000 of my investment in trying to get a version of wine using the "Gemma by Gemma Gucci" name to the point of production and sale.

31. Neither the wine nor the gourmet gelato products were ever authorized for sale commercially under the "Gemma by Gemma Gucci" name pursuant to any license agreement with me, my companies nor Gemma Gucci.

32.     In late November 2007, I sent cease and desist letters to entities using the name "Gemma Gucci" on handbags, gelato and other items, requesting that such entities stop their unauthorized use of the name "Gemma Gucci" with respect to certain products.

**BEDDING MAKER VERATEX AGREES TO LICENSE JENNIFER GUCCI'S NAME**

33.     In late 2006/early 2007, I entered into discussion with a company by the name of Veratex, Inc. regarding its use of Jennifer Gucci's name on a line of bedding products.

34.     The marketing and branding of the line of bedding and other products to be sold under the "Casa di Collezione by Jennifer Gucci" name was to coincide with the release of the TV mini-series and book about Jennifer Gucci and her marriage and life with Paolo Gucci and the Gucci family.

35.     In conjunction with those discussions, I provide Veratex personnel with a copy of Judge Connor's 1988 decision in the Paolo Gucci trademark case against Gucci, as well as other materials about Jennifer Gucci, and her use of her name to market and sell various products. At the time, I informed Veratex of my belief that Jennifer Gucci could use her name in conjunction with the marketing and sale of bedding products because of Judge Connor's decision in Paolo Gucci's case, as well as the resolution of the German tribunal in the Flitsch matter.

36.     In or about February 2007, I traveled with Jennifer Gucci to Veratex's offices in New York City to discuss designs for proposed bedding to be marketed and sold by Veratex under Jennifer Gucci's name. During that trip Jennifer Gucci gave Veratex personnel input in to her tastes and desires regarding colors and styles for the Veratex bedding line of products.

37.     During the process of creating and designing Veratex's line of bedding products which would bear the "Casa di Collezione by Jennifer Gucci" name, Jennifer Gucci had input as to how the proposed bedding and bath products would ultimately appear.

38. During my discussions with Veratex personnel, I informed them that they could not use Jennifer Gucci's initials, "J" and "G" in an interlocking manner, and that on any label or packaging, the letters used for the name "Jennifer Gucci" had to be the same size as the lettering for the house mark Veratex intended on using in conjunction with Jennifer Gucci's name.

39. In February 2007, Veratex provided me with proposed packaging for its line of bedding products using the "Casa di Collezione by Jennifer Gucci" name. I immediately informed Veratex it could not use packaging for product that contained an interlocking "J" and "G".

40. During the February 2007 timeframe, I made statements to a textile periodical known as Home Textiles Today in conjunction with the promotion of Veratex's line of "Casa di Collezione by Jennifer Gucci" bedding products.

41. In March 2007, both my attorney and I on several occasions I reiterated to Veratex personnel that the proposed packaging designs needed to be revised, as, in my opinion, the proposed packaging did not follow the guidelines I had discussed with Veratex regarding use of Jennifer Gucci's name. In particular, I advised Veratex personnel that the use of the name "Jennifer Gucci" by itself did not follow the guidelines of Judge Connor's decision.

42. It is my understanding that prior to a June 2007 show for the Veratex line of bedding products using the "Jennifer Gucci" name, Veratex sent out invitations to potential attendees. Neither I nor Jennifer Gucci had any input in to the design of these invitations. They were sent without our advance knowledge.

43. In mid-June 2007, Veratex held a show regarding the proposed "Casa di Collezione by Jennifer Gucci" line of bedding for potential buyers; the public was not invited to attend the show. In connection with the show, I advised potential buyers that the proposed

packaging for the bedding was not in final form, and would need to be revised further before any merchandise could be sold.

44. At this show, the cosmetics marketer E.L. Erman also showed proposed packaging for its products using the "Collection by Jennifer Gucci" name; this was arranged for by Veratex personnel. I informed Veratex and E.L. Erman personnel that proposed packaging on the cosmetics products was not in accordance with the guidelines we had provided to them, and was not in accordance with the provisions of Judge Connor's decision in the Paolo Gucci matter. Neither I nor Jennifer Gucci saw the proposed packaging of E.L. Erman before the June 2007 show in New York City.

45. At this June 2007 Veratex show, I also met with personnel from a mattress company by the name of Therapedic. Therapedic wanted a license to market and sell mattresses under the "Jennifer Gucci" name. I was shown proposed packaging for Therapedic mattresses for the first time at the show. I informed those persons and entities involved with the proposed packaging that it did not meet the guidelines I had provided to Veratex, and the proposed packaging was not in accord with the provisions of Judge Connor's decision in the Paolo Gucci action.

_____
EDWARD LITWAK

Sworn to before me this
16th day of June, 2008

_____
Notary Public
SHIRLEY B. THORNTON
Notary Public, State of New York
No. 01TH6029394
Qualified in Westchester County
Commission Expires August 16, 2009