UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————X

GUCCI AMERICA, INC.,

                     Plaintiff,

  -against-

JENNIFER GUCCI, JENCO DESIGNS, LLC,
JENNICOR, LLC, JENNY GUCCI COFFEE AND
GELATO COMPANY, INC., VERATEX, INC.,
COLLEZIONE DI CASA, INC., E.L. ERMAN-
DEAD SEA COSMETICS CORP., ELE BRANDS
ENTERPRISE, INC., GBN WATCH
COLLECTION, INC., GBN GLOBAL BUSINESS
NETWORK, EDWARD LITWAK d/b/a ED
LITWAK & ASSOCIATES, GEMMA GUCCI,
GEMMA GUCCI COFFEE AND GELATO
COMPANY, INC., ABC CORPORATIONS 1-10,
and JOHN DOES 1-10,

                     Defendants.

———————————————————————————X

Civil Action No. 07 CV 6820
(RMB)(JCF)

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

    Defendants, JENNIFER GUCCI, JENNY GUCCI COFFEE AND GELATO

COMPANY, INC., EDWARD LITWAK d/b/a ED LITWAK & ASSOCIATES and GEMMA

GUCCI, by and through their counsel, Harrington, Ocko & Monk, LLP, respectfully submit their

Findings of Fact and Conclusions of Law as follows:

### JENNIFER GUCCI AND GEMMA GUCCI ARE MEMBERS
### OF THE FAMOUS GUCCI FAMILY

    1.    In December 1977, Jennifer Gucci married Paolo Gucci in Haiti after

approximately a year long romance. Deposition Transcript of Jennifer Gucci, October 12, 2007

("J. Gucci Trans."); Declaration of Jennifer Gucci, June 16, 2008 ("J. Gucci Dec."), at ¶ 2;

Defendants' Trial Exhibit 1, Gucci Wars, by Jennifer Gucci (John Blake Publishing, Ltd 2008)

("Gucci Wars"); Defendants' Trial Exhibit 2, Gucci: A House Divided by Gerald McKnight (Donald I. Fine, Inc., 1987) ("Gucci"); Defendants' Trial Exhibit 3, The House of Gucci, by Sara G. Forden (HarperCollins 2000) ("House of Gucci").

2.    At the time of Jennifer Gucci's marriage to Paolo Gucci, Paolo Gucci was the Chief Designer for the famous Italian fashion house, Guccio Gucci S.p.A., ("Gucci S.p.A.") as well as having other responsibilities and roles in other Gucci family business entities.    J. Gucci Trans.; J. Gucci Dec., at  ¶ 3; Gucci Wars; Gucci; House of Gucci.    At the time of Jennifer Gucci's marriage to Paolo Gucci, he was also a shareholder in the Gucci S.p.A. family business. Gucci Wars;  Gucci; House of Gucci.  Paolo Gucci's grandfather, Guccio Gucci founded the family business.  Id. Paolo Gucci's father, Aldo Gucci, was a also a designer, shareholder, and President of Gucci S.p.A.  Id.

3.    Paolo Gucci was never formally trained as a fashion designer, before or during his employment as a designer by Gucci S.p.A.   J. Gucci Dec., at ¶ 3; House of Gucci; Gucci; Gucci Wars.   During his tenure as Chief Designer for Gucci S.p.A., Paolo Gucci oversaw the design efforts of many subordinates, and often got credit for designs that actually originated with those subordinates.  J. Gucci Dec., at ¶ 3; House of Gucci.

4.    During his tenure at Gucci S.p.A., Paolo Gucci was not only the Chief Designer for Gucci S.p.A., he also supervised a Gucci factory in Italy, and was involved in marketing and merchandising Gucci products around the world, including in Europe, Japan, and the United States, and in particular at Gucci S.p.A.'s Boutique in New York City.  J. Gucci Dec., at ¶ 3; House of Gucci; Gucci; Gucci Wars.

5.    Before her marriage to Paolo Gucci, Jennifer Gucci was classically trained opera singer, having trained in the United Kingdom and Italy.   J. Gucci Dec., at ¶ 4; Gucci Wars.

Before and during her marriage to Paolo Gucci, Jennifer Gucci performed at concerts in the United Kingdom, Italy and the United States. J. Gucci Dec., at ¶ 4; Gucci Wars. Many of Jennifer Gucci's concert performances were written about in newspapers. Defendants' Trial Exhibit 4, Daily Express Article, June 9, 1981; Defendants' Trial Exhibit 5, Hartford Courant, May 29, 1981; Defendants' Trial Exhibit 6, February 12, 1982 newspaper article and February 14, 1982 concert invitation; J. Gucci Dep. Trans., at ¶ 4; Gucci Wars, at .

6.       On June 3, 1983, Jennifer Gucci gave birth to her daughter Gemma Gucci in New York City. Declaration of Gemma Gucci ("G. Gucci Dec."), at ¶ 2. Gemma is the daughter of Paolo Gucci. Id.; Gucci Wars, at . Gemma Gucci spent most of her life growing up in New York City, and living in her parents' apartments in Manhattan. G. Gucci Dec., at ¶ 3. Gemma Gucci attended Trinity School in Manhattan. Id., at ¶ 4. On weekends, Gemma attended classes at New York Fashion Institute of Technology, and during summer vacation periods, Gemma acted as an intern at the interior design firm of Noel Jeffrey, Inc., in New York City. G. Gucci Dec., at ¶¶ 6-8. Gemma Gucci always displayed an interest in fashion and design growing up, but opted to attend St. Andrews University in the United Kingdom instead of Parsons New School for Design in New York City. G. Gucci Dec., at ¶¶ 5-9.

7.       During her marriage to Paolo Gucci, Jennifer Gucci was involved in various aspects of Paolo Gucci's business dealings while he was at Gucci S.p.A. J. Gucci Dec., at ¶ 5; Gucci Wars; House of Gucci. Jennifer Gucci's participation in Paolo Gucci's business dealings at Gucci S.p.A. included attending business meetings and dinners with Gucci S.p.A. officers, employees and customers, and attending meetings with buyers and suppliers. J. Gucci Dec., at ¶ 5; Gucci Wars, at . As a result of my participation in such meetings and events with buyers and suppliers and Gucci S.p.A. employees, I learned about various aspects of fashion design and the

3

manufacturing process.  J. Gucci Dec., at ¶ 5; Gucci Wars.   During my marriage to Paolo Gucci, I also assisted in the public relations aspect of the Gucci S.p.A.'s business, including being involved in setting up fashion shows and other aspects of Gucci S.p.A.'s marketing efforts in the United States and around the World.  J. Gucci Dec., at ¶ 5; Gucci Wars; House of Gucci .

8.      During Jennifer Gucci's marriage to Paolo Gucci, the couple maintained residences in the United Kingdom, Italy and New York City.  J. Gucci Dec., at ¶ 6; Gucci Wars; House of Gucci.  Jennifer Gucci played a large role in decorating and maintaining these various residences while I was married to Paolo Gucci.  J. Gucci Dec., at ¶ 6; defendants' Trial Exhibit 7, October 6, 1986 newspaper article in Woman Today; Defendants' Trial Exhibit 8, December 2, 1989 newspaper article in West Australian; Defendants' Trial Exhibit 9, June 17, 1990 Sunday Express Magazine.

9.      During Jennifer Gucci's marriage to Paolo Gucci, she and Paolo were routinely interviewed and had articles published about them and their lives in newspapers and magazines throughout the world.   J. Gucci Dec., at ¶ 7; Gucci Wars; House of Gucci; Gucci; Defendants' Trial Exhibits 4 – 9.  These articles covered various aspects of their lives as members of the Gucci family and business, including our lifestyles, clothing, fashions, and the decor in their homes.  Id.

10.     In or about 1980, Paolo Gucci was terminated from Gucci.  J. Gucci Dec., at ¶ 8; Gucci Wars; House of Gucci; Gucci.  His termination from Gucci was very public and was written about in the press.  Id.  Subsequently, Paolo Gucci behind to design his own line of merchandise for sale in the United States and the world under his own name; Paolo Gucci. Declaration of Edward Litwak ("Litwak Dec."), at ¶ 2; Declaration of Joseph Oliveri ("Oliveri Dec."), at ¶ 2; Gucci.

11.     In conjunction with working to open his own fashion store in New York and design his own fashion under his own name, in June 1983 Paolo Gucci commenced a legal action in federal Court in the Southern District of New York against Gucci Shops, Inc., also known as Gucci America, Inc.  J. Gucci Dec., ¶ 8; Gucci Wars; House of Gucci;  Defendants' Trial Exhibits 10-12, June 17, 1998, July13, 1988, and January 12, 1994 Orders of Judge Conner in Case No. 83 Civ. 4453 (WCC).  Paolo Gucci sued Gucci Shops in this action in order to obtain a declaration from the Court that he was entitled to use his name "Paolo Gucci" in designing and developing products, and that such use of his name on those products did not infringe upon the trademarks or trade names owned by Gucci S.p.A.  Id.; J. Gucci Dec., at ¶ 8.  Paolo Gucci indicated in the suit that he intended on using his name on leather goods and clothing that competed directly against the market niches already occupied by fashion goods and products traditionally marketed and sold by Gucci.  J. Gucci Dec., at ¶ 8; Defendants' Trial Exhibits 10-12.  In this action, the Corporate Gucci S.p.A. defendants counterclaimed for trademark infringement against Paolo Gucci.  Id.

12.     After a trial, Judge Conner issued a decision and order.  Defendants' Trial Exhibit 10.  In that Order, Judge Conner decided that "(1) Paolo Gucci was entitled to identify himself as the designer of products so long as he did so in a manner which would not lead to an appreciable number of consumers believing that his products were associated with Gucci's; (2) Paolo Gucci was entitled to use his name to identify himself as the designer of products sold under a trademark that did not include the word "Gucci"; (3) to avoid possible confusion, Paolo Gucci was allowed to use his name "Paolo Gucci", but that such name had to appear after the trademark; (4) the name "Paolo Gucci" must be no more prominent than the trademark with

which it was used; and (5) Paolo Gucci was allowed to use his name along with a disclaimer which notified consumers that Paolo Gucci was no longer affiliated with any Gucci entities. Id.

13.    A subsequent order by Judge Conner in July 1988 indicated that Paolo Gucci could only use the letters "PG" in conjunction with the prominently displayed phrase "Designed by Paolo Gucci". Id.

14.    After Judge Conner's decision, Paolo Gucci placed a paid advertisement in Women's Wear Daily on November 30, 1988 in which he announced his debut as an independent designer, separate and apart from Gucci, he would sell products utilizing the name "Paolo Gucci" in accordance with Judge Conner's Order.  J. Gucci Dec., at ¶ 10; House of Gucci, at 88.

15.    During this period, Gerald McKnight published a book entitled "Gucci: A House Divided" in which he chronicled the history of the Gucci fashion empire.  Gucci; J. Gucci Dec., at ¶ 12.  The book highlighted Paolo Gucci's battle to use his own name on his designs, and described Jennifer Gucci's marriage to Paolo Gucci and the circumstances of that marriage. Gucci; J. Gucci Dec., at ¶ 12.

16.    During the period in which Paolo Gucci began to use his own name to market and sell fashion products, he engaged Edward Litwak to act as his licensing agent regarding the promotion of his name, products and boutique in New York.  J. Gucci Dec., at ¶ 11; Litwak Dec., at ¶ 2.

17.    During this period, Paolo Gucci also hired Joseph Oliveri to assist him in designing and coordinating Paolo Gucci's fashion efforts.  Declaration of Joseph Oliveri ("Oliveri Dec."), at ¶ 2.

18.     While Paolo Gucci was developing and marketing goods and services under his own name, Jennifer Gucci played a substantial role in assisting Paolo Gucci with his design business.  Oliveri Dec., at ¶¶ 4, 5.  In particular, Jennifer Gucci played a significant role in assisting Paolo Gucci with regard to the designs and concepts for a line of luxury hotels Paolo Gucci intended to open under the name "Palazzo Grande by Paolo Gucci".  Oliveri Dec., at ¶¶ 6,7; Defendants' Trial Exhibit 13.  Jennifer Gucci attended meetings with Paolo and his Design Coordinator Joseph Oliveri, as well as Paolo's licensing agent, Edward Litwak, regarding the hotel project, and she provided design input regarding the designs and décor of the proposed hotel chain, including design ideas about furnishings, bedding and bathroom accessories.  J. Gucci Dec., at ¶ 13; J. Oliveri Dec., at ¶ 7.  Jennifer Gucci visited several of the sites for the proposed hotels.  Id.

19.     In 1991, Jennifer Gucci served Paolo Gucci with divorce papers.  J. Gucci Dec., at ¶ 14; Gucci Wars, at   .  The divorce proceedings soon became public knowledge, and Paolo Gucci and Jennifer Gucci became the subjects of numerous newspaper and magazine articles in the United States and around the world.  J. Gucci Dec., at ¶ 14; Defendants' Trial Exhibits 14-22; House of Gucci.  These articles described Jennifer Gucci's residences in the United States and the United Kingdom.  Id.  Several media outlets also ran articles regarding the fact that Paolo Gucci was jailed in 1993 for failure to pay marital and child support to Jennifer Gucci.  Id.

20.     Paolo Gucci died in 1995, and several media channels interviewed Jennifer Gucci regarding her marriage to Paolo. J. Gucci Dec., at ¶ 15.  A TV series entitled "The Gucci's" was run on British TV, and Jennifer Gucci's marriage to Paolo Gucci was a prominent part of the series content.  Id.

21.     During this period, Jennifer Gucci hired Edward Litwak to act as her licensing agent. Litwak Dec., at ¶ 3; J. Gucci Dec., at ¶ 16. As a result of media interest in Jennifer Gucci's marriage to Paolo Gucci, Mr. Litwak also undertook to promote and market Jennifer Gucci's story regarding her membership in the famous jet-setting Gucci fashion family. Id.

## JENNIFER AND GEMMA GUCCI
## BEGIN TO MARKET AND SELL GOODS UNDER HER NAME

22.     In the mid-1990's Jennifer Gucci began promoting her design and fashion talents through the marketing and sales of shoes under her name. During one 38 minute TV spot on Home Shopping Network, HSN sold out its entire inventory of shoes being sold under the Jennifer Gucci name, producing sales revenues of $180,000. J. Gucci Dec., at ¶ 17; Litwak Dec., at ¶¶ 5, 6. In one season, Jennifer Gucci's businesses obtained shoe sales orders amounting to $9 million. Litwak Dec., at ¶ 6.

23.     In mid-2000, Jennifer and Gemma Gucci begin to design, market and promote jewelry under each of their names. J. Gucci Dec., at ¶¶ 18-20; G. Gucci Dec., at ¶¶ 13-18; Litwak Dec., at ¶¶ 10-14. Both Jennifer and Gemma Gucci provided input regarding the design and fashion of the jewelry to be sold under their respective names.

24.     In conjunction with these marketing and sales efforts, Jennifer and Gemma Gucci entered into agreements with Flitsch & Bendayan GmbH ("Flitsch"), a German company. J. Gucci Dec., at ¶¶ 18-20; G. Gucci Dec., at ¶¶ 13-18; Litwak Dec., at ¶¶ 10-14. The agreements related to the design, marketing and sale of jewelry by Jennifer Gucci and Gemma Gucci in Europe under the names "Collezione/Collection of Jennifer Gucci" and "Gemma by Gemma Gucci." Id.; Defendants' Trial Exhibit 23. The sales of both lines jewelry in Europe and elsewhere included disclaimers indicating that neither Jennifer Gucci nor Gemma Gucci were

8

associated or affiliated with Gucci. Litwak Dec., at ¶ 11; J. Gucci Dec., at ¶ 18; Defendants'
Trial Exhibit 23.

25.    The Jennifer Gucci line of jewelry was often sold through the European
equivalent of the Home Shopping Network. J. Gucci Dec., at ¶¶ 18-20. The jewelry sold under
Gemma Gucci's name was sold in retail stores, including Karlstadt, which operates stores in
Switzerland, Germany and other European countries. G. Gucci Dec., at ¶ 14. Gucci affiliate
Gucci S.p.A. was aware of these sales and marketing efforts regarding jewelry sold under
Jennifer Gucci and Gemma Gucci's names.

26.    In early 2000, Gucci S.p.A. threatened Flitsch with legal action regarding the sale
of jewelry under Gemma Gucci's name in Germany. Apparently, Gucci S.p.A was of the belief
that certain jewelry products sold under the Gemma Gucci name by Karlstadt did not contain
proper disclaimers. G. Gucci Dec., at ¶¶ 14-16. In response, Flitsch brought a legal action
against Gucci S.p.A. in a German court in Hamburg Germany regarding the use of the Gemma
Gucci name. Id.; Defendants' Trial Exhibit 24.

27.    Ultimately the parties to that legal action agreed that Gemma Gucci could sell
jewelry under her name as long as the products contained the words "designed" or "styled" by
before the name "Gemma Gucci". J. Gucci Dec., at ¶ 20; G. Gucci, at ¶¶ 16-18; Defendants'
Trial Exhibit 24.

28.    During this period, Gucci did not bring any claims, suits or legal actions against
Jennifer Gucci for marketing, promoting and selling her line of jewelry in Europe under the
name "Collezione/Collection of Jennifer Gucci". Litwak Dec., at ¶ 13. In fact, representatives
from a Gucci affiliate attended a large international jewelry exhibit in Basel Switzerland which
had a Flitsch exhibition of jewelry under the names "Gemma by Gemma Gucci" and "Collection

9

of Jennifer Gucci", and those representatives commented that the jewelry met the criteria for

how such products could be properly marketed and sold.  Litwak Dec., at ¶ 14.

## INTERNATIONAL TV NETWORKS AGREE
## TO HELP PRODUCE MOVIES ABOUT JENNIFER GUCCI

29.    In mid-2000, Showtime approached Jennifer Gucci's licensing agent about the

possibility of doing a TV movie or mini-series about Jennifer Gucci's marriage to Paolo Gucci

and her life as a member of the Gucci family.  J. Gucci Dec., at ¶ 22; Litwak Dec., at ¶¶ 18-23;

Defendants' Trial Exhibits 26-28.

30.    During this same period, Sara G. Borden released her book "The House of

Gucci".  The book provided a detailed description of the history of the Gucci family and

businesses, as well as describing Jennifer Gucci's marriage to Paolo Gucci, and the

circumstances surrounding the murder of Maurizio Gucci by his wife.  J. Gucci Dec., at ¶ 21;

House of Gucci.  The book was reviewed in Women's Wear Daily, The wall Street Journal, The

Economist, and Cosmopolitan.  Id.

31.    In 2001, Showtime entered in to a second option agreement for the same project,

but ultimately, in the period after September 11, 2001, Showtime chose not exercise its option to

do the movie and/or mini-series.  Litwak Dec., at ¶ 19.

32.    In late 2006, Edward Litwak, Jennifer Gucci's licensing agent, entered in to

discussions with Canadian Television Network and Italian Television Network to have them

produce a made-for-TV movie/mini-series about Jennifer Gucci's life and marriage to Paolo

Gucci.  Litwak Dec., at ¶ 20.

33.    In August 2006, Capri Films and Film Capital Partners entered in to a joint

venture agreement to make a TV mini-series based upon Jennifer Gucci's marriage and life with

Paolo Gucci; this project is still being pursued by the interested parties.  Litwak Dec., at ¶ 21.

34.     In late 2007, Mr. Litwak entered in to discussions and negotiations with Lifetime Network to produce a 4 hour made-for-TV movie about Jennifer Gucci and her marriage to Paolo Gucci. Litwak Dec., at ¶¶ 22-23. Lifetime plans to shoot scenes for the show in spring 2009, with the show to air possibly in August 2009. Id.

35.     During this same time period, Dominick Dunne televised an episode on his TV show on Court TV (n/k/a Tru TV), "Power, Privilege and Justice" entitled "Crime of Fashion" about the Gucci family and the Murder of Paolo Gucci's cousin Maurizio Gucci by his wife. The show included details about Jennifer Gucci's marriage to Paolo Gucci. J. Gucci Dec., at ¶ 24.

## WE NETWORK WANTS TO PRODUCE A REALITY SHOW ABOUT GEMMA GUCCI

36.     In or about mid-2005, the WE Network entered in to discussions with Gemma Gucci's licensing agent to do a reality TV show about Gemma Gucci and her aspirations to become a designer in New York City. Litwak Dec., at ¶¶ 24-27; G. Gucci Dec., at 19-22.

37.     The We Network promoted the proposed show in certain announcements. Id.

38.     Ultimately, Gemma Gucci decided not to do the reality show, and the project was canceled. Id.

## BUSINESS ENTITIES SHOW INTEREST IN PROMOTING FOOD AND WINE PRODUCTS UNDER GEMMA GUCCI'S NAME

39.     In mid-2005 various business entities show an interest in marketing and promoting gourmet foods and wines under the Gemma Gucci name. Litwak Dec., at ¶¶ 28-32; G. Gucci Dec., at ¶¶ 23-26.

40.     In his capacity as Gemma Gucci's licensing agent, and as owner of the master license for marketing and promoting Gemma Gucci and Jennifer Gucci's names, Mr. Litwak negotiated with certain business entities about using Gemma Gucci's name on wine and gelato products. Litwak Dec., at ¶¶ 28-32; G. Gucci Dec., at ¶¶ 23-26. Temporary licenses were

11

granted to certain business entities to develop sample products, and Gemma Gucci provided her thoughts on her likes and dislikes regarding certain of the products and their labels.  Id.

41.     Ultimately, the wine and gourmet food opportunities did not come to market.  Id.

## GEMMA GUCCI BEGINS DESIGNING HANDBAGS

42.     In late 2006, design entities approached Gemma Gucci about her interest in designing handbags and other accessories under her name.  G. Gucci Dec, at ¶¶ 27-30; Defendants' Trial Exhibits 29-32.

43.     In conjunction with such interest, Gemma Gucci met with designers to discuss handbags designs and concepts for those designs.  Id.

## VERATEX AGRES TO LICENSE THE JENNIFER GUCCI NAME
## FOR BEDDINGS AND HOME FURNISHINGS

44.     In late 2006/early 2007, Mr. Litwak entered in to discussions and negotiations with bedding maker Veratex, Inc. regarding the use of the Jennifer Gucci name on a line of bedding and home décor and furnishing products.  Litwak Dec., at ¶¶ 33-45; J. Gucci Dec., at ¶¶ 25-32.

45.     The marketing and branding for the line of bedding products would be sold under the label "Casa Di Collezione by Jennifer Gucci".  Litwak Dec., at ¶¶ 34-35.  The marketing of the proposed products was to take place in conjunction with the release of the proposed TV mini-series about Jennifer Gucci's life and marriage to Paolo Gucci, and the release of a book by Jennifer Gucci about her life and marriage.  Id.

46.     In conjunction with these discussions and negotiations, Mr. Litwak provided Veratex personnel with a copy of Judge Conner's June 1998 decision in the Paolo Gucci case, as well as other materials about Jennifer Gucci.  Litwak Dec., at ¶¶ 35-36; J. Gucci Dec., at ¶¶ 28-30; Defendants' Trial Exhibits 33-40.

47.    In January of 2007, Mr. Litwak and Jennifer Gucci traveled to Veratex's offices in New York City to discuss designs for the proposed products. Litwak Dec., at ¶¶ 36-40. During those meetings and subsequently, Jennifer Gucci informed Veratex personnel of her likes and dislikes regarding the designs, styles and fabrics proposed for use in the line of bedding products to be sold under her name. J. Gucci Dec., at ¶¶ 28-29; Litwak Dec., at ¶¶ 37-40; Defendants' Trial Exhibits 41-44.

48.    It was made clear to Veratex personnel that the bedding products proposed for marketing and sale under the Jennifer Gucci name would bear the label "Case di Collezione by Jennifer Gucci", and that the promotional materials, labels and packaging for the products had to abide by the guidelines contained in Judge Conner's decision in the Paolo Gucci action. Litwak Dec., at ¶¶ 35-45. Veratex personnel were informed that the products could not contain the interlocking letters "J" and "G". Id.

49.    In February/March of 2007, Veratex personnel provided Edward Litwak and Jennifer Gucci with samples of proposed packaging for the line of bedding products. Litwak Dec., at ¶¶ 38-41. Veratex personnel were subsequently informed on several occasions that the proposed packaging did not abide by the licensing agreement Veratex had entered in to for use of Jennifer Gucci's name, and that the packaging had to be changed to meet the guidelines provided for in Judge Conner's decision. Litwak Dec., at ¶¶ 38-41.

50.    In June 2007, Mr. Litwak and Jennifer Gucci attended a show for the proposed Veratex bedding to be marketed and sold under the "Casa Di Collezione" and "Jennifer Gucci" label. J. Gucci Dec., at ¶¶ 30-32; Litwak Dec., at ¶¶ 42-45. Prior to the show, Veratex sent out invitations for the show to various buyers, as well as to Gucci. Neither Mr. Litwak nor Jennifer

Gucci had any input in the design of the invitations, and neither saw or reviewed the invitations before they were sent out. Id.

51.     The Public was not invited to the June 2007 Veratex show; only potential buyers. At the show, Veratex personnel were informed by Edward Litwak that the proposed packaging for the bedding products was not in accordance with the license or Judge Conner's order in the Paolo Gucci case. Litwak Dec., at ¶¶ 42-45; J. Gucci Dec., at ¶¶ 30-32.

52.     At the show, Mr. Litwak and Jennifer Gucci were provided samples of proposed packaging for a line of skin care products to be sold under the Jennifer Gucci name by E.L. Erman. Litwak Dec., at ¶ 44; J. Gucci Dec., at ¶ 32. Prior to that date, E.L. Erman personnel had not provided either Mr. Litwak or Jennifer Gucci with samples of any proposed packaging that would be displayed at the show. Id. Both Mr. Litwak and Jennifer Gucci expressed dismay and concern to E.L. Erman personnel about this proposed packaging, and E.L. Erman personnel were informed that the company and its packaging would have to comply with Judge Conner's order in the Paolo Gucci action. J. Gucci Dec., at ¶ 32; Litwak Dec., at ¶ 44.

53.     During this same time period, mattress company Therapedic expressed interest in licensing use of the Jennifer Gucci name for mattress products. Litwak Dec., at ¶ 45. In June 2007, Therapedic personnel provided samples of proposed packaging for mattress items using the Jennifer Gucci name to Mr. Litwak for the first time. Id. Mr. Litwak immediately informed Therapedic personnel that the packaging did not meet the requirements of the license granted to Veratex, and did not meet the guidelines of Judge Conner's decision in the Paolo Gucci action, and the packaging would have to be changed. Id.

14

**JENNIFER GUCCI PUBLISHES A BOOK ABOUT HER LIFE WITH PAOLO GUCCI**

54.    In early 2008, Jennifer Gucci released her book about her life and marriage to Paolo Gucci, entitled "Gucci Wars".  J. Gucci Dec., at ¶ 33; Gucci Wars.  The book is available for purchase in the United States.

**JENNIFER AND GEMMA GUCCI ARE ENTITLED TO USE THEIR SURNAMES ON PRODUCTS AND PLAINTIFF IS NOT ENTITLED TO AN INJUNCTION, DAMAGES OR ATTORNEYS FEES UNDER THE LANHAM ACT OR NEW YORK LAW**

55.    Plaintiff Gucci of America, Inc. has brought an action against Jennifer Gucci, Gemma Gucci, and their licensing agent, Edward Litwak under the Lanham Act for trademark infringement, counterfeiting, false designation of origin, and dilution, as well as common law claims for trademark infringement and unfair competition, and claims under New York Statutes GBL §§ 349 and 360-l for deceptive business practices and dilution.  Plaintiff is also requesting that the Court issue a broad and overreaching injunction precluding Jennifer and Gemma Gucci from using their sur-names on anything, as well requesting attorneys' fees and exemplary damages.

56.    Plaintiff's demand in this action amounts to a request to this Court that Gucci family members be precluded from using their sur-names in conjunction with any products, even products which Jennifer Gucci or Gemma Gucci personally design or which they personally select, market or sell.  Such a demand is overreaching and.

57.    Plaintiff cannot demonstrate any of its claims have merit, and certainly can not show that it is entitled to preclude Jennifer and Gemma Gucci from using their sur-names on products they help to design and promote, under the proper circumstances and with the appropriate disclaimers.  Case law is clear that Jennifer and Gemma Gucci are entitled to use

15

their sur-names on products which they personally design, select and promote, as long as they include obvious disclaimers that show consumers neither is associated with Plaintiff.

58.    Plaintiff's claims must also fail under the doctrine of laches and acquiescence as Plaintiff and its affiliates have known about Jennifer and Gemma Gucci's use of their names on products in the manner now complained of for some seven (7) years, but acquiesced in such use. It would be inequitable for Plaintiff to be able to preclude Jennifer and Gemma Gucci from using their sur-names in the appropriate manner, given the amount of time and investment made to promote products using their names.

59.    Plaintiff also cannot establish the requisite elements to succeed on its claims of dilution under the Lanham Act or New York law; Plaintiff cannot establish absolute identity of the marks at issue, and no conduct by Defendants have caused Plaintiff to lose the ability of its marks to serve as unique identifiers of its goods.

60.    Lastly, Plaintiff is not entitled to attorneys' fees or exemplary damages as there is no evidence in this case that Defendants' actions fall in to the category of willfulness are exception, as required for such damages under the Lanham Act.

**<u>PLAINTIFF IS NOT ENTITLED TO A PERMANENT INJUNCTION OR DAMAGES</u>**

61.    Plaintiff requests the Court issue a broad almost limitless injunction against Defendants to preclude them from essentially marketing, promoting or selling any products, goods or services bearing their sur-names, or to associate themselves publicly with products they design, select or promote.  Plaintiff's request for such an injunction is without merit and is not supported by the facts.

62.    An injunction is one of the most drastic tools in the judicial arsenal and should not be routinely granted.  <u>Hanson Trust PLC v. SCM Corp.</u>, 774 F.2d 47, 60 (2d Cir. 1985).  A party

seeking an injunction must demonstrate: (1) a likelihood of irreparable harm in the absence of such injunction; and (2) and actual success on the merits.  Federal Exp. Corp. v. Federal Expresso, Inc., 201 F.3d 168, 173 (2d Cir. 2000); Omicron Capital, LLC v. Omicron Capital, LLC, 433 F.Supop.2d 382, 395 (S.D.N.Y. 2006).   Irreparable harm is the sin quo non of injunctive relief, and a plaintiff has the burden of proving such irreparable harm before a permanent injunction can issue.  The Comic Strip, Inc. v. FOX TV, 710 F.Supp. 976, 980-81 (S.D.N.Y. 1989).

## PLAINTIFF CANNOT DEMONSTRATE A PROBABILITY OF CONFUSION  ON ITS INFRINGMENT AND DILUTION CLAIMS

63.      In order to prevail on its request for an injunction under the Lanham Act for trademark infringement, false designation of origin or dilution, Plaintiff must demonstrate the infringing mark is likely to cause confusion among consumers as to the source or sponsorship of the product.  Nora Beverages Inc. v. Perrier Group, 269 F.3d 114, 118 (2d Cir. 2001).  There must be a probability of confusion, not a mere possibility.  Gruner+Jahr USA v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993).  In order to recover damages, a plaintiff must be prove actual confusion.  Perfect Fit Indust., Inc. v. Acme Quilting Co., Inc., 618 F.2d 950, 955 (2d Cir. 1980).  Courts in the Second Circuit apply a multi factor test (commonly known as the Polaroid Test) in evaluating the likelihood of confusion.  Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961); Star Industries, Inc. v. Bacardi & Co., Ltd., 412 F.3d 373, 384 (2d Cir. 2005).  When the marks involve high value, expensive goods sold to truly sophisticated buyers or premium, expensive goods, including business buyers, there is a presumption that such buyers are less likely to be confused.  Omicron, 433 F.Supp.2d at 393.  Lack of a public survey on the issue of likelihood on confusion, when a plaintiff has the time and resources to conduct one, weighs against a finding of likelihood of confusion.  Pan Am World Airways v. Panamerican

School of Travel, Inc., 810 F.2d 1160 (2d Cir. 1986).  In the case of a counterfeiting claim, a Court need not undertake a review of the Polaroid Factors, but a Plaintiff must show that the marks at issue are indistinguishable from the registered mark.

64.     In this instance, Plaintiff will be unable to demonstrate that the marks authorized by Defendants for use by Veratex are confusingly similar to Gucci's registered marks, or counterfeits of such marks.

65.     As described above, Defendants entered in to a license agreement with Veratex to use the name of Jennifer Gucci on bedding products.  Defendants and the terms of their license agreement with Veratex (and others) were clear:  Veratex could only use the name of Jennifer Gucci in accordance with the guidelines provided for in Judge Conner's decision in the Paolo Gucci action; namely, (1) Jennifer Gucci's name could not be used as a trademark; (2) Jennifer Gucci's name must be proceeded by a mark that does not include the name Gucci; (3) Jennifer Gucci's name must be proceeded by the term or phrase "designed by" or "by"; and (4) the name Jennifer Gucci could not be placed in a manner more prominent than that of the mark which did not include the Gucci name.  This is essentially the same manner in which Defendants have used their names to promote and sell other goods; namely, shoes and jewelry.

66.     Indeed, Jennifer Gucci and her licensing agent, Edward Litwak, only authorized the use of her name on products if such use abided by the provisions in Judge Conner's decision in the Paolo Gucci case.  The fact that Veratex may not have abided by its license agreement with Jennifer Gucci or Edward Litwak cannot be ascribed to Defendants.  Defendants did not instruct Veratex to use red and green on the proposed product packaging, Defendants did not instruct Veratex to use an interlocking "J" and "G" on the  proposed product packaging, Defendants did not instruct Veratex to use a repeating diamond pattern with a tan background on

the proposed product packaging, and Defendants did not instruct Veratex to separate the Casa di Collezione mark from the phrase "by Jennifer Gucci" or to use different fonts and letter sizes for the Casa di Collezione mark and the Jennifer Gucci name.  Defendants were also not involved in creating the invitation to the June 2007 product show; that creation was solely that of Veratex.

67.    Furthermore, no products were ever sold using the alleged infringing marks.  The allegedly infringing packaging was shown to Defendants and sophisticated potential buyers, but never to the public, or consumer.  Thus, Plaintiff can show no damages as a result of any of the conduct of Defendants.

68.    Moreover, Defendants informed Veratex on numerous occasions, that certain aspects of the proposed product packaging for the bedding products, did not fall within the terms of the licensing agreement, and appeared to fall outside of the provisions of Judge Conner's decision in the Paolo Gucci action against Gucci S.p.A.  Moreover, Defendants were not involved in the process of creating the supposedly offending packaging materials.  None of the actions by Defendants warrant a finding of infringement, false designation of origin or counterfeiting under the Lanham Act.

69.    In addition, Plaintiffs have failed to come forward with any evidence indicating any consumers were actually confused by the proposed product packaging; weighing against a finding of actual, or even a likelihood of confusion.

70.    Plaintiff will also be unable to succeed on its common law claims for infringement and unfair competition.   New York common law claims for infringement and unfair competition require proof of almost the same elements as Lanham Act claims.  Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980); 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC, 447 F.Supp.2d 266, 288 (S.D.N.Y. 2006).  In essence, New York

common law claims for infringement and unfair competition require proof of misappropriation of the labors and expenditures of another. <u>Saratoga</u>, 625 F.2d at 1044. In addition, a plaintiff must show an element of bad faith conduct on the part of the defendant. <u>Id</u>.

71.    In this instance, Plaintiff will be unable to prove any aspects of its common law infringement or unfair competition claims. First, Defendant has demonstrated that Plaintiff's Lanham Act claims are without merit; the labels and disclaimers actually authorized by Defendants do not infringe on Plaintiff's marks.

72.    Second, and more importantly, Defendants acted in good faith in choosing the style of their labels and disclaimers. Defendants were under the belief and understanding that as long as they complied with the guidelines and strictures of Judge Conner's decision in the Paolo Gucci action, that Defendants could use their names on goods and services in which they played a role in creating. As described above, Defendant, and the licenses and instruction they have provided about the use of their name on goods and services requires that their names not be used in conjunction with a mark that contains the name "Gucci" alone, and that they include the phrase "designed by" or "by" a before their name with a disclaimer indicating to consumers that they are not affiliated with Plaintiff.

73.    Thus, Plaintiff will be unable to succeed on its common law infringement and unfair competition claims.

## DEFENDANTS ARE ENTITLED TO USE THEIR SUR-NAMES TO PROMOTE AND SELL PRODUCTS IN WHICH THEY PLAYED A DESIGN ROLE

74.    Under case law in the Second Circuit, Defendants are entitled to use their sur-names to market, promote and sell products, and thus their use of their sur-name Gucci, with the appropriate disclaimers, does not constitute infringement, false designation of origin or counterfeiting.

75.     The Second Circuit has clearly stated that to prohibit an individual from using his/her true family sur-name is essentially to take away his identity, and such action would impose such a grievous injury on an individual, that a court will avoid imposing such a remedy if possible.  Taylor Wine, Inc. v. Bully Hill Vineyards, Inc., 569 F.2d 731 (1978); Haven Capital Management, Inc. v. Haven Advisors, LLC, 965 F.Supp. 528 (S.D.N.Y. 1997); Gucci v. Gucci, 688 F.Supp. 916, 927 (S.D.N.Y. 1988).  As long as the individual can show that he/she has worked in the business at issue, and as a result, possesses experience and skills and a desire to work in the field, Courts will generally not impose the drastic remedy of enjoining an individual from using his/her sur-name.  Gucci, 688 F.Supp. at 927.

76.     In this instance it is clear that Jennifer and Gemma Gucci should be allowed to use their sur-name, Gucci, in conjunction with designing, promoting and selling products and services using their names, as long as they do not use the name Gucci as a trademark, and they use disclaimers indicating neither is associated with Plaintiff.  Jennifer Gucci was married to Paolo Gucci for more than 14 years; in the press and the public eye Jennifer Gucci's name is strongly asscoaited with Paolo Gucci, the Gucci family and the fashion design business.  The press, business entities and the public continue to contact Jennifer Gucci about the Gucci family, and she continues to be mentioned in books and TV shows about the Gucci family.  During her 14-year marriage to Paolo Gucci, Jennifer Gucci played a role in his designing, marketing and promoting goods and products sold by Gucci, and later goods and products marketed and sold by Paolo Gucci.  During her marriage to Paolo Gucci, Jennifer Gucci also decorated and/or helped decorate the various residences the couple lived in while in the United States, Italy and the United Kingdom.

77.    After Paolo Gucci's untimely death, Jennifer Gucci continued to be involved in the design and sale of fashion goods, including shoes and jewelry. In conjunction with the use of her name to sell such goods, Jennifer Gucci has made it a practice to ensure that an appropriate disclaimer is associated with the goods she sold under her name; namely, that any label included the phrase "designed by" or "by" Jennifer Gucci, and that her products were not associated with Plaintiff or its affiliates. Jennifer Gucci has made numerous appearances, on TV and in person, promoting and marketing goods sold under her name

78.    Gemma Gucci is Paolo Gucci's daughter, and the name Gucci appears on her birth certificate in the United States. She has been in the public eye since birth, and is still the object of public interest. Gemma Gucci has also been involved for years in the design and sale of jewelry bearing her name. Gemma Gucci has taken courses in design, interned for a designer in New York, and been involved in the design process for proposed handbags, as well as jewelry. Jewelry sold under the Gemma by Gemma Gucci name in Europe contained disclaimers that she was not affiliated with Plaintiff, and tags on the jewelry contained the statement "designed by" or "by" Gemma Gucci in order to preclude confusion.

79.    Clearly, under Second Circuit case law, Defendants are entitled to use their sur-names to promote products and goods in which they played a role creating and/or designing. As such, Defendants cannot be found to have infringed upon Plaintiff's marks, nor counterfeited such marks or products. As such, Plaintiff's Lanham Act claims for infringement, false designation of origin, and counterfeiting against these Defendants fail.

## PLAINTIFF IS ESTOPPED FROM PURSUING ITS INFRINGEMENT CLAIMS UNDER THE DOCTRINE OF LACHES

80.    Even if Plaintiff had viable claims for infringement, false designation of origin or counterfeiting, under the doctrine of laches, Plaintiff cannot succeed on such claims.

81.     Under the doctrine of laches, a plaintiff is precluded from succeeding on infringement claims if it has knowledge of defendant's use of the allegedly infringing mark, delays too long in bringing infringement claims, and defendant would be prejudiced if plaintiff were now allowed to assert such rights.  Saratoga, 625 F.2d at 1041.

82.     In this instance, Plaintiff has know of Defendants' use of the labels and phrases "Designed by Jennifer Gucci" or "Gemma by Gemma Gucci" for years.  Jennifer Gucci sold shoes in the United States using such terms, and both Jennifer and Gemma Gucci have used such terms and phrases in selling jewelry with the full awareness of Plaintiff's affiliates.

83.     After years of using such phrases and terms to market and sell products under the names Jennifer and Gemma Gucci, with Plaintiff's knowledge, it would be inequitable to preclude Defendants from being able to sue those same labels and disclaimers now.

## PLAINTIFF WILL BE UNABLE TO SUCCEED ON ITS CLAIMS FOR DILUTION

84.     Plaintiff has asserted claims for dilution under the Lanham Act and New York law.  Plaintiff will be unable to succeed under either claim.

85.     In order to establish dilution under the Lanham Act (dilution under New York statutory law) for purposes of injunctive relief, a plaintiff must demonstrate an association arising from the similarity of the mark or trade name and the famous mark that impairs the distinctiveness of the famous mark.  Dan-Foam v. Brand Named Beds, LLC, 500 F.Supp.2d 296, 306 (S.D.N.Y. 2007); Malleteir v. Dooney & Bourke, 2008 WL 2245814, at *13 (S.D.N.Y. May 30, 2008).  A plaintiff cannot prevail on a state or federal dilution claim unless the marks at issue are very or substantially similar.  Id.  A plaintiff must demonstrate either blurring or tarnishment through defendant's use of the mark.  Dan-Foam, 500 F.Supp.2d at 307.  Tarnishment occurs if it is shown that plaintiff's mark will suffer negative associations through defendant's use.  Id.

Blurring occurs when defendant's use of the mark causes a whittling away of an established trademark's selling power through unauthorized use.  <u>Deer & Co. v. MTD Products, Inc.</u>, 41 F3d 39, 43 (2d Cir. 1994).

86.    In order to prevail on a claim for monetary damages, a plaintiff must establish actual dilution.  <u>Malleteir</u>, 2008 WL 2245814, at *13.  The mental association by consumers between the marks is insufficient to obtain monetary damages.  <u>Id</u>.

87.    Here as described above, Plaintiff will be unable to succeed on its dilution claims; the Defendants have always provided that the use of their name would not be done as a trademark, and that the name "Gucci" would never standalone or be used as a trademark.

88.    Defendants' use of their sur-name on labels and disclaimers associated with goods they designed promoted or personally selected would be consistent with Judge Conner's decision in the Paolo Gucci action.  Namely, that Defendants would, and have, consistently disclosed that they are not affiliated with Plaintiff, and that any use of their sur-name was done in the following manner:  "Collection of Jennifer Gucci", "Design by Jennifer Gucci", or "Gemma by Gemma Gucci".  Defendants have not used their sur-name by itself, and have not presented their sur-name Gucci in any manner more prominent than the phrases "Designed by" or "by".

89.    Nor can Plaintiff show actual dilution; there is no evidence that Defendants' conduct as blurred or tarnished Plaintiff's marks because the packaging for the bedding and cosmetic products complained of have never been sold to a single consumer.  Thus, Plaintiff cannot succeed on its Federal or State Law dilution claims.

## PLAINTIFF IS NOT ENTITLED TO EXEMPLARY DAMAGES OR ATTORNEYS FEES

90.    Plaintiff has asserted that it is entitled to exemplary damages and attorneys' fees under the Lanham Act as a result of Defendants' conduct.  Plaintiff is entitled to neither as

Defendants' actions demonstrate that their conduct was not willful, and this case does not qualify as an exceptional case for purposes of awarding attorneys' fees.

91.     Under 15 U.S.C. § 1117(a), a court is empowered to award exemplary damages, at its discretion, and upon . Under this same provision of the Lanham Act, a court is also empowered to award attorneys' fees.  <u>Gidatex v. Campaniello Imports. Ltd</u>, 82 F.Supp.2d 136, 147 (S.D.N.Y. 2000).  An award of attorneys' fees under the Lanham Act is only warranted if the case is exceptional, where there is a showing of willfulness or deliberateness on the part of the defendant.  <u>Id</u>.; <u>Quaker State Oil v. Kooltone, Inc.</u>, 649 F.2d 94, 95 (2d Cir. 1981)

92.     Plaintiffs will be unable to show that anything about this case is exceptional, or that any of Defendants' conduct was willful or deliberate.  First, Defendants had a good faith belief, based on Judge Conner's decision in the Paolo Gucci action, that they had a right to use their sur-name "Gucci" as long as they followed the strict limitations of Judge Conner's decision.  Defendants did just that, and expressed to their licensees the requirements to follow the guidelines provided for in this decision.

93.     Furthermore, Plaintiff will be unable to prove any damages as a result of Defendants' actions; no product using the labels and packaging at issue was ever <u>sold</u>.

94.     For these reasons, and those to be proven by Defendants at the trial of this matter, the Court should find against Plaintiff on its claims for infringement, counterfeiting, false origin, deceptive business practices, and dilution.

Dated: White Plains, New York

      June 17, 2008

                                   Respectfully submitted,

                                   HARRINGTON, OCKO & MONK, LLP

                                     s/ Kevin J. Harrington

                 By: _____
                                   Kevin J. Harrington [KH-5027]
                                   John T.A. Rosenthal [JR-4819]
                                   *Attorneys for Defendants Jennifer Gucci,*
                                   *Jenny Gucci Coffee and Gelato Company,*
                                   *Inc., Edward Litwak d/b/a Ed Litwak &*
                                   *Associates, and Gemma Gucci*
                                   81 Main Street, Suite 215
                                   White Plains, NY 10601
                                   (914) 686-4800

TO:   Louis Sherman Ederer, Esq. [LE-7574]
       John Maltbie, Esq. [JM-3658]
       ARNOLD & PORTER, LLP
       *Attorneys for Plaintiff*
       399 Park Avenue
       New York, NY 10022
       (212) 715-1000

       Howard M. Rogatnick, Esq. [HR-3777]
       BRYAN CAVE LLP
       *Attorneys for Defendants Veratex, Inc.*
       *Collezione Di Casa, Inc. and E.L.*
       *Erman – Dead Sea Company, Ele*
       *Brands Enterprise, Inc., GBN Watch*
       *Collection, Inc., and GBN Global*
       *Business Network*
       1290 Avenue of the Americas
       New York, NY 10104
       (212) 541-1296

R. Kevin Fisher, Esq.
FISHER & KREKORIAN
3130 Wilshire Boulevard, Suite 200
Santa Monica, CA  90403
*Attorneys for Defendants Veratex, Inc.*
*Collezione Di Casa, Inc. and E.L.*
*Erman – Dead Sea Company, Ele*
*Brands Enterprise, Inc., GBN Watch*
*Collection, Inc., and GBN Global*
*Business Network*

Martin Simone, Esq.
SIMONE & ROOS
3530 Wilshire Boulevard, Suite 1600
Los Angeles, CA  90010