Louis S. Ederer (LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
Phone (212) 715-1000
Fax (212) 715-1399

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                                                               :
GUCCI AMERICA, INC.,                                           :    Civil Action No. 07 Civ. 6820(RMB)
                                                               :
            Plaintiff,                                         :
                                                               :    **PLAINTIFF'S PROPOSED**
      - against -                                              :    **FINDINGS OF FACT AND**
                                                               :    **CONCLUSIONS OF LAW**
JENNIFER GUCCI, JENCO DESIGNS, LLC,                            :
JENNICOR, LLC, JENNY GUCCI COFFEE                              :
AND GELATO COMPANY, INC., VERATEX,                             :
INC., COLLEZIONE DI CASA, INC., E.L.                           :
ERMAN - DEAD SEA COSMETICS CORP.,                              :
ELE BRANDS ENTERPRISE, INC., GBN                               :
WATCH COLLECTION, INC., GBN GLOBAL                             :
BUSINESS NETWORK, EDWARD LITWAK                                :
d/b/a ED LITWAK & ASSOCIATES, GEMMA                            :
GUCCI, GEMMA GUCCI COFFEE AND                                  :
GELATO COMPANY, INC., ABC                                      :
CORPORATIONS 1-10, and JOHN DOES 1-10,                         :
                                                               :
            Defendants.                                        :
                                                               :
-------------------------------------------------------------- x

# TABLE OF CONTENTS

**PAGE**

I.    **GUCCI'S PROPOSED FINDINGS OF FACT** ............................................ 2

    A.    Gucci and the World Famous Gucci Trademarks ............................... 2

    B.    Defendant's Infringing Acts ...................................................... 7

        1.    Background of Defendants' Litwak, Jennifer Gucci and Gemma Gucci ...................................................................... 7

        2.    Litwak and Gemma Gucci's Efforts to Exploit the GEMMA GUCCI Name on Handbags and Gelato Products ..................... 11

        3.    Litwak and Gemma Gucci's Efforts to Exploit the GEMMA GUCCI Name on Wine Products ......................................... 22

        4.    Litwak and Jennifer Gucci's Efforts to Exploit the JENNIFER GUCCI Name on Hosiery Products ....................................... 26

        5.    Litwak and Jennifer Gucci's Efforts to Exploit the JENNIFER GUCCI Name on Home Products and Bedding .................... 33

        6.    Litwak and Jennifer Gucci's Efforts to Exploit the JENNIFER GUCCI Name on Spa and Bath Products, Jewelry and Watches ..................................................................... 42

        7.    Unless Permanently Enjoined Defendants' Conduct will Cause Gucci to Suffer Irreparable Harm ....................................... 46

II.    **GUCCI'S PROPOSED CONCLUSIONS OF LAW** ...................................... 47

    A.    Jurisdictional Basis for Gucci's Claims ...................................... 47

    B.    Gucci's Claims — Generally .................................................. 48

    C.    Gucci's Claims For Trademark Infringement and False Designation of Origin Under Sections 32(1) and 43(a) of the Lanham Act Should be Granted as Gucci has Demonstrated that it has Valid Marks That are Entitled to Protection and Defendants Have Infringed One or More of Those Marks .................................................................. 49

        1.    Gucci's Trademarks Are Registered and Valid ....................... 50

        2.    There is a Likelihood of Confusion Between the Gucci Trademarks, Including the GUCCI Brand Name, and the Commercial Use of the Names JENNIFER GUCCI and GEMMA GUCCI ............................................................... 53

            i.    The Strength of the Gucci Trademarks Favors A Finding of Likely Confusion .......................................... 57

            ii.    The Similarity Between Defendants' JENNIFER

GUCCI and GEMMA GUCCI Marks and the Gucci
Trademarks Favors A Finding of Likely Confusion ........ 59

iii. The Parties' Goods Are In Close Competitive
Proximity of One Another and There Is No Gap To
Bridge ................................................................. 61

iv. There Is Already Evidence of Actual Confusion.............. 64

v. Defendants' Have Acted In Bad Faith ................................ 65

vi. Defendants' Goods Are Of An Inferior Quality
Than Gucci's ....................................................... 69

vii. The Sophistication of the Buyers ........................................ 70

3.    The Use of a Personal Name Constitutes Trademark
Infringement and False Designation of Origin Where There is
A Likelihood of Confusion ................................................. 71

4.    Gucci's Claims For Trademark Counterfeiting Under Section
32(1) of the Lanham Act Should be Granted as Gucci has
Demonstrated that Gucci has Valid Marks and that
Defendants Have Used Marks that are Substantially
Indistinguishable from Those Marks ................................... 79

D.  The Defendants' Have Diluted Gucci's Famous Trademarks Under
Federal Law ....................................................................... 80

E.  The Defendants' Have Diluted the World Famous Gucci Trademarks
Under New York Gen. Bus. Law § Section 360-1 .............................. 83

F.  Defendants' Have Committed Unfair Competition and Common Law
Trademark Infringement Under New York Common Law ........................... 85

G.  Defendants Have Violated New York Gen. Bus. Law § Section 349 ............... 86

H.  Defendants Are Jointly and Severally Liable and Defendants Jennifer
Gucci and Gemma Gucci are Liable for the Acts of Litwak, Who They
Appointed to Act as Their Licensing Agent ........................................ 88

I.  Defendants' Counterclaims for Declaratory Judgment Should be
Denied ............................................................................ 89

J.  Gucci's Claims are Justiciable and are Not Moot ............................. 90

K.  Gucci's Claims are Not Barred by the German Judgment ..................... 92

L.  Gucci is Entitled to a Permanent Injunction Enjoining Defendants
From Making Any Commercial Use of the Names JENNIFER GUCCI
and/or GEMMA GUCCI in Addition to Copying and Using Any Other
Designs or Indicia That Infringe Upon Other Famous Gucci America

       Trademarks.................................................................................................. 96

M.    Gucci is Entitled to Recover Enhanced Damages and Statutory
       Damages From Defendants.................................................................. 97

N.    Gucci is Entitled to Recover its Costs and Reasonable Attorneys' Fees ......... 99

# TABLE OF AUTHORITIES

## CASES

*Aeration Solutions, Inc. v. Dickman*, Civ. No. 03-1284, 85 Fed. App'x 772 (Fed. Cir. Jan. 15, 2004)......................................................................................................................48

*Allee v. Medrano*, 416 U.S. 802, 94 S. Ct. 2191, 40 L.Ed. 2d 566 (1974) ...................90

*Allied Main Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y.2d 538 (1977)........................86

*American Home Prods. Corp. v. Johnson Chemical Co.*, 589 F.2d 103 (2d Cir. 1978)..............59

*Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384 (2d Cir. 1995)...............................59

*Arthur Young, Inc. v. Arthur Young & Co.*, 579 F.Supp. 384 (N.D.Ala. 1983)...........................74

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 CIV. 9721 (PKL) (THK), 98 CIV. 0123 (PKL) (THK), 2002 WL 2012618 (S.D.N.Y. Sept. 3, 2002) ...........................74

*Basile, S.p.A. v. Basile*, 899 F.2d 35 (D.C. Cir. 1990)....................................................60

*Bertolli, USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.*, 662 F. Supp. 203 (S.D.N.Y. 1987) .......................................................................................................................*Passim*

*Best Cellars Inc. v. Grape Foods at Dupont, Inc.*, 90 F. Supp.2d 431 (S.D.N.Y. 2000)..............86

*Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694 (2d Cir. 1961)......................91,92

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 178 F. Supp. 2d 198 (E.D.N.Y. 2001)...................................................................................................................86

*Bristol-Myers Squibb Co. v. McNeil - P.P.C., Inc.*, 973 F.2d 1033 (2d Cir. 1992) ....................57

*Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474 (2d Cir. 1996)...........................................55

*Cartier, Inc. v. Deziner Wholesale, L.L.C.*, No. Civ. 4947 (RLC), 2000 WL 347171 (S.D.N.Y. April 3, 2000)...............................................................................................82

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217 (2d Cir. 1987)...........................................................................................57,64,69,99,100

*Champion Spark Plug Co. v. Champion*, 23 F.Supp. 638 (D. Mich. 1938) .................................75

*Charles of Ritz Group, Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317 (2d Cir. 1987) ........58

*Chemical Corp. of Am. v. Anheuser-Busch, Inc.*, 306 F.2d 433 (5th Cir. 1962) ...................62,63

*Citigroup Inc. v. City Holding Company*, 171 F. Supp. 2d 333 (S.D.N.Y. 2001) ......................60

*Clinique Labs. Inc. v. Dep Corp.*, 945 F. Supp. 547 (S.D.N.Y. 1996) ..........................62

*Coach, Inc. v. We Care Trading Co.*, 2001 U.S. Dist. LEXIS 9879 (S.D.N.Y. July 19, 2001); *aff'd*, 67 Fed. Appx. 626 (2d Cir. 2002) .................................................100

*Coach Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162 (2d Cir. 1991) ..................86

*Collins v. Aztar Corp.*, No. 99-7912, 2000 WL 302782 (2d Cir. Mar. 20, 2000) ......................96

*Compania Ron Bacardi S.A. v. American Bacardi Rum Corp.*, 63 N.Y.S.2d 610 (N.Y. Sup. 1934)..............................................................................................75

*Conopco, Inc., v. Cosmair, Inc.*, 49 F. Supp. 2d 242 (S.D.N.Y. 1999) ..........................64

*Consolidated Cigar Corp. v. Monte Cristi de Tabacos*, 58 F. Supp. 2d 188 (S.D.N.Y. 1999) ................................................................................................69

*Consumers Union of U.S., Inc. v. Theodore Hamm Brewing Co.*, 314 F. Supp. 697 (D. Conn. 1970)..............................................................................................91

*Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857 (5th Cir. 1967).................................................................................62,63

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979) ........................................................................................53,73

*Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296 (S.D.N.Y. 2007)..................................................................................58

*Deere & Co. v. MDT Products, Inc.*, 41 F.3d 39 (2d Cir. 1994) ................................84

*Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108 (S.D.N.Y.1981) ......................68

*E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525 (11th Cir. 1985)..............................................................................93,94,95

*Emilio Pucci Societa A Responsibilita Limitata v. Pucci Corp.*, 1988 U.S. Dist. LEXIS 14097 (N.D. Ill. Dec. 13, 1988) ..................................................54,71,73

*Field Enters. Educ. Corp. v. Cove Indus., Inc.*, 297 F. Supp. 989 (E.D.N.Y. 1969) ..................91

*Forschner Group Inc. v. Arrow Trading Co.*, 124 F.3d 402 (2d Cir. 1997)................................86

*Fourth Toro Family L.P. v. PV Bakery, Inc.*, 88 F. Supp. 2d 188 (S.D.N.Y 2000)....................57

*Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.*, 875 F. Supp. 966 (E.D.N.Y. 1994) ............................................................................................................62,63

*Fruit of the Loom, Inc. v. Am. Mktg. Enters.*, 1999 U.S. Dist. LEXIS 11060 (S.D.N.Y. July 22, 1999)........................................................................................................100

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591 (5th Cir.1985)...................................................................................................93,94

*Gaidon v. Guardian Life Ins.*, 94 N.Y.2d 330, 725 N.E.2d 598, 704 N.Y.S.2d 177 (2000)............................................................................................................87

*Gamlen Chemical Co. v. Gamlen*, 79 F.Supp. 622 (W.D.Pa. 1948)...........................75

*Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137 (2d Cir.1997)..........96

*Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103 (2d Cir. 1988)...................100

*Gianni Versace S.p.A. v. Alfredo Versace*, No. 01 Civ. 9645, 2003 WL 22023946 (S.D.N.Y. Aug. 27, 2003) ..........................................................................60,61

*GMA Accessories, Inc. v. BOP LLC*, 07 Civ. 3219 (LTS) (DCF), 2007 U.S. Dist. LEXIS 64386 (S.D.N.Y. Aug. 29, 2007) ....................................................................50

*Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores*, 20 F.Supp. 703 (D.C.Pa. 1937) ....................................................................................................75

*Grotian, Helfferich, Schulz, Th. Steinweg Nacht. v. Steinway & Songs*, 523 F.2d 1331 (2d Cir. 1975)........................................................................................Passim

*Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072 (2d Cir. 1993)............52

*GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273 (S.D.N.Y. 2002) .........Passim

*Gucci v. Gucci Shops, Inc.*, 688 F. Supp. 916 (S.D.N.Y. 1988) ...................52,65,76,78

*Gucci v. Gucci Shops, Inc.*, No. 83 CIV. 4453 (WCC), 1988 WL 75263 (S.D.N.Y July 13, 1988) .........................................................................76

*Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060 (S.D.N.Y. 1991).........................................................................52,58,68,69

*Gucci Am., Inc. v. Dart, Inc.*, 715 F.Supp. 566 (S.D.N.Y. 1989) .................................52

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269 (S.D.N.Y. 2003) ..............79,96

*Gucci Am., Inc. v. Pieta*, No. Civ. 04-9626, 2006 WL 4725706 (C.D.Cal. January 23, 2006) .......................................................................................................................52

*Gucci Shops, Inc. v. Dodo Mark 1 S.r.l.*, No. 84 Civ. 2089, 1984 WL 322 (S.D.N.Y. May 4, 1984) ........................................................................................................52

*Gucci Shops, Inc. v. Dreyfoos & Assocs., Inc.*, Case No. 83-709-CIV-ALH, 1983 WL 425 (S.D. Fla. Nov. 7, 1983)........................................................................52

*Gucci Shops, Inc. v. R.H. Macy & Co., Inc.*, 446 F. Supp. 838 (S.D.N.Y. 1977).......................52

*Guiness United Distillers & Vintners B.V. v. Anheuser-Bush, Inc.*, No. 02 CIV. 0861(LMM), 2002 WL 1543817 (S.D.N.Y. July 12, 2002) ..............................................64

*Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58 (2d Cir. 1999) .........................................................48

*Harlequin Enters., Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir. 1981) .........................59

*Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755 (2d Cir. 1960)....................60

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir. 1988)...............................................62,69

*Hat Corp. of Am. v. D L Davis Corp., Ltd.*, 4 F. Supp. 613 (D.Conn. 1933) ...............................75

*Hertz Equip. Rental Corp., et al. v. Hertz Equip. Int'l, Inc.*, 281 F.Supp. 1019 (S.D.Fla.1967)..............................................................................................................75

*Hoyt Heater Co. v. Hoyt*, 68 Cal.App.2d 523, 157 P.2d 657, 65 U.S.P.Q. 294 (1945)......................................................................................................75

*Independent Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127 (E.D.N.Y. 1998).........................................................................................................101

*In re The Leslie Fay Cos., Inc.*, 216 B.R. 117 (S.D.N.Y. 1997) ....................................54,70,71,73

*In re Vuitton Et Fils S.A.*, 606 F.2d 1 (2d Cir. 1979)....................................................................79

*John Walker & Sons, Ltd. v. Bethea*, 305 F.Supp. 1302 (D.C.S.C. 1969) ..........................62,63,75

*John Zink Co. v. Zinkco*, 2 U.S.P.Q.2d 1606 (N.D.Okla. 1986).................................................75

*Johnson & Johnson Consumer Cos., Inc. v. Aini*, 540 F. Supp. 2d 374 (E.D.N.Y. 2008)...........................................................................................................83

*Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506 (S.D.N.Y. 1993).................54,94

*Juicy ZCouture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ.7203 (DLC), 2006 WL 1012939
(S.D.N.Y. Apr. 19, 2006)................................................................................................94

*Karlin v. IVFAm., Inc.*, 93 N.Y.2d 282, 712 N.E.2d 662, 690 N.Y.S.2d 495 (1999)..................87

*Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386 (Fed. Cir. 1989) ......................................60

*Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.*, 142 A.D.2d 448, 536 N.Y.S.2d 792 (App.Div.
1988) ..............................................................................................................................88

*Kookai, S.A. v. Shabo*, 950 F. Supp. 605 (S.D.N.Y. 1997)...................................................62,63

*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700 (2d Cir. 2004)................................................93

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123 (S.D.N.Y. 1993)..............68

*Lang v. Retirement Living Pub. Co.*, 949 F.2d 576 (2d Cir. 1991)..............................................65

*Lawn Tennis Assoc. v. British Tennis Agency*, 1 U.S.P.Q.2d 1283 (S.D.N.Y.1986)....................65

*Lazzaroni USA Corp. v. Steiner Foods*, No. Civ. 05-4476 (JAG), 2006 WL 932345
(D.N.J. April 11, 2006) ....................................................................................................74

*Lexington Mgt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271 (S.D.N.Y.
1998) ...........................................................................................................................50,51

*Lingo Corp v. Topix, Inc.*, 01 Civ. 2863 (RMB), 2003 WL 223454 (S.D.N.Y. Jan. 31,
2003) ..............................................................................................................................88

*Linotype Co. v. Varityper, Inc.*, 1989 WL 94338 (S.D.N.Y. Aug. 4, 1989) ...............................96

*Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986)..............*Passim*

*Lomaglio Assocs. v. LBK Mktg. Corp.*, 876 F. Supp. 41 (S.D.N.Y. 1995)..................................48

*Lord Jeff Knitting Co., v. Warnaco, Inc.*, 594 F. Supp. 579 (S.D.N.Y. 1984).............................84

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 81 U.S.P.Q.2d 1064 (E.D. Va.
Nov. 3, 2006) ..................................................................................................................81

*Make Up For Ever, S.A. v. SOHO Forever, LLC*, 198 F.R.D. 56 (S.D.N.Y. 2000) ....................88

*Max Factor & Co. v. Factor*, 226 F.Supp. 120 (S.D.Cal. 1963)...................................................75

*Mayo Clinic v. Mayo's Drug & Cosmetic, Inc.*, 262 Minn. 101, 113 N.W.2d 852, 132
U.S.P.Q. 691 (1962)........................................................................................................75

*McDonald's Corp. v. McBagel's Inc.*, 649 F. Supp. 1268 (S.D.N.Y. 1986) ...............................53

*McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir. 1979)......................................59

*McNeilab, Inc. v. Am. Home Prods. Corp.*, 501 F. Supp. 517 (S.D.N.Y. 1980) ....................90,91

*Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026 (2d Cir.1989) ........................................................................................................................83,84

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987)......................*Passim*

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1026 (S.D.N.Y. 1994) ......................................................................................................99,100

*Moseley v. Victoria Secret Catalogue, Inc.*, 537 U.S. 418 (2003)..............................................80

*Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95 (2d Cir. 1989) .........................98

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208 (2d Cir. 1999) ..............................................81,82

*National Football League v. Miller*, 99 Civ. 11846 (JSM), 2000 U.S. Dist. LEXIS 3929 (S.D.N.Y. Mar. 30, 2000) ................................................................................................48

*Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576 (2d Cir. 2005) ............................55

*NBA v. Design Mgmt. Consultants, Inc.*, 289 F. Supp. 2d 373 (S.D.N.Y. 2003) .......................99

*NBA Properties, Inc. v. YMG, Inc.*, No. 93 C 1533, 1993 WL 462836 (N.D. Ill. Nov. 9, 1993) ............................................................................................................................68

*New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183 (2d Cir. 2001)..................................55

*New York v. Feldman*, 210 F. Supp. 2d 294 (S.D.N.Y. 2004) ....................................................88

*New York State Soc'y of Certified Public Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331 (S.D.N.Y. 1999).........................................................................56,65,66

*Nike, Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp.2d 1352 (S.D. Ga. 2003) .........................85

*Nikon, Inc. v. Ikon Corp.*, 803 F. Supp. 910 (S.D.N.Y. 1992)....................................................61

*Osawa & Co. v. B & H Photo*, 589 F. Supp. 1163 (S.D.N.Y. 1984) ...........................................93

*Oswego Laborer's Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 647 N.E.2d 741, 623 N.Y.S. 2d 529 (1995)....................................................................87

*Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891 (2d Cir. 1982) .................... 59

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 99 Civ. 10175 (JSM), 2002 U.S. Dist. LEXIS 16066 (S.D.N.Y. Aug. 27, 2002) ....................................................................... 99

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950 (2d Cir. 1980), *cert. denied*, 459 U.S. 832 (1982) .......................................................................... 68

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 WL 896952 (E.D.N.Y. Mar. 26, 2004) ......................................................................................................... 55

*Playtex Prods., Inc. v. First Quality Hygienic, Inc.*, 965 F.Supp. 339 (E.D.N.Y. 1996) .............................................................................................. 58

*Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492 (2d Cir. 1961) .................................... 55,61

*Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir. 1987) ............................................ 79

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132 (9th Cir. 1986) ................................ 90,91

*Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, *amended by*, 1992 U.S. App. LEXIS 32204 (2d Cir. 1992), *aff'd*, 37 F.3d 74 (2d Cir. 1994) ....................................... 69

*Proctor & Gamble Co. v. Quality King Distribs., Inc.*, 974 F.Supp. 190 (E.D.N.Y. 1997) .............................................................................................. 87

*Project Strategies Corp., v. Nat'l Comm. Corp.*, 948 F. Supp. 218 (E.D.N.Y. 1996) .............. 100

*Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F.Supp. 198 (D.Md 1988) ...................... 62,63

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) .............................................. 90,92

*Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134 (2d Cir. 1991) .............................................................................................. 69

*Rolex Watch U.S.A., Inc. v. Jones*, 99 Civ. 2359, 2002 U.S. Dist. LEXIS 6657 (S.D.N.Y. Apr. 17, 2002) ........................................................................................... 98

*Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095 (2d Cir. 1982) .................................................. 85

*Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 375-77 (S.D.N.Y. 2000) .............................. 47

*Savage Universal Corp. v. Grazier Constr., Inc.*, 04 Civ. 1089 (GEL), 2004 U.S. Dist. LEXIS 16088 (S.D.N.Y. Aug. 13, 2004) .......................................................... 48

*Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004) ................................................. *Passim*

*Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167 (2d Cir. 1976)................................60

*Schering Corp. v. Schering Aktiengesellschaft*, 667 F.Supp. 175 (D.N.J. 1987)........................74

*Schieffelein & Co. v. Jack Co. of Boca, Inc.*, 725 F. Supp. 1314 (S.D.N.Y. 1989) ....................88

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995)....................................87

*Sherrell Perfumers, Inc. v. Revlon, Inc.*, 483 F. Supp. 188 (S.D.N.Y. 1980) .............................91

*Sports Auth. v. Prime Hospitality Corp.*, 89 F.3d 955 (2d Cir. 1996) .........................................55

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 2004 WL 2158120 (S.D.N.Y. Sept. 28, 2004) .................................................................................................................................55

*Stern's Miracle-Gro Prods., Inc. v. Shark Prods. Inc.*, 823 F. Supp. 1077, 1090 (S.D.N.Y. 1993).......................................................................................................*Passim*

*Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 611, 709 N.Y.S.2d 892 (2000)..........................................................................................................................87

*Syntax Labs, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566 (2d Cir. 1971) ...............................53

*T. Anthony Ltd. v. Louis Vuitton Malletier*, 30 U.S.P.Q.2d 1214 (S.D.N.Y. 1993)..................................................................................................57,59,60

*Talk To Me Prods., Inc. v. Larami Corp.*, 992 F.2d 469 (2d Cir. 1993)......................................86

*The Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133 (2d Cir. 1999)..........................................................................................................................50

*Time, Inc. v. Peterson Publ'g Co.*, 173 F.3d 113 (2d Cir. 1999)..................................................50

*Topps Co., Inc. v. Gerrit J. Verburg Co.*, 41 U.S.P.Q.2d 1412 (S.D.N.Y. 1996).........................79

*Triangle Publ'ns Inc. v. Standard Plastic Prods.*, 241 F.Supp. 613 (E.D.Pa. 1965)..............62,63

*Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339 (S.D.N.Y. 1998) ........................................86

*Upjohn Co. v. Am. Home Prods. Corp.*, 598 F. Supp. 550 (S.D.N.Y. 1984) .........................90,91

*Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633 (2d Cir.), *cert. denied*, 352 U.S. 871 (1956).................................................................................93,95

*Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141 (2d Cir. 2003) .................................................*Passim*

*Vitabiotics, Ltd. v. Krupa*, 606 F. Supp. 779 (E.D.N.Y. 1984).................................................101

*WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463 (S.D.N.Y. 2002) ...................................82

*Wells v. Universal Pictures Co.*, 166 F.2d 690 (2d Cir. 1948) ....................................................88

*Wojnarowicz v. Am. Family Ass'n*, 745 F.Supp. 130 (S.D.N.Y.1990)........................................96

*W.W.W. Pharm. Co., Inc., v. The Gillette Co.*, 984 F.2d 567 (2d Cir. 1993)...............................70

*Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928)..................................................85

*815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643 (2d Cir. 1988) ................................86

## STATUTES AND OTHER RESOURCES

15.U.S.C. § 1057...........................................................................................................50,57

15.U.S.C. § 1065.................................................................................................................51

15 U.S.C. § 1114.........................................................................................................49,55,72

15 U.S.C. § 1115....................................................................................................50,51,52,57

15 U.S.C. § 1116.................................................................................................................96

15 U.S.C. § 1117..........................................................................................................97,98,99

15 U.S.C. § 1125.................................................................................................49,55,72,80,81

28 U.S.C. § 1331.................................................................................................................47

28 U.S.C. § 1338.................................................................................................................47

28 U.S.C. § 1367.................................................................................................................47

H. Rep. 104-374 (1995) .......................................................................................................81

*McCarthy on Trademarks* § 13.3 (2007) ...................................................................................74

*McCarthy on Trademarks* § 11:73 (2007) .................................................................................58

*McCarthy on Trademarks* § 24:24 (2007) .................................................................................62

*McCarthy on Trademarks* § 30:107 (2007) ................................................................99

New York G.B.L. § 349 ......................................................................86,87,88,101

New York G.B.L. § 360-l ................................................................................83

PUB. L. 100-667 § 132 ..............................................................................53,73

PUB. L. 109-312, 120 Stat. 1730................................................................81

Plaintiff Gucci America, Inc. ("Gucci"), the owner and exclusive distributor in the United States of fine leather goods, clothing, accessories, home products, fragrances, perfumes, jewelry and watches sold under the GUCCI brand name — one of the world's most recognized brand names — and in conjunction with other well-known Gucci marks, designs and indicia, including Gucci's famous GREEN-RED-GREEN Stripe Design (U.S. Trademark Reg. Nos. 1,122,780, 1,123,224, and 1,483,526) and REPEATING GG Pattern Design (U.S. Trademark Reg. Nos. 2,680,237, 3,072,547, and 3,072,549) (collectively the "Gucci Trademarks"), by its attorneys Arnold & Porter LLP, respectfully submits the following Proposed Findings of Fact ("Pl. Proposed Findings") and Conclusions of Law ("Pl. Proposed Conclusions").

As set forth here, given the enormous market strength and widespread consumer recognition of the GUCCI brand name, Defendants' efforts to license, manufacture, market and sell a full line of consumer products utilizing the JENNIFER GUCCI and/or GEMMA GUCCI names is likely to cause confusion with the world famous GUCCI trademark, and will result in substantial and irreparable harm to Gucci. Defendants, who have a family relation to a now deceased Gucci family member who last worked in the Gucci business over twenty years ago, themselves have nothing whatsoever to do with Gucci's business, are not designers of any products sold in the United States, and have no reputation as designers of any products in the United States. As the evidence makes clear, the only reason they and their representatives are trying to license and use the names JENNIFER GUCCI and GEMMA GUCCI is to take advantage of the substantial goodwill symbolized by the GUCCI mark to give their products instant brand recognition that took Gucci 80 years to build up. Accordingly, Gucci seeks a permanent injunction barring Defendants from infringing any of Gucci's famous registered

trademarks, and from making any commercial use of the names JENNIFER GUCCI and

GEMMA GUCCI, either on products or in connection with the marketing, promotion and/or

advertising of any product.

## I.    GUCCI'S PROPOSED FINDINGS OF FACT

### A.    Gucci and the World Famous Gucci Trademarks

1.      Gucci is organized and exists under the laws of the State of New York, with its

principal place of business located at 685 Fifth Avenue, New York, New York 10022.  Moss

Witness Statement at ¶4.

2.      GUCCI is one of the most famous and most recognized brand names in the United

States and the world, and one of the most iconic names in fashion and design.  Moss Witness

Statement at ¶5; Pl. Tr. Exs. 230 - 234.

3.      The GUCCI brand was founded in Florence, Italy in 1921 by Guccio Gucci.  In

1938, the Gucci company expanded its operations and opened its first retail store outside of

Florence, on the Via Condotti in Rome.  In the decades that followed, Gucci became famous for

its fine leather goods, and then built on its reputation to become one of the leading luxury goods,

fashion and accessory brands in the world.  Moss Witness Statement at ¶6; Pl. Tr. Exs. 231, 233.

4.      In 1953, Gucci became one of the pioneers of Italian design in the United States

when it opened its first American retail store in the Savoy Plaza Hotel on East 58th Street in New

York City.  Shortly thereafter, it expanded its presence in the United States, opening retail stores

in Palm Beach, Florida and Beverly Hills, California.  Moss Witness Statement at ¶7; Pl. Tr. Exs.

231, 233.

5.      Over the years, Gucci's product line has encompassed handbags, luggage, men's

apparel, women's apparel; apparel accessories, sunglasses, footwear, jewelry, watches,

fragrances, home products and even automobiles, all sold under the world famous GUCCI brand name (the "Gucci Products"). Today, all authorized Gucci Products bear the GUCCI brand name, either on their labels, hang tags affixed to the products, or on the products themselves. Moss Witness Statement at ¶8; Pl. Tr. Exs. 230 - 233.

6.      Since its inception, the GUCCI brand name has been synonymous with luxurious and elegant products and services, and, currently, the GUCCI brand name is one of the most recognized brand names in the world. Consumers and the trade instantly identify Gucci as the source of all products sold under the GUCCI brand name. Moss Witness Statement at ¶9; Novak Witness Statement at ¶3; Pl. Tr. Exs. 230 - 234.

7.      Over many decades, literally hundreds of millions of consumers have been exposed to the GUCCI brand name and the other Gucci trademarks, including Gucci's GREEN-RED-GREEN Stripe design and REPEATING GG Pattern design marks, not only in advertisements, but in fashion magazines, television programs and motion pictures. For example, recent press reports recount that Jacqueline Kennedy, Audrey Hepburn, and young Princess Caroline of Monaco were fans of the label, and that Gucci's archives of famous photo shoots include Princess Diana as a child bride and young woman, Britt Ekland trading GUCCI logos with Peter Sellers, and Madonna in various leather jackets. Moss Witness Statement at ¶10; Pl. Tr. Exs. 231, 233.

8.      Gucci spends many millions of dollars each year advertising the Gucci Products, with an advertising campaign that includes frequent full-page advertisements in the *New York Times*, *Los Angeles Times*, *Harper's Bazaar*, *Vogue*, and numerous other widely distributed magazines and news publications. Moss Witness Statement at ¶11; Pl. Tr. Exs. 232-233.

3

9.     Gucci manufactures, licenses and wholesales a broad range of consumer products that utilize the GUCCI brand name and other iconic Gucci trademarks, including the GREEN-RED-GREEN Stripe design and REPEATING GG Pattern design marks, only to the most select, high-end, retail outlets. In addition, Gucci owns approximately 50 stores throughout North America that sell exclusively GUCCI Products. GUCCI Products are also sold in over 200 additional boutiques around the world. Moss Witness Statement at ¶12.

10.     Over many years, Gucci has realized enormous and ever-increasing sales of GUCCI brand products, such sales totaling in the billions of dollars in the United States alone. Moss Witness Statement at ¶13.

11.     Gucci endeavors to maintain the reputation for quality and luxury that it has painstakingly developed in the GUCCI brand name. Strict quality control standards are imposed in the manufacture of all products bearing the GUCCI trademark. Gucci's adherence to only the highest quality standards has resulted in widespread and favorable public acceptance among consumers for Gucci Products. Moss Witness Statement at ¶14.

12.     There are, in essence, two types of Gucci clients. The first is the longstanding client who views GUCCI as a 'lifestyle' brand, outfitting him or herself in GUCCI clothing, shoes and accessories, and also purchasing GUCCI brand products from other product categories, including gift and home items. This client tends to be a more mature consumer, very knowledgeable about the full range of GUCCI products, and generally discerning in making his or her purchasing decisions. Novak Witness Statement at ¶7.

13.     The second category of Gucci clientele, which is a very large and growing category, includes customers who are first-time or occasional purchasers of GUCCI products.

4

This client, while also knowledgeable about the GUCCI brand, is typically younger and somewhat less sophisticated than the first client, and somewhat less familiar with the overall GUCCI product line, and therefore more susceptible to deception. Novak Witness Statement at ¶7.

14.    As a result of Gucci's extensive advertising and promotion, adherence to the highest quality standards for manufacturing and materials, and extraordinary sales success, the GUCCI brand name, according to the Nielsen Company's November 2007 global brands survey, is the world's "most coveted luxury brand," with one in five consumers reporting that they would choose the GUCCI brand over any other luxury goods brand. Moss Witness Statement at ¶15; Novak Witness Statement at ¶4; Pl. Tr. Exs. 230 - 234.

15.    Further, for the last three consecutive years, the GUCCI brand has been ranked among the top 50 global brands in Business Week's annual ranking of the 100 Best Global Brands, in studies conducted by the highly respected market research company, Interbrand Corporation. In 2005, Gucci ranked number 49 among the top 100 Global Brands, and in 2006 and 2007, Gucci ranked 46 out of 100. Some of the brands ranking higher than Gucci were COCO-COLA, MICROSOFT, MERCEDES BENZ, NIKE and AMERICAN EXPRESS, while some ranking lower included COLGATE, NESTLE, MOTOROLA, PANASONIC, SHELL and LEVI'S. Business Week further estimated the value of the GUCCI brand in 2007 at $7.7 billion dollars worldwide, an 8% increase from 2006. Novak Witness Statement at ¶5; Pl. Tr. Ex. 234.

16.    In the early 1960's, Gucci adopted and began using the GREEN-RED-GREEN Stripe and REPEATING GG Pattern designs. By the late 1960's, these designs began appearing on a wide range of consumer products sold under the world famous GUCCI brand name. Today,

the GREEN-RED-GREEN Stripe Design and REPEATING GG Pattern Design are two of the most recognized design marks in the world, and two of Gucci's "iconic" trademarks, used time and again, from season to season, on a wide variety of goods.  Moss Witness Statement at ¶16; Pl. Tr. Exs. 230, 231, 233.

17.    GUCCI brand products featuring the GREEN-RED-GREEN Stripe and REPEATING GG Pattern designs have been worn over the years by such celebrities as Sarah Jessica Parker, Jessica Alba, Katie Holmes, Sammy Davis Jr., Michael Caine, Ellen Barkin, Britt Ekland, Peter Sellers, Linda Carter, Ringo Starr, Sharon Stone, Amanda Bynes, Sarah Michelle Geller, Joel Madden, Gwen Stefani, Britney Spears, Lindsay Lohan, P Diddy, America Ferrera, Renee Zellweger, Paris Hilton, Kanye West and Lebron James.  Moss Witness Statement at ¶17; Pl. Tr. Exs. 231 - 233.

18.    Today, and for many years, the GUCCI, GREEN-RED-GREEN Stripe design and REPEATING GG Pattern design trademarks, have been some of the most widely-recognized marks in the United States, possessing strong secondary meaning among consumers and the trade.  These trademarks immediately identify Gucci as the exclusive source of the products to which the marks are affixed, and signify goodwill of incalculable value.  Moss Witness Statement at ¶18; Pl. Tr. Exs. 230 - 233.

19.    Gucci is the owner of all right, title and interest in and to, *inter alia*, the following trademarks and/or service marks which are federally registered in the United States:

| MARK | Reg. No. | Reg. Date | Class(es) |
|---|---|---|---|
| GUCCI | 876,292<br>959,338<br>972,078<br>1,093,769<br>1,140,598<br>1,168,477<br>1,169,019<br>1,168,922<br>1,200,991<br>1,202,802<br>1,321,864<br>1,340,599 | 09/09/69<br>05/22/73<br>10/30/73<br>06/20/78<br>10/21/80<br>09/08/81<br>09/15/81<br>09/15/81<br>07/13/82<br>07/27/82<br>02/26/85<br>06/11/85 | 16, 18, 21, 25<br>14<br>42<br>16<br>3<br>25<br>9<br>6<br>14<br>25<br>9<br>14 |
| GREEN-RED-GREEN STRIPE  | 1,122,780<br>1,123,224<br>1,483,526 | 07/24/79<br>07/31/79<br>04/05/88 | 18<br>14<br>25 |
| REPEATING GG DESIGN  | 2,680,237<br>3,072,547<br>3,072,549 | 01/28/03<br>03/28/06<br>03/28/06 | 14<br>25<br>18 |

Moss Witness Statement at ¶19; Pl. Tr. Exs. 206 - 223.

### B.    Defendant's Infringing Acts

#### 1.    Background of Defendants' Jennifer Gucci, Gemma Gucci and Litwak

20.    Defendant Jennifer Gucci (whose maiden name was Jennifer Puddefoot) is the ex-wife of Paolo Gucci, a Gucci family member who worked for various Gucci affiliates for many

years as a designer, until he was asked to leave the Gucci company in 1980. Gemma Gucci is the daughter of Jennifer and Paolo Gucci. *See*, Jennifer Gucci Dep. Testimony at pp. 8:9 — 11:18, 12:9-25, 18:15 — 19:18.

21. Paolo Gucci and Jennifer Gucci divorced acrimoniously in 1991, eleven years after Paolo Gucci left the Gucci company, and four years prior to his death. *See*, Jennifer Gucci Dep. Testimony at pp. 19:19 — 20:11.

22. In the late 1980's, following his departure from the Gucci company, Paolo Gucci attempted to license his name for use with various lines of apparel and accessories. Paolo Gucci's licensing agent at the time was Defendant Litwak. *See*, Jennifer Gucci Dep. Testimony at pp. 17:25 — 18:14; Litwak Dep. Testimony at pp. 14:9 — 15:7.

23. Subsequent to the introduction of Paolo Gucci's own line of licensed goods in the late 1980's, litigation ensued between Paolo Gucci and Gucci (then known as "Gucci Shops, Inc.") in this Court. That litigation culminated in a decision of the Court allowing Paolo Gucci to use his name, not as a trademark, to identify himself as the designer of goods he designed. *See*, Litwak Dep. Testimony at pp. 104:17 — 118:23; Pl. Tr. Exs. 14-15.

24. This Court based its decision on its determination that Paolo Gucci had built up a substantial personal reputation as a designer over the twenty-five (25) years he spent as the lead designer of the Gucci company, and that he had the right to take advantage of his personal reputation by identifying himself as the designer of goods he had designed. In so concluding, this Court specifically held, however, that its decision was personal to Paolo Gucci — "[t]he rights granted to, and the obligations upon, Plaintiff by this Final Judgment are personal to Paolo

Gucci". Litwak testified at the trial of that action on behalf of Paolo Gucci. *See*, Pl. Tr. Exs. 14-15.

25.    Thereafter, in 1994, this Court, upon an application made by Gucci Shops, Inc. complaining that Paolo Gucci was licensing his name for goods that he was neither involved in designing nor selecting, issued an Order "clarifying" its prior judgment, which stated that all designs indicated as being "designed by" or "selected by" Paolo Gucci must in fact have been designed by or selected by Paolo Gucci. *See*, Pl. Tr. Ex. 16.

26.    Upon Paulo Gucci's death in 1995, realizing that he no longer had the ability to arrange lucrative licenses for products bearing Paolo Gucci's name, Litwak hatched a scheme to do the next best thing — to become the licensing agent for Paulo Gucci's ex-wife, Jennifer Gucci, and Paulo Gucci's daughter, Gemma Gucci, then twelve (12) years old. *See*, Litwak Dep. Testimony at pp. 17:1 — 18:11, 22:19-23, 23:7 — 24:1.

27.    Within three (3) months of Paolo Gucci's death, both Jennifer Gucci and Gemma Gucci granted Litwak the exclusive right and authority to license the use of their names in connection with a wide variety of consumer products, including, but not limited to, handbags, jewelry, watches, home products, spa and bath products, furniture, ice cream, gelato, water, casinos and hotels. *See*, Litwak Dep. Testimony at pp. 17:1 — 18:11, 22:19-23, 23:7 — 24:1.

28.    Since that time, Litwak has acted as the licensing agent for both Jennifer Gucci and Gemma Gucci. Each year Litwak sends out approximately one hundred (100) draft licensing agreements involving products to be branded under the JENNIFER GUCCI and/or GEMMA GUCCI names. Only four of these licensing agreements have been signed. *See*, Litwak Dep. Testimony at pp. 48:25 — 49:14.

9

29.    Litwak's *modus operandi*, in attempting to convince prospective investors and licensees to participate in ventures involving the use of the names JENNIFER GUCCI and GEMMA GUCCI in connection with consumer goods, is to show them this Court's decision in the *Gucci Shops, Inc. v. Paolo Gucci* litigation, allowing Paolo Gucci to use his name in connection with the sale of consumer goods, and assure them that Jennifer Gucci and Gemma Gucci, as Paolo Gucci's ex-wife and daughter, have the same right. *See*, generally, Cohen Witness Statement; Pl. Tr. Exs. 19-20.

30.    Unlike Paolo Gucci, however, who had a strong personal reputation as a designer that he developed over the twenty-five (25) years he acted as the lead designer of the Gucci company's product line, neither Jennifer Gucci nor her daughter Gemma Gucci played any official role in the Gucci company, or any other fashion company, and neither have any experience or reputation as designers of any consumer products. *See*, Gemma Gucci Dep. at pp. 175:25 - 176:3, 176:13-16; Jennifer Gucci Dep. at p. 214:15-17; Litwak Dep. at pp. 45:22 - 46:10.

31.    Over the last thirteen (13) years, Litwak has been paid a handsome sum by prospective investors and licensees for ventures involving the proposed use of the names JENNIFER GUCCI and GEMMA GUCCI. Until recently, however, none of these ventures ever got off the ground, and there is no evidence that any substantial quantities of consumer goods bearing the names JENNIFER GUCCI or GEMMA GUCCI have been sold in the United States. *See*, generally, deposition testimony of Jennifer Gucci, Gemma Gucci and Litwak and witness statements of Gazlay, Macaluso and Sizemore.

32.    In an effort to take advantage of their celebrated last name, Jennifer Gucci, Gemma Gucci and/or their representatives, including Litwak, have sought to register the following trademarks in the United States for a variety of goods and services: COLLEZIONE DI JENNIFER GUCCI; (Application Number 75/446,501 dated March 9, 1998); COLLEZIONE DI JENNIFER GUCCI (Application Number 75/446,502 dated March 9, 1998); JENNIFER DESIGNED BY JENNIFER GUCCI (Application Number 76/228,124 dated March 22, 2001) ; GEMMA GUCCI (Application Number 78/173,379 dated October 11, 2002); GEMMA GUCCI (Application Number 78/695,443 dated August 18, 2005); and REBEL GUCCI (Application Number 78/695,464 dated August 18, 2005). However, the Trademark Office has refused registration of each of these marks, indicating that the applied-for marks would be confusingly similar to one or more of the famous registered GUCCI trademarks (see, Pl. Proposed Findings at ¶19), and each of these applications was abandoned. See, Pl. Tr. Exs. 90 - 93, 224 - 229.

33.    In addition, for many years, Litwak has been attempting to enter into business agreements with various companies in an effort to exploit the JENNIFER GUCCI and GEMMA GUCCI names on consumer products; however, until recently, none of these ventures ever got off the ground. See, generally, deposition testimony of Jennifer Gucci, Gemma Gucci and Litwak.

### 2.    Litwak and Gemma Gucci's Efforts to Exploit the GEMMA GUCCI Name on Handbags and Gelato Products

34.    Defendants Litwak and Gemma Gucci have attempted to exploit the name GEMMA GUCCI on handbags and gelato products. In late 2003, John Macaluso ("Macaluso"), the President of Gemma Gucci Gourmet Foods, Inc. and De Riera for Gemma Gucci, Inc. (De Riera"), Nevada corporations based in Phoenix, Arizona, met with Litwak who informed him

that he owned the rights to the name GEMMA GUCCI, who he explained was the daughter of a member of the Gucci family and a former designer for the GUCCI brand. Litwak further explained that he was involved in licensing the GEMMA GUCCI name for use with various product categories, and asked whether Macaluso would be interested in a license to use her name. While Macaluso had never heard of Gemma Gucci, he had heard of the GUCCI brand and he thought that the use of the GUCCI name would certainly attract attention. In fact, Macaluso thought that any businessperson would jump at the chance to get the GUCCI name attached to his business. At this time, Macaluso did express his concern to Litwak about whether the Gucci company would take issue with any such use; however, Litwak assured him that there had been a court decision that permitted Gemma Gucci to use her name on consumer products, which also extended to her mother, Jennifer Gucci, who, Litwak told Macaluso, he also represented. Macaluso Witness Statement at ¶¶1-3.

35.     Ultimately Macaluso entered into two license agreements with Litwak. The first was for the use of the GEMMA GUCCI name in connection with food products, including gourmet items in gift baskets and gift sets, ice cream and food products including pasta, olive oil and caviar. The second license was for the use of the GEMMA GUCCI name in connection with small leather goods, handbags and wallets. Macaluso Witness Statement at ¶4; Pl. Tr. Exs. 257,258.

36.     Each of the licenses issued to Macaluso by Litwak required him to pay royalties to Litwak in the amount of 5% of the gross sales of the licensed products. For the food products, the license set a minimum gross sales amount of $350,000 for the first year, which increased to $500,000 over the subsequent four years. For the handbags, the license set a minimum gross

12

sales amount of $350,000 for the first year, which increased to $500,000 over the subsequent four years. In addition, Macaluso paid Litwak a total of approximately $15,000 as advance payments for the licenses. Macaluso Witness Statement at ¶5; Pl. Tr. Exs. 257,258.

37.    In order to exploit the food product license, Macaluso formed Gemma Gourmet in May 2004. Thereafter, he began to develop a gelato product that would eventually be sold under the name GEMMA BY GEMMA GUCCI. In developing the gelato product, Macaluso did not take any direction and received no input from Gemma Gucci. In fact, the first time Macaluso ever spoke to Gemma Gucci was in March 2008, when she called him in connection with events related to this lawsuit. Macaluso did, however, show the labels he had developed for the product to Litwak, which Litwak approved. Macaluso Witness Statement at ¶6; Pl. Tr. Ex. 189.

38.    In attempting to market and sell the GEMMA GUCCI gelato product, Macaluso worked with Perry Best of SHD Marketing, Inc., a broker with strong connections to wholesale clubs such as Costco, Sam's Club and other mass market retail outlets, to try to place the product in nationwide retail stores. As part of these efforts, over the course of three years, Macaluso participated with Mr. Best in a number of "road shows" where the gelato product was shown to buyers from Sam's Club and Costco. Macaluso Witness Statement at ¶7.

39.    In 2007, Danny Lee told Macaluso that he had sold some GEMMA GUCCI wine products to Eccentric Gourmet, a small retail store located in Anthem, Arizona, and that he could probably place some GEMMA GUCCI gelato product in the store as well. Macaluso provided Danny Lee with a couple hundred dollars worth of GEMMA GUCCI gelato, which he, in turn, placed in Eccentric Gourmet. The product was subsequently featured in a report broadcast by KNXV-TV, the local ABC television affiliate on Phoenix, Arizona. A copy of the broadcast was

13

subsequently placed on the website of SHD Marketing on a page featuring a description of the GEMMA GUCCI gelato product. During the news segment, the reporter indicates that the gelato product comes from the Gucci company. Macaluso Witness Statement at ¶8; Pl. Tr. Exs. 8,190.

40.     Despite Macaluso's efforts to place the gelato product in retail stores, he was largely unsuccessful in doing so, at least until mid-2007. Nevertheless, Litwak continued to insist that Gemma Gourmet pay him its minimum royalty payment obligations. To date, Gemma Gourmet has paid Litwak over $30,500 in royalties and other payments relating to the food products license. While these payments posed a substantial economic hardship on Macaluso and his mother (who had also become involved as an investor in the venture), Macaluso felt that his efforts to market and promote the GEMMA GUCCI gelato would eventually bear fruit, and so he continued to keep the license going. Macaluso Witness Statement at ¶9; See Pl. Tr. Ex. 259.

41.     In fact, in late 2007, it appeared that the license would begin to pay off, as Macaluso learned that Sam's Club had decided to place the GEMMA GUCCI gelato in its stores nationally. In January 2008, Macaluso informed Litwak of the Sam's Club order, and he told Macaluso (despite the fact that Litwak purported to terminate the Gemma Gourmet license in November 2007) that Macaluso should move ahead with the sale. Macaluso then had manufactured about $20,000 worth of GEMMA GUCCI gelato, which was subsequently sold to Sam's Club. Macaluso Witness Statement at ¶10.

42.     Right after Macaluso shipped the order to Sam's Club in mid-January 2008, he learned that Gemma Gucci had been sued by Gucci in this litigation. While Litwak had previously mentioned that he was involved in a lawsuit involving the JENNIFER GUCCI name, he never told Macaluso that Gemma Gucci had been named as a defendant, or that a Temporary

Restraining Order had been issued by the Court enjoining the use the GUCCI trademark. Macaluso Witness Statement at ¶11.

43.    After Macaluso learned that there was a litigation going on with Gucci involving the GEMMA GUCCI name, he discussed what to do with the product that had been placed in Sam's Club with Mr. Best. Mr. Best, in turn, mentioned the lawsuit to the regional buyer for Sam's Club, who had helped them place the product in the stores. The regional buyer informed them that they had to inform Sam's Club headquarters and the GEMMA GUCCI gelato product was ultimately removed from Sam's Club and returned to Macaluso. Macaluso is now paying for the product to be held in cold storage. Macaluso Witness Statement at ¶12.

44.    With respect to the GEMMA GUCCI handbag license, Macaluso received that license from Litwak in December 2003, and he formed De Riera in May 2004 to exploit that license. Just as was the case with the gelato product, Gemma Gucci was not involved in any way with his efforts to develop and market GEMMA GUCCI handbags. Instead, Macaluso would show his handbag designs to Litwak. Macaluso Witness Statement at ¶13.

45.    Approximately three and one half years ago, Macaluso contacted Randy Sizemore, the President of Infinity International, a Denver, Colorado-based corporation d/b/a Leather Creations ("Sizemore"), who had experience in designing and manufacturing fashion items, and asked him to help Macaluso develop the GEMMA GUCCI handbag line. As a result of their combined efforts, by mid-2007, Macaluso and Sizemore had developed a full line of GEMMA GUCCI handbags that were ready to be introduced to the public. Macaluso Witness Statement at ¶14; Sizemore Witness Statement at ¶¶1-3; Pl. Tr. Ex. 247.

15

46.    Before committing to getting involved in De Riera's business, Sizemore met with Litwak in or around September-October 2005 in Denver, Colorado. Litwak informed Sizemore that he represented Gemma Gucci and held the rights to license her name. Further, Litwak told Sizemore that he wanted him to partner with Macaluso because he did not think Macaluso had the ability to bring product to market, and proposed that they would eventually restructure the De Riera license to include Sizemore's company. Sizemore Witness Statement at ¶4.

47.    With respect to the products themselves, Litwak informed Sizemore that he was looking for low cost handbags that could be sold on QVC or Home Shopping Network. With respect to designs, Litwak suggested that Sizemore use design elements that Sizemore knew Gucci was famous for, such as the GUCCI horsebit design. Sizemore told Litwak that he would not infringe the intellectual property rights of others. Sizemore Witness Statement at ¶5.

48.    As De Riera did not have much money, in lieu of compensation Sizemore was promised that he would become the exclusive manufacturer for the GEMMA GUCCI handbags. Sizemore ultimately agreed with Macaluso to become involved with De Riera and, using his contacts in the fashion and manufacturing industries, Sizemore began to assist Macaluso with designing and developing handbags to be sold under the GEMMA GUCCI name. Sizemore Witness Statement at ¶6.

49.    While Macaluso and Sizemore made a good team, seeking approval for their designs through Litwak and his associate Danny Lee was frustrating. Further, Sizemore's repeated requests to meet with Gemma Gucci to discuss the handbag designs were never responded to favorably. Despite these issues, in January 2007, Sizemore began to work with some of his designer contacts in Brazil and by April 2007 had begun to submit handbag designs

for Litwak's approval through Danny Lee. By July 2007, Macaluso and Sizemore had developed a line of handbags that were ready to be introduced to the public. Sizemore Witness Statement at ¶7; Pl. Tr. Ex. 247.

50.     In late August 2007, Sizemore and Macaluso presented the GEMMA GUCCI handbags at the MAGIC Show in Las Vegas, the annual trade show for the fashion, apparel and accessories industry. Macaluso Witness Statement at ¶15; Sizemore Witness Statement at ¶8.

51.     Following the MAGIC Show, Macaluso and Sizemore identified an opportunity to promote the GEMMA GUCCI handbags at the Phoenix (Arizona) Fashion Week, a series of fashion shows intended to highlight Phoenix-area boutiques and designers, which was scheduled to begin in early November 2007. Sizemore Witness Statement at ¶9.

52.     Just before Phoenix Fashion Week, on or about November 4, 2007, Sizemore met with Litwak in Denver, Colorado to discuss the marketing and promotion of the GEMMA GUCCI handbag line, including a promotional event that he was looking to put together in Los Angeles, California. From Sizemore's perspective, the primary purpose of the meeting was to discuss where they were going with the GEMMA GUCCI handbags and how they fit into the overall licensing picture. In fact, during Litwak's visit, Sizemore introduced Litwak to several potential investors. Litwak, however, who had approved the handbag line as well as the efforts to promote GEMMA GUCCI handbags at Phoenix Fashion Week, expressed his concern that De Riera did not have deep enough pockets to properly promote the GEMMA GUCCI handbags. Litwak claimed that De Riera owned him $270,000 in back royalties and claimed that he was

going to take the license away from Macaluso. Litwak even offered to sell Sizemore the license for $200,000 once he took it away from Macaluso.[1] Sizemore Witness Statement at ¶10.

53.     Nevertheless, Sizemore and Macaluso promoted the GEMMA GUCCI handbags at Phoenix (Arizona) Fashion Week. In advance of Phoenix Fashion Week, they arranged with D. Frank Designs, a Scottsdale, Arizona furniture boutique, to hold a party featuring the GEMMA GUCCI handbags in the D. Frank Designs store on October 19, 2007. Macaluso Witness Statement at ¶16; Sizemore Witness Statement at ¶9.

54.     During Phoenix (Arizona) Fashion Week, Sizemore met a woman named Brooke Palmer, who told him that she had been a schoolmate of Gemma Gucci's. Ms. Palmer asked whether she could speak with Gemma Gucci, who she assumed would be attending the fashion show. Sizemore told Ms. Palmer that Gemma was not in attendance. Because he continued to have concerns regarding Gemma Gucci's knowledge of what he was doing with the GEMMA GUCCI handbags, Sizemore subsequently emailed Ms. Palmer to ask if she would forward my contact information to Gemma Gucci. As Sizemore wrote in the email, "If it is possible I am not sure she even seen any of the collection do you think you could pass along our information so that maybe we could touch base with her about the collection as the designer I have always wanted to talk to her about her thoughts and something that matched her personally." Sizemore Witness Statement at ¶¶12-13; Pl. Tr. Ex. 248.

---

[1] Litwak has testified in this action that the promotion of the GEMMA GUCCI handbags during Phoenix Fashion Week was done without his knowledge or authorization; that he did not learn about the Phoenix Fashion Week show until after it occurred; that he was not involved in any discussions regarding an event in Los Angeles to promote GEMMA GUCCI handbags; that he never discussed the possibility of having Gemma Gucci attend the Phoenix Fashion Week show; and that he never saw or received any samples of the GEMMA GUCCI handbags, were all completely false as Litwak had direct knowledge of all of Macaluso and Sizemore's efforts to promote the GEMMA GUCCI handbags in October and November 2007, well after this lawsuit was commenced. Further, Litwak continued to offer and negotiate license agreements for use of both the GEMMA GUCCI and JENNIFER GUCCI names, including offering a GEMMA GUCCI license to both Macaluso and Sizemore, after this lawsuit commenced.

55.    Shortly after the Phoenix Fashion Week events, Litwak came to Phoenix. Litwak met with Deborah Frank of D. Frank Designs and her friend Sheila Martin, who was involved in the furniture business. Litwak offered Ms. Martin a licenses to use the GEMMA GUCCI and JENNIFER GUCCI names in connection with furniture. As Macaluso and Sizemore had become suspicious of Litwak by this time, they cautioned Ms. Martin to be careful. Macaluso Witness Statement at ¶17.

56.    During this period, Litwak claimed that De Riera owed him approximately $270,000 in past royalty payments. While De Riera may not have paid Litwak everything it owed him in terms of its minimum royalty payment obligations for the handbag license, Macaluso had paid Litwak an overall total of more than $37,500 in connection with the license over the period 2004 to 2007. Macaluso Witness Statement at ¶18; Pl. Tr. Ex. 259

57.    After consulting with Macaluso, Sizemore sent Litwak a letter seeking to clarify the relationship of the parties moving forward. In response, Macaluso received two letters from Litwak purporting to terminate both the Gemma Gourmet and the De Riera license for failure to pay the minimum royalty payments. Macaluso Witness Statement at ¶19; Sizemore Witness Statement at ¶14; Pl. Tr. Exs. 191-192, 255-256.

58.    Despite the termination letters, Litwak continued to discuss issues relating to the license agreements with Macaluso. In fact, during a meeting with Litwak and Danny Lee following the November termination letters, Litwak offered to rewrite the contracts and wipe out the purported overdue royalty payments. Litwak also wanted Macaluso to pay $25,000 as an advance payment to obtain the new licenses. By this point, however, Macaluso had become very

Sizemore Witness Statement at ¶16.

19

suspicious of Litwak and was not about to give him more money. Macaluso Witness Statement at ¶20.

59.    It was also during this period, in December 2007 - January 2008, that Litwak called Macaluso to discuss the litigation involving the JENNIFER GUCCI name. Litwak stated that if he could find investors to provide him with money to fight the lawsuit, Litwak would provide those investors with licenses once the case was resolved. Macaluso Witness Statement at ¶21.

60.    With the exception of the placement of the GEMMA GUCCI gelato product in Sam's Club, Macaluso's efforts to promote the GEMMA GUCCI products had substantially cooled by this time. In addition, both Macaluso and Sizemore had begun to investigate Litwak's claimed business relationship with Gemma Gucci. As a result, in February 2008, they learned for the first time that Gemma Gucci was a named defendant in this lawsuit and that the Temporary Restraining Order had been issued. When they confronted Litwak about the case, he told them to lay low because the case would be settled soon. Macaluso and Sizemore immediately stopped all activity relating to the GEMMA GUCCI products. Macaluso Witness Statement at ¶22; Sizemore Witness Statement at ¶15.

61.    On February 14, 2008, Macaluso received an email from Litwak in which he offered him favorable terms on a new or renegotiated license for either the food products or the handbags if Macaluso would sue Gucci in Arizona. Specifically, Litwak promised a credit of five times the legal fees for litigating the case up to a maximum of $300,000. Having figured by this time, however, that getting more involved with Litwak would only be throwing good money

after bad, and having lost several hundred thousand dollars in his dealings with Litwak, Macaluso ignored his email. Macaluso Witness Statement at ¶23; Pl. Ex. 260.

62.     Then, out of the blue, in late March 2008, Macaluso was contacted by Gemma Gucci, who had learned about him from this lawsuit. Gemma Gucci told Macaluso that she had not been aware of any of his activities in relation to the GEMMA GUCCI gelato product or the GEMMA GUCCI handbags. Macaluso discussed with Gemma Gucci the issue of whether she had actually ever sold or licensed the rights to her name to Litwak. While Gemma Gucci stated that Litwak had previously had the right to license her name, once she turned eighteen, he no longer had those rights. At Gemma Gucci's request, Macaluso subsequently emailed her three documents Litwak had given to him years earlier, purporting to be signed by her, which Litwak had claimed were documents showing that she had granted him the rights to use her name. In an email dated April 1, 2008, Gemma Gucci responded to Macaluso that the signatures on these documents were not hers. The email further states that while Gemma Gucci had told Litwak that she had been in touch with Macaluso, she did not want to raise the issue of the apparently forged documents with him until after the trial. Macaluso Witness Statement at ¶24; Pl. Tr. Exs. 261,262.

63.     Given that he had directly paid Litwak approximately $100,000 from 2004 to 2007 in connection with licenses to use a name that Litwak may never have actually owned or had the right to use, and because his mother had basically handed over her life savings to Litwak, after Macaluso received Gemma Gucci's email on April 1, 2008, he felt seriously violated. Accordingly, Macaluso approached the Arizona Attorney General's office about Litwak's conduct and have asked the office to investigate him. However, on May 1, 2008, Macaluso

21

received a response noting that the Attorney General's Office could not represent individual consumers. Macaluso Witness Statement at ¶25; Pl. Tr. Ex. 263.

64.    As a result of his involvement with Litwak, Macaluso and his mother have lost several hundred thousand dollars in royalty fees and product development and promotion costs. In addition, Macaluso has wasted a large portion of the last four years trying to develop and market GEMMA GUCCI products. In doing so, Macaluso never intended to infringe on any trademarks owned by Gucci, but instead acted in good faith and in complete reliance on the representations and assurances of Litwak, that he had the right to exploit GEMMA GUCCI name. Macaluso Witness Statement at ¶26.

### 3.    Litwak and Gemma Gucci's Efforts to Exploit the GEMMA GUCCI Name on Wine Products

65.    Defendants Litwak and Gemma Gucci have also attempted to exploit the name GEMMA GUCCI on wine products. In mid-2005, Litwak met with Richard Gazlay ("Gazlay"), the then owner of Awesome Wines, LLC, an Anthem, Arizona-based distributor of wine. The purpose of this meeting was to was to discuss a license to manufacture, sell and distribute wines under the name GEMMA GUCCI. Gazlay Witness Statement at ¶¶1-2.

66.    While Gazlay had never heard of Gemma Gucci at the time, and in fact have never actually met her to this day, he had certainly heard of the well-known GUCCI brand. Litwak told Gazlay that Gemma was the daughter of a member of the Gucci family that had originally founded the GUCCI brand. Litwak further explained that he had purchased the rights to license the GEMMA GUCCI name, as well as the name of her mother, JENNIFER GUCCI, and informed Gazlay that he had the right to license those names for whatever products he wanted, so long as he paid Gemma Gucci and Jennifer Gucci royalties on the sale of any licensed products.

22

Gazlay's understanding, from what Litwak had told him, was that there would be no conflict with Gucci if he was to proceed with a license to use the GEMMA GUCCI name. Gazlay Witness Statement at ¶3.

67.    Litwak further told Gazlay that he had recently cancelled a license for GEMMA GUCCI wine products that had been held by Renaissance Corporation of Utah, and that he was looking for a new licensee to exploit what he considered to be a potentially lucrative product category. In fact, Litwak claimed that with his connections and the television reality show "Rebel Gucci", a reality television show project he was working on with Gemma Gucci, he could help sell more than a million bottles of GEMMA GUCCI wines per year. Gazlay Witness Statement at ¶4.

68.    As a result of Gazlay's discussions with Litwak, he decided to go into business with him and they formed Gemma Gucci Wines, Inc. ("GGW"). GGW, a Nevada corporation, was created on or about September 28, 2005. Litwak, Gazlay and an associate of theirs, Danny Lee, were partners in GGW. Litwak made his initial contribution to the corporation of $27,000, and that was his only contribution, although the parties agreed to contribute equal amounts as the business developed. Danny Lee told Gazlay he contributed half of Litwak's initial and only investment.[2] In addition, Litwak sold $50,000 worth of stock in GGW to Mary Brand, an individual residing in Fountain Hills, Arizona. He also sold 30 shares of GGW to Donna Gallo and Richard Viccarone, of Cleveland, Ohio. Further, Danny Lee sold 25 shares of GGW to Martin Simone, Litwak's attorney, who lives in Southern California. Gazlay Witness Statement at ¶5.

---

[2] Litwak's claim in this litigation that he invested $50,000 in GGW is simply not true. Gazlay Witness Statement at ¶5.

69.    Upon its formation, GGW entered into a worldwide license agreement with Litwak, effective September 25, 2005, for use of the trademark GEMMA GUCCI in connection with wine products. The agreement called for payment of 7% royalties to Litwak on gross sales, and set a minimum gross sales figure for the first year of the license at $300,000, requiring a minimum total royalty payment of $21,000 in the first year to keep the license going. Gazlay Witness Statement at ¶6; Pl. Tr. Ex. 182.

70.    Gazlay was in charge of the day-to-day operations of GGW, and, accordingly, he traveled to vineyards in California to select the wines to be sold under the GEMMA GUCCI name. Gazlay never discussed with Gemma Gucci what types of wines she preferred, nor was she involved in actually selecting the wines that he ultimately chose. Further, Gazlay was responsible for complying with all of the regulatory requests for the sale and distribution of alcoholic beverage products in the United States, and for finding distributors in various states for the product. Gazlay Witness Statement at ¶7.

71.    With respect to the label design for the wine products, GGW hired a Phoenix, Arizona-based graphic designer to design the labels. While Gazlay provided his input on the label design, Litwak was responsible for approving the front label and for the text that appeared on the back label, which stated:

> For over half a century The Gucci Family have hosted lavish dinner and parties for heads of state, queens, kings, and celebrities worldwide. Gemma Gucci, daughter of patriarch Paolo, former head of design for The House of Gucci and granddaughter of Aldo Gucci has selected this special wine for the most discriminating taste. "As I am no longer affiliated with my parents former company Guccio Gucci SPA, I now bring my Florentine tradition especially for you."

Gazlay Witness Statement at ¶8; Pl. Tr. Ex. 183.

24

72.     GGW ultimately ordered approximately 800 cases of GEMMA GUCCI wine from a California vineyard. The majority of the wine was distributed in Arizona, but Gazlay was able to find distributors to sell small quantities in Ohio. Litwak's claimed connections that would make GEMMA GUCCI wine into a million bottle brand never materialized, and in fact, he never helped sell a single bottle of wine nor produced the television reality show. Gazlay Witness Statement at ¶9.

73.     By early 2007, Gazlay realized he was putting far more effort and expense into the GEMMA GUCCI wine venture than either of his partners. Overall, he spent more than $100,000 developing and attempting to market the product. Meanwhile, Litwak and Danny Lee put nothing more into the company. Nevertheless, Litwak continued to insist that GGW pay the minimum royalties, which Litwak told Gazlay were going to be paid directly to Gemma Gucci. Gazlay Witness Statement at ¶10.

74.     In April 2007, Litwak informed Gazlay that he was terminating the GEMMA GUCCI license to GGW, for failure to pay royalties. Gazlay did not fight Litwak on this, because he could see the venture was going nowhere, but he at least wanted to make sure that he was compensated for the substantial expenses he had incurred. In an April 24, 2007 email, Gazlay informed Litwak that he wanted to meet with him to review all of the expenses that he had incurred and to wind up the affairs of GGW. In response, Litwak sent Gazlay an email objecting to his expenses, claiming that they had not been approved by him or Danny Lee. Further, Litwak threatened Gazlay with legal action if he did not repay his initial investment. Gazlay Witness Statement at ¶11; Pl. Tr. Exs. 185,186,188.

75.    Rather than litigating with Litwak over his expenses, Gazlay eventually agreed to repay his initial investment in GGW less moneys loaned to Danny Lee, which resulted in an amount of $21,000. As Litwak claimed that he had already paid $21,000 in royalties to Gemma Gucci, he insisted that Gazlay make the check payable to him. And while Gazlay saw Litwak had made out a corresponding check to Gemma Gucci, Gemma Gucci never received any money from the wine venture. Gazlay Witness Statement at ¶12; Gemma Gucci Dep. Testimony at 83:20 - 84:18.

76.    As a result of his involvement with Litwak, Gazlay lost over $100,000, not to mention the enormous amount of time and effort he put into developing the GEMMA GUCCI wine products. In doing so, Gazlay never intended to infringe on any trademarks owned by Gucci, but instead acted in good faith and in complete reliance on the representations and assurances of Litwak, that he had the right to exploit the GEMMA GUCCI name.[3] Gazlay Witness Statement at ¶14.

### 4.    Litwak and Jennifer Gucci's Efforts to Exploit the JENNIFER GUCCI Name on Hosiery Products

77.    In January 2007, Brian Jaffe, the Manager and co-owner of Proportion Fit Products LLC ("Proportion Fit"), a Phoenix, Arizona-based company engaged in the business of designing, manufacturing and selling hosiery products, met with Litwak who claimed that he owned the rights to the name JENNIFER GUCCI and that he was involved in licensing those

---

[3] In addition to his involvement with GGW, Gazlay paid Danny Lee $5,000 for 20% of the stock in a Litwak company named Gemma Gucci Coffee and Gelato, Inc. ("Gemma Coffee"), another Litwak venture formed for the purpose of exploiting the GEMMA GUCCI name. Gazlay also paid Danny Lee $5,000 for 20% of the stock in De Riera. Although Litwak was aware that Gemma Coffee was named as a defendant in this lawsuit, he has not taken any steps to file an Answer to the Complaint on behalf of Gemma Coffee and that the company is now in default in this litigation. Gazlay, along with another investor in Gemma Coffee, feel they have been duped by Litwak into making these investments, and have become suspicious that he does not own the rights to the GEMMA GUCCI name. Gazlay Witness Statement at ¶13.

rights in various categories. Litwak then inquired as to whether Proportion Fit would be interested in taking out a license to use the JENNIFER GUCCI name for ladies hosiery. Jaffe Witness Statement at ¶¶1-3.

78.    While Jaffe had never heard of Jennifer Gucci, he was certainly aware of the GUCCI name, and asked Litwak whether the use of the JENNIFER GUCCI name would pose any problems. Litwak, however, assured Jaffe that there would be no problems with respect to the Gucci company, and further informed him that a Court had decided that Jennifer Gucci had the right to use her name. In light of this, Jaffe thought that the proposed license made a lot of sense because of the instant name recognition the product would have among consumers. Jaffe Witness Statement at ¶4.

79.    On or about January 26, 2007, Jaffe received a letter from Litwak enclosing a proposed license agreement for the use of the trademark JENNIFER GUCCI in connection with panty hose, regular hosiery, socks, trouser socks, and knee-highs made in large sizes 1x through 6x. The agreement also provided that Proportion Fit would have a right of first refusal for a license to do "regular size" hosiery. Further, the license called for an up-front payment of $10,000,which Jaffe negotiated down to $5,000 (the two individuals he was dealing with, Litwak and Danny Lee, said they would put up an additional $5,000 to acquire 5% of the company he would set up to sell the JENNIFER GUCCI line). Jaffe Witness Statement at ¶5; Pl. Tr. Ex. 87.

80.    In addition to the license agreement, Litwak, on or about January 26, 2007, faxed to Proportion Fit what Jaffe understood to be suggested designs for packaging for the hosiery product. Included among the suggested designs were several variations of the initials "JG", some

of which also included the JENNIFER GUCCI name. Jaffe Witness Statement at ¶6; Pl. Tr. Ex. 87.

81. On or about February 25, 2007, Proportion Fit paid Litwak $5,000 in accordance with the license agreement, and then started to work on packaging designs for the hosiery product. Jaffe Witness Statement at ¶7.

82. On or about February 14, 2007, Jaffe emailed to Litwak a proposed logo featuring a stylized version of the initials "JG" and the name JENNIFER GUCCI. Litwak responded to the email the next day, stating that Proportion Fit's proposed design did "not work," and suggested that we have a telephone conversation to discuss the proposed packaging. When Jaffe spoke to Litwak, he informed me that Proportion Fit needed to follow certain guidelines for the JENNIFER GUCCI hosiery product, which he indicated that he would send. Jaffe Witness Statement at ¶8; Pl. Tr. Ex. 35.

83. On February 21, 2007, Litwak sent an email to Proportion Fit saying "See if this works better for you." Attached to the email was what appeared to be packaging for a JENNIFER GUCCI sheet set. The packaging prominently displayed the name JENNIFER GUCCI against a background consisting of stripes of green, red and green. The packaging also included a crest design that contained a prominent green-red-green stripe. The reverse side of the packaging prominently displayed the JENNIFER GUCCI name alone, and featured a picture of Jennifer Gucci. Finally, both the front and back of the packaging included a diamond pattern design utilizing a repeating "JG" design, which was similar to one of the designs that Litwak had previously provided. Jaffe noted that this design appeared to be similar to a repeating "GG" design that he had seen on GUCCI brand products, but assumed that Litwak, as the licensor of

28

the JENNIFER GUCCI name, would not have suggested that they use such a design unless he was absolutely sure that the Gucci company would have no problem with it. Jaffe Witness Statement at ¶9; Pl. Tr. Ex. 36.

84.     Based on what Jaffe understood to be Litwak's instructions, Proportion Fit redesigned the hosiery packaging. The resulting packaging design for the JENNIFER GUCCI hosiery product made prominent use of the JENNIFER GUCCI name, a green-red-green stripe, and the repeating "JG" pattern — all of which appeared prominently on the packaging design provided to Proportion Fit by Litwak. Jaffe Witness Statement at ¶10; Pl. Tr. Exs. 87,236.

85.     On or about March 20, 2007, Litwak sent Jaffe another sample packaging design for a JENNIFER GUCCI product. This packaging also made prominent use of the green-red-green stripe and the repeating "JG" pattern. Jaffe Witness Statement at ¶11; Pl. Tr. Ex. 37.

86.     Throughout the period from January to June 2007, Jaffe attempted to contact Litwak by phone to try to set up a meeting with Jennifer Gucci to discuss the hosiery line. As Proportion Fit was going to be using her name on a special line of hosiery products, Jaffe felt it was important to discuss with her the styles and manufacturing of this new line of products. However, Litwak and Danny Lee kept telling Proportion Fit that Jennifer Gucci was traveling in and out of the country, and was unable to set up an appointment. Jaffe then became suspicious of Litwak, and began to do his own research about the licensing of the JENNIFER GUCCI name. As a result, Jaffe found articles on the Internet indicating that a California company called Veratex, Inc. ("Veratex") held a license to use the JENNIFER GUCCI name. Jaffe Witness Statement at ¶12.

87.    On July 14, 2007, Jaffe wrote an email to Avi Cohen ("Cohen"), who he understood to be the President of Veratex. The purpose of may email was to try to verify that the license agreement he had entered into was legitimate, and to ask Cohen whether Veratex had run into any problems with the real Gucci company in licensing the JENNIFER GUCCI name. Jaffe Witness Statement at ¶13; Pl. Tr. Ex. 86.

88.    Shortly thereafter, Jaffe received a telephone call from Cohen. In that conversation, Cohen told him that Litwak had granted Veratex a license to use the JENNIFER GUCCI name for bath and bedding products, and had also given Veratex a right of first refusal with respect to all other product categories. Cohen informed Jaffe that his license was intended to be a master license for all product categories, including hosiery products, and he expressed his surprise that Proportion Fit had also received a license from Litwak. Jaffe Witness Statement at ¶14.

89.    Following the telephone conversation with Cohen, on or about July 14, 2007 Jaffe wrote Cohen a letter to express his hope that any conflict between the rights granted to Proportion Fit and the rights granted to Veratex could be worked out. Jaffe further informed Cohen that while Proportion Fit had originally developed its own logo for the hosiery products, he had been informed by Litwak that Proportion Fit needed to follow a design template that other licensees were using, which they had done. Along with the letter, Jaffe provided Cohen with a copy of the license agreement with Litwak, correspondence he had had with Litwak, and some examples of the packaging designs Proportion Fit had put together based on Litwak's instructions. Jaffe Witness Statement at ¶15; Pl. Tr. Ex. 87.

90.    As Jaffe was also still concerned about the possibility of infringing the rights of the Gucci company, at or about this time he also contacted the Gucci company. Jaffe spoke with someone in Gucci's legal department, and told him that Proportion Fit had been approached about becoming a licensee for JENNIFER GUCCI hosiery products. Jaffe asked whether Gucci would have any opposition to Proportion Fit's use of the JENNIFER GUCCI name for hosiery. Jaffe Witness Statement at ¶16.

91.    On July 26, 2007, Jaffe was contacted by Louis Ederer of Arnold & Porter LLP, counsel for Gucci, responding to his inquiry. Jaffe explained his concerns to Mr. Ederer and was informed that he should write him a letter expressing his concerns. Jaffe Witness Statement at ¶17.

92.    On that same day, Jaffe responded to Mr. Ederer's request for a letter, and informed him that Proportion Fit had executed a license agreement for a line of JENNIFER GUCCI brand hosiery with Litwak and that Proportion Fit had been asked to develop packaging for the JENNIFER GUCCI hosiery line that would conform to packaging designs developed by Veratex. Along with this letter, Jaffe enclosed examples of the JENNIFER GUCCI hosiery packaging designs. Jaffe Witness Statement at ¶18; Pl. Tr. Ex. 236.

93.    On or about July 30, 2007, Jaffe received a letter from Mr. Ederer stating that the Gucci company had sued Ms. Gucci, Mr. Litwak, Veratex and other defendants for trademark infringement and other claims, in connection with the licensing, manufacture and sale of products bearing the JENNIFER GUCCI name. Mr. Ederer further stated that while Proportion Fit had not been sued, Gucci was expecting that Proportion Fit would cooperate by confirming that it would not engage in further activity concerning the development, marketing, manufacture and/or

sale of a line of JENNIFER GUCCI hosiery or other products. Mr. Ederer further demanded that Proportion Fit provide him with a copy of the license agreement with Litwak and all correspondence and other documents concerning the license agreement or products bearing the name JENNIFER GUCCI. Jaffe Witness Statement at ¶19; Pl. Tr. Ex. 237.

94.    In response, on that same day, Jaffe provided Mr. Ederer with the requested confirmation and materials. Jaffe Witness Statement at ¶20; Pl. Tr. Ex. 238.

95.    Shortly thereafter, on July 31, 2007, Jaffe received an angry letter by email from Litwak, in which he indicated he was cancelling Proportion Fit's license agreement. In the letter, Litwak claimed that Proportion Fit was being terminated because it had failed to get approval for its packaging design for the JENNIFER GUCCI products. Litwak also referred to the fact that Jaffe had contacted Gucci in order to ask about whether the license for JENNIFER GUCCI product would cause any trouble, and that Jaffe had provided the examples of the JENNIFER GUCCI hosiery packaging designs to Gucci. Litwak further threatened legal action against Proportion Fit. Jaffe Witness Statement at ¶21; Pl. Tr. Ex. 239.

96.    None of what Litwak wrote in his July 31, 2007 letter to Jaffe made any sense. The packaging designs created by Proportion Fit were based on the design template that Litwak instructed them to follow. Moreover, Litwak's cancellation of Proportion Fit's license agreement was obviously motivated by the fact that Jaffe had contacted Gucci and provided it with the documentation showing that Litwak had instructed Proportion Fit to design packaging that prominently used not only the name JENNIFER GUCCI, but also a green-red-green stripe design and a repeating "JG" pattern that appeared similar to designs used by Gucci. Jaffe Witness Statement at ¶22.

97.    It was never Proportion Fit's intention to infringe on any trademarks owned by Gucci. Proportion Fit is a legitimate company that has never been involved in any dispute like this before. Proportion Fit acted in good faith and in complete reliance on the representations and assurances of Litwak, many of which were false. As a result, Proportion Fit lost not only the $5,000 advance they paid to Litwak, but also the time, money (over $10,000 in graphic design costs and sample packaging costs) and effort they put into developing Jennifer Gucci licensed products (including working with special hosiery mills to develop a department store grade of Panty Hose, Tights and Body Firmers to meet the quality necessary for the Jennifer Gucci Line). Jaffe Witness Statement at ¶23.

### 5.    Litwak and Jennifer Gucci's Efforts to Exploit the JENNIFER GUCCI Name on Home Products and Bedding

98.    In January 2007, Litwak contacted Cohen, president of Veratex, a company engaged in the business of designing, manufacturing and selling bedding and bathroom accessories, such as quilts, blankets, sheets, towels and shower curtains, informing him that he was the licensing agent for Jennifer Gucci, that he was looking to license the rights to use the JENNIFER GUCCI name in connection with a whole range of consumer products and that he and Jennifer Gucci owned and controlled those rights. Cohen Witness Statement at ¶¶1-4; Springer Witness Statement at ¶2.

99.    During his meeting with Cohen, Litwak informed Cohen that he was the licensing agent for Jennifer Gucci, the widow of Paolo Gucci, a member of the Gucci family. Litwak was looking to license the rights to use Jennifer Gucci's name in connection with a range of products and told Cohen that he and Jennifer Gucci owned and controlled those rights. Litwak also informed Cohen that the timing for a licensing relationship was particularly good, since a motion

picture or television series about Jennifer Gucci's life in the Gucci family was in production and was anticipated to be released in the near future. Litwak also told Cohen that a book about Jennifer Gucci's life would be published in the near future, and that he expected a tremendous amount of publicity surrounding the release of the movie, the publishing of the book, and the expected launch of other products at that time. Cohen Witness Statement at ¶4.

100.    Cohen was well aware at the time he met with Litwak in January 2007 of the well-known GUCCI brand name, and he asked Litwak whether they could expect any resistance from Gucci. Cohen Witness Statement at ¶5.

101.    Litwak informed Cohen that there was a court decision from the 1980's involving Paolo Gucci, Jennifer Gucci's husband, which allowed Paolo Gucci to use his name on products, so long as he used some other brand name in conjunction with his name, and that this decision provided a "roadmap" for the use of the JENNIFER GUCCI name and that if they followed the decision, "we would not have any problems with the Gucci company." Cohen Witness Statement at ¶5.

102.    In January 2007, Litwak also provided Cohen with materials purporting to show that Jennifer Gucci had sold products using her name before. At the time, I understood from my discussions with Litwak that the products shown in these materials had been commercially sold. Cohen Witness Statement at ¶6; Pl. Tr. Ex. 20.

103.    At the time Cohen met with Litwak in January 2007, Veratex had been looking for the opportunity to expand its business. The program with Jennifer Gucci sounded like an excellent opportunity for Veratex. The JENNIFER GUCCI name and the planned publicity surrounding her other projects would give them instant brand name recognition and credibility.

34

Cohen therefore decided to go ahead with a licensing program with Litwak and Jennifer Gucci to develop a JENNIFER GUCCI line of products. Cohen Witness Statement at ¶7.

104.    On or about February 2, 2007 Cohen met with Litwak at Veratex's offices in Panorama City, California. At this meeting, it was discussed that Veratex would be designing bedding and bath products, complete with the product packaging, to be sold using the name JENNIFER GUCCI. During the meeting, Litwak provided design materials and instructions to Shane Springer ("Springer"), Veratex's graphic designer, to be used in the development of packaging designs for the JENNIFER GUCCI bedding and bath line. Litwak informed Springer that he was free to use any of the designs contained in the documents to develop the packaging designs for the line. Prior to the meeting, Springer was not aware of Jennifer Gucci, but later came to learn that she had been married to Paolo Gucci, a member of the Gucci family and a former designer for the Gucci brand. Cohen Witness Statement at ¶8; Springer Witness Statement at ¶3; Pl. Tr. Exs. 203,210.

105.    Included in the materials Litwak provided to Springer were documents containing the phrase "Collezione Di Jennifer Gucci", as well as a number of different designs, including a green-red-green stripe design; several designs featuring the initials "JG"; a repeating diamond pattern design that featured interlocking inverted "GG's"; and a crest design. Cohen Witness Statement at ¶9; Springer Witness Statement at ¶4; Pl. Tr. Exs. 203,210.

106.    Litwak specifically informed Springer that he could use the crest design, the green-red-green color combination, and a repeating "JG" design. Although Springer was relatively unfamiliar with products sold by Gucci, or with Gucci's designs, he was aware that Gucci had used a repeating "GG" pattern design. In fact, upon seeing the repeating "GG" pattern

35

design in the materials provided by Litwak, Springer became concerned that the use of a repeating "JG" pattern on the Veratex packaging might cause problems with Gucci. Springer raised this concern and was informed by Litwak that Veratex was free to use a repeating "JG" design. Springer Witness Statement at ¶5.

107.    Also in February 2007, Cohen and other Veratex team members[4] had a meeting with Litwak and Jennifer Gucci at the Veratex showroom in New York City. The purpose of the meeting was to discuss the licensing deal and to plan for the development and launch of the JENNIFER GUCCI bedding and bath line. At that time, Veratex employees showed Litwak and Jennifer Gucci bedding and bath products from Veratex's then-current product line, which Jennifer Gucci indicated she liked. While Jennifer Gucci met with Veratex designers during this February meeting, she did not provide Veratex's designers with any specific designs created solely by her. Moreover, she discussed the designs and styles that she liked from a line that Veratex had already created with Veratex's designers. In fact, at no time during the development of the JENNIFER GUCCI line did Jennifer Gucci design any products for the line. Cohen Witness Statement at ¶10; Cho Deposition Testimony at pp. 13:19 — 16:21; 18:25 — 19:24.

108.    Following his meeting with Litwak and Jennifer Gucci in New York in February 2007, Cohen agreed that Veratex would do a preliminary launch consisting of a private showroom showing of the JENNIFER GUCCI bedding and bath line at Veratex's New York showroom in the summer of 2007, with the idea that the line would, hopefully, appear in stores in time to coincide with the release of the movie/television series and book. Veratex also put out a

---

[4] One of those team members was Sandy Cho ("Cho"), a designer of bedding products at Veratex. Prior to meeting Jennifer Gucci at Veratex's New York showroom in February 2007, Cho had never heard of Jennifer Gucci. Further, in all her years as a designer of bedding products, she had never heard of Jennifer Gucci, by reputation or otherwise, as a designer of bedding products, or any other products for that matter. Cho Dep. Testimony at pp. 58:4-12.

press release to the trade to that effect at that time. Cohen Witness Statement at ¶11; Pl. Tr. Ex. 28.

109.    Over the course of the next few months, Veratex began to design product and develop packaging for the JENNIFER GUCCI bedding and bath line. Taking the materials that Litwak provided at the February 2, 2007 meeting, Springer created draft packaging inserts for the line. In creating the packaging inserts, he relied almost exclusively on the materials Litwak had provided to him. The packaging inserts featured the use and placement of the JENNIFER GUCCI name on the front insert; utilized green-red-green stripe design; and included a repeating diamond pattern with overlapping "JG's" at the corners of the diamonds. Further, Springer used a photograph of Jennifer Gucci along with her signature and a "romance," a short piece of text describing her relationship to the product, all of which was included in substance in the packet of materials provided by Litwak. Springer also included a crest design in the insert that featured a green-red-green stripe. However, he did not use the crest design contained in Litwak's materials, but instead purchased a different crest through a clip art supplier. Cohen Witness Statement at ¶12; Springer Witness Statement at ¶6; Pl. Tr. Exs. 22,23,24,26,27.

110.    Shortly after he created the prototype packaging, Springer showed it to Cohen and Litwak. At no point in time did Litwak raise any issues with respect to the designs that Springer prepared or asked him to change any of the designs. Moreover, while he tweaked the prototype packaging with revisions prior to the June 2007 private showroom event showcasing the JENNIFER GUCCI line at Veratex's New York showroom, as far as Springer was aware the packaging displayed at the June 2007 event continued to use the JENNIFER GUCCI name, the

green-red-green stripe design in the background, the crest design with the green-red-green stripe, and the repeating "JG" pattern.  Springer Witness Statement at ¶7; Pl. Tr. Exs. 22,23,24,26,27.

111.    At or about this time, in an article concerning Veratex's licensing agreement with Jennifer Gucci, defendant Litwak, who is identified in the article as the licensing manager for Jennifer Gucci, stated that the JENNIFER GUCCI line of products "will have a Gucci-esque look." Pl. Tr. Ex. 28.

112.    Moreover, during the development of the packaging, Cohen was in contact with both Litwak and Jennifer Gucci regarding the packaging for the bedding and bath line.  For example, in a series of emails, Cohen sent Jennifer Gucci proposed packaging for her review.  In an e-mail dated February 28, 2007, in response to one of his emails, Jennifer Gucci wrote "Great looking package." In fact, the only comment Cohen ever remembers Jennifer Gucci making about the packaging was her suggestion to use the name "Jenny Gucci" rather than "Jennifer Gucci." Cohen Witness Statement at ¶13; Pl. Tr. Exs. 64,100.

113.    With respect to the bedding and bath products, Veratex's designers worked in accordance with their usual routine — they prepared design boards showing different fabrics, color combinations and design elements, which were submitted for my approval.  While Cohen showed these design boards to Litwak, he does not know whether Litwak was showing them to Jennifer Gucci.  Cohen did not receive any feedback or criticism from Litwak, or from Jennifer Gucci, with respect to the proposed product designs.  On several occasions during this period, Jennifer Gucci emailed me to say that she could not wait to see the line of products that Veratex would be launching.  As far as Cohen was aware, Jennifer Gucci had no role in the design or

development of the products for the new line. Cohen Witness Statement at ¶14; Pl. Tr. Exs. 67,69-75.

114.    In late spring – early summer 2007, Collezione di Casa, Inc. ("Collezione"), which had been formed shortly prior to that time, entered into a license agreement with Litwak and Jennifer Gucci. The agreement granted Collezione the right of first refusal on all licenses in other product categories, making Collezione the master licensee for all products to be sold under the JENNIFER GUCCI name. Cohen Witness Statement at ¶¶3,15; Pl. Tr. Ex. 63.

115.    During the period February to June 2007, Veratex began to investigate the possibility of entering into JENNIFER GUCCI licenses with third parties in other product categories. Cohen Witness Statement at ¶16.

116.    Over that period Veratex developed relationships with Louisville Bedding Company, a maker of bedding accessories, to develop a line of bedding accessory products; E.L. Erman - Dead Sea Cosmetics Corp. and related companies ("Erman"), to develop a line of skin care and cosmetics products and to develop lines of jewelry and watches. Cohen Witness Statement at ¶17; Talbert Witness Statement at ¶¶1-11; Pl. Tr. Ex. 235.

117.    In addition, Veratex had discussions with Michael Pino, of Therapedic, Inc., a company involved in the manufacture of mattresses, about developing a mattress line, and also about expanding the licensing program internationally. Cohen Witness Statement at ¶18.

118.    Cohen kept Litwak advised of these discussions and these prospective relationships, and Litwak approved moving forward with each of them. Cohen also showed Litwak and Jennifer Gucci the packaging that was being developed by Erman during this period. Cohen Witness Statement at ¶19; Pl. Tr. Ex 253.

119.    In or about May 2007, Veratex began to plan for its preliminary launch of the JENNIFER GUCCI bed and bath line at its New York showroom. The launch was to take place in June 2007. In connection with the launch, Springer designed a full page advertisement that would run in a trade publication, and created an invitation that would be sent out to prospective industry attendees. The advertisement and invitation demonstrated how Veratex intended to use the JENNIFER GUCCI brand name and other packaging designs. The advertisement and invitation were designed using the materials that Litwak provided to Springer during the February 2, 2007 meeting. Springer Witness Statement at ¶8; Cohen Witness Statement at ¶20; Pl. Tr. Exs. 28-30,76,77.

120.    The showroom event took place at Veratex's New York showroom from June 19-21, 2007. Litwak and Jennifer Gucci were in attendance. At the showroom event, Veratex displayed packaging materials showing how they intended to use the JENNIFER GUCCI name, the green-red-green design, and the repeating "JG" design. Also on display was a poster created by Erman that depicted photo-shopped bottles for the skin care line. Cohen Witness Statement at ¶21; Pl. Tr. Ex. 157.

121.    At no time during the showroom event featuring the JENNIFER GUCCI bedding and bath line did Litwak or Jennifer Gucci indicate that they had any problem with any of Veratex/Collezione's products or materials. At the showroom event, they both advised Cohen that they were pleased with the packaging designs Veratex had developed. The only issue raised concerned the Erman material, which, according to Litwak, did not follow the court decision from the 1980's. Cohen Witness Statement at ¶22.

122.    At the June 2007 showroom event, Veratex displayed hundreds of products that Collezione planned to sell. As far as Cohen knows, Jennifer Gucci had no involvement in design or development of any of those products. Cohen Witness Statement at ¶23.

123.    From time to time over the period March to August 2007, Cohen asked Litwak about the progress of the film about Jennifer Gucci's life in the Gucci family. Each time he asked, Litwak would tell him that the film was to go into production in the near future. In one email, Litwak confirmed this and informed Cohen that that the film would star Andy Garcia. Litwak also repeatedly told Cohen, as he indicated in this email, that he had other JENNIFER GUCCI projects in the works, including a hotel/casino project, a coffee shop project, and others. Throughout this period, Cohen trusted Litwak, and his assurances that the film was on track. The film, the book and the attendant publicity was an important consideration in Veratex's decision to move forward with this project. Veratex would have had much less interest in this project without the recognition of the JENNIFER GUCCI name and attendant publicity that the movie and the book would generate. Cohen Witness Statement at ¶24; Pl. Tr. Exs. 31,38,40.

124.    After the June showroom event, the next major trade show where products could be shown was the New York Home Fashion Show in early August 2007. Veratex/Collezione had previously decided not to show the JENNIFER GUCCI line at the August show. Rather, they wanted to continue to develop the line, and to privately show it to buyers after the showroom event. Cohen Witness Statement at ¶26.

125.    During the period from June to August 2007, Veratex continued its negotiations with Louisville for a bedding license, and Litwak and Cohen reviewed and approved packaging designs for the Louisville line. Although we had not yet signed a license agreement with

41

Louisville, Cohen understands that Louisville was interested in the project and later learned that it was Louisville's intention to launch its JENNIFER GUCCI bedding line at the August 2007 New York Home Fashion Show in New York. Cohen Witness Statement at ¶27; Pl. Tr. Ex. 68.

126.    It was never Veratex's intention to infringe on any trademarks owned by Gucci. Veratex acted in good faith, in reliance on the representations and assurances of Litwak and Jennifer Gucci. Cohen Witness Statement at ¶28.

### 6.    Litwak and Jennifer Gucci's Efforts to Exploit the JENNIFER GUCCI Name on Spa and Bath Products, Jewelry and Watches

127.    On or about July 13, 2007, Erman entered into sublicense agreements with Collezione, an affiliate of Veratex, to make and sell cosmetics and skin care products and watches bearing the JENNIFER GUCCI name. Ergas Witness Statement at ¶2; Pl. Tr. Exs 57,60.

128.    Erman negotiated the sublicense agreements with Cohen of Veratex, which held a master license to use the JENNIFER GUCCI name for all products. Also involved in the discussions leading up to the sublicense agreements was Litwak, who, Erman understood, was involved with all rights to the use of the JENNIFER GUCCI name on products, who had licensed the name to Veratex, and who also gave approval to Erman as a sublicensee. Cohen Witness Statement at ¶15; Ergas Witness Statement at ¶3.

129.    The reason Erman had an interest in developing, manufacturing and selling lines of goods featuring the JENNIFER GUCCI name was that, at the time, they were looking to do a high-end cosmetics line for one of their customers under a brand name different from the names they had used for their cosmetics products in the past. What interested Erman about the JENNIFER GUCCI name was that she was the wife of Paolo Gucci of the Gucci family that was responsible for creating the well-known GUCCI luxury brand line, and the use of her name,

combined with her upcoming movie and book, would give Erman instant name recognition for their new product line. Ergas Witness Statement at ¶4.

130.    During Erman's discussions with Cohen and Litwak about a license agreement, Erman was told about a Court decision issued regarding Jennifer Gucci's husband Paolo Gucci, a Gucci family member, allowing him to use his name on products. Erman was informed that it would not be a problem if Jennifer Gucci followed the Court decision in the use of her name on products. Ergas Witness Statement at ¶5.

131.    In or about late May to early June 2007, an Erman employee developed a photo-shopped image of a line of JENNIFER GUCCI cosmetic products, using JENNIFER GUCCI as the brand name for the line. The photo-shopped images included the use of the JENNIFER GUCCI name along with design elements that Erman had received from Veratex, including a repeating "JG" design and a crest design that featured a green-red-green stripe. Ergas Witness Statement at ¶6; Pl. Tr. Exs. 43,45,46.

132.    In early June 2007, Yakov Ergas ("Ergas"), a then officer of Erman, attended a meeting at Veratex's offices, to review and discuss the cosmetics line. Litwak, who was present at this meeting, provided an overview of his plans for branding the JENNIFER GUCCI name, including a movie that was supposedly in production and a book about Jennifer Gucci's life as well as plans for hotels and a chain of coffee shops. With respect to the skin care products, Litwak told Ergas that he expected that Erman would sell millions of products worldwide. Ergas Witness Statement at ¶7; Pl. Tr. Ex. 47.

133.    At the meeting, Erman showed the photo-shopped images they had developed for the JENNIFER GUCCI cosmetic products, complete with the prominent use of the JENNIFER

43

GUCCI brand name, the interlocking "JG" design, and the crest design which featured a green-red-green stripe, to Litwak. Erman subsequently emailed the photo-shopped images to Jennifer Gucci, who had no comment on the proposed packaging, other than to say that she liked it very much, and preferred it in red. Ergas Witness Statement at ¶8; Pl. Tr. Ex. 253.

134.    Erman also sent Jennifer Gucci some samples of the cosmetics products it intended to sell, and she indicated that she liked the products very much. At no time did she design or develop the products other than to inform Erman generally what brands of skin care and cosmetics products she liked. Ergas Witness Statement at ¶9; Pl. Tr. Exs. 47,254.

135.    David Elan, a representative of Erman, attended Veratex's New York showroom event in June 2007. Both Litwak and Jennifer Gucci were present. At this event, Erman displayed posters and fliers displaying the packaging for the JENNIFER GUCCI skin care line, but, at that time, neither Litwak nor Jennifer Gucci said anything about any problems with the posters or fliers Erman had developed. Ergas Witness Statement at ¶10; Pl. Tr. Ex. 157.

136.    In or about early July 2007, Erman also indicated an interest in sublicensing the JENNIFER GUCCI name for watches and jewelry. Erman had some previous experience designing, making and selling watches and jewelry, and in view of the fact that it appeared there was going to be a major launch of JENNIFER GUCCI products, and a lot of publicity surrounding a movie about Jennifer Gucci's life as part of the Gucci family, and her book, Erman thought there was an opportunity to sell watches and jewelry under the JENNIFER GUCCI name. Erman raised the prospect of a watch license with Litwak who said that they should find the right product and pursue it. Ergas Witness Statement at ¶11.

44

137.    In connection with seeking a license from Veratex for these products, Erman prepared or caused to be prepared prototype drawings of JENNIFER GUCCI-branded watches that Erman showed to Veratex in approximately early July 2007. On the face of certain of the watches we included the JENNIFER GUCCI name as well as a crest design which featured a green-red-green stripe. Ergas Witness Statement at ¶12; Pl. Tr. Exs. 58,61.

138.    Shortly thereafter, Erman negotiated a watch sublicense with Veratex. While Erman also wanted to enter into a jewelry license with Veratex, it was decided that they should wait and see how the watches performed before moving into jewelry. Ergas Witness Statement at ¶13; Pl. Tr. Ex. 60.

139.    At some point in approximately July 2007, Erman posted the photo-shopped images of its new JENNIFER GUCCI line of cosmetics products on Erman's website, www.deadsea-costmetics.com, and also on the business-to-business website www.alibaba.com. At this point, Erman were getting closer to launching the cosmetics line, and they were looking to see what the public and the trade reaction to the line might be. Ergas Witness Statement at ¶14; Pl. Tr. Exs. 55-56.

140.    Soon after Erman posted the photos on these websites, they were informed to take them down, because they could not sell product that only used the name JENNIFER GUCCI and that Gucci had objected to the items claiming that they infringed certain trademarks owned by Gucci. Erman was surprised by this development, as they had relied on the assurances provided by Litwak and Jennifer Gucci that they would be able to use Jennifer Gucci's name. Ergas Witness Statement at ¶15.

45

141.   While it is true that Erman was interested in licensing the JENNIFER GUCCI name for cosmetics, jewelry and watches, at no time did Erman ever wish to infringe the trademarks of Gucci or any other party. It is for that reason that Erman agreed to immediately stop selling any products using the JENNIFER GUCCI name or any other marks or designs that might infringe any trademark owned by Gucci. Ergas Witness Statement at ¶16.

### 7.   Unless Permanently Enjoined Defendants' Conduct will Cause Gucci to Suffer Irreparable Harm

142.   In the luxury brand category, image is everything, and anything that diminishes the image of the brand in the eyes of the consumer will cause him or her to lose confidence in the brand. Novak Witness Statement at ¶10

143.   Defendants are doing everything in their power to deceive potential consumers into believing that their products are somehow associated with Gucci. This is evident not only from the packaging designs for JENNIFER GUCCI and/or GEMMA GUCCI products, but also the use of Gucci's iconic GREEN-RED-GREEN Stripe Design and our famous REPEATING GG Pattern Design, not to mention the same well-known block letter font Gucci uses for our GUCCI mark. Novak Witness Statement at ¶8; Pl. Tr. Exs. 22, 23, 24, 26, 27, 29, 32, 33, 34, 45, 46, 65, 183 and 189.

144.   Any consumer familiar with the GUCCI brand, whether Gucci's longstanding client who views GUCCI as a 'lifestyle' brand, or Gucci's second client who are first-time or occasional purchasers of GUCCI products, or even the consumer who does not currently purchase GUCCI products but would like to, is highly likely to be deceived by the packaging materials that Defendants have proposed to use. Novak Witness Statement at ¶¶7, 9.

46