UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

GUCCI AMERICA, INC.,

        Plaintiff,

- against -

JENNIFER GUCCI, JENCO DESIGNS, LLC,
JENNICOR, LLC, JENNY GUCCI COFFEE AND
GELATO COMPANY, INC., VERATEX, INC.,
COLLEZIONE DI CASA, INC., E.L. ERMAN -
DEAD SEA COSMETICS CORP., ELE BRANDS
ENTERPRISE, INC., GBN WATCH
COLLECTION, INC., GBN GLOBAL BUSINESS
NETWORK, EDWARD LITWAK d/b/a ED
LITWAK & ASSOCIATES, GEMMA GUCCI,
GEMMA GUCCI COFFEE AND GELATO
COMPANY, INC., ABC CORPORATIONS 1-10,
and JOHN DOES 1-10,

        Defendants.

------------------------------------------------------------- x

Civil Action No.
07 cv 6820 (RMB) (JCF)

## WITNESS STATEMENT OF JOHN MACALUSO ON BEHALF OF PLAINTIFF GUCCI AMERICA, INC.

John Macaluso declares as follows under penalty of perjury:

1. I am the President of Gemma Gucci Gourmet Foods, Inc. ("Gemma Gourmet") and De Riera for Gemma Gucci, Inc. (De Riera"), Nevada corporations based in Phoenix, Arizona. I respectfully submit this witness statement in support of Gucci's claims against defendants Edward Litwak d/b/a Ed Litwak & Associates ("Litwak") and Gemma Gucci.

2. In late 2003, I was introduced by Danny Lee, an acquaintance of mine who lives in the Phoenix area, to Ed Litwak ("Litwak"). Litwak informed me that he owned the rights to the name GEMMA GUCCI, who he explained was the daughter of a member of the Gucci family and a former designer for the GUCCI brand. Litwak further explained that he was involved in licensing the GEMMA GUCCI name for use with various product categories, and asked whether I would be interested in license to use her name.

3. While I had never heard of Gemma Gucci, I had heard of the GUCCI brand and I thought that the use of the GUCCI name would certainly attract attention. In fact, I think any businessperson would jump at the chance to get the GUCCI name attached to his business. At this time, I did express my concern to Litwak about whether the Gucci company would take issue with any such use; however, Litwak assured that there had been a court decision that permitted Gemma Gucci to use her name on consumer products, which also extended to her mother, Jennifer Gucci, who, Litwak told me, he also represented.

4. I ultimately entered into two license agreements with Litwak. The first was for the use of the GEMMA GUCCI name in connection with food products, including gourmet items in gift baskets and gift sets, ice cream and food products including pasta, olive oil and caviar. The second license was for the use of the GEMMA GUCCI name in connection with small leather goods, handbags and wallets. *See* Pl. Tr. Exs. 257 - 258.

5. Each of the licenses issued to me by Litwak required me to pay royalties to Litwak in the amount of 5% of the gross sales of the licensed products. For the food products, the license set a minimum gross sales amount of $350,000 for the first year, which increased to $500,000 over the subsequent four years. For the handbags, the license set a minimum gross sales amount of $350,000 for the first year, which increased to $500,000 over the subsequent four years. *See* Pl. Tr. Exs. 257 - 258. In addition, I paid Litwak a total of approximately $15,000 as advance payments for the licenses.

6. In order to exploit the food product license, I formed Gemma Gourmet in May 2004. Thereafter, I began to develop a gelato product that would eventually be sold under the name GEMMA BY GEMMA GUCCI. In developing the gelato product, I did not take any direction and received no input from Gemma Gucci. In fact, as discussed below, the first time I ever spoke to Gemma Gucci was in March 2008, when she called me in connection with events related to this lawsuit. I did, however, show the labels I had developed for the product to Litwak, which he approved. *See* Pl. Tr. Ex. 189.

7. In attempting to market and sell the GEMMA GUCCI gelato product, I worked with Perry Best of SHD Marketing, Inc., a broker with strong connections to wholesale clubs such as Costco, Sam's Club and other mass market retail outlets, to try to place the product in nationwide retail stores. As part of these efforts, over the course of three years, I participated with Mr. Best in a number of "road shows" where the gelato product was shown to buyers from Sam's Club and Costco.

8. In 2007, Danny Lee told me that he had sold some GEMMA GUCCI wine products to Eccentric Gourmet, a small retail store located in Anthem, Arizona, and that he could probably place some GEMMA GUCCI gelato product in the store as well. I provided Danny

Lee with a couple hundred dollars worth of GEMMA GUCCI gelato, which he, in turn, placed in Eccentric Gourmet. The product was subsequently featured in a report broadcast by KNXV-TV, the local ABC television affiliate on Phoenix, Arizona. A copy of the broadcast was subsequently placed on the website of SHD Marketing on a page featuring a description of the GEMMA GUCCI gelato product. *See* Pl. Tr. Exs. 8, 190. I noted that during the news segment, the reporter appears to believe that the gelato product comes from the Gucci company.

9. Despite my efforts to place the gelato product in retail stores, I was largely unsuccessful in doing so, at least until mid-2007. Nevertheless, Litwak continued to insist that Gemma Gourmet pay him its minimum royalty payment obligations. To date, Gemma Gourmet has paid Litwak over $30,500 in royalties and other payments relating to the food products license. *See* Pl. Tr. Ex. 259. While these payments posed a substantial economic hardship on me and my mother (who had also become involved as an investor in the venture), I felt that my efforts to market and promote the GEMMA GUCCI gelato would eventually bear fruit, and so I continued to keep the license going.

10. Finally, in late 2007, it appeared that the license would begin to pay off, as I learned that Sam's Club had decided to place the GEMMA GUCCI gelato in its stores nationally. In January 2008, I informed Litwak of the Sam's Club order, and he told me (despite the fact that, as discussed below, Litwak purported to terminate the Gemma Gourmet license in November 2007) that I should move ahead with the sale. I then had manufactured about $20,000 worth of GEMMA GUCCI gelato, which was subsequently sold to Sam's Club.

11. Unfortunately, my long awaited success in selling GEMMA GUCCI gelato was short-lived. Right after I shipped the order to Sam's Club in mid-January 2008, I learned that Gemma Gucci had been sued by Gucci America, Inc. in this litigation. While Litwak had

previously mentioned that he was involved in a lawsuit involving the JENNIFER GUCCI name, he never told me that Gemma Gucci had been named as a defendant, or that a Temporary Restraining Order had been issued by the Court enjoining the use the GUCCI trademark.

12. After I learned that there was a litigation going on with Gucci involving the GEMMA GUCCI name, I discussed what to do with the product that had been placed in Sam's Club with Mr. Best. Mr. Best, in turn, mentioned the lawsuit to the regional buyer for Sam's Club, who had helped us placed the product in the stores. The regional buyer then informed us that we had to inform Sam's Club headquarters and the GEMMA GUCCI gelato product was ultimately removed from Sam's Club and returned to me. I am now paying for the product to be held in cold storage.

13. With respect to the GEMMA GUCCI handbag license, I received that license from Litwak in December 2003, and I formed De Riera in May 2004 to exploit that license. Just as was the case with the gelato product, Gemma Gucci was not involved in any way with my efforts to develop and market GEMMA GUCCI handbags. Instead, I would show our handbag designs to Litwak.

14. Approximately three and a half years ago, I contacted Randy Sizemore, who had experience in designing and manufacturing fashion items, and asked him to help me develop the GEMMA GUCCI handbag line. As a result of our combined efforts, by mid-2007, we had developed a full line of GEMMA GUCCI handbags that were ready to be introduced to the public. *See* Pl. Tr. Ex. 247.

15. In late August 2007, Mr. Sizemore and I presented the GEMMA GUCCI handbags at the MAGIC Show in Las Vegas, the annual trade show for the fashion, apparel and accessories industry.

16. Following the MAGIC Show, we promoted the GEMMA GUCCI handbags at Phoenix (Arizona) Fashion Week, a series of fashion shows intended to highlight Phoenix-area boutiques and designers, which was scheduled to begin in early November 2007. In advance of Phoenix Fashion Week, we arranged with D. Frank Designs, a Scottsdale, Arizona furniture boutique, to hold a party featuring the GEMMA GUCCI handbags in the D. Frank Designs store on October 19, 2007.

17. Shortly after the Phoenix Fashion Week events, Litwak came to Phoenix. I am informed that during this visit, Litwak met with Deborah Frank of D. Frank Designs and her friend Sheila Martin, who was involved in the furniture business. Ms. Martin later told me and Randy Sizemore that Litwak had offered her licenses to use the GEMMA GUCCI and JENNIFER GUCCI names in connection with furniture. As we had become suspicious of Litwak by this time, we cautioned Ms. Martin to be careful.

18. During this period, Litwak claimed that De Riera owed him approximately $270,000 in past royalty payments. While De Riera may not have paid Litwak everything it owed him in terms of its minimum royalty payment obligations for the handbag license, I had paid Litwak an overall total of more than $37,500 in connection with the license over the period 2004 to 2007. *See* Pl. Tr. Ex. 259.

19. After consulting with me, Randy Sizemore sent Litwak a letter seeking to clarify the relationship of the parties moving forward. In response, I received two letters from Litwak purporting to terminate both the Gemma Gourmet and the De Riera license for failure to pay the minimum royalty payments. *See* Pl. Tr. Ex. 191 - 192.

20. Despite the termination letters, Litwak continued to discuss issues relating to the license agreements with me. In fact, during a meeting with Litwak and Danny Lee following the

November termination letters, Litwak offered to rewrite the contracts and wipe out the purported overdue royalty payments. Litwak also wanted me to pay $25,000 as an advance payment to obtain the new licenses. By this point, however, I had become very suspicious of Litwak and was not about to give him more money.

21.     It was also during this period, in December 2007-January 2008, that Litwak called me to discuss the litigation involving the JENNIFER GUCCI name. Litwak stated that if I could find investors to provide him with money to fight the lawsuit, he would provide those investors with licenses once the case was resolved.

22.     With the exception of the placement of the GEMMA GUCCI gelato product in Sam's Club, my efforts to promote the GEMMA GUCCI products had substantially cooled by this time. In addition, Randy Sizemore and I had begun to investigate Litwak's claimed business relationship with Gemma Gucci. As a result, in February 2008, we learned for the first time that Gemma Gucci was a named defendant in this lawsuit and that the Temporary Restraining Order had been issued. When I confronted Litwak about the case, he told me to lay low because the case would be settled soon. We immediately stopped all activity relating to the GEMMA GUCCI products.

23.     Then, on February 14, 2008, I received an email from Litwak in which he offered me favorable terms on a new or renegotiated license for either the food products or the handbags if I would sue Gucci in Arizona. Specifically, Litwak promised a credit of five times the legal fees for litigating the case up to a maximum of $300,000. *See* Pl. Tr. Ex. 260. Having figured by this time, however, that getting more involved with Litwak would only be throwing good money after bad, and having lost several hundred thousand dollars in my dealings with Litwak, I ignored his email.

24. Then, out of the blue, in late March 2008, I was contacted by Gemma Gucci, who apparently had learned about me from this lawsuit. Gemma Gucci told me that she had not been aware of any of my activities in relation to the GEMMA GUCCI gelato product or the GEMMA GUCCI handbags. I further discussed with Gemma Gucci the issue of whether she had actually ever sold or licensed the rights to her name to Litwak. While Gemma Gucci stated that Litwak had previously had the right to license her name, once she turned eighteen, he no longer had those rights. At Gemma Gucci's request, I subsequently emailed her three documents Litwak had given to me years earlier, purporting to be signed by her, which he had claimed were documents showing that she had granted him the rights to use her name. *See* Pl. Tr. Ex. 261. In an email dated April 1, 2008, Gemma Gucci responded to me that the signatures on these documents were not hers. The email further states that while Gemma Gucci had told Litwak that she had been in touch with me, she did not want to raise the issue of the apparently forged documents with him until after the trial. *See* Pl. Tr. Ex. 262.

25. Given that I had directly paid Litwak approximately $100,000 from 2004 to 2007 in connection with licenses to use a name that Litwak may never have actually owned or had the right to use, and because my mother had basically handed over her life savings to Litwak, after I received Gemma Gucci's email on April 1, 2008, I felt seriously violated. Accordingly, I have approached the Arizona Attorney General's office about Litwak's conduct and have asked the office to investigate him. However, on May 1, 2008, I received a response noting that the Attorney General's Office could not represent individual consumers. *See* Pl. Tr. Ex. 263.

26. As a result of my involvement with Litwak, my mother and I have lost several hundred thousand dollars in royalty fees and product development and promotion costs. In addition, I have wasted a large portion of the last four years trying to develop and market

GEMMA GUCCI products. In doing so, I never intended to infringe on any trademarks owned by Gucci, but instead acted in good faith and in complete reliance on the representations and assurances of Litwak, that he had the right to exploit GEMMA GUCCI name. I now wish I had never gotten involved with him in the first place.

JUN-17-2008 02:26P FROM:GEMMA GUCCI GOURMET  6022253841           TO:12127151399        P.2/2

DECLARED UNDER PENALTY OF PERJURY THIS 17 DAY OF JUNE, 2008

*John Macaluso*
John Macaluso