UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— X

GUCCI AMERICA, INC.,

                            Plaintiff,

    -against-

JENNIFER GUCCI, JENCO DESIGNS, LLC,
JENNICOR, LLC, JENNY GUCCI COFFEE AND
GELATO COMPANY, INC., VERATEX, INC.,
COLLEZIONE DI CASA, INC., E.L. ERMAN-
DEAD SEA COSMETICS CORP., ELE BRANDS
ENTERPRISE, INC., GBN WATCH
COLLECTION, INC., GBN GLOBAL BUSINESS
NETWORK, EDWARD LITWAK d/b/a ED
LITWAK & ASSOCIATES, GEMMA GUCCI,
GEMMA GUCCI COFFEE AND GELATO
COMPANY, INC., ABC CORPORATIONS 1-10,
and JOHN DOES 1-10,

                         Defendants.

———————————————————————————— X

Civil Action No. 07 CV 6820
(RMB)(JCF)

## DEFENDANTS' REVISED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants, JENNIFER GUCCI, JENNY GUCCI COFFEE AND GELATO

COMPANY, INC., EDWARD LITWAK d/b/a ED LITWAK & ASSOCIATES ("Litwak") and

GEMMA GUCCI (collectively "Defendants"), by and through their counsel, Harrington, Ocko &

Monk, LLP, pursuant to the Court's instructions issued at the trial of this matter on June 29,

2009, respectfully submit their Revised Proposed Findings of Fact and Conclusions of Law as

follows:

### PRELIMINARY STATEMENT

Gucci America, Inc. ("Gucci" or "Plaintiff") brought this action against no less than ten

(10) corporate defendants, as well as the three Individual Defendants Jennifer Gucci, Gemma

Gucci and Edward Litwak, over very limited proposed use of the names "Jennifer Gucci" and "Gemma Gucci" on bedding products, skin care products, gelato and wine, among other things. Gucci admits it has no trademark registrations in any of the international categories for trademark registration of the products at issue in this case.  See Hearing Transcript, at pgs. 4-9; Declaration of Jonathan Moss, General Counsel for Gucci ("Moss Dec."), at pg. 4; Plaintiffs' Trial Exhibits 206-223.   The conduct alleged by Plaintiff against Defendants regarding use of their names in a supposedly infringing, diluting or deceptive manner pre-dates October 2006. Witness Statement of Richard Gazlay, at ¶ 5; Witness Statement of Jennifer Gucci, at ¶ 17; Hearing Trans., at pgs. 192, 221, 225.

       In its Amended Complaint, Gucci alleges causes of actions against all of the defendants for trademark infringement, trademark counterfeiting, false designation of origin and dilution under the Lanham Act, deceptive acts and dilution under N.Y.G.B.L. §§ 349, 360-l, and common law trademark infringement and unfair competition.  Amended Complaint, at ¶¶ 40-92.  Gucci settled with or dismissed all of the corporate defendants that created the never approved, unfinished, never sold packaging and products actually at issue in this litigation.  See Final Judgment and Order for Permanent Injunction against Veratex, Collezione Di Casa, E.L. Erman, ELE Brands, GBN Watch, GBN Global Business, dated June 23, 2008; Stipulation and Order of Dismissal against Louisville Bedding Co., dated August 23, 2007.

       Yet, Gucci continues to seek statutory and actual damages, exemplary damages, and attorneys' fees, as well as a permanent injunction against the remaining Individual Defendants. In Gucci's action against the remaining Defendants, along with the claim of damages, Gucci essentially asks that the Court issue a permanent injunction to preclude Jennifer Gucci and Gemma Gucci from ever using their first name together with their sur-name in any commercial

context, regardless of whether Gucci has registered trademarks in the international classification categories for the goods and services at issue; regardless of the personal involvement of Jennifer or Gemma in the project at issue; and regardless of whether there are appropriately worded and displayed disclaimers.

Gucci, however, has failed to put before the Court <u>any</u> evidence of conduct by the remaining Individual Defendants that proves a likelihood of confusion, actual confusion, or willfulness, sufficient to support any of Plaintiff's claims or its requested relief in this action. The evidence actually submitted to the Court at trial shows just the opposite. Indeed, Gucci's failure to submit any evidence to the Court to support its claims of infringement, dilution and deceptive acts is all the more significant given that during the litigation Gucci conducted dozens of depositions of parties and non-parties, collected tens of thousands of pages of documents in one-way discovery, and Gucci undertook the equivalent of a nation-wide manhunt for would-be infringers. Moreover, despite Gucci's massive, expansive and expensive undertakings in this litigation, Gucci apparently failed to accomplish or put on evidence of the most basic element of any serious trademark infringement or dilution action; namely, a comprehensive survey of relevant consumers. Such a survey would have analyzed the likelihood of confusion as between Gucci's registered trademarks, and the manner in which Jennifer Gucci and Gemma Gucci agreed to allow their names to be licensed and used regarding a very narrow set of products; consistent with the protocols set forth by Judge Conner in the Paolo Gucci action, and consistent with the Court Order from a German Court approving a stipulation between Gemma Gucci and Gucci S.p.A )the parent of Gucci America, Inc.), permitting Gemma Gucci's use of her name under similar tightly controlled circumstances.

As to Gemma Gucci and her alleged conduct, Plaintiff Gucci has submitted no evidence to the Court that anything Gemma Gucci has done has created actual confusion, a likelihood of confusion, or dilution as between her use of her birth name, and Gucci's registered trademarks at issue in this litigation. As shown *infra* at pages 17 to 22, 31 to 44, Gucci has failed to carry its burden to prove actual confusion, likelihood of confusion, or dilution, and has failed to demonstrate any willful conduct on the part of Gemma Gucci; Gemma Gucci did not license her name to any of the Former Defendants involved in bedding, cosmetics or hosiery, and Gucci has presented no evidence that Gemma Gucci was involved in any gelato or coffee licensing activities.

Moreover, the General Counsel of Plaintiff Gucci, Jonathan Moss, admitted at trial that Gucci has essentially already agreed that Gemma Gucci can use her name in a certain manner on projects she is involved in.   Hearing Trans., at pgs. 12-13, 149-50; Defendants' Trial Exhibit 25. The settlement agreement between Gucci S.p.A. (Plaintiff's Italian parent company) and Gemma Gucci indicates that Gemma Gucci's limited use of her name is not likely to confuse consumers, as long as Gemma Gucci abides by the terms of this previous Court Ordered stipulation entered in the German Court.  At trial, Plaintiff Gucci does not even dispute the applicability of that Courted Ordered Stipulation to judging the conduct alleged against Gemma Gucci in this instance.  Hearing Trans., at pgs. 12-13.

Prior to trial, Plaintiff Gucci submitted Witness Statements from Jonathan Moss and Terilyn Novak, employees of Gucci, which included conclusory statements and opinions about the likelihood of confusion, the strength of Gucci's marks, and the opinions and behaviors of Gucci supposed customers.  Defendants, with the Courts' permission filed a motion *in limine*, challenging such statements as improper expert testimony, being offered by lay witnesses, and

without the disclosure required pursuant to Rule 26.  The Court granted Defendants' Motion, and precluded Gucci's employees from providing such evidence.

After several Court ordered revisions, the improper opinions and other improper testimony of Gucci's employees were not received in evidence and are not a part of the evidence of this case.  Gucci offered no substitute evidence to support claims of likelihood of confusion, actual confusion, blurring or tarnishment.  Hence, the evidence offered by Gucci on its case in chief fails to establish any of the required elements of proof to support their claims against Defendants.  Therefore, Gucci claims should be dismissed for lack of evidence on Gucci's case in chief.

Gemma Gucci has always maintained that she does not want to engage in any activities that would be the cause of likely confusion for consumers as between her activities and those of Plaintiff Gucci.  Hearing Trans., at pgs. 147-48.   Notwithstanding the lack of proof submitted by Gucci at trial against Gemma Gucci on any of its claims, including trademark infringement, dilution, counterfeiting or unfair competition; in order to demonstrate her own good faith in matters involving commercial use of her name, Gemma Gucci will agree to the Court's entering a permanent injunction in which she is limited to using her birth name in accordance with the terms of the Court Ordered stipulation entered in the German Court with Gucci S.p.A., and to abide by restrictions similar in nature to those provided for by Judge Conner's Judgment and Order in the *Paolo Gucci* action.  Gemma Gucci would also agree that such permanent injunction may <u>further</u> limit her use of her name to only be used in conjunction with goods and services in trademark categories in which, as of the date this suit was filed, Plaintiff Gucci had no registered trademarks.  Such injunction would enable Gemma Gucci to use her name in conjunction with such things as interior design services, coffee and gelato services and products, and personal

5

style or purchasing services, but <u>not</u> in connection with leather goods, women's fashions and other categories in which Gucci has registered its trademarks.

Plaintiff has also submitted no evidence to the Court to support its claims of infringement, dilution, deceptive acts, or willfulness against Defendant Jennifer Gucci. <u>See</u> *infra*, at pages 1 to 20, 22 to 44. All of the evidence indicates that Jennifer Gucci executed a license agreement in mid-June 2007 with Former Defendant Collezione di Casa. The license agreement was extensively negotiated by Collezione's counsel Kevin Fisher, and Jennifer Gucci's licensing agent Defendant Edward Litwak, with assistance of counsel, Martin Simone. In that license agreement, Jennifer Gucci agreed to allow Former Defendant Collezione the very limited use of her entire name on bedding products she actually helped to design. Hearing Trans., at pgs. 77, 80, 105-06; Jennifer Gucci Witness Statement, at ¶¶ 26-30; Deposition Transcript of Avi Cohen, President of Collezione ("Cohen Trans."), at pgs. 29:9-24, 30:6-14, 31:9-18, 41:11-23, 42:1-22, 162:1-22, 163:1-22; Plaintiff's Exs. 63, 120. Such limited use by Former Defendant Collezione of Jennifer Gucci's name on bedding products had to be approved by Defendants Jennifer Gucci and Edward Litwak, and Collezione's packaging and products had abide by strict guidelines described in the license agreement; the same sort of strict guidelines provided for in Judge Conner's Order and Judgment in the *Paolo Gucci v. Gucci Shops* action. Plaintiff's Exs. 14, 15, 57, 63, 120; Hearing Trans, at pgs. 38-41; Cohen Trans, at pgs. 29:9-24, 30:6-14, 31:9-18, 41:11-23, 42:1-22, 162:1-22, 163:1-22; Deposition Transcript of Yakov Ergas, employee of E.L. Erman ("Ergas Trans."), at pgs. 40, 84-86; Witness Statement of Yakov Ergas, at ¶ 5.

Despite the very clear restrictions contained in the license agreement(and those in the sublicense agreements to which Defendants were <u>not</u> parties), Former Defendants Collezione,

and sublicense E.L. Erman (and others) created unfinished, sample packaging for bedding and cosmetics that violated the terms of the license agreement. This unfinished, sample packaging was <u>never</u> approved by Defendant Jennifer Gucci and Defendant Litwak, and <u>never</u> sold to consumers. Hearing Trans., at pgs. 107-109, 116, 119; Cohen Trans., at pgs. 67:19-25, 69:1-11, 77:4-12, 78:5-8, 79:20-25, 80:17-25, 81:1-6, 82:9-24, 83:2-7,14-21; Ergas Trans., at pgs. 63-64, 77, 112-13, 115-16. In fact, all the evidence demonstrates that when finally apprised of the unfinished, sample packaging for the products (products never sold to the public), Defendants Jennifer Gucci and Edward Litwak informed Collezione and Erman in no uncertain terms that the unfinished, sample packaging was improper, was not in accordance with the license agreement or the terms of the *Paolo Gucci* Decision, and had to be changed. Hearing Trans., at pgs. 107-09, 116, 119; Cohen Trans., at pgs. 67:19-25, 69:1-11, 77:4-12, 78:5-8, 79:20-25, 80:17-25, 81:1-6, 82:9-24, 83:2-7,14-21.

The evidence clearly shows that Jennifer Gucci acted all times in good faith belief that she had a right to use her family name under very strict guidelines, such as those provided for in the *Paolo Gucci* Decision of Judge Conner. Furthermore, Jennifer Gucci acted on the good faith belief that use of her name on projects where she was indeed involved as part of the design process/team, had been accepted by Gucci S.p.A. (the parent company of Plaintiff Gucci America, Inc.) based upon the Court Ordered stipulation entered in the German Court with the consent of Gucci S.p.A. Defendants' Exhibit 25. The evidence also shows that Jennifer Gucci never intended to, nor desired to cause any confusion or likelihood of confusion as between herself and Plaintiff Gucci. Hearing Trans., at pgs. 101, 114.

Jennifer Gucci, in similar fashion to Gemma Gucci, is willing to stipulate to this Court's entry of a permanent injunction and order which limits her to the use of her name in accordance

with the terms of the Court Ordered stipulation between Gucci S.p.A. and Gemma Gucci, and to abide by restrictions similar in nature to those provided for by Judge Conner's Judgment and Order in the *Paolo Gucci* action. Moreover, Defendant Jennifer consents that such permanent injunction may <u>further</u> limit her use of her name to only those trademark categories of goods or services for which Plaintiff Gucci had no trademark registrations as of the date this action was filed. Such injunction would enable Jennifer Gucci to use her name in conjunction with such limited categories of goods and services like mineral water, coffee and gelato products and personal style or purchasing services, but <u>not</u> in connection with leather goods, women's fashions and other categories in which Gucci has registered its trademarks.

Nor has Plaintiff produced evidence sufficient to support its claims of infringement, dilution, deceptive acts or willfulness against Defendant Litwak. While Defendant Litwak may have engaged in aggressive licensing practices, there is no evidence that he urged anyone to violate Gucci's trademark rights or knowingly engaged in activities that might violate those rights. In fact, just the opposite occurred. Defendant Litwak operated under the belief that Jennifer Gucci and Gemma Gucci could use and license their names, as long as they did so in a manner that coincided with the terms and conditions enunciated in Judge Conner's Decision in the *Paolo Gucci v. Gucci* action, and were consistent with the Court Ordered stipulation entered by the German Court with the consent of Gucci S.p.A. concerning Gemma Gucci's use of her name in commerce. Hearing Trans., at pgs. 167-68; Defendants' Exhibit 25. Defendant Litwak informed each and every licensee desiring to license the Jennifer Gucci and Gemma Gucci names that in order to satisfy the terms of their license agreement, the licensee had to abide by and follow the provisions of Judge Conner's decision in the *Paolo Gucci v. Gucci* action.

8

Hearing Trans, at pgs. 38, 41,155, 196-97; Plaintiff's Exs. 63, 57, 120; Cohen Trans., at pgs. 29:9-24, 30:6-14, 31:9-18.

It is also beyond dispute that the evidence shows that Defendant Litwak repeatedly and consistently informed Former Defendant Veratex/Collezione and its President Avi Cohen, that the unfinished, sample packaging for the bedding products was not in accordance with the terms of the license agreement or the strictures of Judge Conner's Decision, and that it had to be changed. Cohen Trans., at pgs. 67:19-25, 75:8-11, 77:4-12, 78:5-8, 79:20-25, 80:17-25, 81:1-6, 82:9-24, 83:2-7,14-21, 84:2-3,15-17, 88:7-13, 90:1-10,11-15, 93:4-8, 94:4-12, 98:1-7, 124:23-25, 125:1-9; Hearing Trans., at pgs. 83, 86-87, 107-09, 116. In fact, Mr. Cohen was informed of this by his Vice President Dale Talbot, and his outside counsel, Kevin Fisher. Cohen Trans., at pg. 88:7-13. Despite these warnings, Mr. Cohen pressed ahead with the improper unfinished, sample packaging, and invited Gucci to attend and view the unfinished, sample packaging which had not yet been approved by Defendant Jennifer Gucci or Defendant Litwak, as required under the license agreement with Veratex/Collezione. Hearing Trans., at pg. 108.

Litwak also expressed his concerns to Collezione, Cohen and E.L. Erman/Ergas regarding the unfinished, sample packaging for Collezione's sub-licensee, E.L.Erman and its proposed, unfinished, sample cosmetic's packaging. Hearing Trans., at pgs. 40, 43, 45; Cohen Trans., at pgs. 211:15-25, 212:1-24, 220:3-20. Neither Jennifer Gucci nor Litwak ever gave final approval for such packaging, and certainly not before E.L. Erman placed the packaging on its website without permission or approval. Ergas Trans., at pg. 113. Neither Litwak, nor Jennifer Gucci ever approved Cohen's decision to show the unfinished, unapproved sample packaging to Gucci; which ultimately resulted in this lawsuit being filed. Id.

During communications in May/June 2007, Mr. Litwak and Avi Cohen expressed the same sentiment about improper aspects of Proportion Fits' unfinished, sample packaging to Mr. Brian Jaffe, President of non-party Proportion Fit, and.  Cohen Trans., at pgs. 191:1-25, 192:1-25, 193:1-25, 198:10-25, 199:1-20.  Mr. Cohen told Mr. Jaffe in no uncertain terms that the unfinished, sample packaging was not proper and could not be used, and not to show it to anyone.  Id.; Hearing Trans., at pg. 23.  Proportion Fit never marketed any products using the unfinished, sample packaging, and never sold any such products.  Id.

Lastly, of particular significance, Plaintiff Gucci has submitted no evidence that any of the corporate entities or their representatives with whom Defendants entered in to license agreements were confused or likely to be confused as to any association between Jennifer Gucci and Plaintiff Gucci.  To the contrary, the evidence demonstrates that not a single person, whether a corporate defendant in this action or an individual dealing with such corporate defendants (or even the Individual Defendants), was confused or likely to be confused that there was any association as between Defendants Jennifer Gucci and Gemma Gucci and Plaintiff Gucci.  The entities have all admitted that they knew from the very beginning of their business dealings with Defendants that Defendants Jennifer Gucci and Gemma Gucci were not associated or affiliated with Plaintiff Gucci.  See Richard Gazlay Witness Statement, at ¶3; Brian Jaffe Witness Statement, at ¶4; Witness Statement of Yakov Ergas, at ¶16; Ergas Trans., at pg. 20.  In addition, not a single unfinished, sample package for the bedding products or the hosiery products was ever directly marketed to the general public and no products relating to bedding, hosiery or cosmetics were ever sold, by any entity.  Hearing Trans., at pgs. 28, 46; Cohen Trans, at pgs. 88:7-13, 94:4-12.

For these reasons, and those more fully described below, and in the Witness Statements of Jennifer Gucci, Gemma Gucci, Edward Litwak and Joseph Oliveri, the Court should find that Gucci has failed to carry its burden of proving Defendants have committed any acts of infringement, dilution or deception, willful or otherwise, with respect to Gucci's registered trademarks. Therefore, the Court should deny Plaintiff's requests for actual and exemplary damages and attorneys' fees. Moreover, the Court should deny Gucci demand for a permanent injunction, except in the manner set forth above, embodying appropriate limitations on the ways in which Gemma Gucci and Jennifer Gucci can properly use their names, and on what categories of goods and services.

The Court should grant Defendants' Counterclaims for declaratory relief, and find that Defendants Jennifer Gucci and Gemma Gucci may use their full names in a specifically limited and defined fashion, as set forth above.

## JENNIFER GUCCI AND GEMMA GUCCI ARE FAMOUS MEMBERS OF THE GUCCI FAMILY

1.      In December 1977, Jennifer Gucci married Paolo Gucci in Haiti after approximately a year long romance. Declaration of Jennifer Gucci, June 16, 2008 ("J. Gucci Dec."), at ¶ 2; Defendants' Trial Exhibit 1, Gucci Wars, by Jennifer Gucci (John Blake Publishing, Ltd 2008) ("Gucci Wars"); Defendants' Trial Exhibit 2, Gucci: A House Divided by Gerald McKnight (Donald I. Fine, Inc., 1987) ("Gucci"); Defendants' Trial Exhibit 3, The House of Gucci, by Sara G. Forden (HarperCollins 2000) ("House of Gucci").

2.      At the time of Jennifer Gucci's marriage to Paolo Gucci, Paolo Gucci was the Chief Designer for the Italian fashion house, Guccio Gucci S.p.A., ("Gucci S.p.A."), as well as having other responsibilities and roles in other Gucci family business entities. J. Gucci Dec., at ¶ 3; Gucci Wars; Gucci; House of Gucci. At the time of Jennifer Gucci's marriage to Paolo

11

Gucci, he was also a shareholder in the Gucci S.p.A. family business.   Gucci Wars; Gucci; House of Gucci.  Paolo Gucci's grandfather, Guccio Gucci founded the family business.  Id. Paolo Gucci's father, Aldo Gucci, was also a designer, shareholder, and President of Gucci S.p.A.  Id.

3.     Paolo Gucci was never formally trained as a fashion designer, before or during his employment as a designer by Gucci S.p.A.  J. Gucci Dec., at ¶ 3; House of Gucci; Gucci; Gucci Wars.  During his tenure as Chief Designer for Gucci S.p.A., Paolo Gucci oversaw the design efforts of many subordinates, and often got credit for designs that actually originated with those subordinates.  J. Gucci Dec., at ¶ 3; House of Gucci.

4.     During his tenure at Gucci S.p.A., Paolo Gucci was not only the Chief Designer for Gucci S.p.A., he also supervised a Gucci factory in Italy, and was involved in marketing and merchandising Gucci products around the world, including in Europe, Japan, and the United States, and in particular at Gucci S.p.A.'s Boutique in New York City.  J. Gucci Dec., at ¶ 3; House of Gucci; Gucci; Gucci Wars.

5.     Before her marriage to Paolo Gucci, Jennifer Gucci was classically trained opera singer, having trained in the United Kingdom and Italy.  J. Gucci Dec., at ¶ 4; Gucci Wars. Before and during her marriage to Paolo Gucci, Jennifer Gucci performed at concerts in the United Kingdom, Italy and the United States.  J. Gucci Dec., at ¶ 4; Gucci Wars.  Many of Jennifer Gucci's concert performances were written about in newspapers.  Defendants' Trial Exhibit 4, Daily Express Article, June 9, 1981; Defendants' Trial Exhibit 5, Hartford Courant, May 29, 1981; Defendants' Trial Exhibit 6, February 12, 1982 newspaper article and February 14, 1982 concert invitation; J. Gucci Dep. Trans., at ¶ 4; Gucci Wars.

6.        On June 3, 1983, Jennifer Gucci gave birth to her daughter Gemma Gucci in New York City.   Declaration of Gemma Gucci ("G. Gucci Dec."), at ¶ 2.   Gemma is the daughter of Paolo Gucci.  Id.; Gucci Wars, at 129.  Gemma Gucci spent most of her life growing up in New York City, and living in her parents' apartments in Manhattan.  G. Gucci Dec., at ¶ 3.   Gemma Gucci attended Trinity School in Manhattan.  Id., at ¶ 4.  On weekends, Gemma attended classes at New York Fashion Institute of Technology, and during summer vacation periods, Gemma acted as an intern at the interior design firm of Noel Jeffrey, Inc., in New York City.  G. Gucci Dec., at ¶¶ 6-8.  Gemma Gucci always displayed an interest in fashion and design growing up, but opted to attend St. Andrews University in the United Kingdom instead of Parsons New School for Design in New York City.  G. Gucci Dec., at ¶¶ 5-9.

7.        During her marriage to Paolo Gucci, Jennifer Gucci was involved in various aspects of Paolo Gucci's business dealings while he was at Gucci S.p.A.  J. Gucci Dec., at ¶ 5; Gucci Wars; House of Gucci.  Jennifer Gucci's participation in Paolo Gucci's business dealings at Gucci S.p.A. included attending business meetings and dinners with Gucci S.p.A. officers, employees and customers, and attending meetings with buyers and suppliers.  J. Gucci Dec., at ¶ 5; Gucci Wars.  As a result of her participation in such meetings and events with buyers and suppliers and Gucci S.p.A. employees, Jennifer Gucci learned about various aspects of fashion design and the manufacturing process.  J. Gucci Dec., at ¶ 5; Gucci Wars.  During her marriage to Paolo Gucci, Jennifer Gucci also assisted in the public relations aspect of the Gucci S.p.A.'s business, including being involved in setting up fashion shows and other aspects of Gucci S.p.A.'s marketing efforts in the United States and around the World.  J. Gucci Dec., at ¶ 5; Gucci Wars; House of Gucci.

8.      During their marriage Paolo Gucci often got style and fashion input from Jennifer Gucci in order to get a woman's perspective on his designs and ideas.  Hearing Trans., at pg. 246.  This input by Jennifer Gucci to Paolo Gucci was particularly critical given that most of the design staff for Paolo Gucci were men.  Id.  In addition, Jennifer Gucci would assist Paolo Gucci in his design endeavors by "shopping the market"; essentially find competing designs and products and bring those ideas back to Paolo Gucci to discuss them.  Id.

9.      During Jennifer Gucci's marriage to Paolo Gucci, the couple maintained residences in the United Kingdom, Italy and New York City.  J. Gucci Dec., at ¶ 6; Gucci Wars; House of Gucci.  Jennifer Gucci played a large role in decorating and maintaining these various residences while she was married to Paolo Gucci.  J. Gucci Dec., at ¶ 6; Defendants' Trial Exhibit 7, October 6, 1986 newspaper article in Woman Today; Defendants' Trial Exhibit 8, December 2, 1989 newspaper article in West Australian; Defendants' Trial Exhibit 9, June 17, 1990 Sunday Express Magazine.

10.     During Jennifer Gucci's marriage to Paolo Gucci, she and Paolo were routinely interviewed and had articles published about them and their lives in newspapers and magazines throughout the world.   J. Gucci Dec., at ¶ 7; Gucci Wars; House of Gucci; Gucci; Defendants' Trial Exhibits 4–9.  These articles covered various aspects of their lives as members of the Gucci family and business, including our lifestyles, clothing, fashions, and the decor in their homes. Id.

11.     In or about 1980, Paolo Gucci was terminated from Gucci.  J. Gucci Dec., at ¶ 8; Gucci Wars; House of Gucci; Gucci.  His termination from Gucci was very public and was written about in the press.  Id.  Subsequently, Paolo Gucci determined that he would design his own line of merchandise for sale in the United States and the world under his own name; Paolo

Gucci.  Declaration of Edward Litwak ("Litwak Dec."), at ¶ 2; Declaration of Joseph Oliveri ("Oliveri Dec."), at ¶ 2; Gucci.

## PAOLO GUCCI INITIATES SUIT AGAINST GUCCI TO BE ABLE TO USE HIS NAME ON COMPETING MERCHANDISE

12.     In conjunction with working to open his own fashion store in New York and design his own fashion under his own name, in June 1983 Paolo Gucci commenced a legal action in Federal Court in the Southern District of New York against Gucci Shops, Inc., also known as Gucci America, Inc.  J. Gucci Dec., ¶ 8; Gucci Wars; House of Gucci; Defendants' Trial Exhibits 10-12 (June 17, 1998, July 13, 1988, and January 12, 1994 Orders of Judge Conner in Case No. 83 Civ. 4453 (WCC)).   Paolo Gucci sued Gucci Shops in this action in order to obtain a declaration from the Court that he was entitled to use his name "Paolo Gucci" in designing and developing products, and that such use of his name on those products did not infringe upon the trademarks or trade names owned by Gucci S.p.A.  Id.; J. Gucci Dec., at ¶ 8.   Paolo Gucci indicated in the suit that he intended on using his name on leather goods and clothing; goods that competed directly against the market niches already occupied by fashion goods and products traditionally marketed and sold by Gucci.  J. Gucci Dec., at ¶ 8; Defendants' Trial Exhibits 10-12.

13.     In this action, the Corporate Gucci counterclaimed for trademark infringement against Paolo Gucci.  Id.

14.     After a lengthy trial, Judge Conner issued a decision and order.  Defendants' Trial Exhibits 10-12.  In that Order, Judge Conner held that "(1) Paolo Gucci was entitled to identify himself as the designer of products so long as he did so in a manner which would not lead to an appreciable number of consumers believing that his products were associated with Gucci's; (2) Paolo Gucci was entitled to use his name to identify himself as the designer of products sold

under a trademark that did not include the word "Gucci"; (3) to avoid possible confusion, Paolo Gucci was allowed to use his name "Paolo Gucci", but that such name had to appear after the trademark; (4) the name "Paolo Gucci" must be no more prominent than the trademark with which it was used; and (5) Paolo Gucci was allowed to use his name along with a disclaimer which notified consumers that Paolo Gucci was no longer affiliated with any Gucci entities.  Id. Judge Conner also held that Paolo Gucci could not use his name as a trademark.  Plaintiff's Ex. 14, at ¶ 6.

15.     A subsequent order by Judge Conner in July 1988 indicated that Paolo Gucci could only use the letters "PG" in conjunction with the prominently displayed phrase "Designed by Paolo Gucci".  Plaintiff's Ex. 16.

16.     The subsequent Order also indicated that Paolo Gucci could license his trademark rights to a corporation which has the right to find sub-licensees for the marks and designs.  Id.

17.     After Judge Conner's decision, Paolo Gucci placed a paid advertisement in Women's Wear Daily on November 30, 1988 in which he announced his debut as an independent designer, separate and apart from Gucci, he would sell products utilizing the name "Paolo Gucci" in accordance with Judge Conner's Order.   J. Gucci Dec., at ¶ 10; House of Gucci, at 88.

18.     During this period, Gerald McKnight published a book entitled "Gucci: A House Divided" in which he chronicled the history of the Gucci fashion empire.  Gucci; J. Gucci Dec., at ¶ 12.  The book highlighted Paolo Gucci's battle to use his own name on his designs, and described Jennifer Gucci's marriage to Paolo Gucci and the circumstances of that marriage. Gucci; J. Gucci Dec., at ¶ 12.

19.     During the period in which Paolo Gucci began to use his own name to market and sell fashion products, he engaged Edward Litwak to act as his licensing agent regarding the promotion of his name, products and boutique in New York.  J. Gucci Dec., at ¶ 11; Litwak Dec., at ¶ 2.

20.     During this period, Paolo Gucci also hired Joseph Oliveri to assist him in designing and coordinating Paolo Gucci's fashion efforts.   Declaration of Joseph Oliveri ("Oliveri Dec."), at ¶ 2.

21.     While Paolo Gucci was developing and marketing goods and services under his own name, Jennifer Gucci played a substantial role in assisting Paolo Gucci with his design business.  Oliveri Dec., at ¶¶ 4, 5.  In particular, Jennifer Gucci played a significant role in assisting Paolo Gucci with regard to the designs and concepts for a line of luxury hotels Paolo Gucci intended to open under the name "Palazzo Grande by Paolo Gucci".  Oliveri Dec., at ¶¶ 6,7; Defendants' Trial Exhibit 13.  Jennifer Gucci attended meetings with Paolo and his Design Coordinator Joseph Oliveri, as well as Paolo's licensing agent, Edward Litwak, regarding the hotel project, and she provided design input regarding the designs and décor of the proposed hotel chain, including design ideas about furnishings, bedding and bathroom accessories.   J. Gucci Dec., at ¶ 13; J. Oliveri Dec., at ¶ 7.  Jennifer Gucci visited several of the sites for the proposed hotels.  Id.; Hearing Trans., at pgs. 244-46.

## JENNIFER GUCCI AND PAOLO GUCCI'S DIVORCE PROCEEDINGS ARE GIVEN PROMANENT AND WIDE ATTENTION IN THE PRESS

22.     In 1991, Jennifer Gucci served Paolo Gucci with divorce papers.  J. Gucci Dec., at ¶ 14; Gucci Wars.  The divorce proceedings soon became public knowledge, and Paolo Gucci and Jennifer Gucci became the subjects of numerous newspaper and magazine articles in the United States and around the world.  J. Gucci Dec., at ¶ 14; Defendants' Trial Exhibits 14-22;

House of Gucci.  These articles described Jennifer Gucci's residences in the United States and the United Kingdom.  Id.  Several media outlets also ran articles regarding the fact that Paolo Gucci was jailed in 1993 for failure to pay marital and child support to Jennifer Gucci.  Id.

23.    Paolo Gucci died in 1995, and several media channels interviewed Jennifer Gucci regarding her marriage to Paolo. J. Gucci Dec., at ¶ 15.  A TV series entitled "The Gucci's" was run on British TV, and Jennifer Gucci's marriage to Paolo Gucci was a prominent part of the series content.  Id.

24.    Shortly after this period, Jennifer Gucci hired Edward Litwak to act as her licensing agent.  Litwak Dec., at ¶ 3; J. Gucci Dec., at ¶ 16; Hearing Trans., at pgs. ___.  As a result of media interest in Jennifer Gucci's marriage to Paolo Gucci, Mr. Litwak also undertook to promote and market Jennifer Gucci's story regarding her membership in the famous jet-setting Gucci fashion family.  Id.

## JENNIFER AND GEMMA GUCCI
## BEGIN TO MARKET AND SELL GOODS UNDER THEIR OWN NAMES

25.    In the mid-1990's Jennifer Gucci began promoting her design and fashion talents through the marketing and sales of shoes under her name.  During one 38 minute TV spot on Home Shopping Network, HSN sold out its entire inventory of shoes being sold under the Jennifer Gucci name, producing sales revenues of $180,000. J. Gucci Dec., at ¶ 17; Litwak Dec., at ¶¶ 5, 6.  In one season, Jennifer Gucci's businesses obtained shoe sales orders amounting to $9 million.  Litwak Dec., at ¶ 6.

26.    During this period, Jennifer Gucci was also sought out by certain fashion periodicals to critique the fashions and tastes of high-profile celebrities.  Plaintiff's Ex. 20, at pg. 2.

18

## GUCCI S.P.A. AGREES THAT GEMMA GUCCI CAN USE HER NAME TO MARKET AND SELL HER OWN LINE OF JEWELRY

27.     In mid-2000, Jennifer and Gemma Gucci begin to design, market and promote jewelry under each of their names.  J. Gucci Dec., at ¶¶ 18-20; G. Gucci Dec., at ¶¶ 13-18; Litwak Dec., at ¶¶ 10-14.  Both Jennifer and Gemma Gucci provided input regarding the design and fashion of the jewelry to be sold under their respective names.

28.     In conjunction with these marketing and sales efforts, Jennifer and Gemma Gucci entered into agreements with Flitsch & Bendayan GmbH ("Flitsch"), a German company.  J. Gucci Dec., at ¶¶ 18-20; G. Gucci Dec., at ¶¶ 13-18; Litwak Dec., at ¶¶ 10-14.  The agreements related to the design, marketing and sale of jewelry by Jennifer Gucci and Gemma Gucci in Europe under the names "Collezione/Collection of Jennifer Gucci" and "Gemma by Gemma Gucci."  Id.; Defendants' Trial Exhibit 23.  The sales of both lines jewelry in Europe and elsewhere included disclaimers indicating that neither Jennifer Gucci nor Gemma Gucci were associated or affiliated with Gucci.  Litwak Dec., at ¶ 11; J. Gucci Dec., at ¶ 18; Defendants' Trial Exhibit 23.

29.     The Jennifer Gucci line of jewelry was often sold through the European equivalent of the Home Shopping Network.  J. Gucci Dec., at ¶¶ 18-20.  The jewelry which was sold under Gemma Gucci's name was sold in retail stores, including Karlstadt, which operates stores in Switzerland, Germany and other European countries.  G. Gucci Dec., at ¶ 14.  Gucci affiliate Gucci S.p.A. was aware of these sales and marketing efforts regarding jewelry sold under Jennifer Gucci and Gemma Gucci's names.

30.     In early 2000, Gucci S.p.A. threatened Flitsch with legal action regarding the sale of jewelry under Gemma Gucci's name in Germany.  Apparently, Gucci S.p.A was of the belief that certain jewelry products sold under the Gemma Gucci name by Karlstadt, a Germany-based

retail chain, did not contain proper disclaimers.  G. Gucci Dec., at ¶¶ 14-16.  In response, Flitsch

brought a legal action against Gucci S.p.A. in a German court in Hamburg Germany regarding

the use of the Gemma Gucci name.  Id.; Defendants' Trial Exhibit 24.

      31.     Ultimately the parties to that legal action agreed that Gemma Gucci could sell

jewelry under her name as long as the products and/or packaging contained the words "designed"

or "styled" by before the name "Gemma Gucci".  J. Gucci Dec., at ¶ 20; G. Gucci, at ¶¶ 16-18;

Defendants' Trial Exhibit 24; Hearing Trans., at pgs. 12-14.

      32.     During this period, Gucci did not bring any claims, suits or legal actions against

Jennifer Gucci for marketing, promoting and selling her line of jewelry in Europe under the

name "Collezione/Collection of Jennifer Gucci".  Litwak Dec., at ¶ 13.  In fact, representatives

from a Gucci affiliate attended a large international jewelry exhibit in Basel Switzerland which

had a Flitsch exhibition of jewelry under the names "Gemma by Gemma Gucci" and "Collection

of Jennifer Gucci", and those representatives commented that the jewelry met the criteria for

how such products could be properly marketed and sold.  Litwak Dec., at ¶ 14.

## INTERNATIONAL TV NETWORKS AGREE
## TO HELP PRODUCE MOVIES ABOUT JENNIFER GUCCI

      33.     In mid-2000, Showtime approached Jennifer Gucci's licensing agent about the

possibility of doing a TV movie or mini-series about Jennifer Gucci's marriage to Paolo Gucci

and her life as a member of the Gucci family.  J. Gucci Dec., at ¶ 22; Litwak Dec., at ¶¶ 18-23;

Defendants' Trial Exhibits 26-28; Plaintiff's Exs. 12-14.

      34.     During this same period, Sara G. Borden released her book "The House of

Gucci".  The book provided a detailed description of the history of the Gucci family and

businesses, as well as describing Jennifer Gucci's marriage to Paolo Gucci, and the

circumstances surrounding the murder of Maurizio Gucci by his wife.  J. Gucci Dec., at ¶ 21;

House of Gucci.  The book was reviewed in Women's Wear Daily, The Wall Street Journal, The Economist, and Cosmopolitan.  Id.

35.     In 2001, Showtime entered in to a second option agreement for the same project, but ultimately, in the period following the events of September 11, 2001, Showtime chose not exercise its option to do the movie and/or mini-series.  Litwak Dec., at ¶ 19.

36.     In late 2006, Edward Litwak, Jennifer Gucci's licensing agent, entered in to discussions with Canadian Television Network and Italian Television Network to have them produce a made-for-TV movie/mini-series about Jennifer Gucci's life and marriage to Paolo Gucci.  Litwak Dec., at ¶ 20.

37.     In August 2006, Capri Films and Film Capital Partners entered in to a joint venture agreement to make a TV mini-series based upon Jennifer Gucci's marriage and life with Paolo Gucci; this project is still being pursued by the interested parties.  Litwak Dec., at ¶ 21.

38.     In late 2007, Mr. Litwak entered in to discussions and negotiations with Lifetime Network to produce a 4 hour made-for-TV movie about Jennifer Gucci and her marriage to Paolo Gucci.  Litwak Dec., at ¶¶ 22-23.  Lifetime plans to shoot scenes for the show in spring 2009, with the show to air possibly in August 2009.  Id.

39.     During this same time period, Dominick Dunne televised an episode on his TV show on Court TV (n/k/a Tru TV), "Power, Privilege and Justice" entitled "Crime of Fashion" about the Gucci family and the Murder of Paolo Gucci's cousin Maurizio Gucci by his wife.  The show included details about Jennifer Gucci's marriage to Paolo Gucci.  J. Gucci Dec., at ¶ 24.

## WE NETWORK MADE OFFER TO PRODUCE
## A REALITY SHOW ABOUT GEMMA GUCCI

40.    In or about mid-2005, the WE Network entered in to discussions with Gemma Gucci's licensing agent to do a reality TV show about Gemma Gucci and her aspirations to become a designer in New York City.  Litwak Dec., at ¶¶ 24-27; G. Gucci Dec., at ¶¶ 19-22.

41.    The We Network promoted the proposed show in certain announcements.  Id.

42.    Ultimately, for personal reasons, Gemma Gucci decided not to do the reality show, and the project was canceled.  Id.

43.    Defendant Litwak invested over $100,000 in this project, which investment he has never recouped.  Hearing Trans., at pg. 233.

## BUSINESS ENTITIES SHOW INTEREST IN PROMOTING FOOD AND WINE PRODUCTS UNDER GEMMA GUCCI'S NAME

44.    In mid-2005 various business entities began to show an interest in marketing and promoting gourmet foods and wines under the Gemma Gucci name.  Litwak Dec., at ¶¶ 28-32; G. Gucci Dec., at ¶¶ 23-26.

45.    In his capacity as Gemma Gucci's licensing agent, Mr. Litwak negotiated with certain business entities about using Gemma Gucci's name on wine and gelato products.  Litwak Dec., at ¶¶ 28-32; G. Gucci Dec., at ¶¶ 23-26.  Temporary licenses were granted to certain business entities to develop sample wine and gelato products.

46.    Gemma Gucci provided her thoughts regarding her likes and dislikes as to the wine products and their labels.  Id.; Hearing Trans., at 50-51, 141-43.  The wine label designs provided by Gemma Gucci were not the labels ultimately used for the wine products.  Hearing Trans., at pgs. 50, 142.

47.    The wine labels for the Gemma by Gemma Gucci wine that did get adopted did not contain red and green stripes, nor an interlocking "GG" mignon.  Hearing Trans., at pg. 140;

Plaintiff's Exs. 342-43.  The wine labels contained a very specific disclaimer indicating that

Gemma Gucci was not affiliated with Plaintiff. Hearing Trans., at pg. 55; Plaintiff's Exs. 342-43.

48.      Ultimately, the wine opportunity did not get beyond very limited markets, and the

investors, Mr. Litwak and Mr. Gazlay, barely recouped their investments.  Hearing Trans., at

pgs. 55-56.

49.      There is no indication that any consumers every complained about the quality of

the wines sold under the name "Gemma by Gemma Gucci.

50.      No evidence was submitted by Gucci that any distributor, retailer or customer

who purchased "Gemma by Gemma Gucci" wines mistakenly believed this wine product was

being sold by Gucci America, Inc.

## GEMMA GUCCI BEGINS DESIGNING HANDBAGS

51.      In late 2006, design entities approached Gemma Gucci about her interest in

designing handbags and other accessories under her name.  G. Gucci Dec, at ¶¶ 27-30;

Defendants' Trial Exhibits 29-32.

52.      In conjunction with such interest, Gemma Gucci met with designers to discuss

handbags designs and concepts for those designs.  Id.

## LITWAK ENTERS INTO A LIMITED LICENSE AGREEMENT
## FOR HOSIERY WITH NON-PARTY PROPORTION FIT

53.      In or about January 2007, Defendant Litwak entered in to a very limited license

agreement with non-party Proportion Fit for use of the name Jennifer Gucci on woman's hosiery

products.  Hearing Trans., at pgs. 23-27.  The license agreement specifically required that

Proportion Fit get the approval of Mr. Litwak for any packaging.  Hearing Trans., at pg. 22.

Jennifer Gucci was not aware of the license agreement with Proportion Fit.  Hearing Trans., at

pg. 76.

54.    At the time of the license agreement, Mr. Brian Jaffe, President of Proportion Fit, was fully aware that Jennifer Gucci was not in any way affiliated with or associated with Plaintiff Gucci. Witness Statement of Brian Jaffe, at ¶ 4.

55.    Mr. Litwak informed Mr. Jaffe that Proportion Fit had to abide by the requirements of Judge Connor's Order in the Paolo Gucci Decision. Hearing Trans., at pg. 21. Such requirements also included the fact that Proportion Fit could not use an interlocking "JG" pattern. Hearing Trans., at pgs. 22, 26-27.

56.    Proportion Fit never got the approval to sell any products using any preliminary designs for proposed packaging, and never sold or marketed any products using such packaging to the public. Id.

## VERATEX/COLLEZIONE DI CASA AGREES TO LICENSE THE LIMITED USE OF JENNIFER GUCCI'S NAME FOR BEDDING AND HOME FURNISHINGS

57.    In late 2006/early 2007, Mr. Litwak entered in to discussions and negotiations with bedding maker Veratex, Inc. regarding the use of the Jennifer Gucci name on a line of bedding and home décor and furnishing products to be produced by a Veratex Company, Collezione Di Casa. Litwak Dec., at ¶¶ 33-45; J. Gucci Dec., at ¶¶ 25-32; Cohen Trans., at pgs. 29:9-24.

58.    The marketing and branding for the line of bedding products would be sold under the label "Casa Di Collezione by Jennifer Gucci". Litwak Dec., at ¶¶ 34-35. The marketing of the proposed products was to take place in conjunction with the release of the proposed TV mini-series about Jennifer Gucci's life and marriage to Paolo Gucci, and the release of a book by Jennifer Gucci about her life and marriage. Id.

59.     In conjunction with these discussions and negotiations, Mr. Litwak provided Veratex personnel with a copy of Judge Conner's June 1998 decision in the *Paolo Gucci* case, as well as other materials about Jennifer Gucci.  Litwak Dec., at ¶¶ 35-36; J. Gucci Dec., at ¶¶ 28-30; Defendants' Trial Exhibits 33-40; Cohen Trans., at pgs. 29:9-24, 30:6-14.

60.     In January of 2007, Mr. Litwak and Jennifer Gucci traveled to Veratex's offices in New York City to discuss designs for the proposed products.  Litwak Dec., at ¶¶ 36-40. During those meetings and subsequently, Jennifer Gucci informed Veratex personnel of her likes and dislikes regarding the designs, styles and fabrics proposed for use in the line of bedding products to be sold under her name.  J. Gucci Dec., at ¶¶ 28-29; Litwak Dec., at ¶¶ 37-40; Defendants' Trial Exhibits 41-44; Cohen Trans, at pgs. 41:11-23, 42:1-22, 43:10-25, 45:1-18, 47:12-24.

61.     It was made clear to Mr. Cohen and Veratex/Collezione personnel that the bedding products proposed for marketing and sale under the Jennifer Gucci name would bear the label "Case di Collezione by Jennifer Gucci", and that the promotional materials, labels and packaging for the products had to abide by the guidelines contained in Judge Conner's decision in the *Paolo Gucci* action.  Litwak Dec., at ¶¶ 35-45.  Veratex personnel were informed that the products could not contain the interlocking letters "J" and "G".  Id.; Cohen Trans., at pgs. 30:6-14, 31:9-18, 66:9-13, 67:19-25, 75:8-11, 77:4-12, 79:20-25, 80:17-25, 81:1-6, 82:9-24, 83:2-7,14-21, 84:2-3,15-17, 90:1-10,11-15, 124:23-25, 125:1-9, 157:2-23.

62.     In February/March of 2007, Veratex/Collezione personnel provided Edward Litwak and Jennifer Gucci with samples of proposed, unfinished packaging for the line of bedding products.  Litwak Dec., at ¶¶ 38-41.  Veratex/Collezione personnel, including Avi Cohen were subsequently informed on several occasions that the proposed packaging did not

25

abide by the licensing agreement Veratex had entered in to for use of Jennifer Gucci's name, and that the packaging had to be changed to meet the guidelines provided for in Judge Conner's decision in the *Paolo Gucci* action.  Litwak Dec., at ¶¶ 38-41; Cohen Trans., at pgs. 30:6-14, 31:9-18, 66:9-13, 67:19-25, 75:8-11, 77:4-12, 79:20-25, 80:17-25, 81:1-6, 82:9-24, 83:2-7,14-21, 84:2-3,15-17, 90:1-10,11-15, 124:23-25, 125:1-9.

63.    During this period, Mr. Cohen, President of Veratex/Collezione was informed by his own Vice President, Mr. Dale Talbot, and his outside counsel, Mr. Kevin Fisher, that the proposed, unfinished sample packaging was not correct.  Cohen Trans., at pgs. 88:7-13.

64.    The unfinished, sample proposed packaging was never approved by Mr. Litwak or Jennifer Gucci, and was never ready for market, and Mr. Cohen of Veratex/Collezione has admitted as much.  Cohen Trans., at pgs. 88:7-13, 90:1-10,11-15, 93:4-8, 94:4-12, 96:12-18, 97:10-25, 98:1-7.

65.    During this period, the parties continued to negotiate a license agreement regarding the use of Jennifer Gucci's name on bedding products by Veratex/Collezione. Plaintiff's Ex. 120.   Mr. Kevin Fisher, outside counsel for Veratex/Collezione, helps negotiate the license agreement on behalf of Veratex/Collezione, and Mr. Martin Simone, outside counsel for Mr. Litwak, assisted Mr. Litwak in negotiating the license agreement.  Id.

66.    During the negotiation process Mr. Fisher and Mr. Cohen were fully aware that Veratex/Collezione would have to abide by the requirements of Judge Conner's Decision in the *Paolo Gucci* action, and Mr. Litwak had provided them with a copy of that decision.  Cohen Trans., at pgs. 29:9-24, 30:6-14, 31:9-18.

67.    The parties did not enter in to a final license agreement until June 11, 2007. Plaintiff's Ex. 120.  The final license agreement specifically provided that the only rights granted

by Jennifer Gucci and Mr. Litwak to Veratex/Collezione were those consistent with Judge

Conner's Decision in the Paolo Gucci action. Plaintiff's Ex. 63, at ¶ 1.6.   The final license

agreement provides that Jennifer Gucci and Mr. Litwak had final approval on all packaging for

any products sold under the license.  Id., at ¶ 4.1, 4.2.

68.     The license agreement also provided that Veratex only had a license for use of

Jennifer Gucci's name on bedding and bathroom accessories.  Id., at Exhibit "A".  The final

license agreement allows Veratex/Collezione a right of first refusal on license for other products.

Id.

## VERATEX/COLLEZIONE BEGIN LICENSE AGREEMENTS WITH OTHER COMPANIES WITHOUT ADVISING JENNIFER GUCCI OR LITWAK

69.     Between January and June 2007, Mr. Cohen began negotiating and discussing

license agreements with various other companies regarding their possible use of Jennifer Gucci's

name on their products.  Plaintiff's Ex. 41-46, 48-62.  Such companies included E.L. Erman and

ELE Brands regarding cosmetics and watches, as well as Therapedic Mattress.  Plaintiff's Ex.

41-46, 48-62, 78-86.  Some of these negotiations initiated by Mr. Cohen and Veratex/Collezione

took place months before Jennifer Gucci actually executed any license agreement with

Veratex/Collezione.  Id.  In each instance, the other companies were made aware that any use by

that company of Jennifer Gucci's name had to abide by Judge Conner's decision in the *Paolo

Gucci* action.  Plaintiff's Exs. 49, 84; Ergas Trans., at 84-85.

70.     Veratex entered in to a sublicense agreement with E.L. Erman and ELE Brands.

Plaintiff's Exs. 57, 60.  Both agreements provide that the sublicense must abide by all the

restrictions of the Veratex/Collezione license agreement, including that the sublicense must

follow Judge Conner's Decision in the *Paolo Gucci* action.  Plaintiff's Ex. 57, at ¶ 4.5; Plaintiff's

Ex. 60, at ¶ 4.5.

71.     Jennifer Gucci and Mr. Litwak never approved of any of the unfinished, proposed sample packaging of any of these companies, and never gave permission for the companies to market any products using this packaging.  Ergas Trans., at 112-13, 115-17; Hearing Trans., at 107-09.

## JENNIFER GUCCI AND EDWARD LITWAK INFORM VERATEX/COLLEZIONE AND E.L.ERMAN THAT THE PROPOSED PACKAGING IS IMPROPER

72.     In June 2007, Mr. Litwak and Jennifer Gucci attended a show for the proposed Veratex bedding to be marketed and sold under the "Casa Di Collezione" and "Jennifer Gucci" label.  J. Gucci Dec., at ¶¶ 30-32; Litwak Dec., at ¶¶ 42-45.  Prior to the show, Veratex/Collezione sent out invitations for the show to various buyers, as well as to Gucci.  Neither Mr. Litwak nor Jennifer Gucci had any input in the design of the invitations, and neither saw or reviewed the invitations before they were sent out.  Id.

73.     The Public was not invited to the June 2007 Veratex show; only potential buyers.

74.     Prior to the show, Jennifer Gucci and Edward Litwak were provided an opportunity to view the unfinished, proposed sample packaging for the first time.  Hearing Trans., at 107-09.   At that time, Jennifer Gucci and Edward Litwak informed Veratex/Collezione personnel that the proposed packaging for the bedding products and cosmetics was not in accordance with the license agreement or Judge Conner's order in the Paolo Gucci case.  Litwak Dec., at ¶¶ 42-45; J. Gucci Dec., at ¶¶ 30-32; Cohen Trans., at pgs. 79:20-25, 80:17-25, 81:1-6, 82:9-24, 83:2-7,14-21, 84:2-3,15-17; Hearing Trans., at pgs. 107-09.

75.     At the show, E.L. Erman personnel provided Mr. Litwak or Jennifer Gucci with samples of unfinished, proposed packaging that would be displayed at the show.  Litwak Dec., at ¶ 44; J. Gucci Dec., at ¶ 32.  Both Mr. Litwak and Jennifer Gucci expressed dismay and concern to E.L. Erman personnel about this proposed packaging, and E.L. Erman personnel were

informed that the company and its packaging would have to comply with Judge Conner's order in the Paolo Gucci action.  J. Gucci Dec., at ¶ 32; Litwak Dec., at ¶ 44; Ergas Trans., at pgs. 112-13, 115-17.

76.    In June 2007, Therapedic personnel provided samples of proposed packaging for mattress items using the Jennifer Gucci name to Mr. Litwak for the first time.  Mr. Litwak immediately informed Therapedic personnel that the packaging did not meet the requirements of the license granted to Veratex, and did not meet the guidelines of Judge Conner's decision in the Paolo Gucci action, and the packaging would have to be changed.  Id.

## PROPORTION FIT IS INFORMED THAT ITS UNFINISHED PACKAGING IS IMPROPER

77.    During communications in May/June 2007, Mr. Litwak and Avi Cohen also advised Mr. Brian Jaffe, President of non-party Proportion Fit, about improper aspects of Proportion Fits' unfinished, sample packaging.  Cohen Trans., at pgs. 191:1-25, 192:1-25, 193:1-25, 198:10-25, 199:1-20.  Mr. Cohen told Mr. Jaffe in no uncertain terms that the unfinished, sample packaging was not proper, and not to show it to anyone.  Id.

78.    Proportion Fit never used the unfinished, unapproved sample packaging in marketing, and never sold any products using such packaging.  Hearing Trans., at pg. 23.

## JENNIFER GUCCI PUBLISHES A BOOK ABOUT HER LIFE WITH PAOLO GUCCI

79.    In early 2008, Jennifer Gucci released her book about her life and marriage to Paolo Gucci, entitled "Gucci Wars".  J. Gucci Dec., at ¶ 33; Gucci Wars.  The book is available for purchase in the United States.

## JENNIFER AND GEMMA GUCCI ARE ENTITLED TO USE THEIR FAMILY NAMES ON PRODUCTS WHICH THEY ARE PERSONALLY INVOLVED IN DESIGNING OR SELECTING AND PLAINTIFF IS NOT ENTITLED TO AN INJUNCTION, DAMAGES OR ATTORNEYS FEES UNDER THE LANHAM ACT OR NEW YORK LAW

80.     Plaintiff Gucci has brought an action against Jennifer Gucci, Gemma Gucci, and their licensing agent, Edward Litwak under the Lanham Act for trademark infringement, counterfeiting, false designation of origin, and dilution, as well as common law claims for trademark infringement and unfair competition, and claims under N.Y.S.G.B.L. §§ 349 and 360-l for deceptive acts and dilution.  Plaintiff is also requesting that the Court issue an extremely broad and overreaching injunction precluding Jennifer Gucci and Gemma Gucci from using their family names on anything, regardless of the context or the product or service.  Gucci is also requesting that the Court grant them attorneys' fees and exemplary damages for alleged willful conduct by the Defendants.

81.     Plaintiff's demand in this action amounts to a request to this Court that Gucci family members be precluded from using their family names in conjunction with any products, even products which Jennifer Gucci or Gemma Gucci personally design or which they personally select, market or sell.  Gucci is asking the Court to grant such an overreaching request despite the fact that the only products at issue in this action are not products in categories for which Gucci has any trademark registrations, and Gucci has admitted as much to the Court.  Hearing Trans., at pgs. 12-14.

82.     Plaintiff has not demonstrated that any of its claims have merit, and certainly has not showed that Plaintiff is entitled to preclude Jennifer Gucci and Gemma Gucci from using their family names on products they help to design and promote, under the proper circumstances and with the appropriate disclaimers.  Case law is clear that Jennifer Gucci and Gemma Gucci are entitled to use their family names on products which they personally design, select and promote, as long as they include disclaimers that show consumers that neither individual nor their products are associated with Plaintiff.

83.     Plaintiff's claims also fail under the doctrine of laches and acquiescence as Plaintiff and its affiliates have known about Jennifer Gucci and Gemma Gucci's use of their names on products in the manner now complained of for some seven (7) years.  Despite such knowledge, Plaintiff Gucci acquiesced in such use.  In fact, Plaintiff Gucci agreed in a prior Consent Order in 2001 to allow Gemma Gucci to use her name in the same manner now complained of in this action.  Hearing Trans., at pgs. 12-14; Defendants' Exhibit 25.

84.     It would be inequitable for Plaintiff to be able to preclude Jennifer Gucci and Gemma Gucci from using their complete names in the appropriate manner, given the total lack of proof of actual confusion or even likelihood of confusion; and particularly given that specific procedures and requirements can be put in place by this Court to avoid instances of confusion from taking place in the future.

85.     Plaintiff has not established the requisite elements to succeed on its claims of dilution under the Lanham Act or New York law; Plaintiff has not established absolute identity of the marks at issue, and no conduct by Defendants have caused Plaintiff to lose the ability of its marks to serve as unique identifiers of its goods.

86.     Nor has Plaintiff established or proven actual confusion as required for damages for dilution that allegedly began before October 2006, as required under the Lanham Act.

87.     Lastly, Plaintiff is not entitled to attorneys' fees or exemplary damages; Plaintiff has produced no evidence in this case that Defendants' actions fall in to the category of willfulness, or that such conduct alleged was exceptional, as required for such forms of damages under the Lanham Act.

31

## PLAINTIFF IS NOT ENTITLED TO A PERMANENT INJUNCTION OR DAMAGES

88.     Plaintiff requests the Court issue a broad almost limitless injunction against Defendants to preclude them from essentially marketing, promoting or selling any products, goods or services whatsoever bearing their sur-names, or to associate themselves publicly with products they design, select or promote.  Plaintiff's request for such an injunction is without merit and is not supported by the evidence submitted by Gucci at trial.

89.     An injunction is one of the most drastic tools in the judicial arsenal and should not be routinely granted.  Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir. 1985).  A party seeking an injunction must demonstrate: (1) a likelihood of irreparable harm in the absence of such injunction; and (2) and actual success on the merits.  Federal Exp. Corp. v. Federal Expresso, Inc., 201 F.3d 168, 173 (2d Cir. 2000); Omicron Capital, LLC v. Omicron Capital, LLC, 433 F.Supop.2d 382, 395 (S.D.N.Y. 2006).   Irreparable harm is the sin quo non of injunctive relief, and a plaintiff has the burden of proving such irreparable harm before a permanent injunction can issue.  The Comic Strip, Inc. v. FOX TV, 710 F.Supp. 976, 980-81 (S.D.N.Y. 1989).

## PLAINTIFF CANNOT DEMONSTRATE A PROBABILITY OF
## CONFUSION ON ITS INFRINGMENT AND DILUTION CLAIMS

90.     In order to prevail on its request for an injunction under the Lanham Act for

trademark infringement, false designation of origin or dilution, Plaintiff must demonstrate the

infringing mark is likely to cause confusion among consumers as to the source or sponsorship of

the product.  Nora Beverages Inc. v. Perrier Group, 269 F.3d 114, 118 (2d Cir. 2001).  There

must be a probability of confusion, not a mere possibility.  Gruner-Jahr USA v. Meredith Corp.,

991 F.2d 1072, 1077 (2d Cir. 1993).  In order to recover damages, a plaintiff must prove actual

confusion.  Perfect Fit Indust., Inc. v. Acme Quilting Co., Inc., 618 F.2d 950, 955 (2d Cir. 1980).

Courts in the Second Circuit apply a multi factor test (commonly known as the Polaroid Test) in

evaluating the likelihood of confusion.  Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d

Cir. 1961); Star Industries, Inc. v. Bacardi & Co., Ltd., 412 F.3d 373, 384 (2d Cir. 2005).   When

the marks involve high value, expensive goods sold to truly sophisticated buyers or premium,

expensive goods, including business buyers, there is a presumption that such buyers are less

likely to be confused.  Omicron, 433 F.Supp.2d at 393.   Lack of a public survey on the issue of

likelihood on confusion, when a plaintiff has the time and resources to conduct one, weighs

against a finding of likelihood of confusion.  Pan Am World Airways v. Panamerican School of

Travel, Inc., 810 F.2d 1160 (2d Cir. 1986).  Lack or proof of actual confusion also weighs

against a finding of likelihood of confusion.  Id.  In the case of a counterfeiting claim, a Court

need not undertake a review of the Polaroid Factors, but a Plaintiff must show that the marks at

issue are indistinguishable from the registered mark.

91.     In this instance, Plaintiff has not demonstrated that the trademarks and usage

actually authorized by Defendants for use by Veratex/Collezione are confusingly similar to

Gucci's registered trademarks.  Nor has Plaintiff demonstrated that the trademarks and usage

33

actually authorized by Defendants for use by Veratex/Collezione equate to counterfeits of such registered trademarks.

92.     First, as described above, Gucci failed to introduce any evidence of any consumer survey regarding Defendants' use of their family names on categories of products for which Gucci has no registered trademark.  Survey evidence has become standard for plaintiffs seeking to prove trademark infringement or dilution.  Gucci's failure to undertake or provide the Court with any survey evidence in this action is particularly telling given the amount of resources and time Gucci and its counsel have allocated to prosecuting this action.  Gucci's failure submit this most basic form of evidence in the context of a trademark infringement and dilution action is tantamount to an admission that there is no evidence of likelihood of confusion as between Gucci's registered trademarks, and the very limited way in which Defendants agreed to permit their names to be used on product lines for projects they were involved with.

93.     As described above, Defendants entered in to a license agreement with Veratex/Collezione to use the name of Jennifer Gucci on bedding products.  Defendants and the terms of their license agreement with Veratex (and others) were clear:  Veratex could only use the name of Jennifer Gucci in accordance with the guidelines provided for in Judge Conner's decision in the *Paolo Gucci* action; namely, (1) Jennifer Gucci's name could not be used as a trademark; (2) Jennifer Gucci's name must be proceeded by a mark that does not include the name Gucci; (3) Jennifer Gucci's name must be proceeded by the term or phrase "designed by" or "by"; and (4) the name Jennifer Gucci could not be placed in a manner more prominent than that of the mark which did not include the Gucci name.  This is essentially the same manner in which Defendants have used their names to promote and sell other goods; namely, shoes and

34

jewelry. This is also consistent with the terms of the Consent Order which Gucci S.p.A. had

agreed to for marketing of products under Gemma Gucci's name.

94.    Indeed, Jennifer Gucci and her licensing agent, Edward Litwak, only authorized

the use of her name on products if such use abided by the provisions in Judge Conner's decision

in the *Paolo Gucci* case. The fact that Veratex may not have abided by its license agreement

with Jennifer Gucci or Edward Litwak cannot be ascribed to Defendants. Defendants did not

instruct Veratex to use red and green on the proposed product packaging, Defendants did not

instruct Veratex to use an interlocking "J" and "G" on the proposed product packaging,

Defendants did not instruct Veratex to use a repeating diamond pattern with a tan background on

the proposed product packaging, and Defendants did not instruct Veratex to separate the Casa di

Collezione mark from the phrase "by Jennifer Gucci" or to use different fonts and letter sizes for

the Casa di Collezione mark and the Jennifer Gucci name. Defendants were also not involved in

creating the invitation to the June 2007 product show; that creation was solely that of Veratex.

95.    Defendants informed Veratex on numerous occasions that certain aspects of the

proposed product packaging for the bedding products, did not fall within the terms of the

licensing agreement, and appeared to fall outside of the provisions of Judge Conner's decision in

the Paolo Gucci action against Gucci S.p.A. Defendants were not involved in the process of

creating the supposedly offending packaging materials. None of the actions by Defendants

warrant a finding of infringement, false designation of origin or counterfeiting under the Lanham

Act.

96.    Defendants also did not authorize use of their names on cosmetic packaging in the

manner done by Former Defendant E.L. Erman; sub-licensee of Former Defendant

Veratex/Collezione. E.L. Erman never got approval from Jennifer Gucci or Edward Litwak for

any of Erman's proposed, unfinished sample packaging, as required under its sublicense agreement with Veratex/Collezione. Nor did Erman get approval from anyone to post such packaging on its website; a posting that was immediately removed by Erman when informed that it was improper by Veratex/Collezione and Cohen.

97.    Moreover, as soon as Defendants became aware of the unfinished, proposed sample packaging for such products, Defendants immediately informed Former Defendants Veratex/Collezione that the packaging and its contents were improper, did not abide by the terms of the license agreement, and could not be used. Indeed, Mr. Cohen of Veratex/Collezione was informed of this fact by his Vice President and outside counsel, yet Mr. Cohen chose to go ahead with a public display of the improper, unfinished sample packaging anyway without ever seeking or obtaining the approval of Defendants Jennifer Gucci or Edward Litwak.

98.    Furthermore, no products were ever sold using the alleged infringing marks. The allegedly infringing packaging was shown to Defendants and a very limited number of sophisticated potential buyers, but never to the public, and never to any consumers. Moreover, there is no evidence any of the potential buyers were confused as to any association between Plaintiff and Defendants. Thus, Plaintiff can show no damages as a result of any of the conduct of Defendants.

99.    With respect to non-party Proportion Fit, that non-party was advised that it had to follow the dictates of Judge Conner's Decision in the *Paolo Gucci* action. Proportion fit was also advised by Mr. Litwak that it could not use an interlocking "JG" pattern, and that any proposed packaging had to be approved by Mr. Litwak. Defendants never approved any of Proportion Fits' unfinished, sample packaging. Furthermore, Proportion Fit was advised by Mr.

Litwak and Cohen in May/June 2007 that the proposed, unfinished packaging was not proper and could not be used by Proportion Fit to market or sell its goods.

100.    Proportion Fit never marketed or sold any products using this unfinished, sample packaging.

101.    In addition, Plaintiffs have failed to come forward with any evidence indicating any consumers were actually confused by the proposed product packaging; weighing against a finding of actual, or even a likelihood of confusion.

102.    Plaintiff will also be unable to succeed on its common law claims for infringement and unfair competition.   New York common law claims for infringement and unfair competition require proof of almost the same elements as Lanham Act claims.  Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980); 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC, 447 F.Supp.2d 266, 288 (S.D.N.Y. 2006).  In essence, New York common law claims for infringement and unfair competition require proof of misappropriation of the labors and expenditures of another.   Saratoga, 625 F.2d at 1044.  In addition, a plaintiff must show an element of bad faith conduct on the part of the defendant.  Id.

103.    In this instance, Plaintiff has failed to prove any aspects of its common law infringement or unfair competition claims.  First, Defendant has demonstrated that Plaintiff's Lanham Act claims are without merit; the labels and disclaimers actually authorized by Defendants do not infringe on Plaintiff's marks, nor dilute such marks.

104.    Second, and more importantly, Defendants acted in good faith in establishing a policy for their labels and disclaimers.  Defendants were under the belief and understanding that as long as they complied with the guidelines and strictures of Judge Conner's decision in the Paolo Gucci action, that Defendants could use their family names on goods and services in

which they played a role in creating. As described above, Defendants, and the licenses and instruction they have provided about the use of their name on goods and services requires that their names not be used in conjunction with a mark that contains the name "Gucci" alone, and that they include the phrase "designed by" or "by" a before their name with a disclaimer indicating to consumers that they are not affiliated with Plaintiff.

105.    Moreover, due to the Court Ordered stipulation with Gucci S.p.A. over the rights of Gemma Gucci to use her name in an approved manner, Defendants were under the good faith belief that as long as they abided by the requirements of that stipulation, they would not be impinging upon Gucci's registered trademarks.

106.    Thus, Plaintiff has not succeeded in proving the required elements of its common law infringement and unfair competition claims.

## DEFENDANTS ARE ENTITLED TO USE THEIR FULL NAMES TO PROMOTE AND SELL PRODUCTS IN WHICH THEY PLAYED A DESIGN ROLE

107.    Under case law in the Second Circuit, Defendants are entitled to use their full names to market, promote and sell products, and thus their use of their sur-name Gucci, with the appropriate disclaimers. Such use does not constitute infringement, false designation of origin or counterfeiting.

108.    The Second Circuit has clearly stated that to prohibit an individual from using his/her true family sur-name is essentially to take away his identity, and such action would impose such a grievous injury on an individual, that a court will avoid imposing such a remedy if possible. Taylor Wine, Inc. v. Bully Hill Vineyards, Inc., 569 F.2d 731 (1978); Haven Capital Management, Inc. v. Haven Advisors, LLC, 965 F.Supp. 528 (S.D.N.Y. 1997); Gucci v. Gucci, 688 F.Supp. 916, 927 (S.D.N.Y. 1988). As long as the individual can show that he/she has

worked in the business at issue, and as a result, possesses experience and skills and a desire to work in the field, Courts will generally not impose the drastic remedy of enjoining an individual from using his/her sur-name. Gucci, 688 F.Supp. at 927. Moreover, use of a similar name in a somewhat different manner, precludes a finding of likelihood of confusion. Buitoni Foods Corp. v. Gio. Buton, 680 F.2d 290, 293 (2d Cir. 1982).

109.   In this instance it is clear that Jennifer and Gemma Gucci should be allowed to use their full names, including their sur-name Gucci, in conjunction with designing, promoting and selling products and services using their names, as long as they do not use the name Gucci separately or as a trademark, and they use disclaimers indicating neither is associated with Plaintiff. Jennifer Gucci was married to Paolo Gucci for more than 14 years; in the press and the public eye Jennifer Gucci's name is strongly associated with Paolo Gucci, the Gucci family and the fashion design business. The press, business entities and the public continue to contact Jennifer Gucci about the Gucci family, and she continues to be mentioned in books and TV shows about the Gucci family. During her 14-year marriage to Paolo Gucci, Jennifer Gucci played a role in his designing, marketing and promoting goods and products sold by Gucci, and later goods and products marketed and sold by Paolo Gucci. During her marriage to Paolo Gucci, Jennifer Gucci also decorated and/or helped decorate the various residences the couple lived in while in the United States, Italy and the United Kingdom.

110.   After Paolo Gucci's untimely death, Jennifer Gucci continued to be involved in the design and sale of fashion goods, including shoes and jewelry. In conjunction with the use of her name to sell such goods, Jennifer Gucci has made it a practice to ensure that an appropriate disclaimer is associated with the goods she sold under her name; namely, that any label included the phrase "designed by" or "by" Jennifer Gucci, and that her products were not associated with

39

Plaintiff or its affiliates. Jennifer Gucci has made numerous appearances, on TV and in person, promoting and marketing goods sold under her name. No evidence was submitted by Gucci of any actual conclusion or likelihood of confusion caused by Jennifer Gucci's sale of goods over the past many years.

111.    Gemma Gucci is Paolo Gucci's daughter and the sur-name Gucci appears on her birth certificate in the United States. She has been in the public eye since birth, and is still the object of public interest. Gemma Gucci has also been involved for years in the design and sale of jewelry bearing her name. Gemma Gucci has taken courses in design, interned for a designer in New York, and been involved in the design process for proposed handbags, as well as jewelry. Jewelry sold under the Gemma by Gemma Gucci name in Europe contained disclaimers that she was not affiliated with Plaintiff, and tags on the jewelry contained the statement "designed by" or "by" Gemma Gucci in order to preclude confusion.

112.    Moreover, the manner in which Defendants agreed to license their names to others is not confusingly similar to Gucci's registered trademarks. Furthermore, Defendants' license agreements involved products in which Gucci has no registered trademarks, and Gucci through its General Counsel, Jonathon Moss, has admitted as much.

113.    Clearly, under Second Circuit case law, Defendants are entitled to use their sur-names to promote products and goods in which they played a role creating and/or designing. As such, Defendants cannot be found to have infringed upon Plaintiff's marks, nor counterfeited such marks or products. As such, Plaintiff's Lanham Act claims for infringement, false designation of origin, dilution and counterfeiting against these Defendants fail.

## PLAINTIFF IS ESTOPPED FROM PURSUING ITS
## INFRINGEMENT CLAIMS UNDER THE DOCTRINE OF LACHES

114.    Even if Plaintiff had viable claims for infringement, false designation of origin or counterfeiting, which is not the case here, under the doctrine of laches, Plaintiff cannot succeed on such claims.

115.    Under the doctrine of laches, a plaintiff is precluded from succeeding on infringement claims if it has knowledge of defendant's use of the allegedly infringing mark, delays too long in bringing infringement claims, and defendant would be prejudiced if plaintiff were now allowed to assert such rights.  Saratoga, 625 F.2d at 1041.

116.    In this instance, Plaintiff has known of Defendants' use of the labels and phrases "Designed by Jennifer Gucci" or "Gemma by Gemma Gucci" for years.  Jennifer Gucci sold shoes in the United States using such terms, and both Jennifer and Gemma Gucci have used such terms and phrases in selling jewelry with the full awareness of Plaintiff's affiliates.  Gucci's General Counsel, Jonathan Moss, conceded that Gucci was aware of these sales activities.  Hearing Trans., at pgs. 8-14.

117.    After years of knowing of the conduct of Jennifer and Gemma Gucci to market and sell products under the names Jennifer and Gemma Gucci, with appropriate disclaimers, it would be inequitable to allow Plaintiff to now enjoin these women from properly selling non-infringing products with appropriate disclaimers.

## PLAINTIFF HAS NOT SUCCEEDED IN PROVING ITS CLAIMS FOR DILUTION

118.    Plaintiff has asserted claims for dilution under the Lanham Act and New York law.  Plaintiff has failed to submit evidence sufficient to support either claim.

119.    In order to establish dilution under the Lanham Act (or dilution under New York statutory law) for purposes of injunctive relief, a plaintiff must demonstrate an association

41

arising from the similarity of the mark or trade name and the famous mark that impairs the distinctiveness of the famous mark. Dan-Foam v. Brand Named Beds, LLC, 500 F.Supp.2d 296, 306 (S.D.N.Y. 2007); Malleteir v. Dooney & Bourke, 2008 WL 2245814, at *13 (S.D.N.Y. May 30, 2008). A plaintiff cannot prevail on a state or federal dilution claim unless the marks at issue are very or substantially similar. Id. A plaintiff must also demonstrate either blurring or tarnishment through defendant's use of the mark. Dan-Foam, 500 F.Supp.2d at 307. Tarnishment occurs if it is shown that plaintiff's mark will suffer negative associations through defendant's use. Id. Blurring occurs when defendant's use of the mark causes a whittling away of an established trademark's selling power through unauthorized use. Deer & Co. v. MTD Products, Inc., 41 F3d 39, 43 (2d Cir. 1994). A sophisticated consumer market precludes a finding of dilution under New York law. Mead Central Inc. v. Toyota Motor Sales, 875 F.2d 1026, 1031 (2d Cir. 19899).

120.    In order to prevail on a claim for monetary damages, a plaintiff must establish actual dilution, and actual confusion for conduct which began before October 2006. Malleteir, 2008 WL 2245814, at *13; GMA Accessories, Inc. v. Croscill, Inc., 2008 WL 591803, at *9 n.13 (S.D.N.Y. March 3, 2008). The mental association by consumers between the marks is insufficient to obtain monetary damages. Malleteir, 2008 WL 2245814, at *13.

121.    Here, as described above, Plaintiff has failed to prove all the necessary elements to succeed on its dilution claims; the Defendants have always provided that the use of their name would not be done as a trademark, and that the name "Gucci" would never stand alone or be used as a trademark.

122.    No evidence whatsoever was produced to establish tarnishment through sales of inferior products or the like. Indeed, the evidence form Mr. Gazlay was that he was selling

42

premium wine products. Hearing Trans., at pg. 49. The evidence from Mr. Cohen of Veratex was that they were planning to sell 800 thread count sheets associated with Jennifer Gucci's name – a high end premium product. Plaintiff's Ex. 25. Similarly, no survey evidence or other probative evidence of blurring was submitted by Gucci.

123.    First, any conduct by Defendants regarding use of their names on products in the manner complained of by Gucci started as early as the mid-90s, and certainly before October 2006.

124.    Second, Defendants' use of their family name on labels and disclaimers associated with goods they designed, promoted or personally selected is entirely consistent with Judge Conner's decision in the *Paolo Gucci* action. Namely, that Defendants would, and have, consistently disclosed that they are not affiliated with Plaintiff, and that any use of their sur-name was done in the following manner: "Collection of Jennifer Gucci", "Design by Jennifer Gucci", or "Gemma by Gemma Gucci". Defendants have not used their family name by itself, have not presented their family name "Gucci" in any manner more prominent than the phrases "Designed by" or "by", and Defendants have not agreed to allow others to use their family name a fashion that does not abide by Judge Conner's Decision in the *Paolo Gucci* action..

125.    Nor has Plaintiff provided the Court with any evidence of actual dilution; there is no evidence that Defendants' conduct as blurred or tarnished Plaintiff's marks because the packaging for the bedding and cosmetic products complained of have never been sold to a single consumer. Nor is there any evidence that the products were inferior in any sense.

126.    The same logic applies to the Proportion Fit hosiery products; no evidence the product is inferior, no evidence the packaging was ever marketed to the public and no evidence the products were ever sold using that packaging.

127.    In addition, there is no evidence that the wine actually sold under the name "Gemma by Gemma Gucci" was inferior in any respect, or that consumers were confused that the wine originated with or was affiliated with Gucci.  Indeed, the wine labels do not use any of Gucci's registered trademark colors or logos, and the wine labels contained a very prominent disclaimer indicating it was not associated with Plaintiff.

128.    Thus, Plaintiff cannot succeed on its Federal or State Law dilution claims.

## PLAINTIFF IS NOT ENTITLED TO
## EXEMPLARY DAMAGES OR ATTORNEYS' FEES

129.    Plaintiff has asserted that it is entitled to exemplary damages and attorneys' fees under the Lanham Act as a result of Defendants' conduct.  Plaintiff is entitled to neither as Defendants' have conclusively demonstrated that their conduct was not willful, and this case does not qualify as an exceptional case for purposes of awarding attorneys' fees.

130.    Under 15 U.S.C. § 1117(a), a court is empowered to award exemplary damages, at its discretion, and upon proof of willfulness.  Under this same provision of the Lanham Act, a court is also empowered to award attorneys' fees.  Gidatex v. Campaniello Imports. Ltd, 82 F.Supp.2d 136, 147 (S.D.N.Y. 2000).  An award of attorneys' fees under the Lanham Act is only warranted if the case is exceptional, where there is a showing of willfulness or deliberateness on the part of the defendant.  Id.; Quaker State Oil v. Kooltone, Inc., 649 F.2d 94, 95 (2d Cir. 1981)

131.    Plaintiffs have failed to come forward with any evidence to show that anything about this case is exceptional, or that any of Defendants' conduct was willful or deliberate.  First, Defendants had a good faith belief, based on Judge Conner's decision in the *Paolo Gucci* action, that they had a right to use their sur-name "Gucci" as long as they followed the strict limitations of Judge Conner's decision.  That same good faith belief was reinforced by the Consent Order these Defendants entered into with Gucci S.p.A.  The contents of that Consent Order indeed

mirrored the terms and conditions in the Paolo Gucci decision. In keeping with that good faith belief, Defendants required their licensees to abide by the requirements and follow the guidelines provided for in the *Paolo Gucci* decision.

132.    In addition, as to Defendant Gemma Gucci, Plaintiff has admitted that her conduct cannot be construed as willful. Plaintiff Gucci has admitted that its Parent Company, Gucci S.p.A. entered into a Consent Order with Gemma Gucci regarding her use of her family name on products. Hearing Trans., at 12-14. Plaintiff Gucci has also admitted that such Consent Order is applicable to the conduct at issue in this action. Id.

133.    Furthermore, Plaintiff has failed to prove any damages as a result of Defendants' actions; no product using the bedding and cosmetics labels and packaging at issue was ever sold. Moreover, Plaintiff has admitted it owns no registered marks for wine, or that any consumer was likely to or was confused that the "Gemma by Gemma Gucci" wine came from or was associated with Plaintiff.

## CONCLUSION

134.    For these reasons, and those to proven by Defendants at the trial of this matter, the Court should find against Plaintiff on its claims for infringement, counterfeiting, false origin, deceptive business practices, and dilution.

135.    Finally, Defendants request entry of a permanent injunction pursuant to Defendants' counterclaim for declaratory relief, which permanent injunction will permit Jennifer Gucci and Gemma Gucci to utilize their respective names in the same or similar fashion as Paolo Gucci was permitted the right to use his name in the Paolo Gucci decision or in the same or similar fashion as provided in the Consent Order with Gucci S.p.A. received in evidence at trial as Defendants' Exhibit 25. In connection with such injunction, Defendants' consent that it

prohibit Defendant from using their names in connection with products covered by the international classification categories of trademarks held by Gucci on the date it filed this action; but that these Defendants be permitted to utilize their names on goods and services in other categories provided they abide by and comply with all other requirements for use of their respective names contained in such injunction.

Dated: White Plains, New York
        July 13, 2009

                            Respectfully submitted,

                            HARRINGTON, OCKO & MONK, LLP

                                s/ Kevin J. Harrington
                            By: _____
                                Kevin J. Harrington [KH-5027]
                                John T.A. Rosenthal [JR-4819]
                                *Attorneys for Defendants Jennifer Gucci,*
                                *Jenny Gucci Coffee and Gelato Company,*
                                *Inc., Edward Litwak d/b/a Ed Litwak &*
                                *Associates, and Gemma Gucci*
                                81 Main Street, Suite 215
                                White Plains, NY 10601
                                (914) 686-4800

TO:     Louis Sherman Ederer, Esq. [LE-7574]
        John Maltbie, Esq. [JM-3658]
        ARNOLD & PORTER, LLP
        *Attorneys for Plaintiff*
        399 Park Avenue
        New York, NY 10022
        (212) 715-1000

        Martin Simone, Esq.
        SIMONE & ROOS
        3530 Wilshire Boulevard, Suite 1600
        Los Angeles, CA 90010