

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **8/5/09**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

GUCCI AMERICA, INC.,

               Plaintiff,

   - against -

JENNIFER GUCCI, JENCO DESIGNS, LLC,
JENNICOR, LLC, JENNY GUCCI COFFEE AND
GELATO COMPANY, INC., VERATEX, INC.,
COLLEZIONE DI CASA, INC., E.L. ERMAN-
DEAD SEA COSMETICS CORP., ELE BRANDS
ENTERPRISE, INC., GBN WATCH
COLLECTION, INC., GBN GLOBAL BUSINESS
NETWORK, EDWARD LITWAK d/b/a ED
LITWAK & ASSOCIATES, GEMMA GUCCI,
GEMMA GUCCI COFFEE AND GELATO
COMPANY INC., ABC CORPORATIONS 1-10,
and JOHN DOES 1-10,

               Defendants.

-------------------------------------------------------------x

07 Civ. 6820 (RMB)(JCF)

**FINDINGS OF FACT &
CONCLUSIONS OF LAW**

## I.   Introduction

On October 2, 2007, Gucci America, Inc. ("Plaintiff" or "Gucci") filed an Amended

Complaint ("Complaint") against Jennifer Gucci ("Jennifer Gucci"), Jenco Designs, LLC ("Jenco"),

Jennicor, LLC ("Jennicor"), Jenny Gucci Coffee and Gelato Company, Inc. ("Jenny Gucci Coffee"),

Veratex, Inc. ("Veratex"), Collezione Di Casa, Inc. ("Collezione"), E.L. Erman-Dead Sea

Cosmetics Corp. ("Erman"), ELE Brands Enterprise, Inc. ("ELE"), GBN Watch Collection, Inc.

("GBN Watch"), GBN Global Business Network ("GBN Global"), Edward Litwak d/b/a Ed Litwak

& Associates ("Litwak"), Gemma Gucci ("Gemma Gucci"), Gemma Gucci Coffee and Gelato

Company, Inc. ("Gemma Gucci Coffee"), ABC Corporations 1–10, and John Does 1–10

(collectively, "Defendants"), pursuant to 15 U.S.C. §§ 1114, 1116, and 1125, New York General

Business Law §§ 349 and 360-l, and New York common law, alleging, among other things, that

Plaintiff is the owner of the right, title and interest in and to federally registered trademarks for the

GUCCI name ("GUCCI Word Mark"), for a GREEN-RED-GREEN Stripe ("GREEN-RED-GREEN Stripe"), and for a REPEATING GG Design ("REPEATING GG") (collectively, the "Gucci Trademarks") and that the Defendants' licensing and sales of various products bearing the words "Jennifer Gucci" ("JENNIFER GUCCI"), "Gemma Gucci" ("GEMMA GUCCI"), a green-red-green stripe ("GREEN-RED-GREEN Stripe"), and/or a repeating "JG" design ("REPEATING JG") constituted trademark infringement, false designation of origin, trademark dilution, unfair competition, deceptive acts and practices under New York law, and common law trademark infringement.[1] (Compl., dated Oct. 2, 2007, ¶¶ 1–19, 21, 29, 43, 50, 56, 65, 71, 76, 81, 89, Ex. A.) Plaintiff seeks injunctive relief, monetary damages, and attorneys' fees. (Id.)[2]

---

[1]     References to Jennifer Gucci and/or Gemma Gucci in licensing agreements and/or on products and packaging generally appear herein in capital letters and references to Jennifer Gucci and Gemma Gucci as individuals generally appear in regular font.

[2]     After the original complaint was filed on July 30, 2007, United States Magistrate Judge James C. Francis, IV, to whom this matter was referred for general pre-trial purposes, entered, on August 20, 2007, a temporary restraining order ("TRO") which prohibited Jennifer Gucci, Jenco, Jennicor, Veratex, Collezione, Erman, and Litwak "from licensing, sublicensing, manufacturing, importing, exporting, advertising, promoting, displaying, distributing, circulating, offering for sale, selling or otherwise disposing of in any manner or removing from their respective business premises (except as otherwise provided herein) any products bearing the JENNIFER GUCCI name" and/or "imitating, copying or making unauthorized use" of the Gucci Trademarks. (TRO at 3.) The TRO was extended, on consent, through trial. (See Memo Endorsement, dated Jan. 14, 2008.) On or about April 8, 2008, Gemma Gucci agreed to be bound, through trial, by the TRO. (Stipulation and Order, dated Apr. 8, 2008, ("Stipulation and Order"), at 3.)

On February 20, 2009, Judge Francis issued an Order of Contempt against Defendant Litwak finding, among other things, that Litwak violated the terms of the TRO "by failing to produce discovery materials as required" and "by failing to provide a copy of [the TRO] to persons with whom he has entered into licensing agreements." (Order, dated Feb. 20, 2009 ("Contempt Order"), at 15.) During discovery, Judge Francis also ordered the forensic examination of Litwak's computer to recover documents and emails that were either deleted or not previously disclosed, as required by the TRO; and Judge Francis convened a conference on or about November 28, 2007 at which the parties agreed that Plaintiff would conduct a forensic examination of Jennifer Gucci's computer. (See Order, dated Oct. 23, 2007; Order dated Aug. 14, 2008.) These forensic examinations recovered emails and electronically stored documents which were damaging to Defendants' case. (See infra. Findings of Fact ¶¶ 36–38, 43, 47.) Judge Francis also determined that Litwak "shall be liable to Gucci for the attorneys' fees and costs incurred in connection with discovery necessitated by his failure to abide by the TRO's discovery provisions." (Contempt Order at 15.)

On November 2, 2007, Jennifer Gucci and Litwak answered the Complaint. (Answer of Jennifer Gucci, dated Nov. 2, 2007 ("J. Gucci Answer"); Answer of Litwak, dated Nov. 2, 2007.) On February 27, 2008, Gemma Gucci answered the Complaint. (Answer of Gemma Gucci, dated Feb. 27, 2008 ("G. Gucci Answer").) Jennifer Gucci and Gemma Gucci each counterclaimed for a declaratory judgment that Jennifer Gucci's and/or Gemma Gucci's "use of a mark containing or comprising of [their respective names] together with 'designed by,' 'created by,' or 'styled by' (or the like) does not infringe upon any rights, if any, of the Plaintiff." (J. Gucci Answer ¶ 103; G. Gucci Answer ¶ 43.)

On June 23, 2008, the Court approved a Consent Final Judgment and Permanent Injunction agreed upon by Plaintiff and Defendants Collezione, Erman, ELE, GBN Watch, GBN Global, and Veratex ("Settling Defendants"), who licensed the JENNIFER GUCCI name for use on various consumer products. The Settling Defendants were "immediately and permanently enjoined and restrained from licensing, sublicensing, manufacturing, importing, exporting, advertising, promoting, displaying, distributing, circulating, offering for sale, selling or otherwise disposing of in any manner any JENNIFER GUCCI Products, or otherwise engaging in any advertisement and promotion of any product using the JENNIFER GUCCI name," or "any product bearing any simulation, reproduction, copy, counterfeit or colorable imitation of the Gucci Trademarks." (Consent Order and Permanent Injunction, dated June 23, 2008 ("Consent Order"), at 3.) [3]

---

[3]    Plaintiff does not appear to have served or identified any "ABC Corporations" or "John Does" and, thus, these Defendants are dismissed. See Shmueli v. City of New York, No. 03 Civ. 1195, 2007 U.S. Dist. LEXIS 42012, at *11 n.4 (S.D.N.Y. June 7, 2007).

Jenco, Jennicor, Jenny Gucci Coffee, and Gemma Gucci Coffee appear to have been served with the Complaint but do not appear to have filed an answer. (See Docket Sheet in 07 Civ. 6820.) Plaintiff did not move for a default judgment against these Defendants nor did Plaintiff assert any claims against these parties in the pretrial order, dated June 17, 2008, or Plaintiff's Pre-Trial Findings of Fact and Conclusions of Law, dated June 17, 2008, or Post-Trial Findings of Fact and Conclusions of Law, dated July 13, 2009. Except insofar as they are included in the injunctions issued herein, any remaining claims against these entities are dismissed. See Desiderio v. Celebrity

In preparation for a bench trial, the parties submitted a Joint Pre-Trial Order (see Jt. Pre-Trial Order, dated June 17, 2008 ("PTO")), and over 400 trial exhibits. On June 17, 2008, Plaintiff submitted affidavits in lieu of direct testimony of its proposed witnesses (each of whom testified at trial) Jonathan Moss, General Counsel of Plaintiff, dated June 16, 2008, Terilyn Novak, eBusiness Director of Plaintiff, dated June 17, 2008, Yakov Ergas, an officer of Erman, ELE, GBN Watch, and GBN Global, dated June 17, 2008, Brian Jaffe, co-owner of Proportion Fit Products LLC ("Proportion Fit"), dated June 13, 2008, and Richard Gazlay, owner of Awesome Wines, Inc., dated June 17, 2008. On June 17, 2008, Defendants submitted affidavits in lieu of direct testimony of their proposed witnesses, i.e., Jennifer Gucci, Gemma Gucci, Litwak, and Joseph Oliveri.[4] Also, on June 17, 2008, the parties submitted pre-trial proposed findings of fact and conclusions of law. (See Pl.'s Pre-Trial Proposed Findings of Fact and Conclusions of Law, dated June 17, 2008 ("Pl. Pre-Trial Findings"); Def.'s Pre-Trial Proposed Findings of Fact and Conclusions of Law, dated June 17, 2008 ("Def. Pre-Trial Findings").)

A bench trial was held on June 29, 2009. At trial, the Court had an excellent opportunity to observe witness demeanor and assess witness credibility during cross examination and re-direct examination.

On July 13, 2009, the parties submitted post-trial proposed findings of fact and conclusions of law. (See Pl.'s Post-Trial Proposed Findings of Fact and Conclusions of Law, dated July 13, 2009 ("Pl. Findings"); Def.'s Post-Trial Proposed Findings of Fact and Conclusions of Law, dated July 13, 2009 ("Def. Findings").)

---

Cruise Lines, Inc., No. 97 Civ. 5185, 1999 U.S. Dist. LEXIS 9699, at *9–10 (S.D.N.Y. June 28, 1999).

[4]    With the consent of the parties, the Court allowed the testimony of Avi Cohen, President and Owner of Veratex and Collezione, to be submitted in the form of deposition designations. (Trial Transcript, dated June 29, 2009 ("Tr."), at 251:7–12.)

As more fully explained below, the Court concludes that Plaintiff has proven that Defendants willfully infringed and diluted the Gucci Trademarks under the Lanham Act, New York General Business Law §§ 349 and 360-l, and New York Common Law.

Pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 52(a), the Court's findings of fact and conclusions of law follow[5]:

## II.    Findings of Fact

<u>Parties</u>

1.    Plaintiff is organized under the laws of the State of New York with its principal place of business at 685 Fifth Avenue, New York, New York 10022.  (Pl. Findings ¶ 1.)

2.    Jennifer Gucci (maiden name "Puddefoot") married Paolo Gucci in December 1977.  (Pl. Findings ¶ 18; Def. Findings ¶ 1.)  "At the time of Jennifer Gucci's marriage to Paolo Gucci, Paolo Gucci was the Chief Designer for the Italian fashion house, Guccio Gucci, S.p.A. ('Gucci S.p.A.')."  (Def. Findings ¶ 2.)  Paolo Gucci died in 1995.  (<u>Id.</u> ¶ 23.)  Jennifer Gucci "was classically trained as an opera singer in both the United Kingdom and Italy." (Decl. of Jennifer Gucci, dated June 16, 2008 ("J. Gucci Decl."), at ¶ 4.)  Jennifer Gucci alleges, among other things, that "during her marriage to Paolo Gucci, [she] was involved in various aspects of Paolo Gucci's business dealings while he was at Gucci S.p.A. . . . [which] included attending meetings and dinners with Gucci S.p.A. officers, employees and customers, and attending meetings with buyers and suppliers" and she "also assisted in the public relations aspect of Gucci S.p.A.'s business, including being involved in setting up

---

[5]    Except as otherwise noted, all Findings of Fact and Conclusions of Law are supported by a preponderance of the evidence.  <u>See</u> <u>Savin Corp. v. Savin Group</u>, 391 F.3d 439, 449 (2d Cir. 2004); <u>Starter Corp. v. Converse, Inc.</u>, 170 F.3d 286, 300 (2d Cir. 1988); <u>Tiffany Inc. v. eBay, Inc.</u>, 576 F. Supp. 2d 463, 493 (S.D.N.Y. 2008); <u>Philip Morris USA Inc. v. Felizardo</u>, No. 03 Civ. 5891, 2004 U.S. Dist. LEXIS 11154, at *21 (S.D.N.Y. June 18, 2004).  While the Second Circuit does not appear to have adopted the clear and convincing standard approved by the Fifth Circuit in <u>CJC Holdings, Inc. v. Wright & Lato, Inc.</u>, 979 F.2d 60, 65 (5th Cir. 1992) for awarding attorneys' fees under the Lanham Act, attorneys' fees in this case are supported by clear and convincing evidence (as are punitive damages).

fashion shows and other aspects of Gucci S.p.A.'s marketing efforts in the United States and around the world." (Def. Findings ¶ 7.)

3.  Gemma Gucci is the daughter of Jennifer Gucci and Paolo Gucci, born on June 3, 1983, in New York City. (Def. Findings ¶ 6.) Gemma Gucci is employed with "Jeffries & Co. . . . an investment bank." (Decl. of Gemma Gucci, dated June 16, 2008 ("G. Gucci Decl."), at ¶ 6.)

4.  Litwak resides in the state of California and conducts a licensing and marketing business called Ed Litwak and Associates with its principal place of business at 12868 Via Latina, Del Mar, California. (Compl. ¶ 15.) As of 1980, Litwak acted as Paolo Gucci's licensing agent "after he [i.e., Paolo Gucci] left Gucci S.p.A. to open his own fashion business." (Decl. of Edward Litwak, dated June 16, 2008 ("Litwak Decl."), at ¶ 2.)

5.  After Paolo Gucci's death in 1995, Litwak began acting as Jennifer Gucci's licensing agent. (Litwak Decl. ¶ 3.) Litwak also acts as Gemma Gucci's licensing agent. (Id.)

6.  Plaintiff was formerly known as Gucci Shops, Inc. (Pl. Findings ¶ 23.) Guccio Gucci, S.p.A. appears to be Plaintiff's Italian parent company and was founded in 1921 in Florence, Italy by Guccio Gucci, Paolo Gucci's grandfather. (Pl. Findings ¶ 2, 18; Def. Findings at 3.)

## Background

7.  Plaintiff manufactures, licenses, sells, and wholesales a range of consumer products ("Gucci Products"), including "handbags, luggage, men's apparel, women's apparel, apparel accessories, sunglasses, footwear, jewelry, watches, fragrances, home products and even automobiles" which bear the Gucci Trademarks. (Pl. Findings ¶¶ 4, 7.) "Gucci spends many millions of dollars each year advertising the Gucci Products" and has realized "sales totaling in the billions of dollars in the United States alone." (Pl. Findings ¶¶ 6, 8.)

8.  Plaintiff owns the Gucci Trademarks which are registered with the United States Patent and Trademark Office ("USPTO"). (Pl. Findings ¶ 17; Pls. Exs. 206–233.)[6]

9.  "Defendants Jennifer Gucci and Gemma Gucci concede, and do not contest, that the GUCCI trademark is well-known and famous." (Pl. Findings ¶ 132; see also Tr. 64:4–8 (J. Gucci: "Q: Do you agree, Ms. Gucci, that the Gucci Company name is well known? A: Of course."); Tr. 147:24–148:4 (G. Gucci: "Q: Would you agree that the Gucci Company name is well known, Ms. Gucci? A: Yes.").) At trial, Jennifer Gucci referred to Plaintiff as "Big Gucci," and referred to herself as "Little Gucci." (Tr. 79:22–78:2 ("The Court: Big Gucci would be who? A: Gucci Incorporated. The Court: The plaintiffs in this case? A: Yes, the plaintiffs. The Court: Who is little Gucci? A: Me. I'm little Gucci.").)

10.  "Neither Jennifer Gucci nor Gemma Gucci have any experience or reputation in the United States as designers of any consumer products." (Pl. Findings ¶ 28; Tr. 63:17–18 (J. Gucci: "Q: Do you recall testifying at your deposition in this case that you did not consider yourself to be a well known designer in the U.S.? A: That's correct. Q: Do you recall also indicating that if someone in the U.S. were to hear your name, their first thought would be that you were Paolo Gucci's wife? A: Yes."); 147:7–9, 17–19 (G. Gucci: "Q: You are not currently working professionally as a designer, are you? A: Unfortunately, no. . . Q: Would it be fair to say, Ms. Gucci, that you do not currently have a reputation as a designer in the United States? A: That's correct."); 158:11–23 (Litwak: "Q: Back in September 2007,

---

[6]   Plaintiff owns the following federally registered trademarks for the GUCCI Word Mark: No. 876,292 (Reg. Date 9/9/69); No. 959,338 (Reg. Date 5/22/73); No. 972,078 (Reg. Date 10/30/73); No. 1,093,769 (Reg. Date 6/20/78); No. 1,140,598 (Reg. Date 10/21/80); No. 1,168,477 (Reg. Date 9/8/81); No. 1,169,019 (Reg. Date 9/15/81); No. 1,168,922 (Reg. Date 9/15/81); No. 1,200,991 (Reg. Date 7/13/82); No. 1,202,802 (Reg. Date 7/27/82); No. 1,321,864 (Reg. Date 2/26/85); and No. 1,340,599 (Reg. Date 6/11/85). Plaintiff owns the following federally registered trademarks for the GREEN-RED-GREEN Stripe design: No. 1,122,780 (Reg. Date 7/24/79); No. 1,123,224 (Reg. Date 7/31/79); and No. 1,483,526 (Reg. Date 4/5/88). And, Plaintiff owns the following federally registered trademarks for the REPEATING GG design: No. 2,680,237 (Reg. Date 1/28/03); No. 3,072,547 (Reg. Date 3/28/06); and No. 3,027,549 (Reg. Date 3/28/06). (Pl. Findings ¶ 17; Pls. Exs. 206–233.)

when this case first started, Jennifer Gucci was not well known as a designer in the United States, is that correct? . . . A: Not as a designer. The Court: What about Gemma Gucci? . . . A: Not as a designer.").)

11.     At the time of Jennifer Gucci's marriage to Paolo Gucci, as noted, Paolo Gucci "was the Chief Designer for the Italian fashion house, Guccio Gucci S.p.A." (Def. Findings ¶ 2.)

12.     "In or about 1980, Paolo Gucci was terminated from Guccio Gucci S.p.A." and, thereafter, began "working to open his own fashion store in New York and design his own fashion[s] under his own name." (Def. Findings ¶ 12.)

13.     In or about June 1983, Paolo Gucci sued Gucci Shops, Inc. (Plaintiff's predecessor) in the United States District Court for the Southern District of New York and "sought a declaration that he had the right to use the name Paolo Gucci as a trademark on products." (Pl. Findings ¶ 23); see Paolo Gucci v. Gucci Shops, Inc., 688 F. Supp. 916 (S.D.N.Y. 1988).

14.     Following a bench trial, United States District Judge William C. Conner held on June 17, 1988, in a thirty-three page Opinion and Order, among other things, that Paolo Gucci "committed federal trademark infringement under 15 U.S.C. § 1114(a), false designation of origin under 15 U.S.C. § 1125(a) [and] common law trademark infringement" by "design[ing] handbags and other leather goods for an Italian company called Italia Italia and licens[ing] that company to use his full name Paolo Gucci in connection with such products." Gucci Shops, Inc., 688 F. Supp. at 919. Judge Conner determined that "the great strength of the 'Gucci' mark, the very close similarity between the mark 'Gucci' and the name 'Paolo Gucci' and the near identity of the nature of the primary products bearing those names creates a likelihood that an appreciable number of ordinarily prudent purchasers will be misled or confused as to the source or sponsorship of goods which bear [Paolo Gucci's] name as a trademark or trade name." Id. at 919. Judge Conner also determined that "on three separate occasions the [USPTO] has refused to register marks consisting of or

including the name 'Paolo Gucci' based on a likelihood of confusion with the 'Gucci' mark"; and "the USPTO has initially refused to register the expression 'Paolo Gucci Designs for Riviera,' finding that 'Gucci is a dominant feature of the mark' and would thus create confusion with products bearing the 'Gucci' mark." Id. at 927.  And, Judge Conner held that "in order to protect the interests of [Gucci Shops] in the 'Gucci' name, Paolo is enjoined from using 'Paolo Gucci' as a trademark or trade name." Gucci Shops, Inc., 688 F. Supp. at 927–28 ("Judge Conner Opinion and Order").[7]

15.     Judge Conner also determined that in order "to enable Paolo to exploit his own talents and identity [as 'a designer and stylist of many Gucci products']," Paolo Gucci may "use his name to identify himself as the designer of products sold under a separate trademark which does not include the name 'Gucci.'  To avoid confusion, the name Paolo Gucci must always appear after the trademark in advertisements and on labels, and must be no more prominent than the trademark.  Moreover, [Paolo Gucci] must use a disclaimer, similar to the one he now employs, which notifies consumers that he is no longer affiliated with any of the Gucci entities." Gucci Shops, 688 F. Supp. at 918, 928.[8]

---

[7]     Judge Conner enjoined Paolo Gucci and his "agents, servants, employees, representatives [presumably including Litwak], licensees, and all persons in active concert or participating with any of them who receive actual notice of this Court's Final Judgment are hereby enjoined in the United States of America from registering, attempting to register, using, advertising, marketing, promoting or authorizing the use of the names "GUCCI" or "PAOLO GUCCI," any logo or symbol consisting of the letters "G," "PG," or "GG," or any other name, mark or symbol that is confusingly similar to any such names or logos, as or as part of a trademark, service mark, business name, or trade name for any product, service or business, or in such a manner as to create the impression that such name, logo or symbol is the trade name or business name of Plaintiff or any designer, manufacturer, distributor, retailer or other business or the trademark or service mark for any product or service." (Final Judgment, dated July 13, 1998 ("Final Judgment"), at 5.)

[8]     In his Final Judgment entered on July 13, 1988, Judge Conner ruled that Paolo Gucci could use his name "on products or services designed by [Paolo Gucci] or under his supervision or selected by [Paolo Gucci] . . . [if used] as part of the phrase 'TRADEMARK DESIGNED (OR SELECTED) BY PAOLO GUCCI'"; and all uses of Paolo Gucci's name must be "accompanied by a disclaimer, prominently displayed, unambiguously stating that Paolo Gucci is not affiliated or associated with Gucci or 'GUCCI' products." (Final Judgment at 3–7.)

16.    Judge Conner also held that "the rights granted to, and the obligations imposed upon [Paolo

Gucci] by this Final Judgment are personal to Paolo Gucci." (Final Judgment at 7.)

17.    Defendants argue that they may license the Jennifer Gucci and Gemma Gucci names to third

parties as long as they and their licensees follow the restrictions Judge Conner placed upon

Paolo Gucci, even though they were not parties to the Gucci Shops case. (See J. Gucci Decl.

¶ 23 ("it was my understanding . . . that I would be permitted to use my name 'Jennifer

Gucci' in conjunction with marketing licensing and sale of certain goods, as long as

I . . . abided by the strictures of Judge Conner's 1988 decision relating to my husband Paolo

Gucci's use of his name."); Tr. 155:4–16; 156:23–157:14 (Litwak: "Q: Prospective

licensees . . . can use Jennifer Gucci's name and Gemma Gucci's name on licensed products

as long as they follow the guidelines laid out by Judge Conner, is that right? A: That is

correct.").)

18.    Gemma Gucci argues that she may license her name to third parties in the United States

based upon a consent judgment, presumably entered on April 19, 2000, by the Regional

Trade Court in Hamburg, Germany in a case between Flitsch & Benayan GmbH ("Flitsch")

and Gucci, S.p.A. (Def. Findings ¶ 30; Def. Ex. 25.) In 2000, Gemma Gucci had "entered

into agreements with Flitsch" which related to the "design, marketing and sale of jewelry by

Gemma Gucci in Europe." (Def. Findings ¶ 28.) Gemma Gucci argues, among other things,

that "the parties to that [German] legal action agreed that Gemma Gucci could sell jewelry

under her name as long as the products and/or packaging contained the words 'designed' or

'styled' by before the name 'Gemma Gucci.'" (Def. Findings ¶ 30.) Also, in 2000, "Flitsch

brought a legal action against Gucci S.p.A. in a German court in Hamburg, Germany

regarding the use of the Gemma Gucci name" associated with "certain jewelry products sold

under the Gemma Gucci name." (Def. Findings ¶ 30.) The German Court appears to have

approved an agreement between Flitsch and Gucci, S.p.A. "that [Flitsch] is entitled to

associate the name of the designer "Gemma Gucci" with the product," "the word 'designed'
or 'styled' is to precede the name [Gemma Gucci]" and; "it is a prerequisite that the designer
is actually 'Gemma Gucci' who designed the jewelry marked with the identification
'Gemma by Gemma Gucci.'" (Def. Ex. 25.)[9]

19.    Plaintiff counters, among other things, that the judgment of the German Court is irrelevant
to Gemma Gucci's use of her name in the United States because "trademark rights are
inherently territorial, and exist in each country only according to and to the extent of that
particular country's statutory scheme" and "none of the parties to the German Order are
parties to the instant action."[10] (Pl. Findings ¶¶ 118, 122.)

20.    At trial, Litwak acknowledged that he was not an attorney (Tr. 155:17–18), and that he did
not have a written opinion from an attorney interpreting Judge Conner's Opinion and Order,
or reaching the (legal) conclusion that Jennifer Gucci and Gemma Gucci (and Litwak) may
license their names if they follow the restrictions Judge Conner placed upon Paolo Gucci.
(Tr: 156:23–157:13 ("The Court: Did you ever consult with an attorney to draw the legal
conclusion that you have drawn that Gemma Gucci and Jennifer Gucci have the same rights
that Paolo Gucci had deriving from Judge Conner? A: Yes, from Donald Parson [i.e.,
Litwak's "lawyer at the time"] . . . The Court: Did he give you a written opinion to that

---

[9]      The terms of the judgment entered by the German Court, on April 19, 2000, appear to be
that "the parties agreed that the petitioner [Flitsch] is entitled to associate the name of the designer
'Gemma Gucci' with the product. In this presentation the word 'designed' or 'styled' is to precede
the name; the phrase 'styled/designed by Gemma Gucci' is to be shown preferably in cursive
lettering ahead of 'Gemma' and is to be distinguished in such a way that shoppers recognize the
reference to the designer. Moreover, the reference to the designer must not appear in a 'signal'
color. It must also differ in color from the 'Gemma' designation. The notation 'styled/designed'
and the 'by Gemma Gucci' wording are not to be shown against different color backgrounds and the
notation "styled/designed' and the 'by Gemma Gucci' may not appear in lettering of a different
color. It is a prerequisite that the designer is actually 'Gemma Gucci' who designed the jewelry
marked with the indentification 'Gemma by Gemma Gucci.'" (Def. Ex. 25.)

[10]     Plaintiff has not argued that this Court should exercise extraterritorial jurisdiction under the
Lanham Act. See Sterling Drug v. Bayer AG, 14 F.3d 733, 745–46 (2d Cir. 1994); Vanity Fair
Mills, Inc. v. T. Eaton Co., 234 F.2d 633 (2d Cir. 1956).

effect?  A:  He drafted the contract but he never gave me a written opinion.  The Court:  So do you have any written legal basis for drawing the legal conclusion that you have drawn? . . . A: No.").)

**Jennifer Gucci's and Gemma Gucci's Trademark Applications Denied**

21.   On March 9, 1998, Jennifer Gucci filed two applications with the USPTO to register the trademark "COLLEZIONE DI JENNIFER GUCCI."  (Pl. Findings ¶ 48.)  These trademark applications were abandoned by Jennifer Gucci and never granted.  (Pl. Ex. 90, 91.)

22.   On March 22, 2001, Jennifer Gucci filed application No. 76/228,124 with the USPTO to register the trademark "JENNIFER DESIGNED BY JENNIFER GUCCI" for use with jewelry, housewares, and clothing.  (Pl. Ex. 92.)  In support of this application, Jennifer Gucci submitted an affidavit, dated January 14, 2002, stating, among other things, that the "mark was designed to avoid any confusion with Gucci [i.e., Plaintiff] and to follow all the guidelines described in the 1988 Final Judgment signed by Judge Conner in the case of Gucci v. Gucci Shops."  (Pl. Ex. 92.)

23.   **On July 10, 2003, application No. 76/228,124 was denied by the USPTO because the "similarities between the marks" Jennifer Gucci and Gucci "are so great as to create a likelihood of confusion" and "given the fame of the GUCCI line of marks, there can be little doubt that consumers are likely to be confused as to the source of the respective parties' goods."  (Pl. Ex. 92 (emphasis added).)**

24.   Jennifer Gucci was aware that this trademark application was denied by the USPTO.  (Tr. 72:23–24 ("Q:  This trademark application was refused, was it not?  A:  Of course, yes.")

25.   On October 11, 2002, Gemma Gucci filed trademark application No. 78/173,379 with the USPTO for the trademark "GEMMA GUCCI."  (Pl. Ex. 227.)  **On or about April 22, 2003, the USPTO denied this application because "the applicant's mark . . . [is] likely to cause confusion, or to cause mistake, or to deceive" and "although applicant's mark**

adds another term to the well known GUCCI name, this is not controlling . . . the mere addition of a term to a registered mark is not sufficient to overcome a likelihood of confusion." (Pl. Ex. 227 (emphasis added).)

**Trademark Infringement, Trademark Dilution, and False Designation of Origin**

26.  On February 2, 2004, Jennifer Gucci granted Litwak the "exclusive right and authority to license the use of the trademark JENNIFER DESIGNED BY JENNIFER GUCCI on a worldwide basis, for all products, for a period of twenty (20) years." (Pl. Findings ¶ 59; Pl. Ex. 5.) This is the same trademark that was rejected by the USPTO on July 10, 2003. (Pl. Ex. 92; see supra ¶¶ 21, 22.)

27.  Litwak testified that he was granted a verbal license by Jennifer Gucci to use Gemma Gucci's name when Gemma Gucci was 15 years old, i.e. in or about 1998. (Tr. 204:24– 204:5 ("Q:  You say that you have a license from Gemma Gucci to license the use of her name with regard to various projects, is that correct?  A:  That is correct.  Q:  That's a verbal license, is that right, Mr. Litwak?  A:  It is a verbal license and it was a license that Jenny's – Gemma's mother gave me when Gemma was 15.").

28.  On or about February 2, 2004, Litwak purportedly entered into a written license agreement with Gemma Gucci for the "exclusive right and authority to license the use of the trademark GEMMA DESIGNED BY GEMMA GUCCI on a worldwide basis, for all products, for a period of twenty (20) years." (Pl. Findings ¶ 95; Pl. Ex. 277.) At trial, Gemma Gucci testified that she never signed this document and that her "signature" on this document was forged. (Tr. 122:25–123:15 ("Q:  Is that your signature on the signature page?  A:  No. Q:  Do you know who signed your name to this document, Ms. Gucci?  A:  I don't . . . Q:  Whoever signed your name to that agreement, did you authorize them to do that? A:  No.").)

29.   At trial, Gemma Gucci "acknowledged that she has a verbal agreement with Litwak
      permitting him to enter into license agreements regarding the use of the GEMMA GUCCI
      name." (Pl. Findings ¶ 97; see also Tr. 124:22–24 (Q: You had a verbal agreement with
      [Litwak] that he could [license the GEMMA GUCCI name], correct? A: Yes.").)

30.   On or about July 16, 2008, Gemma Gucci declined to sign a draft letter provided to her by
      Litwak which states, among other things, "I, Gemma Gucci, when and if I win the [instant]
      court case now proceeding with Gucci America will give a license to Martin Simone/Ed
      Litwak for coffee and gelato shops and the products that go inside." (Tr. 145:10–17.)
      Gemma Gucci also testified that she may give Litwak and Mr. Simone the right to use her
      name in connection with a coffee shop venture if she prevails in the instant case. (Tr.
      145:21–23 ("Q: Do you plan to give Mr. Litwak and Mr. Simone the right to use your name
      in a coffee shop venture if you win this case? A: Perhaps.").)

**Litwak's Licensing of the JENNIFER GUCCI and GEMMA GUCCI Names**

31.   Litwak arranged licenses with third parties to use the JENNIFER GUCCI and GEMMA
      GUCCI names on various consumer products and informed potential licensees that Jennifer
      Gucci and Gemma Gucci "have the same rights to use their names on products and services
      as Paolo Gucci did." (Pl. Findings ¶ 40.)

**JENNIFER GUCCI Licenses**

32.   Although Jennifer Gucci has no professional experience in the coffee business (Tr. 96:25–
      97:2), on August 18, 2006, Litwak licensed the Jenny Gucci Coffee company to use the
      JENNIFER GUCCI name in connection with establishing JENNIFER GUCCI coffee shops.
      (Pl. Findings ¶ 62; Pl. Ex. 7.) At trial, Litwak acknowledged that "he had raised $50,000
      from an investor in connection with the 'JENNIFER GUCCI' coffee shop license." (Pl.
      Findings ¶ 63.) Jennifer Gucci testified that she is still considering a coffee project,
      including placing her name on coffee shops and coffee products. (Tr. 96:16–24 ("Q: Are

14

you aware, Ms. Gucci, of a project involving Jennifer Gucci coffee shops? A: Yes. Q: As far as you know, is that project still under consideration? A: It is. Q: The idea is to use your name on coffee shops and on coffee products that go into the coffee shops, correct? A: That's correct.").)

33.   In early 2007, Litwak began negotiating a license agreement with Avi Cohen, President and Owner of Veratex and Collezione, for use of the JENNIFER GUCCI name on bedding products. (Pl. Findings ¶¶ 69–73.) On or about February 2, 2007, Litwak provided Cohen, by facsimile, with various JENNIFER GUCCI proposed logo designs. (Pl. Exs. 203, 210.) The fax cover sheet from Litwak to Cohen stated "Here are some ways to use the logo." (Pl. Exs. 203, 210.) The logo designs included, among other things, a GREEN-RED-GREEN Stripe, variations of the initials "JG" (some of which were interlocking), and a repeating diamond pattern with interlocking "GG's." (Pl. Findings ¶ 75; Pl. Exs. 203, 210.) Litwak acknowledged that some of the logo designs "would be impermissible" under the Gucci Shops case. (Tr. 179:5–9 ("The Court: So that is a second . . . page [with a REPEATING JG design] that you think would not be permissible? A: That is correct. The Court: With an interlocking JG? A: That is correct.").)

34.   Veratex developed packaging ("Veratex Packaging") for a JENNIFER GUCCI bedding line which included the following features: the words "designed by JENNIFER GUCCI" were placed on the packaging below, but in a size similar to, the words "COLLEZIONE DE CASA"; the name JENNIFER GUCCI appears in the center of a crest design; a REPEATING JG appears in a diamond pattern; there is a GREEN-RED-GREEN Stripe as a border; and the following description of Jennifer Gucci's involvement: "Throughout my life, I have commissioned some of the most exquisite pieces of linen for my personal collection. These fine pieces of linen, inspirations of beauty, are exceptional objects. Never before have I put forth so much effort in attaining aesthetic perfection and combining it with

15

painstaking craftsmanship." (Pl. Exs. 22, 23, 24, 26, 27.)  Among other problems, the

Veratex Packaging did not contain a disclaimer that Jennifer Gucci was not affiliated with

Plaintiff or Plaintiff's products.  (See Pl. Exs. 22, 23, 24, 26, 27.)

35.    On February 10, 2007, an article was published in Home Textiles Today in which Litwak

was quoted as stating that the JENNIFER GUCCI bedding line "will have a Gucci-esque

look with some horse themes." (Pl. Ex. 28.)

36.    Jennifer Gucci testified that when she viewed the Veratex Packaging she was "very

concerned" that it did not comply with Judge Conner's Opinion and Order but in an email,

dated February 28, 2007, from Jennifer Gucci to Cohen she stated, "Great looking

packaging." (Pl. Findings ¶ 79; Tr. 84:2–5; Pl. Ex. 95.)

37.    On March 1, 2007, Cohen emailed the Veratex Packaging to Jennifer Gucci stating, among

other things, that "[t]his is the final drawing." (Tr. 84:13–19.)  Jennifer Gucci responded on

March 2, 2007, stating, "OK, Avi, that is fine whatever you think will sell better, that's what

it's all about." (Tr. 84:17–24; Pl. Ex. 100.)  The Veratex Packaging had included the

JENNIFER GUCCI name, a GREEN-RED-GREEN Stripe, and a REPEATING JG, which

are very similar in appearance – and, consequently, likely confusing to consumers – to

Plaintiff's GUCCI Word Mark, its GREEN-RED-GREEN Stripe, and its REPEATING GG

trademarks.  Jennifer Gucci's approval of this packaging shows, at a minimum, a reckless

disregard for infringement of the Gucci Trademarks.[11]

38.    Jennifer Gucci testified that the emails referred to in paragraphs 36 and 37 were recovered

through a forensic examination of her computer conducted by Plaintiff and that she "had

made a mistake" in deleting and/or not disclosing those emails during discovery.  (Tr.

79:15–21 ("Q:  So your testimony is that Gucci, through the forensic examination of your

---

[11]    Moreover, the Veratex Packaging did not comport with the restrictions placed upon Paolo
Gucci by Judge Conner because, it appears, Jennifer Gucci was more concerned with what "will sell
better."

computer, found your emails to Veratex designers in which you commented on the designs
that they were showing you; is that your testimony?  A:  Yes.  Because that's what you
wanted. . . . I call them 'big Gucci,' as opposed to 'little Gucci.'  Big Gucci wanted those
emails, and I had made a mistake.").)

39.  On May 15, 2007, a Veratex subsidiary, Collezione, entered into a license agreement with
     Litwak and Jennifer Gucci to use the JENNIFER GUCCI name on bed and bath products.
     (Pl. Findings ¶ 82; Pl. Ex. 63.)

40.  In June 2007, the Veratex Packaging was used at a trade show exhibiting "the proposed
     'CASA DI COLLEZIONE BY JENNIFER GUCCI' line of bedding for potential buyers."
     (Litwak Decl. ¶ 42.)  As noted, the Veratex Packaging bore highly similar – and likely
     confusing – versions of the Gucci Trademarks, i.e. the JENNIFER GUCCI name, a GREEN-
     RED-GREEN Stripe, and a REPEATING JG.

41.  Jennifer Gucci testified that, after she saw the Veratex Packaging for the JENNIFER
     GUCCI bedding line at the trade show in June 2007, she told Litwak that "he was pushing
     the envelope again" (Tr. 116:9–11), presumably because the Veratex Packaging bore marks
     similar to the Gucci Trademarks.  There is no evidence that Jennifer Gucci informed Litwak
     that he was "pushing the envelope" in February and March of 2007.  (See Findings of Fact
     ¶¶ 36, 37.)

42.  Although Jennifer Gucci had no experience in the design of hosiery products and testified
     that she "[n]ever heard of a company called Proportion Fit" until trial and "[n]ever
     review[ed] any samples of JENNIFER GUCCI hosiery products" (Tr. 76:13–18), on January
     26, 2007, Litwak licensed Proportion Fit to use the JENNIFER GUCCI name on hosiery
     products.  (Pl. Findings ¶ 64.)  On February 14, 2007, Brian Jaffe, co-owner of Proportion
     Fit, designed a hosiery package using an interlocking "JG" and emailed the design to
     Litwak.  (Pl. Ex. 35.)  Litwak responded that the design "did not work."  (Id.)  At trial,

17

Litwak testified that he believed Defendants "couldn't use an interlocking 'JG.'" (Tr. 177:2.)

43.    On February 21, 2007, Litwak emailed Jaffe the Veratex Packaging stating, "See if this works better for you." (Pl. Ex. 23, 26.) Jaffe understood that Litwak was directing him to use design elements, such as a REPEATING JG in a diamond pattern and a GREEN-RED-GREEN Stripe, upon the packaging which were very similar to Plaintiff's REPEATING GG and GREEN-RED-GREEN Stripe. (Tr. 32:12–24 ("Q:  Did you take this packaging design into account in doing the packaging designs that you were working on?  A: Yes.  Q:  Ok. You'll notice that there is an interlocking JG on this packaging?  A:  Mm-hmm.  Q:  There is also a green-red-green stripe design, is there not?  A:  Yes.  Q:  So when you did your packaging, did you draw from these two examples that I just showed you?  A:  That's exactly what I did.").)  Litwak appears to have sent Jaffee this email with the intent that Jaffe would use the GREEN-RED-GREEN Stripe and REPEATING JG design elements – which Litwak knew were very similar to Plaintiff's GREEN-RED-GREEN Stripe and REPEATING GG – on the Proportion Packaging.

44.    Thereafter, Jaffe developed packaging for hosiery products ("Proportion Packaging") which included the following features:  the words JENNIFER GUCCI displayed in a block font in the center of the packaging; a GREEN-RED-GREEN Stripe design; and the back panel has an REPEATING JG in a diamond pattern. (Pl. Exs. 36, 87.)  The Proportion Packaging had included the JENNIFER GUCCI name, a GREEN-RED-GREEN Stripe, and a REPEATING JG, which are very similar in appearance – and, consequently, likely confusing to consumers – to Plaintiff's GUCCI Word Mark, its GREEN-RED-GREEN Stripe, and its REPEATING GG trademarks.  The Proportion Packaging also did not contain a disclaimer that Jennifer Gucci was not affiliated with Plaintiff or Plaintiff's products.  (See id.)

45. At trial, Litwak testified that he "absolutely told" Jaffe that he could not use this packaging referred to in paragraph 44, but Jaffee credibly testified at trial that Litwak and/or Litwak's associate Danny Lee never informed him that Proportion Fit could not use this proposed packaging design. (Tr. 34:24–35:2 (Jaffe: "Q: Now, this letter [dated July 31, 2007 from Litwak to Jaffe] says, 'Mr. Jaffe, according to Mr. Lee, on numerous occasions you were told this package was unacceptable and, if used, would cause serious problems.' Did that ever happen? A: Never."); Tr. 188:19–189:14.)

46. In or about May 2007, Erman developed a packaging design ("Erman Packaging") for a JENNIFER GUCCI cosmetics line which included the following features: the name JENNIFER GUCCI displayed in a block font in the center of the package; and a REPEATING JG in a diamond pattern on the package. (See Pl. Ex. 45.) The Erman Packaging had included the JENNIFER GUCCI name and a REPEATING JG, which are very similar in appearance – and, consequently, likely confusing to consumers – to Plaintiff's GUCCI Word Mark and its REPEATING GG trademarks. The Erman Packaging also did not contain a disclaimer that Jennifer Gucci was not affiliated with Plaintiff or Plaintiff's products. (See id.)

47. In an email, dated May 31, 2007, Jennifer Gucci responded to an email from Cohen (which had attached pictures of the Erman Packaging) and stated, "I simply love the red packaging very chic and rich lookin[g]." (Tr. 94:19–95:1.) Jennifer Gucci's approval of this packaging shows, at least, a reckless disregard for the fact that the Erman Packaging may infringe upon the Gucci Trademarks.[12]

48. Although Erman had been developing a skin care and cosmetics product line under the JENNIFER GUCCI name since May 2007, Veratex did not execute a sublicense with Erman

---

[12] The Erman Packaging did not comport with the restrictions placed upon Paolo Gucci by Judge Conner.

"to develop a line of skin care and cosmetics products" until July 13, 2007. (Pl. Findings ¶ 84; Pl. Ex. 57.) Litwak "gave his approval" to the agreement even though he knew that the USPTO rejected registration of this trademark. (Id.)

49.     Although Jennifer Gucci does not have any professional experience in the bottled water business (Tr. 95:9–11 ("Q: Now, Ms. Gucci, do you have any professional experience in the bottled water business? A: No.")), on November 8, 2007, Litwak sent a proposed license agreement for JENNIFER GUCCI bottled water to JCB and Associates of Verona, Wisconsin. (Pl. Findings ¶ 83.) Again, Litwak sent this license agreement knowing that the USPTO had rejected the registration of this trademark.

50.     Jennifer Gucci was aware that, in 2007, Litwak "was trying to negotiate a bottled water license." (Tr. 95:4–8.) Litwak "solicited a $10,000 payment" in connection with this license agreement. (Contempt Order at 5, 6.)

51.     After entry of the TRO by Magistrate Judge Francis on August 20, 2007, a bottled water product appeared on the website http://jennifergucci.com/international_ design.html, (see Pl. Ex. 338), including the name JENNIFER GUCCI. [13] "Jennifer" was written in cursive while "Gucci" was displayed in a block text. (Id.) The water bottle had included the JENNIFER GUCCI name which is very similar in appearance – and, consequently, likely confusing to consumers – to Plaintiff's GUCCI Word Mark. And, the appearance of the word "GUCCI" on the water bottle in block text similar to that used by Plaintiff on its products only served to enhance the likelihood of consumer confusion between the JENNIFER GUCCI name and the GUCCI Word Mark. The water bottle also did not have a disclaimer that Jennifer Gucci was not affiliated with Plaintiff or Plaintiff's products. (See id.)

---

[13]     Litwak initially failed to disclose this license but the forensic examination of Litwak's computer "unearthed numerous additional documents, including those related to the water license." Judge Francis held Litwak in contempt of the TRO, on February 20, 2009, because, among other reasons, these documents "came within the TRO's requirements for disclosure." (Contempt Order at 12; see also supra n.2.)

52.     Litwak appears to have profited from his licensing activities because he "received numerous payments from investors and/or licensees for ventures involving the use of the names Jennifer Gucci and Gemma Gucci." (Pl. Findings ¶ 129.)

53.     At trial, Jennifer Gucci and Litwak conceded that their use of a GREEN-RED-GREEN Stripe design and/or a REPEATING JG in a diamond shaped pattern on packaging for licensed products would result in customer confusion with Plaintiff's GREEN-RED-GREEN Stripe design and its REPEATING GG pattern design. (Pl. Findings ¶ 131; see also Tr. 119:6–18 (J. Gucci: ("The Court: do you think that that [repeating diamond shaped] JG design is permissible, as you understand [Judge Conner's] order? A: No, I don't think it is permissible. . . . The Court: And what about this [GREEN-RED-GREEN Stripe] that goes around your picture? . . . A: I don't think it is permissible."); 180:16–19 (Litwak: "The Court: And why could [Avi Cohen not use a particular design]? A: Because . . . there were repeating diamonds in the back or repeating JGs."); 184:15–185:4 (Litwak: "I found out . . . that there are trademarks to the red-and-green that I never knew about, and so, therefore, we would never even think of using it. We do not want confusion. . . . The Court: So do you think it would be confusing? A: That would be confusing, yes.").) Jennifer Gucci and/or Litwak, however, approved of the use of these marks anyway. In light of Litwak's awareness of Gucci's use of a GREEN-RED-GREEN Stripe on its products, the Court found Litwak's remarks to be disingenuous and, frankly, not credible.

54.     Jennifer Gucci also testified that, although Litwak had specifically informed potential licensees of the details of an alleged movie about Jennifer Gucci's life being made in August 2007 (Pl. Ex. 28 ("The movie will be shot starting in August in Toronto for 30 days then moving on to Milan and Florence for the next 30 days"), such a movie was never made. (Tr. 98:16–23 ("The Court: But was that movie that is referred to in the email, was it shot in August in Toronto for 30 days? A: No, your Honor. The Court: Did it then move on to

21

Milan and Florence for the next 30 days?  A:  No.  The Court:  So that never happened?  A:
It never happened.").)  The Court concludes that this was, at best, inaccurate sales promotion
by Litwak.

55.   Defendants Jennifer Gucci and Gemma Gucci appear not to have any experience or
expertise associated with the products at issue and appear to have exercised little or no
quality control over any of the products licensed under the JENNIFER GUCCI (and/or
GEMMA GUCCI) name(s).  (Findings of Fact ¶¶ 32, 37, 44, 51.)  And, Litwak knew this.

**GEMMA GUCCI Licenses**

56.   Although Gemma Gucci did not design handbags (Tr. 135:23–25), on December 3, 2003,
Litwak licensed De Riera, a company owned by John Macaluso, to use the GEMMA
GUCCI name on handbags.  (Pl. Findings ¶ 99; Pl. Ex. 258.)  Litwak granted this license
even though the USPTO had rejected a trademark application for the word GEMMA
GUCCI on April 22, 2003.  (Findings of Fact ¶ 25.)

57.   Macaluso "developed a line of 'GEMMA BY GEMMA GUCCI' handbags under the license
issued by Litwak" which "were introduced at the Phoenix (Arizona) Fashion Week . . . in
early November 2007."  (Pl. Findings ¶ 105.)  The handbags were shown at the Phoenix
fashion show under the GEMMA GUCCI name which is very similar – and, consequently,
likely confusing to consumers – to Plaintiff's GUCCI Word Mark.  There was no indication
that the handbags had a disclaimer that Gemma Gucci was not affiliated with Plaintiff or
Plaintiff's products.  There was no evidence that these handbags were sold to customers.

58.   On November 14, 2007, Litwak canceled the license granted to De Riera because of
Macaluso's failure to make royalty payments.  (See Tr. 214:6–11.)  On February 14, 2008,
approximately seven months after the initiation of the instant litigation, Litwak sent
Macaluso an email stating that if Macaluso filed suit against Gucci in Arizona, then Litwak
would give Macaluso "a credit of up to five times what will be spent defending the case up

to a maximum of $300,000, and that credit will be applied to a new contract for the gelato or the handbag license." (Tr. 215:6–11.) At trial, Litwak acknowledged that he wanted Macaluso to bring a lawsuit against Gucci simply because Gucci had sued Defendants. (See Tr. 217:10–12 ("The Court: So essentially you wanted to sue them just because they sued you? A: That is correct.").)

59.    Although Gemma Gucci had no experience with gelato products and she had "never seen a GEMMA BY GEMMA GUCCI gelato product" prior to this lawsuit (Tr. 134:2–7), on December 3, 2003, Litwak licensed Gemma Gucci Gourmet Foods, Inc. ("Gemma Gucci Gourmet"), another company owned by Macaluso, to use the GEMMA GUCCI name in connection with food products, including ice cream. (Pl. Findings ¶ 99; Pl. Ex. 257.) Litwak granted this license even though the USPTO had rejected a trademark application for the word GEMMA GUCCI. (Findings of Fact ¶ 25.)

60.    Macaluso offered for sale a GEMMA BY GEMMA GUCCI gelato product. (Pl. Findings ¶ 103.) Litwak acknowledged that the gelato "was sold at a retail location in Arizona." (Pl. Findings ¶ 103.) The gelato packaging bore the words GEMMA BY GEMMA GUCCI which is very similar – and, consequently, likely confusing to consumers – to Plaintiff's GUCCI Word Mark. It also did not have a disclaimer that Gemma Gucci was not affiliated with Plaintiff or Plaintiff's products. (Pl. Ex. 189.)

61.    On September 28, 2005, Litwak licensed Gemma Gucci Wines, Inc. ("Gemma Gucci Wines"), a corporation in which Litwak was a partner with Richard Gazlay, to use the GEMMA GUCCI name in connection with wine distribution. (Pl. Findings ¶ 112; Pl. Ex. 182.) Litwak granted this license even though the USPTO had rejected a trademark application for the word GEMMA GUCCI. (Findings of Fact ¶ 25.)

62.    Gazlay selected the wines to be sold under the GEMMA GUCCI name. (Pl. Findings ¶ 115.) "Gazlay never discussed with Gemma Gucci what types of wine she preferred, nor

23

was she involved in actually selecting the wines that he ultimately chose." (Pl. Findings ¶ 115; Witness Statement of Richard Gazlay, dated June 17, 2008 ("Gazlay Stmt."), ¶ 7.)

63.    A wine bottle label was developed by Litwak and Gazlay and included the following features which likely confused consumers of GEMMA GUCCI wine with Paolo Gucci, The House of Gucci, and the Gucci Family:  the front label includes the words GEMMA BY GEMMA GUCCI; and the back label states, "For over a half century The Gucci Family have hosted lavish dinners and parties for heads of state, queens, kings and celebrities worldwide.  Gemma Gucci, daughter of patriarch Paolo, former head of design for The House of Gucci and granddaughter of Aldo Gucci has selected this special wine for the most discriminating taste.  As I am no longer affiliated with my parents' former company Guccio Gucci SPA I now bring my Florentine tradition especially for you." (Pl. Ex. 183, 342, 343.) Litwak provided the text for the label.  (Tr. 57:6–10.)

64.    Gazlay ordered approximately 800 cases of GEMMA BY GEMMA GUCCI wine from a California vineyard and approximately 600 of these cases were sold.  (Pl Findings ¶ 116; Tr. 55:24–25.)

65.    Gemma Gucci testified that she was not kept abreast of all of the licensing activities involving her name that were undertaken by Litwak.  (Tr. 130:14–17 ("Q:  So are you saying you were not being kept abreast of all the licensing that was going on with respect to your name when you were younger?  A:  Not every single one of them, no.").)  Gemma Gucci, however, allowed Litwak to license her name for use on products – even though the USPTO had rejected an application for the use of her name – without regard to whether such use would infringe upon the Gucci Trademarks.

66.    Defendants Jennifer Gucci and Gemma Gucci appear not to have any experience or expertise associated with the products at issue and appear to have exercised little or no

quality control over any of the above products licensed under the GEMMA GUCCI name. (Findings of Fact ¶¶ 56, 59, 60, 62.)

67.   Finally, Litwak also testified that he would like Plaintiff Gucci America, Inc. to buy out Jennifer Gucci's and Gemma Gucci's names for $20 million.  (Tr. 227:14–228:1 ("Q:  Mr. Litwak, isn't this all about you trying to get Gucci to buy you out?  A:  Would I like Gucci to buy me out? . . . I would love it if they would pay me $20 million.  Jenny and I could go off and have a nice time and Jenny could live comfortably up there and I could live in Belmar.  Q:  Did you ever write the words, 'In my perfect world, the Guccis would buy out Gemma's and Jennifer's names?'  A:  Probably, yes.  To this day I still believe that.").)

## III.   Conclusions of Law

### Plaintiff has Proven Trademark Infringement and False Designation of Origin under the Lanham Act

1.   Plaintiff's claims for [i] trademark infringement under 15 U.S.C. § 1114, and [ii] false designation of origin under 15 U.S.C. § 1125(a) are analyzed under substantially the same standard.  See W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 570–71 (2d Cir. 1993) ("In order to prevail on its claims of false designation of origin under 15 U.S.C. § 1125(a) or trademark infringement under 15 U.S.C. § 1114, [Plaintiff] must show a likelihood of confusion.")

2.   Plaintiff has shown that its marks are valid trademarks.  Tri-Star Pictures, 14 F. Supp. 2d at 353.  Indeed, there is no dispute that Plaintiff's marks are valid and entitled to protection and, thus, "the analysis turns to the likelihood of confusion."  Franklin Res., Inc. v. Franklin Credit Mgmt. Corp., 988 F. Supp. 322, 326 (S.D.N.Y. 1997).

3.   Plaintiff has proven likelihood of confusion between its GUCCI Word Mark and the names JENNIFER GUCCI and GEMMA GUCCI, between its GREEN-RED-GREEN Stripe and Defendants' use of a GREEN-RED-GREEN Stripe, and between its REPEATING GG

25

design, and Defendants' use of a REPEATING JG under "the non-exclusive multi-factor

test" developed by Judge Henry J. Friendly of the United States Court of Appeals for the

Second Circuit in <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492, 495 (2d Cir. 1961),

which considers: "[i] the strength of the mark, [ii] the similarity of the . . . marks, [iii] the

proximity of the products, [iv] actual confusion, [v] the likelihood of plaintiff's bridging the

gap, [vi] defendant's good faith in adopting its mark, [vii] the quality of defendant's

products, and [viii] the sophistication of the consumers." <u>Louis Vuitton Malletier v. Dooney</u>

<u>& Bourke, Inc.</u>, 454 F.3d 108, 116 (2d Cir. 2006).

4.    Plaintiff has also proven that the Defendants willfully infringed upon the Gucci Trademarks

because, among other reasons, they had knowledge that their use of the JENNIFER GUCCI

name, the GEMMA GUCCI name, a GREEN-RED-GREEN Stripe, and/or a REPEATING

GG infringed upon the Gucci Trademarks and/or they demonstrated a reckless disregard for

Plaintiff's trademark rights in adopting their marks. "Willful infringement may be attributed

to the defendant's actions where [they] had knowledge that [their] conduct constituted

infringement or where [they] showed a reckless disregard for the owner's rights." <u>Yurman</u>

<u>Studio, Inc. v. Castaneda</u>, No. 07 Civ. 1241, 2008 U.S. Dist. LEXIS 99849, at *6 (S.D.N.Y.

Dec. 1, 2008).

**Strength of Plaintiff's Marks**

5.    The Gucci Trademarks at issue, <u>i.e.</u>, the GUCCI Word Mark, the GREEN-RED-GREEN

Stripe, and the REPEATING GG, are strong marks because, among other reasons, Plaintiff's

trademark registrations (<u>i.e.</u> for the GUCCI Word Mark and the GREEN-RED-GREEN

Stripe, and the REPEATING GG) are "registered trademarks [which] are presumed to be

distinctive and should be afforded the utmost protection." <u>Lois Sportswear, U.S.A., Inc. v.</u>

<u>Levi Strauss & Co.</u>, 799 F.2d 867, 871 (2d Cir. 1986). And, Plaintiff's trademark

registrations for the GUCCI Word Mark and the GREEN-RED-GREEN Stripe have been in

place for more than five years, thus their "entitlement to protection is incontestable" and they are "deemed to be strong and to have developed secondary meaning." <u>24 Hour Fitness USA, Inc. v. Tribeca Fitness, LLC</u>, 277 F. Supp. 2d 356, 361 (S.D.N.Y. 2003).

6. Several courts in this district have found that the Gucci Trademarks are strong marks. <u>See Gucci Am., Inc. v. Action Activewear, Inc.</u>, 759 F. Supp. 1060, 1064 (S.D.N.Y. 1991) ("The Gucci marks at issue consist, inter alia, of variations of a "GG" symbol, green and red stripes [and the Gucci word mark] . . . constitute 'strong' trademarks, which are accorded the broadest protection against infringement."); <u>Gucci Am., Inc. v. Dart, Inc.</u>, 715 F. Supp. 566, 568 (S.D.N.Y. 1989) ("The green-red-green stripe device is a strong mark"); <u>Gucci Shops</u>, 688 F. Supp. at 925 (finding "great strength of the 'Gucci' marks").

7. This <u>Polaroid</u> factor weighs strongly in favor of Plaintiff.

**Similarity of the Marks**

8. Plaintiff argues, among other things, that "the primary names in question here – JENNIFER GUCCI and GEMMA GUCCI on the one hand and GUCCI on the other hand – are for all intents and purposes, identical" and "the green-red-green stripe design and the repeating diamond-shaped pattern, which Jennifer Gucci and Litwak encouraged and/or approved for use, are highly similar, if not identical to Gucci's GREEN-RED-GREEN Stripe Design and REPEATING GG Pattern marks." (Pl. Findings ¶ 45.)

9. There is strong similarity between Plaintiff's registered GUCCI Word Mark and the names JENNIFER GUCCI and GEMMA GUCCI as used by Defendants, <u>i.e.</u>, Defendants' licensing products and/or selling products which bear the names JENNIFER GUCCI and/or GEMMA GUCCI creates a likelihood that an appreciable number of ordinarily prudent purchasers will be misled or confused as to the source or sponsorship of the goods. <u>See Carl Zeiss Stiftung v. Veb Carl Zeiss Jena</u>, 433 F.2d 686, 706 (2d Cir. 1970) ("Here the key words are 'Zeiss' and 'Carl Zeiss.' These names represent trademarks . . . and [c]onfusion is

not avoided by adding the words 'VEB' and 'Jena'"); see also Gucci Shops, 688 F. Supp. at 925; A.V. by Versace, Inc. v. Gianni Versace, S.p.A., 87 F. Supp. 2d 281, 285 (S.D.N.Y. 2000) (preliminary injunction "prohibited Mr. [Alfredo] Versace from using his name as a trademark"); Petrie Method, Inc. v. Petrie, No. 88 Civ. 3289, 1988 U.S. Dist. LEXIS 14189, at *5 (E.D.N.Y. Dec. 6, 1988) ("The name Petrie is not only the salient feature of the trademark, however, but also David Petrie's family name."); Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd., 662 F. Supp. 203, 207 (S.D.N.Y. 1987) (there is "close similarity of the Bertolli trademark" and Filippo Bertolli's use of his surname in "the name 'Filippo Bertolli Fine Foods'").

10.     Consumers would be justified reasonably in believing that products bearing the names JENNIFER GUCCI and/or GEMMA GUCCI come from the same source as Plaintiff's products because of the presence of "Gucci" in Defendants' licensed products, particularly where JENNIFER GUCCI and GEMMA GUCCI are used as "the dominant part of the mark." Versace, 2003 U.S. Dist. LEXIS 14858, at *38 ("Both marks have the surname 'Versace' as the 'focal point' of the designation").

11.     For example, the typeface used by Defendants for the JENNIFER GUCCI name on the bedding, hosiery, cosmetics, and water packaging is nearly identical to the block typeface used by Plaintiff on its products. (Compare Pl. Ex. 22, 23, 24, 25, 36, 87, 338 with Pl. Ex. 233); see Banff, Ltd. v. Federated Dept. Stores, Inc., 638 F. Supp. 652, 656 (S.D.N.Y. 1986) ("Similarity of typefaces must be considered as aggravating the similar impression generated by the two closely worded labels").

12.     As noted, the USPTO denied Jennifer Gucci's and Gemma Gucci's application(s) to register trademarks including the "Gucci" name based upon the "similarity between the marks." (Pl. Ex. 92 (similarities between the marks of Jennifer Gucci and Gucci "are so great as to create a likelihood of confusion" and "given the fame of the GUCCI line of marks, there can be

little doubt that consumers are likely to be confused as to the source of the respective parties' goods."), Pl. Ex. 227 ("the applicant's mark [GEMMA GUCCI] . . . [is] likely to cause confusion, or to cause mistake, or to deceive" and "although applicant's mark adds another term to the well known GUCCI name, this is not controlling . . . the mere addition of a term to a registered mark is not sufficient to overcome a likelihood of confusion."); see also M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha, 250 F. Supp. 2d 91, 98 (E.D.N.Y. 2003) ("courts in the Second Circuit must give great weight to the USPTO's refusal to register a defendant's mark").

13.  Jennifer Gucci and Litwak acknowledged that there was similarity – and potential consumer confusion – between Plaintiff's GREEN-RED-GREEN Stripe design and its REPEATING GG Pattern trademarks and Defendants' use of a GREEN-RED-GREEN Stripe and/or a REPEATING JG in a diamond shaped pattern.  (Findings of Fact ¶ 52; see also Tr. 119:6–18 (J. Gucci: ("The Court:  do you think that that [repeating diamond shaped] JG design is permissible, as you understand [Judge Conner's] order? A:  No, I don't think it is permissible. . . . The Court:  And what about this green-red-green stripe that goes around your picture? . . . A:  I don't think it is permissible."); 180:16–19 (Litwak:  "The Court:  And why could [Avi Cohen not use a particular design]? A:  Because . . . there were repeating diamonds in the back or repeating JGs."); 184:15–185:4 (Litwak:  "I found out . . . that there are trademarks to the red-and-green that I never knew about, and so, therefore, we would never even think of using it.  We do not want confusion. . . . The Court:  So do you think it would be confusing?  A:  That would be confusing, yes.").)).

14.  This Polaroid factor weighs strongly in favor of Plaintiff.

**Proximity of the Products**

15.  Proximity concerns "whether the products or services sold under the parties' marks compete with one another."  O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 522

(S.D.N.Y. 2008).  "The inquiry includes both market and geographic proximity.  Market proximity asks whether the two products are in related areas of commerce while geographic proximity looks to geographic separation of the products."  Juicy Couture v. L'Oreal USA, Inc., No. 04 Civ. 7203, 2006 U.S. Dist. LEXIS 20787, at *70 (S.D.N.Y. Apr. 19, 2006).

16.   Plaintiff sells a product line of handbags, luggage, men's apparel, women's apparel, apparel accessories, sunglasses, footwear, jewelry, watches, fragrances, home products and (even) automobiles.  (Findings of Fact ¶ 7.)  Defendants licensed and/or planned to sell handbags, women's apparel, cosmetics, and home products which would bear either the JENNIFER GUCCI name, the GEMMA GUCCI name, a GREEN-RED-GREEN Stripe, and/or a REPEATING JG design.  Because Defendants' products would "compete in the same market[,] there is a large degree of competitive proximity."  Landscape Forms, Inc. v. Columbia Cascade Co., 117 F. Supp. 2d 360, 367 (S.D.N.Y. 2000).

17.   Defendants' licenses and/or sales of wine, coffee, gelato, and water may not compete directly with Plaintiff's product line but "direct competition between the products is not a prerequisite to relief," because "competitive proximity must be measured with reference to the first two Polaroid factors."  Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987); (see Concl. of Law ¶¶ 7, 14.)  The significant strength of the Gucci Trademarks requires that they be given broad protection against infringers.  Id.  And, the substantial similarity between the Gucci Trademarks and the marks used by Defendants (i.e., the JENNIFER GUCCI name, the GEMMA GUCCI name, a GREEN-RED-GREEN Stripe, and/or a REPEATING JG Design) "entitles [Gucci's] marks to protection over a broader range of related products."  Id. at 258; see also Sears, Roebuck & Co. v. Sears Realty Co., No. 89 Civ. 1350, 1990 U.S. Dist. LEXIS 16395, at *34 (N.D.N.Y. 1990) ("[w]here strong and well known marks are used by others, the scope of protection, will extend far to other product fields."); Quality Inns Int'l, Inc. v. McDonald's Corp., 695 F. Supp. 198, 221 (D.

Md. 1988) (proximity between fast food restaurants and motels); <u>John Walker & Sons, Ltd.</u> <u>v. Bethea</u>, 305 F. Supp 1302 (D.S.C. 1969) (proximity between scotch whiskey and motels).

18.    "The degree of proximity between the products [or services] is relevant here primarily insofar as it bears on the likelihood that customers may be confused as to the source of the products, rather than as to the products themselves, and the concern is not direct diversion of purchasers but indirect harm through loss of goodwill or tarnishment of reputation." <u>McGregor-Doniger, Inc. v. Drizzle, Inc.</u>, 599 F.2d 1126, 1135 (2d Cir. 1979); <u>see also</u> <u>Gucci</u> <u>Shops</u>, 688 F. Supp. at 925.

19.    Although Plaintiff does not currently sell coffee, water, wine, or gelato, "it is reasonable to assume that consumers may believe that [Defendants' products are] produced by the same company . . . or that the product[s] [are] a joint effort," <u>Guinness United Distiller v.</u> <u>Anheuser-Busch, Inc.</u>, No. 02 Civ. 861, 2002 WL 1543817, at *4 (S.D.N.Y. July 12, 2002), because the Gucci Trademarks are "'famous' and 'well known' . . . [there is a] greater likelihood that use [of the JENNIFER GUCCI or GEMMA GUCCI names] on noncompetitive products will cause confusion," <u>Sears, Roebuck & Co.</u>, 1990 U.S. Dist. LEXIS 16395, at *34; (<u>see also</u> USPTO Application No. 76/228,124, Pl. Ex. 92 (similarities between the marks of JENNIFER GUCCI and GUCCI "are so great as to create a likelihood of confusion" and "given the fame of the GUCCI line of marks, there can be little doubt that consumers are likely to be confused as to the source of the respective parties' goods."); USPTO Application No. 78/173,379, Pl. Ex. 227 ("the applicant's mark [GEMMA GUCCI] . . . [is] likely to cause confusion, or to cause mistake, or to deceive" and "although applicant's mark adds another term to the well known GUCCI name, this is not controlling . . . the mere addition of a term to a registered mark is not sufficient to overcome a likelihood of confusion.").

31

20.    Moreover, the text on the GEMMA BY GEMMA GUCCI wine labels (purposefully)

exploits the Gucci Trademarks by discussing Gucci family tradition (Pl. Ex. 183, 342, 343

("The Gucci Family have hosted lavish dinners and parties for heads of state, queens, kings

and celebrities worldwide.  Gemma Gucci, daughter of patriarch Paolo, former head of

design for The House of Gucci and granddaughter of Aldo Gucci has selected this special

wine for the most discriminating taste")).  "The talk about family tradition undoubtedly

further tended to promote confusion." John B. Stetson Co. v. Stephen L. Stetson Co., 85

F.2d 586, 588 (2d Cir. 1936).

21.    But, even if consumers do not consciously conclude or speculate that Defendants' product is

affiliated with Plaintiff's, there is the likelihood that consumers will be attracted to

Defendants' product "by the 'good will' and positive image" established by the Gucci

Trademarks.  "The trademark laws are designed to avoid this type of subtle confusion, even

if it might be dispelled by the consumer herself upon further investigation." Frank

Brunckhorst Co. v. G. Heileman Brewing Co., 875 F. Supp. 966, 970 (E.D.N.Y. 1994).

22.    The parties' products are also in geographic proximity because "Plaintiff distributes its

goods nationally so that whichever area [D]efendants enter, [P]laintiff will have preceded

them." Polo Fashions, Inc. v. Extra Special Prod., Inc., 451 F. Supp. 555, 561 (S.D.N.Y.

1978).

23.    This Polaroid factor weighs in favor of Plaintiff.

**Bridging the Gap**

24.    Plaintiff and Defendants occupy the same market for cosmetics, bedding, handbags, and

hosiery and with respect to these products (which bore either the JENNIFER GUCCI name,

the GEMMA GUCCI name, a GREEN-RED-GREEN Stripe, and/or a REPEATING JG

design) "there is no gap to bridge." Rush Indus. v. Garnier LLC, 496 F. Supp. 2d 220, 228

(E.D.N.Y. 2007).

25.     Although Plaintiff has not previously sold coffee, water, wine, or gelato "the trademark owner does not lose . . . merely because it has not previously sold the precise good or service sold by the secondary user." Virgin Enters. v. Nawab, 335 F.3d 141, 150 (2d Cir. 2003). "Consumers may well assume 'in this era of corporate diversification that the parties are related companies.'" Frank Brunckhorst, 875 F. Supp. at 980 (quoting Lambda Elecs. Corp. v. Lambda Tech., Inc., 515 F. Supp. 915, 926 (S.D.N.Y. 1981).

26.     This Polaroid factor weighs in favor of Plaintiff.

**Actual Confusion**

27.     Actual confusion is "highly probative of the likelihood of confusion, and proof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion," R.F.M.A.S., Inc. v. So, No. 06 Civ. 13114, 2009 U.S. Dist. LEXIS 45907, at *110–11 (S.D.N.Y. May 13, 2009), or "empirical studies or expert testimony," Atlantic Richfield Co. v. Arco Globus Int'l Co., No. 95 Civ. 6361, 1997 U.S. Dist. LEXIS 9397, at *24 (S.D.N.Y. May 29, 1997).

28.     Plaintiff did not present any expert testimony as to actual confusion and, although Plaintiff argues that "various websites, including www.gucci.news.newslib.com; www.transnationale.org, and www.zib.com" listed articles and press releases concerning the activities of Defendants' third-party licensees as recent news about Gucci, (Pl. Findings ¶ 47), these websites were not entered as trial exhibits.

29.     Plaintiff did not conduct, as far as the Court is aware, a customer survey and "[a]lthough consumer surveys are not necessary to prove a likelihood of confusion, the lack of survey evidence weighs against any finding of actual confusion between the parties' marks." Patsy's Italian Rest., Inc. v. Banas, 531 F. Supp. 2d 483, 486 (E.D.N.Y. 2008).

30.     Although "the Second Circuit recognizes that evidence of actual confusion is substantial proof that strongly supports its likelihood," Register.com, Inc. v. Domain Registry of Am.,

No. 02 Civ. 6915, 2002 U.S. Dist. LEXIS 24795, at *39 (S.D.N.Y. Dec. 27, 2002), a

"Plaintiff need not provide evidence of a single instance of actual confusion to prevail on the

merits," Generation X Int'l Corp. v. No Excuses Sportswear, No. 98 Civ. 1935, 1998 U.S.

Dist. LEXIS 4693, at *22 (S.D.N.Y. Apr. 3, 1998).

31.    There is ample evidence in the record that Defendants' use of the JENNIFER GUCCI name,

the GEMMA GUCCI name, a GREEN-RED-GREEN Stripe, and a REPEATING JG on the

products detailed above in the Court's Findings of Fact creates a strong likelihood that an

appreciable number of ordinarily prudent purchasers would be misled or confused as to the

source or sponsorship of goods which bear these marks because, among other reasons, of (i)

the strength of Plaintiff's GUCCI Word Mark, its GREEN-RED-GREEN Stripe and its

REPEATING GG; (ii) the similarity between Defendants' marks as compared with the

Gucci Trademarks; and (iii) the Defendants adopted their marks in bad faith and intended to

trade upon the goodwill of the Gucci Trademarks.  (See Findings of Fact ¶¶ 10, 22–25, 28,

30, 33, 35–38, 40–43, 47; Concl. of Law ¶¶ 33–41.)  And, the Defendants' bad faith in

adopting very similar versions of the Gucci Trademarks for use on their own products

"raises the presumption of a likelihood of confusion." Tri-Star Pictures, 14 F. Supp. 2d at

357.

32.    This Polaroid factor weighs in favor of Plaintiff.

**Defendants' Bad Faith**

33.    A defendant's bad faith in adopting a senior user's trademark "raises the presumption of a

likelihood of confusion." Tri-Star Pictures, 14 F. Supp. 2d at 357.  This factor focuses on

"whether the defendant adopted its mark with the intention of capitalizing on plaintiff's

reputation and goodwill and any confusion between his and the senior user's product." Lang

v. Retirement Living Pub. Co., 949 F.2d 949, 583 (2d Cir. 1991).  Bad faith can be

demonstrated through "a showing of actual or constructive knowledge of the prior user's mark." Versace, 2003 U.S. Dist. LEXIS 14858, at *36.

34.    Defendants acted with bad faith.  Among other things, Defendants were fully aware of the Gucci Trademarks; and they were also fully aware of the USPTO's findings that the similarities between the marks of JENNIFER GUCCI and GUCCI "are so great as to create a likelihood of confusion" and "given the fame of the GUCCI line of marks, there can be little doubt that consumers are likely to be confused as to the source of the respective parties' goods" and "the applicant's mark [GEMMA GUCCI] . . . [is] likely to cause confusion, or to cause mistake, or to deceive" and "although applicant's mark adds another term to the well known GUCCI name, this is not controlling . . . the mere addition of a term to a registered mark is not sufficient to overcome a likelihood of confusion." (Pls. Ex. 92, 227.) They nevertheless sought to trade upon the "Big Gucci" name.  (Tr. 64:4–8 (J. Gucci: "Q:  do you agree, Ms. Gucci, that the Gucci Company name is well known?  A:  Of course.); Tr. 147:24–148:4 (G. Gucci: "Q:  Would you agree that the Gucci Company name is well known, Ms. Gucci?  A:  Yes.").).

35.    Defendants also failed to obtain a written legal opinion as to the scope of Jennifer and/or Gemma Gucci's rights before embarking upon an extensive licensing campaign.  (Tr: 156:23–157:13 ("The Court:  Did you ever consult with an attorney to draw the legal conclusion that you have drawn that Gemma Gucci and Jennifer Gucci have the same rights that Paolo Gucci had deriving from Judge Conner?  A:  Yes, from Donald Parson [Litwak's "attorney at the time"]. . . The Court:  Did he give you a written opinion to that effect?  A: He drafted the contract but he never gave me a written opinion.  The Court:  So do you have any written legal basis for drawing the legal conclusion that you have drawn? . . . A:  No.")).

36.    Litwak conceded that the Veratex bedding "will have a Gucci-esque look with some horse themes" (Findings of Fact ¶ 35); Jennifer Gucci granted Litwak the right to license a

trademark that had already been rejected for registration by the USPTO ("Q: This trademark application was refused, was it not?  A: Of course, yes.")); Gemma Gucci allowed Litwak to license her name even though the USPTO denied her trademark application for the words GEMMA GUCCI (Pl. Ex. 227 ("the applicant's mark . . . [is] likely to cause confusion, or to cause mistake, or to deceive")); Litwak attempted to persuade Macaluso to sue Gucci in Arizona in ("tit for tat") retaliation for Gucci's suit before this Court (Tr. 217:10–12 ("The Court: So essentially you wanted to sue them just because they sued you?  A: That is correct.")); Litwak licensed Gemma Gucci's name although Gemma Gucci's signature on the February 2, 2004 license agreement was apparently forged (Tr. 122:25–123:15 ("Q: Is that your signature on the signature page? A: No.  Q: Do you know who signed your name to this document, Ms. Gucci?  A: I don't. . . . Q: Whoever signed your name to that agreement, did you authorize them to do that?  A: No.")); Gemma Gucci failed to keep abreast of Litwak's licensing activities which relied upon her name (Tr. 130:14–17 ("Q: So are you saying you were not being kept abreast of all the licensing that was going on with respect to your name when you were younger?  A: Not every single one of them, no.")); Litwak emailed Jaffe the Veratex Packaging (which bore the JENNIFER GUCCI name, a GREEN-RED-GREEN Stripe, and a REPEATING JG) and stated, "See if this works better for you" (Pl. Ex. 23, 26); and Jennifer Gucci reviewed the Veratex Packaging and informed Cohen, "OK, Avi, that is fine whatever you think will sell better, that's what it's all about" (Tr. 84:17–24; Pl. Ex. 100).

37.   As further evidence of bad faith, Magistrate Judge Francis held "Litwak violated the terms of the TRO by failing to provide a copy of it to persons with whom he has entered into licensing agreements and by failing to produce discovery materials as required." (Contempt Order at 15.)  As noted, Judge Francis also ordered the forensic examination of Litwak's computer to recover documents and emails that were either deleted or not previously

disclosed, as required by the TRO, and Judge Francis convened a conference on or about November 28, 2007 at which the parties agreed that Plaintiff may conduct a forensic examination of Jennifer Gucci's computer, (see Order, dated Oct. 23, 2007; Order dated Aug. 14, 2008), both of these forensic examinations resulted in the recovery of emails damaging to Defendants' case because they tended to show that Jennifer Gucci approved of packaging which had the JENNIFER GUCCI name, a GREEN-RED-GREEN Stripe, and a REPEATING JG, and that Litwak appeared to direct Jaffe to use logo designs on hosiery packaging which were similar to Plaintiff's GREEN-RED-GREEN Stripe and REPEATING GG marks. (See Pl. Ex. 95 (In an email, dated February 28, 2007 from Jennifer Gucci to Cohen about the Veratex Packaging, she stated, "Great looking packaging."; Pl. Ex. 100 (In an email, dated March 2, 2007, Jennifer Gucci reviewed the Veratex Packaging stated, "OK, Avi, that is fine whatever you think will sell better, that's what it's all about."; Pl. Ex. 23, 26 (Litwak emailed Jaffe the Veratex Packaging stating, "See if this works better for you."). [14]

38.   Although they were not parties to the Gucci Shops litigation (where, in any event, Judge Conner held that "the rights granted to, and the obligations imposed upon [Paolo Gucci] by this Final Judgment are personal to Paolo Gucci," (Final Judgment at 7)), Defendants take the position in this case that they would be on firm legal ground so long as they license Jennifer Gucci and Gemma Gucci's names in accordance with the restrictions Judge Conner placed upon Paolo Gucci. (Findings of Fact ¶ 17.) [15]  Even assuming, arguendo, that Gucci

---

[14]    Judge Francis determined that "Litwak shall be liable for contempt sanctions in the amount of $1,000 per day for each day that he fails to comply with the notice requirement of the TRO" and "he shall be liable to Gucci for the attorneys' fees and costs incurred in connection with discovery necessitated by his failure to abide the TRO's discovery provisions." (Contempt Order at 15; see also supra n.2.)

[15]    Because Paolo Gucci had been a leading designer of Gucci products for many years, it seems implausible to place him in the same legal context as Jennifer Gucci and Gemma Gucci who had little or no reputation, skill, or experience as designers. (Findings of Fact ¶¶ 2, 16; see also Gucci Shops, 688 F. Supp. at 927.

Shops applied to Defendants, Defendants failed to comply with Judge Conner's directives. For example, when Jennifer Gucci viewed the cosmetics packaging (which used only her name on the bottle and no other trademark), she did not object and, in fact, stated that she "simply love[d] the red packaging very chic and rich lookin[g]." (Findings of Fact ¶ 47.) Her actions did not comport with Judge Conner's directive that Paolo Gucci could only use his full name if it were "as part of the phrase 'TRADEMARK DESIGNED (OR SELECTED) BY PAOLO GUCCI.'" (Findings of Fact ¶ 47; Tr. 94:19–95:1; Final Judgment at 4). See Gucci Shops, 688 F. Supp. at 927. In addition, a disclaimer such as the one imposed by Judge Conner on Paolo Gucci (i.e., which was to specify that he "is not affiliated or associated with Gucci or 'GUCCI' products") did not appear on any of the packaging developed in connection with the Jennifer Gucci licensed products, including bedding, cosmetics, hosiery and water (Findings of Fact ¶¶ 34, 44, 46, 51). See Gucci Shops, 688 F. Supp. at 927.

39.    Similarly, Gemma Gucci did not make a good faith effort to abide by Gucci Shops although she claimed that she did so. For example, a disclaimer did not appear on any of the packaging developed in connection with the GEMMA GUCCI handbags or gelato products (Findings of Fact ¶¶ 57, 60). The "disclaimer" which was used on the back label of the GEMMA BY GEMMA GUCCI wine bottle served only to increase potential confusion because it included specific references to Paolo Gucci, The House of Gucci, and the Gucci "family tradition" (Findings of Fact ¶ 61; Conclusions of Law ¶ 20). (See Pl. Ex. 183, 342, 343 ("The Gucci Family have hosted lavish dinners and parties for heads of state, queens, kings and celebrities worldwide. Gemma Gucci, daughter of patriarch Paolo, former head of

design for The House of Gucci and granddaughter of Aldo Gucci has selected this special wine for the most discriminating taste").)[16]

40.    In short, Jennifer Gucci and Gemma Gucci's trademarks appear – with Litwak as the licensing ringleader – to have been "adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade" built by Plaintiff in the Gucci Trademarks and, thus, "the inference of likelihood of confusion is readily drawn." Gucci Am., 759 F. Supp. at 1065.

41.    This Polaroid factor weighs strongly in favor of Plaintiff.

**Product Quality**

42.    There was little, if any, evidence presented as to the quality of Defendants' products, except it was shown that Defendants appear to have exercised little or no quality control over the products they licensed and that neither Jennifer Gucci nor Gemma Gucci demonstrated any experience or expertise associated with these products and, therefore, were unable to exercise quality control even if they were inclined to do so.  (Findings of Fact ¶¶ 33, 38, 45, 52, 55, 66); see also GMA Accessories, Inc. v. Croscill, Inc., No. 06 Civ. 6236, 2008 U.S. Dist. LEXIS 16052, at *30 (S.D.N.Y. Mar. 3, 2008).

43.    This Polaroid factor weighs in favor of Plaintiff.

**Customer Sophistication**

44.    "The inquiry into consumer sophistication considers the general impression of the ordinary purchaser buying under the normally prevalent conditions of the market and giving the

---

[16]    Nor did Gemma Gucci appear to comply with the judgment of a German Court (Findings of Fact ¶¶ 18, 57, 60, 63) which required that "the word 'designed' or 'styled' is to precede the name [Gemma Gucci]," (Def. Ex. 25; see also Findings of Fact ¶¶ 55, 58, 61), even though, the German judgment stated that "it is a prerequisite that the designer is actually 'Gemma Gucci' who designed the [product] marked with the identification 'Gemma by Gemma Gucci.'" (Def. Ex. 25.)  Gemma Gucci played no role in the design of the handbags (Findings of Fact ¶ 57), did not select any of the wines sold under her name (Findings of Fact ¶ 62), and had never seen a GEMMA GUCCI gelato product prior to Plaintiff's bringing this lawsuit (Findings of Fact ¶ 59).

attention such purchasers usually give in buying that class of goods." De Beers LV v. DeBeers Diamond, 440 F. Supp. 2d 249, 279 (S.D.N.Y. 2006).

45.    In general, "the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in a conclusion concerning the source or sponsorship of the product." Bristol Myers Squibb, Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1046 (2d Cir. 1992).

46.    Some courts have found that purchasers of designer goods may more likely be confused by similar marks because of their awareness of the status of the brand name. See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986) ("[W]e believe that it is a sophisticated jeans consumer who is most likely to assume that the presence of appellee's trademark stitching pattern on appellants' jeans indicates some sort of association between the two manufacturers."); Goodheart Clothing Co. v. Laura Goodman Enterprises, No. 87 Civ. 3752, 1988 U.S. Dist. LEXIS 8762, at *16 (S.D.N.Y. Aug. 10, 1988) ("On the contrary, we believe that it is a sophisticated scarves consumer who is most likely to assume that the presence of Goodheart's trademark on defendants' scarves indicated some sort of association between the two manufacturers."); see also Nipon v. Leslie Fay Cos., 216 B.R. 117, 132 (Bankr. S.D.N.Y. 1997). Thus, a consumer who is aware of the Gucci Trademarks could, arguably, be misled more easily by Defendants' use of the JENNIFER GUCCI or GEMMA GUCCI names, especially with a GREEN-RED-GREEN Stripe, and/or a REPEATING JG pattern. It "is the 'subliminal confusion' apparent in the relationship between the entities and the products that can transcend the competence of even the most sophisticated consumer." Leslie Fay Cos., 216 B.R. at 132.

47.    This Polaroid factor weighs in favor of Plaintiff.

48.    The Court finds Defendants' infringement in this case is willful because, among other reasons, Defendants were aware of the Gucci Trademarks; Defendants were aware that

Jennifer Gucci's and Gemma Gucci's USPTO trademark applications were denied; Jennifer Gucci approved the Veratex Packaging and the Erman Packaging that included marks which were highly similar to Plaintiff's GUCCI Word Mark, its GREEN-RED-GREEN Stripe, and REPEATING GG; Litwak essentially directed Jaffe to use the GREEN-RED-GREEN Stripe and REPEATING JG marks (both similar to the Plaintiff's GREEN-RED-GREEN Stripe and REPEATING GG marks) upon hosiery packaging; Gemma Gucci failed to keep herself apprised of Litwak's licensing of her name (a mark which was previously rejected by the USPTO); and Litwak failed to obtain a written trademark opinion of counsel as to whether Jennifer Gucci and/or Gemma Gucci could license their names in accordance with Judge Conner's directives before he embarked upon his extensive licensing campaign. (See Findings of Fact ¶¶ 37, 40, 41, 43, 47–49. 56, 57, 63, 65; Concl. of Law ¶¶ 33–41.) These acts show that Defendants "had 'knowledge that [their] conduct represented infringement or perhaps recklessly disregarded the possibility.'" Hermes Int'l v. Kiernan, No. 06 Civ. 3605, 2008 U.S. Dist. LEXIS 70506, at *11–12 (E.D.N.Y. Aug. 28, 2008) (quoting Kepner-Tregoe, Inc. v. Vroom, 186 F.3d 283, 288 (2d Cir. 1999)). Each of the Defendants was aware of the Gucci Trademarks and of the restrictions placed upon Paolo Gucci for the use of the "Gucci" family name but chose to ignore those restrictions and continued to license their names. The Court finds that Defendants "acted with knowledge of the unlawful nature of [their] actions or, at least, with reckless disregard to such unlawful actions." Hermes, 2008 U.S. Dist. LEXIS 70506, at *12.

49.   In sum, for the reasons stated above, upon weighing the Polaroid factors, the Court concludes that Plaintiff has demonstrated that Defendants willfully infringed the Gucci Trademarks with respect to the licenses granted and/or products sold using the JENNIFER GUCCI and/or GEMMA GUCCI names on handbags, women's apparel, cosmetics, home

products, wine, coffee, gelato, and water in the United States.[17]  Plaintiff has proven its

claims for [i] trademark infringement under 15 U.S.C. § 1114, [ii] false designation of origin

under 15 U.S.C. § 1125(a), [iii] deceptive acts and practices under N.Y. General Business

Law § 349, [iv] common law trademark infringement, and [v] common law unfair

competition.  See Carl Zeiss, 433 F.2d at 706; see also Gucci Shops, 688 F. Supp. at 925;

Versace, 87 F. Supp. 2d 281, 285 (S.D.N.Y. 2000); Bertolli USA, 662 F. Supp. at 207;

Petrie Method, Inc., 1988 U.S. Dist. LEXIS 14189, at *5; Tri-Star Pictures, 14 F. Supp. 2d

at 359; Avon Prods., 984 F. Supp. at 800.

**Trademark Dilution under the Lanham Act 15 U.S.C. § 1125(c)
and N.Y. General Business Law § 360-l**

50.  Plaintiff's claim for trademark dilution is governed by the Trademark Dilution Revision Act

of 2006, Pub. L. No. 109–312, 120 Stat. 1730 (1996) (codified in relevant part at 15 U.S.C.

§ 1125(c)(1)) ("TDRA").  "Under the TDRA, to establish a violation of the Act, a plaintiff

must show that: [i] its mark is famous; [ii] the defendant is making use of the mark in

commerce; [iii] the defendant's use began after the mark became famous; and [iv] the

defendant's use is likely to cause . . . dilution by blurring."  Tiffany Inc. v. eBay, Inc., 576 F.

Supp. 2d 463, 523 (S.D.N.Y. 2008).  While it is not entirely clear that the N.Y. General

Business Law § 360-l is coextensive with the TDRA, "both the federal and the state statutes

require that plaintiffs show a likelihood of dilution, rather than actual dilution."  Id.  "Thus,

while the two statutes may not be identical, they are substantively similar and may be

---

[17]      Plaintiff has also proven its claims under New York General Business Law § 349, common
law trademark, and common law unfair competition because these are analyzed under the same
standard.  See Tri-Star Pictures v. Unger, 14 F. Supp. 2d 339, 359 n.18 (S.D.N.Y. 1998) ("The
standards for trademark infringement are essentially the same under the Lanham Act, New York
law, and the common law."); Avon Prods. v. S.C. Johnson & Son, Inc., 984 F. Supp. 768, 800
(S.D.N.Y. 1997) ("the standards for bringing a claim under § 43(a) of the Lanham Act [15 U.S.C.
§ 1125(a)] are substantially the same as those applied to claims brought under the New York
common law for unfair competition and § 349 . . . of the New York General Business Law.").

analyzed together." Id.; see also Burberry Ltd. v. Euro Moda, Inc., No. 08 Civ. 5781, 2009
U.S. Dist. LEXIS 53250, at *26 n.3 (S.D.N.Y. June 10, 2009).

51.    Plaintiff has established that all of the Defendants violated the Lanham Act and New York
        General Business Law § 360-l.  For one thing, as discussed above (supra at Findings of Fact
        ¶¶ 22, 24), the Gucci Trademarks are famous and Defendants do not argue otherwise (see
        Def. Findings ¶¶ 118–128; see also Conclusions of Law ¶¶ 5–7).

52.    Second, among other things, Defendants' promotion of JENNIFER GUCCI bedding at a
        trade show; their promotion of JENNIFER GUCCI water products on a website;
        Defendants' display of GEMMA GUCCI handbags at the Phoenix Arizona fashion week;
        Defendants' licensing of JENNIFER GUCCI cosmetics; Defendants' licensing of
        JENNIFER GUCCI hosiery products; Defendants' licensing of JENNIFER GUCCI coffee
        products; and their sale of GEMMA GUCCI wine and gelato are sufficient to show the
        commercial use of the JENNIFER GUCCI name, the GEMMA GUCCI name, the GREEN-
        RED-GREEN Stripe and the REPEATING JG marks.  (See Findings of Fact ¶ 64
        ("approximately 600 cases of GEMMA BY GEMMA GUCCI wine were sold"), Findings of
        Fact ¶ 60 (Litwak acknowledged that the GEMMA BY GEMMA GUCCI gelato "was sold
        at a retail location in Arizona"); Findings of Fact ¶ 40 (the Veratex Packaging which bore
        the JENNIFER GUCCI name, the GREEN-RED-GREEN Stripe and the REPEATING JG
        marks were exhibited at a trade show to potential buyers); Findings of Fact ¶ 51 (a bottled
        water product appeared on the website http://jennifergucci.com/ international_design.html);
        Findings of Fact ¶ 57 (GEMMA BY GEMMA GUCCI handbags "were introduced at the
        Phoenix (Arizona) Fashion Week . . . in early November 2007."); Findings of Fact ¶ 35
        (Litwak licensed the Jenny Gucci Coffee company to use the JENNIFER GUCCI name in
        connection with establishing JENNIFER GUCCI coffee shops); Findings of Fact ¶ 42
        (Litwak licensed Proportion Fit to use the JENNIFER GUCCI name on hosiery products);

43

Findings of Fact ¶ 46 (Erman developed a cosmetics product line under the JENNIFER

GUCCI name in May 2007)); see also Cintas Corp. v. UNITE HERE, 601 F. Supp. 2d 571,

580 (S.D.N.Y. 2009) ("The 'commercial use in commerce' requirement of Section 1125(c)

must be performed for profit.").

53.   Third, Defendants' use of the JENNIFER GUCCI name, the GEMMA GUCCI name, the

GREEN-RED-GREEN Stripe and the REPEATING JG marks began after Plaintiff's marks

became famous.  (See Findings of Fact ¶¶ 8, 9, 25, 27); Audi AG v. Shokan Coachworks,

Inc., 592 F. Supp. 2d 246, 281 (N.D.N.Y. 2008).

54.   "The likelihood of blurring is generally assessed by a six-factor test: [i] similarity of the

marks, [ii] similarity of the products covered, [iii] sophistication of the consumers, [iv]

predatory intent, [v] renown of the senior mark, and [vi] renown of the junior mark." Id.

The first five factors are closely analogous to the Polaroid factors already analyzed in

evaluating Plaintiff's Lanham Act claims.  Landscape Forms, 117 F. Supp. 2d at 370; see

paragraphs 4 through 50, above.

55.   As the Court has found, there is [i] a high degree of similarity of Plaintiff's and Defendants'

marks (Concl. of Law ¶¶ 13, 15; Findings of Fact ¶¶ 23, 25, 53); [ii] the products and

markets upon which the marks were used are legally similar (Concl. of Law ¶¶ 24, 28;

Findings of Fact ¶¶ 7, 32, 33, 41, 44, 48, 55, 57, 59); [iii] Plaintiff's sophisticated customers

are likely to be confused (Concl. of Law ¶¶ 44–47); [iv] Defendants acted in bad faith and

clearly intended to trade upon the Gucci name (Concl. of Law ¶¶ 33–41; Findings of Fact ¶¶

9, 19, 25, 30, 35, 37, 42, 50, 56); and [v] Gucci's Trademarks are well-known and famous

(Findings of Fact ¶ 9; Concl. of Law ¶¶ 5–7; see also Concl. of Law ¶¶ 7, 14, 41).

56.   As to the sixth dilution by blurring factor, i.e., "renown of the junior mark," there was no

evidence presented that Jennifer Gucci's and/or Gemma Gucci's names – apart from their

unlawful association with Plaintiff Gucci – have any renown.  Quite the opposite.  (Tr.

44

102:11–14 (J. Gucci: "Q: Let me ask you, Ms. Gucci, with all respect, do you think anyone would have an interest in licensing the use of your name for any products or services if it were Jennifer Puddefoot? A: No.") Tr. 149:1–6 (G. Gucci: "Q: Do you think that anyone would be interested in licensing your name today if you had decided to go by the married name Mairs? . . . A: I think it's hard to say. In general, no.").) Thus, this factor weighs in favor of the Plaintiff. The Jennifer Gucci and/or Gemma Gucci names are "not well known, and . . . will likely lead consumers to associate [their] products with [Gucci]." Cartier, Inc. v. Deziner Wholesale, L.L.C., No. 98 Civ. 4947, 2000 U.S. Dist. LEXIS 4157, at *21 (S.D.N.Y. Apr. 3, 2000).

57.    Plaintiff has proven by that Defendants' use of the JENNIFER GUCCI name, the GEMMA GUCCI name, a GREEN-RED-GREEN Stripe and a REPEATING JG Design causes a likelihood of dilution of Plaintiff's GUCCI Word Mark, GREEN-RED-GREEN Stripe, and REPEATING GG Design under the Lanham Act and N.Y. General Business Law § 360-l. See Burberry Ltd, 2009 U.S. Dist. LEXIS 53250, at *26.

**Relief**

58.    To obtain a permanent injunction, Plaintiff "must demonstrate [i] actual success on the merits and [ii] irreparable harm." Gucci Am., Inc., 286 F. Supp. 2d at 289. "In cases of trademark infringement, a showing of likelihood of confusion establishes the element of irreparable harm." Cartier v. Aaron Faber, Inc., 512 F. Supp. 2d 165, 171 (S.D.N.Y. 2007). Plaintiff is clearly entitled to a permanent injunction. Id.

59.    "[I]f an individual enters a particular line of trade for no apparent reason other than to use a conveniently confusing surname to his advantage, the injunction is likely to be unlimited." Taylor Wine Co. v. Bully Hill Vineyards, Inc., 569 F.2d 731, 735 (2d Cir. 1978). "An absolute ban on the use of a surname is appropriate where the enjoined party's only interest in the use of the surname is to free ride on the reputation of a better known party." A.V. by

*Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 Civ. 9721, 2002 U.S. Dist. LEXIS 16323, at *42 (S.D.N.Y. Sept. 22, 2002).

60. Plaintiff requests that this Court "enjoin Defendants from [i] making any commercial use of the names Jennifer Gucci and/or Gemma Gucci; and [ii] copying and using any other designs or indicia that infringe upon other famous Gucci trademarks, including Gucci's famous GREEN-RED-GREEN Stripe Design and REPEATING GG Pattern Design marks" because, among other reasons, "there is simply no credible evidence that Jennifer Gucci or Gemma Gucci have any renown for design in the United States, or that Defendants' ventures were motivated by anything more than a desire to exploit and trade on the world famous Gucci Trademarks." (Pl. Findings at 44–45.) "Sweeping injunctive relief is needed to ensure that Defendants will not continue to further their scheme of licensing the Gucci name for any product or service for which an investor or licensee will pay them money." (Pl. Findings at 44–45.)[18]

61. Defendants argue unpersuasively, among other things, that the broad injunction requested by Plaintiff should not be entered because "Gemma Gucci has always maintained that she does not want to engage in any activities that would be the cause of likely confusion for consumers"; "Jennifer Gucci acted at all times in good faith belief that she had a right to use her family name under very strict guidelines, such as those provided in the Paolo Gucci Decision of Judge Conner"; and both Jennifer Gucci and Gemma Gucci are "willing to stipulate to this Court's entry of a permanent injunction and order which limits her to the use

---

[18]    The TRO entered on consent on August 20, 2007 prohibits "licensing, sublicensing, manufacturing, importing, exporting, advertising, promoting, displaying, distributing, circulating, offering for sale, selling or otherwise disposing of in any manner or removing from their respective business premises (except as otherwise provided herein) any products bearing the JENNIFER GUCCI name" and/or "imitating, copying or making unauthorized use" of the GUCCI Word Mark, a GREEN-RED-GREEN Stripe, and/or a REPEATING GG Pattern. (TRO at 3; Order, dated Apr. 8, 2008.) As noted, on or about April 8, 2008, Gemma Gucci agreed to be bound, through trial, by the TRO. (Stipulation and Order, dated Apr. 8, 2008, ("Stipulation and Order"), at 3.)

of her name in accordance with the terms of the Court Ordered stipulation between Gucci

S.p.A. and Gemma Gucci [by the German court], and to abide by any restrictions similar in

nature to those provided by Judge Conner's Judgment and Order in the Paolo Gucci case."

(Def. Findings at 7–8.)

62.    "In trademark cases involving the use of surnames . . . a later competitor who seeks to use

the same or similar name must take reasonable precautions to prevent mistake." Abraham

Zion Corp. v. Lebow, 761 F.2d 93, 104 (2d Cir. 1985) (internal quotations omitted); see also

Anheuser-Busch, Inc. v. Balducci Publ., 28 F.3d 769 (8th Cir. 1994);  E. & J. Gallo Winery

v. Gallo Cattle Co., 967 F.2d 1280 (9th Cir. 1992); A.B.C. Carpet Co. v. Naeini, No. 00 Civ.

4882, 2002 U.S. Dist. LEXIS 1129, at *10 (E.D.N.Y. Jan. 22, 2002); Ford Motor Co. v.

Ford Fin. Solutions, Inc., 103 F. Supp. 2d 1126 (N.D. Iowa 2000).  The Defendants did not

take such reasonable precautions.  (See Findings of Fact ¶¶ 33, 41, 46, 50, 52, 55, 58, 61.)

63.    Defendants have flouted, rather than abided by, the legal restrictions placed upon Paolo

Gucci in Gucci Shops – and presumably placed upon Litwak by Judge Conner as Paolo

Gucci's licensing agent or representative.  (See Findings of Fact ¶¶ 32–34, 36–37, 43–47,

51, 53, 60, 63; Concl. of Law ¶ 38 n.15.)

64.    This case calls for a broad injunction because, among other things, of the Court's findings (i)

of bad faith by Litwak, Jennifer Gucci, and Gemma Gucci; (ii) Defendants were fully aware

of the Gucci Trademarks; (iii) Defendants were fully aware of the USPTO's findings that

the similarities between the marks of JENNIFER GUCCI and GUCCI "are so great as to

create a likelihood of confusion" and "given the fame of the GUCCI line of marks, there can

be little doubt that consumers are likely to be confused as to the source of the respective

parties' goods" and "the applicant's mark [GEMMA GUCCI] . . . [is] likely to cause

confusion, or to cause mistake, or to deceive" and "although applicant's mark adds another

term to the well known GUCCI name, this is not controlling . . . the mere addition of a term

47

to a registered mark is not sufficient to overcome a likelihood of confusion" (Pls. Ex. 92, 227); (iv) Litwak masterminded an extensive unlawful licensing scheme even though he was aware of (and apparently included within) Judge Conner's injunction as an agent of Paolo Gucci and even though he was aware of the USPTO's rejections of Jennifer Gucci and Gemma Gucci's trademark applications; (v) Defendants failed to obtain a written legal opinion as to the scope of Jennifer and/or Gemma Gucci's licensing rights, if any, before embarking upon the extensive licensing campaign devised by Litwak; (vi) Litwak conceded that the Veratex bedding "will have a Gucci-esque look with some horse themes"; (vii) Jennifer Gucci granted Litwak the right to license a trademark that had already been rejected for registration by the USPTO; (viii) Gemma Gucci allowed Litwak to license her name even though the USPTO denied her trademark application for the words GEMMA GUCCI (Pl. Ex. 227); (ix) Litwak attempted to persuade Macaluso to sue Gucci in Arizona in ("tit for tat") retaliation for Gucci's suit before this Court; (x) Litwak licensed Gemma Gucci's name although Gemma Gucci's signature on the February 2, 2004 license agreement was apparently forged; (xi) Gemma Gucci failed to keep abreast of Litwak's licensing activities which relied upon her name; (xii) Litwak emailed Jaffe the Veratex Packaging (which bore the JENNIFER GUCCI name, a GREEN-RED-GREEN Stripe, and a REPEATING JG and, thus infringed Plaintiff's marks), and stated, "See if this works better for you"; (xiii) Jennifer Gucci reviewed the Veratex Packaging and informed Cohen, "OK, Avi, that is fine whatever you think will sell better, that's what it's all about" (Tr. 84:17–24; Pl. Ex. 100); (xiv) Magistrate Judge Francis was constrained to find that "Litwak violated the terms of the TRO by failing to provide a copy of it to persons with whom he has entered into licensing agreements and by failing to produce discovery materials as required"; and (xv) Judge Francis was also required to issue an order authorizing the forensic examination of Litwak's computers and to convene a conference on or about November 28, 2007 at which the parties

48

agreed that Plaintiff may conduct a forensic examination of Jennifer Gucci's computer both of which resulted in the recovery of emails and documents damaging to Defendants. (See Findings of Fact ¶¶ 10, 22–25, 28, 30, 33, 35–38, 40–43, 47, 50, 51, 58, 65; Conclusions of Law ¶¶ 33–41.)

65.   Jennifer Gucci, Gemma Gucci, and Litwak were using the Gucci name in areas in which they had no reputation, skill, or professional experience; neither Jennifer Gucci nor Gemma Gucci has a reputation, skill or knowledge as a designer of any of the products at issue; and Jennifer Gucci and Gemma Gucci are unknown as designers in the United States. "[T]he crucial factor of reputation [skill, and/or knowledge] is wholly absent in the present situation." Bertolli, 662 F. Supp. at 207 ("Hence, we fail to see any legitimate interest of defendants which would counsel in favor of allowing them to use Filippo Bertolli's name even in the restricted fashion suggested."); see also Lazzaroni USA Corp. v. Steiner Foods, No. 05 Civ. 4476, 2006 U.S. Dist. LEXIS 20962, at *19 (D.N.J. Apr. 10, 2006) ("Even if this Court were to consider 'Paolo Lazzaroni' to be a personal name, Defendants, as junior users of a mark likely to cause confusion, should be enjoined from its use" because, among other reasons, "it is more than conceivable that this is a blatant attempt to free-ride on the goodwill adhering to the 'Lazzaroni' mark."); Versace, 2002 U.S. Dist. LEXIS 16323, at *41 ("an absolute ban on the use of a surname is appropriate where the enjoined party's only interest in the use of the surname is to free ride on the reputation of a better known party."). "'Bad faith' in infringement cases is germane to a court's choice of remedy." Indep. Living Aids, Inc. v. Maxi-Aids, Inc., 127 Fed. Appx. 533, 536 (2d Cir. 2005); (see also Tr. 63:17–18 (J. Gucci: "Q: Ms. Gucci, you are not claiming in this case that you have the same reputation as a designer that Paolo Gucci had, are you?  A: No, I am not.  Q: Do you recall testifying at your deposition in this case that you did not consider yourself to be a well known designer in the U.S.?  A: That's correct.  Q: Do you recall also indicating that if

someone in the U.S. were to hear your name, their first thought would be that you were

Paolo Gucci's wife?  A:  Yes."); 147:7–9, 17–19 (G. Gucci: "Q:  You are not currently

working professionally as a designer, are you?  A:  Unfortunately, no. . . Q:  Would it be fair

to say, Ms. Gucci, that you do not currently have a reputation as a designer in the United

States?  A:  That's correct."); 158:11–23 (Litwak: "Q:  back in September 2007, when this

case first started, Jennifer Gucci was not well known as a designer in the United States, is

that correct? . . . A:  Not as a designer.  The Court:  What about Gemma Gucci? . . . A:  Not

as a designer.").)

66.    Thus, the appropriate injunction here is one that makes permanent the restrictions contained

in the TRO (on consent) by Judge Francis as to the instant products licensed by Defendants,

with some modifications for any new products or services sought to be offered by

Defendants going forward noted below.  (See TRO at 3); see also Bertolli, 662 F. Supp. at

207; Lazzaroni, 2006 U.S. Dist. LEXIS 20962, at *19; Versace, 2002 U.S. Dist. LEXIS

16323, at *41.

67.    Jennifer Gucci, Gemma Gucci, and Litwak, and their agents, servants, employees,

successors and assigns, and all persons in active concert or participation with them, are

hereby (i) permanently enjoined in the United States from making any commercial use of

the JENNIFER GUCCI and/or GEMMA GUCCI name, including licensing, sublicensing,

manufacturing, importing, exporting, advertising, promoting, displaying, distributing,

circulating, offering for sale, selling or otherwise disposing of in any manner with any

products which are the subject of this lawsuit (e.g., coffee, bedding, housewares, cosmetics,

hosiery, handbags, wine, and gelato); (ii) permanently enjoined from registering or

attempting to register a trademark with the USPTO (or any other U.S. trademark agency) for

the names JENNIFER GUCCI or GEMMA GUCCI, or any other name, mark or symbol that

is confusingly similar to any of the Gucci Trademarks for the use upon any of the products

which are the subject of this lawsuit; and they are (iii) permanently enjoined from imitating, copying or making unauthorized use of designs and indicia that infringe upon the Gucci Trademarks, including the following federally-registered trademarks owned by Gucci, including U.S. Trademark Registration Nos. 876,292, 959,338, 972,078, 1,093,769, 1,140,598, 1,168,477, 1,169,019, 1,168,922, 1,200,991, 1,202,802, 1,321,864, and 1,340,599 for the GUCCI Word Mark; U.S. Trademark Registrations Nos. 1,122,780, 1,123,224, and 1,483,526 for Gucci's GREEN-RED-GREEN Stripe design; and U.S. Trademark Registration Nos. 2,680,237, 3,072,547, and 3,072,549 for Gucci's REPEATING GG Design.

68.  Notwithstanding the need for and imposition of a broad injunction in this case, because injunctions should be "drawn as narrowly as possible," Joseph Scott Co. v. Scott Swimming Pools, Inc., 764 F.2d 62, 67 (2d Cir. 1985), Jennifer Gucci and Gemma Gucci may in the future be permitted to use their full names on any new products or services not included in paragraph 67 consistent with the following conditions:

(a)  they shall have received prior written approval for any such proposed use from the USPTO; and

(b)  they shall serve a copy of any USPTO application upon Plaintiff or Plaintiff's successor contemporaneously with the filing of any USPTO application; and

(c)  they shall have obtained a written opinion from recognized trademark counsel that any such use is lawful;

(d)  any such use shall relate to products or services actually designed by (or selected by) Jennifer Gucci and/or Gemma Gucci; and

51

(e) Jennifer Gucci and/or Gemma Gucci shall have acquired demonstrable reputation(s), skill and knowledge with respect to such products or services; and

(f) all uses of JENNIFER GUCCI and/or GEMMA GUCCI in connection with such products or services in advertisements or hang tags or promotional materials must be accompanied by a disclaimer, prominently displayed and unambiguously stating, that Jennifer and/or Gemma Gucci, respectively, is not affiliated or associated in any way with Gucci or "GUCCI" products; and

(g) Jennifer and Gemma Gucci shall adhere to the requirements of paragraphs 9 through 12 of Judge Conner's Final Judgment in Gucci Shops as entered on July 13, 1988.

**Monetary Damages**

69.    "A party that has established a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) is entitled to recover '[i] defendant's profits . . . and [ii] the costs of the action.'" de Venustas v. Venustas Int'l, LLC, No. 07 Civ. 4530, 2008 U.S. Dist. LEXIS 86581, at *3 (S.D.N.Y. Oct. 24, 2008) (quoting 15 U.S.C. § 1117(a)). "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).

**Accounting of Profits**

70.    Plaintiff "seeks an account of all monies received by Litwak in connection with Defendants' various licensing ventures." (Pl. Findings at 83.)

71.    "In order to recover an accounting of an infringer's profits, a plaintiff must prove that the infringer acted in bad faith." MasterCard Int'l, Inc. v. First Nat'l Bank of Omaha, Inc., No. 02 Civ. 3691, 2004 U.S. Dist. LEXIS 2485, at *34 (S.D.N.Y. Feb. 23, 2004). Profits include a "defendant's sales, while 'defendant must prove all elements of cost or deduction

claimed.'" AAA v. AAA Auto. Club of Queens, Inc., No. 97 Civ. 1180; 1999 U.S. Dist. LEXIS 8892, at *33 (E.D.N.Y. Feb. 17, 1999).

72. As discussed above, Plaintiff has shown that Defendants, including Litwak, acted in bad faith. GTFM, Inc. v. Solid Clothing, Inc., 215 F. Supp. 2d 273, 304 (S.D.N.Y. 2002); (see also Findings of Fact ¶¶ 10, 22–25, 28, 30, 33, 35–38, 40–43, 47, 50, 51, 58, 65; Concl. of Law ¶¶ 33–41.)

73. "A finder of fact may also consider [i] the degree of certainty that the defendant benefited from the unlawful conduct, [ii] availability and adequacy of other remedies, [iii] the role of a particular defendant in effectuating the infringement, [iv] plaintiff's laches; and [v] plaintiff's unclean hands, to determine whether, on the whole, the equities weigh in favor of an accounting." Id.

74. Clearly, Litwak accepted fees and funds from investors in Jennifer Gucci and/or Gemma Gucci licensing business ventures (Findings of Fact ¶¶ 33, 53), and appears to have profited from representing Jennifer Gucci and Gemma Gucci. See Altadis U.S.A. v. De Tabacos, No. 96 Civ. 4209, 2001 U.S. Dist. LEXIS 6892, at *8 (S.D.N.Y. May 17, 2001); see also Ptak Bros. Jewelry, Inc. v. Ptak, No. 06 Civ. 13732, 2009 U.S. Dist. LEXIS 50299, at *5 (S.D.N.Y. June 1, 2009) (defendants' sales showed "no doubt defendants benefitted from their unlawful conduct."); Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 136, 144 (S.D.N.Y. 2000) ("under deterrence rationale, a court may award a defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark").

75. The Court's imposition of an injunction is not adequate to remedy Defendants' past conduct because the injunction "only prevents future conduct." Gidatex, S.r.L., 82 F. Supp. 2d at 144.

76. Defendants, especially Litwak, were personally involved in "effectuating the infringement" by licensing the Jennifer Gucci and Gemma Gucci names for use on a wide range of

commercial products even though, among other things, the USPTO had rejected trademark applications filed by Jennifer Gucci and Gemma Gucci. (See Pl. Exs. 92, 227; Findings of Fact ¶¶ 20–25, 28, 31, 32, 43, 44, 48, 54, 57, 59); see also Mastercard, 2004 U.S. Dist. LEXIS 2485, at *34. They did not take precautions to avoid infringing Plaintiff's marks. (Findings of Fact ¶¶ 31, 32, 34, 43, 45, 47, 52, 61, 63; Concl. of Law ¶¶ 33–41.)

77.  Plaintiff is not barred by laches because "a maximum of six months delay [i.e., from February 10, 2007 when a Home Textiles Daily article was published in which Litwak discussed the debut of a JENNIFER GUCCI bedding line] does not constitute 'unreasonable delay.'" Playboy Enters. v. Chuckleberry Publ., 939 F. Supp. 1032, 1040 n.7 (S.D.N.Y. 1996); see also Eppendorf-Netheler-Hinz GmbH v. Enterton Co. Establishment, 89 F. Supp. 2d 483, 486 (S.D.N.Y. 2000) ("A showing of laches requires," among other things, "unreasonable delay.").

78.  And, there is no evidence in the record (nor do Defendants argue) that Plaintiff has "unclean hands."

79.  Having weighed the factors for determining whether to require an accounting of profits, the Court finds that an "accounting of profits is warranted, based on . . . the . . . evidence of [Defendants'] willful deception and the likelihood that [they] benefited from copying of the [Gucci Trademarks]." AAA, 1999 U.S. Dist. LEXIS 8892, at *33.

80.  Magistrate Judge Francis is respectfully requested to determine Plaintiff's monetary damages, if any, based upon an accounting of Defendants' "profits" and to determine which Defendants owe damages and in what proportion to one another (e.g., individually, jointly and severally, etc.). See W. E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 664 (2d Cir. 1970) ("It is essential to deter companies from willfully infringing a competitor's mark, and the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose all its profits from its use of the infringing

mark."); <u>AAA</u>, 1999 U.S. Dist. LEXIS 8892, at *33 ("Plaintiff will only bear the burden of

proving Defendants' sales, while 'defendant must prove all elements of cost or deduction

claimed.'") (quoting 15 U.S.C. § 1117(a)); <u>see also</u> <u>Nike, Inc. v. Top Brand Co.,</u> No. 00 Civ.

8179, 2005 U.S. Dist. LEXIS 42374, at *39 (S.D.N.Y. July 3, 2005).

**Punitive Damages**

81.    Plaintiff has requested punitive damages because, among other reasons, "a punitive

component is especially appropriate in this case, given Defendants' repeated disobedience of

numerous orders of this Court." (Pl. Findings ¶ 133.)

82.    "Punitive damages will only be awarded on a showing of aggravation or outrage, such as

spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a

conscious and deliberate disregard of the interests of others that the conduct may be called

willful or wanton." <u>Menashe v. V Secret Catalogue, Inc.,</u> 409 F. Supp. 2d 412, 426

(S.D.N.Y. 2006); <u>see e.g.,</u> <u>Pelonis USA, Ltd. v. Del-Rain Corp.,</u> No. 94 Civ. 587S, 2000

U.S. Dist. LEXIS 15279, at *12 (W.D.N.Y. Sept. 5, 2000). This is such a case. "While the

Lanham Act does not authorize an additional award of punitive damages for willful

infringement, punitive damages are available under New York law." <u>Pelonis USA,</u> 2000

U.S. Dist. LEXIS 15279, at *108 (citing <u>Getty Petroleum Corp. v. Bartco Petroleum Corp.,</u>

858 F.2d 103, 109 (2d Cir. 1988)).

83.    The Court awards Plaintiff punitive damages against Litwak (only) in an amount to be

determined by Magistrate Judge Francis, because, among other things, (i) Litwak

masterminded the licensing schemes which the Court determined were unlawful; (ii) Litwak

knew of the USPTO rejections; (iii) Litwak tried to instigate a revenge lawsuit against Gucci

by Macaluso; (iv) Litwak was held in contempt of the TRO; and (v) Litwak had knowledge

of and, appears to have been included in, the injunction in <u>Gucci Shops</u>. (<u>See</u> Findings of

Fact ¶¶ 10, 22–25, 28, 30, 33, 35–38, 40–43, 47, 50, 51, 58, 65; Concl. of Law ¶¶ 33–41.)

84.   Although it is a closer call, the Court does not find that Jennifer Gucci's and/or Gemma

Gucci's "conduct so outrageous or egregious as to justify punitive or exemplary damages,"

against them. L & L White Metal Casting Corp. v. Joseph, 387 F. Supp. 1349, 1358–59

(E.D.N.Y. 1975); Cartier, Inc. v. Four Star Jewelry Creations, Inc., 348 F. Supp. 2d 217, 254

(S.D.N.Y. 2004).

**Attorneys' Fees & Costs**

85.   "In a suit under the Lanham Act, attorney fees should be awarded only in exceptional cases

and only on evidence of fraud or bad faith." Gordon and Breach Science Publ. S.A. v.

Amer. Inst. of Physics, 166 F.3d 438, 439 (2d Cir. 1999); see also Playboy Enters, 687 F.2d

at 564 (affirming district court's "granting permanent injunctive relief . . . award[ing]

attorney fees but den[ying] any punitive damages."); L & L White Metal, 387 F. Supp. at

1358–59 ("award[ing] to the plaintiff reasonable attorney's fees" but "defendants' conduct

[was not] so outrageous or egregious as to justify punitive or exemplary damages.").

86.   Plaintiff is entitled to recover against Defendants its reasonable attorneys' fees in this case

because, as shown above, Defendants' acts of infringement involved violating Judge

Francis' TRO and were otherwise in bad faith (Conclusions of Law ¶¶ 33–41).  Since

"Defendants' infringement of [Plaintiff's] trademark was done in bad faith . . . this case is

deemed exceptional, and it is well within this Court's discretion to award [Plaintiff] its

reasonable attorney's fees." Fruit of the Loom, Inc. v. Am. Mktg. Enters., No. 97 Civ. 3510,

1999 U.S. Dist. LEXIS 3944, at *6–7 (S.D.N.Y. Mar. 26, 1999); N.Y. State Soc'y of CPA's

v. Eric Louis Assocs., 79 F. Supp. 2d 331, 348 (S.D.N.Y. 1999) ("Defendant had not

developed a reputation to speak of, [so] it simply helped itself to that of the plaintiff").

87.   Defendants had notice of Plaintiff's trademark registrations and rights, and of Plaintiff's

claims in this case, and of the Court's entry of a TRO, Bear U.S.A., Inc. v. JooAn, Co., No.

98 Civ. 7649, 2001 U.S. Dist. LEXIS 637, at *29 (S.D.N.Y. Jan. 25, 2001), but nevertheless,

improperly licensed the JENNIFER GUCCI and GEMMA GUCCI names (Findings of Fact ¶¶ 25–32, 41, 45, 47, 50, 55, 58, 60), and continued negotiating licenses of the JENNIFER GUCCI name after the entry of the TRO (Contempt Order at 15).

88.  Also, Defendants' conduct in discovery caused Judge Francis to enter an order for the forensic examination of Litwak's computers to recover emails and documents that were not disclosed, as required by the TRO and Judge Francis convened a conference on or about November 28, 2007 at which the parties agreed that Plaintiff may conduct a forensic examination of Jennifer Gucci's computer. (See Order, dated Oct. 23, 2007; Order, dated Aug. 14, 2008). The materials recovered were damaging to Defendants' case, including emails, in which Jennifer Gucci approved of packaging which had the JENNIFER GUCCI name, a GREEN-RED-GREEN Stripe, and a REPEATING JG, and in which Litwak appeared to direct Jaffe to use logo designs on hosiery packaging which were similar to Plaintiff's GREEN-RED-GREEN Stripe and REPEATING GG marks. (See Pl. Ex. 95 (In an email, dated February 28, 2007 from Jennifer Gucci to Cohen about the Veratex Packaging, she stated, "Great looking packaging."; Pl. Ex. 100 (In an email, dated March 2, 2007, Jennifer Gucci reviewed the Veratex Packaging stated, "OK, Avi, that is fine whatever you think will sell better, that's what it's all about."; Pl. Ex. 23, 26 (Litwak emailed Jaffe the Veratex Packaging stating, "See if this works better for you."). See also GTFM, Inc., 215 F. Supp. 2d at 306.

89.  The Court finds that "a particular need for deterrence is present in this case because of the defendants' bad faith violation of the [Lanham] Act." Mobius Mgmt. Sys. v. Fourth Dimension Software, 880 F. Supp. 1005, 1026 (S.D.N.Y. 1995); see also Indep. Living Aids, Inc., 25 F. Supp. 2d at 130; Goodheart Clothing Co., 1993 U.S. Dist. LEXIS 9173, at *3–4 ("the facts of record thoroughly support plaintiff's claim that the defendants'

infringement of plaintiff's trademark was made in bad faith . . . [therefore] plaintiff's motion . . . awarding attorney fees and costs is granted.").

90.   Plaintiff is also entitled to recover from the Defendants the reasonable costs of this legal action. Bear U.S.A., Inc., 2001 U.S. Dist. LEXIS 637, at *28.

91.   The case is referred to Magistrate Judge Francis also to determine Plaintiff's reasonable attorneys' fees and costs and to apportion these among Defendants.

### Defendants' Counterclaim for a Declaratory Judgment

92.   Defendants request a declaratory judgment for a "permanent injunction [which] will permit Jennifer Gucci and Gemma Gucci to utilize their respective names in the same or similar fashion as Paolo Gucci was permitted the right to use his name in [Gucci Shops] or in the same or similar fashion as provided in the [German Judgment]." (Defs. Findings ¶ 45.) Having determined, among other things, that Defendants do not stand in the shoes of Paolo Gucci, and that Defendants infringed upon the Gucci Trademarks, Jennifer Gucci's and Gemma Gucci's rights are appropriately outlined in paragraphs 67 and 68 supra. See also Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 365 F. Supp. 707, 720 (S.D.N.Y. 1973).

### Defendants' Counsel's Application to be Relieved as Counsel

93.   On or about November 18, 2008, Harrington, Ocko & Monk, LLP ("HOM") applied to be relieved as counsel for Defendants. (See Mem. of Law in Supp. of Mot. of Harrington, Ocko & Monk to be Relieved as Counsel, dated Nov. 18, 2008.) At a conference on February 9, 2009, Plaintiff's counsel proposed that the Court "set a date certain for trial and either Mr. Harrington [Defendants' lead counsel] goes forward or new counsel goes forward." (See Tr. of Proceedings, dated Feb. 9, 2009 ("Feb. 9 Tr."), 3:14–16.) Mr. Harrington replied, "I think that's fair." (Feb. 9 Tr. 3:18.) Mr. Harrington, in fact, represented Defendants during

the trial, and, consequently, HOM's application to be relieved as counsel is denied as moot but also without prejudice.

## IV.    Conclusion and Order

For the foregoing reasons, the Clerk of Court is respectfully requested to enter judgment in favor of Plaintiff enjoining Jennifer Gucci, Gemma Gucci, and Litwak, and their agents, servants, employees, successors and assigns, and all persons in active concert or participation with them, are hereby (i) permanently enjoined in the United States from making any commercial use of the JENNIFER GUCCI and/or GEMMA GUCCI name, including licensing, sublicensing, manufacturing, importing, exporting, advertising, promoting, displaying, distributing, circulating, offering for sale, selling or otherwise disposing of in any manner with any products which are the subject of this lawsuit (e.g., coffee, bedding, housewares, cosmetics, hosiery, handbags, wine, and gelato); (ii) permanently enjoined from registering or attempting to register a trademark with the USPTO (or any other U.S. trademark agency) for the names JENNIFER GUCCI or GEMMA GUCCI, or any other name, mark or symbol that is confusingly similar to any of the Gucci Trademarks for the use upon any of the products which are the subject of this lawsuit; and they are (iii) permanently enjoined from imitating, copying or making unauthorized use of designs and indicia that infringe upon the Gucci Trademarks, including the following federally-registered trademarks owned by Gucci, including U.S. Trademark Registration Nos. 876,292, 959,338, 972,078, 1,093,769, 1,140,598, 1,168,477, 1,169,019, 1,168,922, 1,200,991, 1,202,802, 1,321,864, and 1,340,599 for the GUCCI Word Mark; U.S. Trademark Registrations Nos. 1,122,780, 1,123,224, and 1,483,526 for Gucci's GREEN-RED-GREEN Stripe design; and U.S. Trademark Registration Nos. 2,680,237, 3,072,547, and 3,072,549 for Gucci's REPEATING GG Design.

Jennifer Gucci and Gemma Gucci may in the future be permitted to use their full names on any new products or services not included in paragraph 67 consistent with the following conditions:

(a) they shall have received prior written approval for any such proposed use from the USPTO; and

(b) they shall serve a copy of any USPTO application upon Plaintiff or Plaintiff's successor contemporaneously with the filing of any USPTO application; and

(c) they shall have obtained a written opinion from recognized trademark counsel that any such use is lawful;

(d) any such use shall relate to products or services actually designed by (or selected by) Jennifer Gucci and/or Gemma Gucci; and

(e) Jennifer Gucci and/or Gemma Gucci shall have acquired demonstrable reputation(s), skill and knowledge with respect to such products or services; and

(f) all uses of JENNIFER GUCCI and/or GEMMA GUCCI in connection with such products or services in advertisements or hang tags or promotional materials must be accompanied by a disclaimer, prominently displayed and unambiguously stating, that Jennifer and/or Gemma Gucci, respectively, is not affiliated or associated in any way with Gucci or "GUCCI" products; and

(g) Jennifer and Gemma Gucci shall adhere to the requirements of paragraphs 9 through 12 of Judge Conner's Final Judgment in Gucci Shops as entered on July 13, 1988.

Plaintiff is also entitled to an accounting of profits, its reasonable attorneys' fees and costs incurred in prosecuting this action, and punitive damages from Litwak, and these matters are hereby referred to United States Magistrate Judge James C. Francis, IV for a report and recommendation.

Defendants' counterclaim for a declaratory judgment is resolved at paragraph 92 supra.

And, for the reasons stated above, HOM's application to be relieved as counsel for the Defendants

[#108] is denied as moot.

The matter is respectfully referred to Judge Francis for further proceedings consistent with

these Findings of Fact and Conclusions of Law and with his order(s) in this case.

Dated: New York, New York
     August 5, 2009



RICHARD M. BERMAN, U.S.D.J.