UNITED STATES DISTRICT COURT             **(ECF)**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
GUCCI AMERICA, INC.,                     : 07 Civ. 6820 (RMB) (JCF)
                                         :
             Plaintiff,                  :
                                         :
     - against -                         :        REPORT AND
                                         :     <u>RECOMMENDATION</u>
JENNIFER GUCCI, JENCO DESIGNS, LLC,:
JENNICOR, LLC, JENNY GUCCI COFFEE  :
AND GELATO COMPANY, INC., VERATEX, :
INC., COLLEZIONE DI CASA, INC.,    :
E.L. ERMAN - DEAD SEA COSMETICS    :
CORP., ELE BRANDS ENTERPRISE, INC.,:
GBN WATCH COLLECTION, INC., GBN    :
GLOBAL BUSINESS NETWORK, EDWARD    :
LITWAK, d/b/a ED LITWAK &          :
ASSOCIATES, GEMMA GUCCI, GEMMA     :
GUCCI COFFEE AND GELATO COMPANY    :
INC., ABC CORPORATIONS 1-10, and   :
JOHN DOES 1-10,                    :
                                   :
             Defendants.           :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE RICHARD M. BERMAN, U.S.D.J.:

     Gucci America, Inc. ("Gucci") brings this action charging the

defendants with trademark infringement, trademark counterfeiting,

false designation of origin, trademark dilution, unfair

competition, and unfair and deceptive trade practices, in violation

of the Lanham Act, 15 U.S.C. § 1051 <u>et seq.</u>, and New York law.  On

August 5, 2009, after a bench trial, the Honorable Richard M.

Berman, U.S.D.J., issued Findings of Facts and Conclusions of Law

("Findings") in which he determined that Jennifer Gucci, Gemma

Gucci, and Edward Litwak (collectively, the "Individual

Defendants") willfully infringed and diluted the plaintiff's

trademarks.  He accordingly issued a broad, permanent injunction

against the Individual Defendants' further commercial use of

Jennifer Gucci and Gemma Gucci's names and their use of the plaintiff's trademarks.

Judge Berman then referred this matter to me to determine: (1) monetary damages; (2) punitive damages to be awarded against Mr. Litwak; and (3) attorneys' fees and costs.  On March 12, 2010, I held an inquest at which all of the parties, except for Jennifer Gucci, appeared.[1]  The plaintiff now moves for an award of $1,246,177.95 in damages and $1,894,756.14 in attorneys' fees and costs.

Background[2]

    A.   The Parties

Jennifer Gucci was previously married to the late Paolo Gucci, who served as Chief Designer for the Italian fashion house, Guccio Gucci, S.p.A. ("Gucci, S.p.A."), which is the plaintiff's Italian parent company.  (Findings at 5, ¶ 2; 6, ¶ 6).  Gemma Gucci is the couple's daughter.  (Findings at 6, ¶ 3).  Mr. Litwak conducts a licensing and marketing business called Ed Litwak and Associates.  (Findings at 6, ¶ 4).  He served as Paolo Gucci's licensing agent once Mr. Gucci left Gucci, S.p.A to open his own fashion business.  (Findings at 6, ¶ 4).  After Mr. Gucci's death in 1995, Mr. Litwak

_____

[1] The law firm of Harrington, Ocko & Monk, LLP ("HOM") represented all three of the defendants during the trial of this matter.  However, on December 23, 2009, I granted HOM's motion to be relieved as counsel for Jennifer Gucci and Edward Litwak.  (Order dated Dec. 23, 2009).  Mr. Litwak appeared at the inquest pro se, but Jennifer Gucci did not appear nor did she contact the Court concerning her inability to attend.  HOM continues to represent Gemma Gucci.

[2] Factual aspects of this case are set forth in more detail in the Findings.

began acting as the licensing agent for Jennifer Gucci and Gemma Gucci. (Findings at 6, ¶ 5).

  B.  <u>The Course of the Litigation</u>

  The plaintiff initiated this action on July 30, 2007 by filing a Complaint against Jennifer Gucci and Mr. Litwak as well as six named corporations and some unnamed corporations and individuals. (Complaint ("Compl."), ¶¶ 5-14).  The Complaint alleged that the defendants were infringing three of Gucci's trademarks –– for the Gucci name, for a Green-Red-Green Stripe, and for a Repeating GG Design (collectively, the "Gucci Trademarks") –– by selling consumer products under Jennifer Gucci's name. (Compl., ¶¶ 16, 21-33; Findings at 1-2).

  On August 20, 2007, I issued a temporary restraining order ("TRO") which prohibited Jennifer Gucci, Mr. Litwak, and the corporate defendants[3] "from licensing, sublicensing, manufacturing, importing, exporting, advertising, promoting, displaying, distributing, circulating, offering for sale, selling or otherwise disposing of in any manner or removing from their respective business premises . . . any products bearing the JENNIFER GUCCI name" or "imitating, copying or making unauthorized use" of the Gucci Trademarks. (TRO at 3-4).  The TRO was extended, on consent, through trial. (Stipulation and Order Extending Temporary Restraining Order on Consent dated Jan. 4, 2008 at 3; Letter of

_____

  [3] One corporate defendant, Louisville Bedding Company, was not included in the TRO because it had been voluntarily dismissed from the action.  (Temporary Restraining Order and Order for Expedited Discovery on Consent dated Aug. 20, 2007 ("TRO") at 2; Stipulation and Order of Dismissal dated Aug. 23, 2007).

Edward G. Williams dated Jan. 14, 2008 at 3; Findings at 2 n.2).

Gucci filed an Amended Complaint on October 2, 2007, adding Gemma Gucci and five additional corporations as defendants. (Amended Complaint ("Amend. Compl."), ¶¶ 5-19). In this revised pleading, the plaintiff alleged that, like her mother, Gemma Gucci "attempted to capitalize on the popularity of the world famous GUCCI Trademark by licensing, attempting to license and/or permitting various companies to use GEMMA GUCCI as a brand name and trademark." (Amend. Compl., ¶ 29). Gemma Gucci later agreed to be bound through trial by the TRO. (Stipulation and Order dated April 8, 2008 ("April 2008 Order") at 3; Findings at 2 n.2).

In March 2008, the attorneys representing Mr. Litwak and Jennifer Gucci requested to be relieved as counsel, with other attorneys taking their place. (Order to Show Cause dated March 13, 2008). The plaintiff opposed their request, arguing in essence that it would further delay the trial of this action and cause it prejudice. (Memorandum of Law in Opposition to the Motion to Withdraw of Stewart Occhipinti LLP at 1-9). The Court granted the motion and, in April 2008, HOM was retained to represent the Individual Defendants. (Declaration of John T.A. Rosenthal dated April 26, 2010 ("Rosenthal Decl."), ¶¶ 7, 10; Notice of Appearance dated April 28, 2008).

As a consequence of the elusive behavior of Jennifer Gucci and Mr. Litwak, the plaintiff faced obstacles during the discovery process. During discovery proceedings, Jennifer Gucci agreed to allow the plaintiff to conduct a forensic examination of her

4

computer. (Findings at 37, ¶ 37; 57, ¶ 88; Memorandum Endorsement dated March 13, 2008 at 1). That examination "recovered emails and electronically stored documents which were damaging to Defendants' case," but which had not been shared during initial discovery. (Findings at 2 n.2 (citing Findings at 16-17, ¶¶ 36-38; 19, 47)). Jennifer Gucci testified that the non-disclosure of these files had been "a mistake." (Findings at 16-17, ¶ 38).

In addition, Mr. Litwak was, to say the least, dilatory in responding to Gucci's discovery requests. As a result, on August 14, 2008, I ordered him to respond to the requests immediately. (Order dated Aug. 14, 2008 ("Aug. 2008 Order") at 2). I also ordered a forensic examination of Mr. Litwak's computers, explaining that the examination was "justified by the fact that Mr. Litwak provided incomplete deposition testimony concerning licensing activities and that he failed to produce e-mail that was directly related to such activity." (Aug. 2008 Order at 2-3).

In November 2008, HOM moved to withdraw as counsel for the Individual Defendants based, among other reasons, on Mr. Litwak's obstructive behavior during discovery and the Individual Defendants' failure to pay money owed to the firm. (Declaration of Kevin J. Harrington dated Nov. 18, 2008, ¶¶ 6-17). The plaintiff opposed this motion, asserting that it would be prejudiced by HOM's withdrawal because it would further delay trial. (Memorandum of Law in Opposition to the Motion to Withdraw of Harrington, Ocko & Monk LLP at 15; Transcript dated Feb. 9, 2009 ("Feb. 2009 Tr.") at 2-3). Judge Berman did not specifically rule on the motion but

instead took the parties' suggestion to set a firm trial date and allow the defendants to attempt to seek new counsel in the meantime, to continue to be represented by HOM, or to represent themselves pro se.   (Feb. 2009 Tr. at 3).   HOM ultimately represented the Individual Defendants at trial.

On February 20, 2009, I issued an order "find[ing] that Mr. Litwak violated the terms of the TRO by failing to provide a copy of it to persons with whom he has entered into licensing agreements and by failing to produce discovery materials as required." (Memorandum and Order dated Feb. 20, 2009 ("Feb. 2009 Order") at 15; Findings at 36, ¶ 37).   I further found that Mr. Litwak was required to provide "any person or entity with whom he has entered into a license agreement" with a copy of the TRO by overnight courier or face contempt sanctions.   (Feb. 2009 Order at 10). Additionally, I explained that the forensic examination of Mr. Litwak's computer turned up "highly relevant documents" relating to the licensing of Jennifer Gucci's name that Mr. Litwak had not disclosed in violation of the demands of the TRO, and I found Mr. Litwak's excuses for this violation incredible.   (Feb. 2009 Order at 10-13; Findings at 18, ¶ 43; 37, ¶ 37).   I found further support from his business dealings for the determination that Mr. Litwak was untrustworthy.   (Feb. 2009 Order at 13-14).

As a sanction, I ordered that Mr. Litwak reimburse "Gucci for the attorneys' fees and costs incurred in connection with discovery necessitated by his failure to abide by the TRO's discovery provisions."   (Feb. 2009 Order at 15).   I suggested that Gucci make

6

an application for such fees at the conclusion of the litigation, when other attorneys' fees might be awarded. (Feb. 2009 Order at 14-15).

Of the ten named corporate defendants sued by Gucci (collectively, the "Corporate Defendants"), six -- Veratex, Inc.; Collezione di Casa, Inc.; E.L. Erman-Dead Sea Cosmetics Corp.; ELE Brands Enterprise, Inc.; GBN Watch Collection, Inc.; and GBN Global Business Network (collectively, the "Settling Defendants") -- answered the complaint. The Settling Defendants were represented by the same counsel. Gucci entered into a settlement agreement with the Settling Defendants, part of which included their consent to be permanently enjoined from further infringement of the Gucci Trademarks. (Final Judgment and Order for Permanent Injunction on Consent dated June 23, 2008 ("June 2008 Order") at 2-3; Transcript dated June 23, 2008 ("June 2008 Tr.") at 16-17; Findings at 3). Thus, on June 23, 2008, the claims against the Settling Defendants were dismissed with prejudice. (June 2008 Order at 3).

The other four named defendant corporations -- Jenco Designs, LLC; Jennicor, LLC; Jenny Gucci Coffee & Gelato Company, Inc.; and Gemma Gucci Coffe & Gelato Company, Inc. (collectively, the "Defaulting Defendants") -- never answered the Amended Complaint, and the plaintiff did not seek a default judgment against them. (Findings at 3 n.3). Therefore, in his Findings, Judge Berman dismissed all of the remaining claims against these defendants "[e]xcept insofar as they are included in the injunctions issued herein." (Findings at 3 n.3).

7

On June 29, 2009, the case proceeded to a bench trial before Judge Berman, at which "the court had an excellent opportunity to observe witness demeanor and assess witness credibility." (Findings at 4).   The parties also submitted over 400 trial exhibits.  (Findings at 4).

At trial, the Individual Defendants heavily relied on the outcomes of two separate lawsuits to defend their actions.   The first was an opinion by the Honorable William C. Conner, U.S.D.J., in Gucci v. Gucci Shops, Inc., 688 F. Supp. 916 (S.D.N.Y. 1988). This litigation arose from Paulo Gucci's quest for "a declaration that he had the right to use the name Paolo Gucci as a trademark on products."  (Findings at 8, ¶¶ 13-14).  After a bench trial, Judge Connor found that Mr. Gucci had committed trademark infringement and enjoined Mr. Gucci from using his name as a trademark or trade name.  (Findings at 8-9, ¶ 14).  The judge further held that

> "[t]o enable Paolo to exploit his own talents and identity [as 'a designer and stylist of many Gucci products']," Paolo Gucci may "use his name to identify himself as the designer of products sold under a separate trademark which does not include the name 'Gucci.'  To avoid confusion, the name Paolo Gucci must always appear after the trademark in advertisements and on labels, and must be no more prominent than the trademark.  Moreover, [Paolo Gucci] must use a disclaimer, similar to the one he now employs, which notifies consumers that he is no longer affiliated with any of the Gucci entities."

(Findings at 9, ¶ 15 (quoting Gucci Shops, 688 F. Supp. at 918, 928)).   Judge Conner also determined that "the rights granted to, and the obligations imposed upon [Paolo Gucci] by this Final Judgment are personal to Paolo Gucci." (Findings at 10, ¶ 16 (quoting Final Judgment dated July 13, 1988 at 7)).  At trial, the

Individual Defendants asserted that they could license the Gemma Gucci and Jennifer Gucci names so long as they adhered to the restrictions set forth in Gucci Shops. (Findings at 10, ¶ 17).

The Individual Defendants also claimed that a consent judgment entered by the Regional Trade Court in Hamburg, Germany, in April 2000 gave them permission to license Jennifer Gucci's and Gemma Gucci's names to third parties in the United States. (Defendants' Revised Proposed Findings of Fact and Conclusions of Law ("Def. Findings") at 3, 4, 7, 8; Findings at 10, ¶ 18). The judgment resulted from a lawsuit between Flitsch & Benayan GmbH ("Flitsch") and Gucci, S.p.A regarding the use of Gemma Gucci's name in connection with certain jewelry products. (Findings at 10, ¶ 18). The German court approved an agreement between Flitsch and Gucci, S.p.A. allowing Flitsch to associate Gemma Gucci with its product so long as the word "designed" or "styled" precedes her name on any product and Gemma Gucci actually designs the jewelry marked "Gemma by Gemma Gucci." (Findings at 10, ¶ 18). The defendants argued that their compliance with the requirements of this judgment on products to be marketed in the United States undermined the claim that these products would be confused with those of the plaintiff and also was evidence of their good faith. (Def. Findings at 3, 4, 7, 8).

    C.   Judge Berman's Findings[4]

    In his post-trial Findings, Judge Berman determined that all

_____

    [4] I provide only a brief summary of Judge Berman's detailed Findings, focusing on the information that is relevant to the instant motions.

three Individual Defendants willfully infringed the Gucci Trademarks "with respect to the licenses granted and/or products sold using the JENNIFER GUCCI and/or GEMMA GUCCI names on handbags, women's apparel, cosmetics, home products, wine, coffee, gelato, and water in the United States." (Findings at 41-42, ¶ 49; 26, ¶ 4). He also found that the Individudal Defendants diluted the Gucci Trademarks in violation of 15 U.S.C. § 1125(c)(1) of the Lanham Act and New York General Business Law § 360-l. (Findings at 42-43, ¶¶ 50-51; 45, ¶ 57).

The judge held that the Individual Defendants acted willfully and in bad faith. (Findings at 26, ¶ 4; 35, ¶ 34; 40-41, ¶ 48). This determination was based in part on the fact that the Individual Defendants "were fully aware" that the United States Patent and Trademark Office ("USPTO") had rejected Jennifer Gucci's and Gemma Gucci's applications for trademarks to use their names commercially, and yet proceeded to license these names nonetheless. (Findings at 12-13, ¶¶ 21-25; 35-36, ¶¶ 34-36; 40-41, ¶ 48).

With regard to the Individual Defendants' reliance on the holding in Gucci Shops, Judge Berman wrote: "Even assuming, arguendo, that Gucci Shops applied to Defendants, Defendants failed to comply with Judge Conner's directives." (Findings at 37-38, ¶ 38). He explained that the disclaimer that Judge Conner required of Paolo Gucci -- that he "specify that he is not affiliated or associated with Gucci or GUCCI products" -- was not placed on any of the packaging created for products that were to be associated with Jennifer Gucci. (Findings at 38, ¶ 38 (internal quotation

marks omitted)).  And the judge noted that Gemma Gucci, although claiming to abide by the Gucci Shops ruling, did not put a disclaimer on packaging for handbag and gelato products and "[t]he 'disclaimer' which was used on the back label of the GEMMA BY GEMMA GUCCI wine bottle served only to increase potential confusion because it included specific references to Paolo Gucci, The House of Gucci, and the Gucci 'family tradition.'"  (Findings at 38, ¶ 39).

Additionally, Judge Berman remarked that Ms. Gucci did not comply with the German court's mandate that she actually design products labeled with her name.  (Findings at 39, ¶ 39 n.16).  "Gemma Gucci," the judge noted, "played no role in the design of the handbags, did not select any of the wines sold under her name, and had never seen a GEMMA GUCCI gelato product prior to Plaintiff's bringing this lawsuit."  (Findings at 38, ¶ 39 n.16 (internal citations omitted)).

Having found liability, Judge Berman held that "an 'accounting of profits is warranted, based on . . . the . . . evidence of [Defendants'] willful deception and the likelihood that [they] benefitted from copying of the [Gucci Trademarks]."  (Findings at 54, ¶ 79 (quoting American Automobile Association (Incorporated) v. AAA Automobile Club of Queens, Inc., No. 97 CV 1180, 1999 WL 97918, at *10 (E.D.N.Y. Feb. 8, 1999)) (alterations in Findings).  He thus instructed me "to determine Plaintiff's monetary damages, if any, based upon an accounting of Defendants' 'profits' and to determine which Defendants owe damages and in what proportion to one another

(e.g., individually, jointly and severally, etc.)." (Findings at 54, ¶ 80). Judge Berman also determined that Gucci is entitled to an award of punitive damages against Mr. Litwak. (Findings at 55, ¶ 83). Deeming it "a closer call," Judge Berman found that an award of punitive damages against Jennifer Gucci or Gemma Gucci was not warranted. (Findings at 56, ¶ 84).

Finally, Judge Berman determined that "because . . . Defendants' acts of infringement involved violating Judge Francis' TRO and were otherwise in bad faith," the plaintiff is entitled to recover its reasonable attorneys' fees and costs. (Findings at 56, ¶ 86; 58, ¶ 90). He requested that I determine the amount of Gucci's reasonable attorneys' fees and costs and recommend how liability for them should be apportioned among the defendants. (Findings at 58, ¶¶ 90-91).

Discussion

A.   The Individual Defendants' Profits

        In establishing a defendant's profits, a plaintiff has the burden of proving the gross revenues of the infringers. Haaretz Daily Newspapers, Ltd. v. Chani Inc., No. 98 Civ. 2878, 2000 WL 703785, at *2 (S.D.N.Y. May 31, 2000); see also Days Inn Worldwide, Inc. v. Amar Hotels, Inc., No. 05 Civ. 10100, 2008 WL 2485407, at *6 (S.D.N.Y. June 18, 2008) (same, under Lanham Act); Trustees of Plumbers and Pipefitters National Pension Fund v. Daniel Weintraub & Associates, Inc., No. 04 CV 2611, 2007 WL 4125453, at *3 (E.D.N.Y. Nov. 16, 2007); Pavia v. Around the Clock Grocery, Inc., No. 03 CV 6465, 2005 WL 4655383, at *3 (E.D.N.Y. Nov. 15, 2005).

The defendant, conversely, "must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).  Thus,

> [o]rdinarily, a plaintiff that has proved the amount of infringing sales would be entitled to that amount unless the defendant adequately proved the amount of costs to be deducted from it.  This sequence of proof thus places the burden of proving costs on the party with the superior access to such information, namely the infringing defendant.

American Honda Motor Co. v. Two Wheel Corp., 918 F.2d 1060, 1063 (2d Cir. 1990) (citation omitted); accord Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 7 (2d Cir. 1989); Chloe v. Zarafshan, No. 06 Civ. 3140, 2009 WL 2956827, at *5 (S.D.N.Y. Sept. 15, 2009).  "[I]f the actual sales cannot be precisely determined, the court may resolve any doubts against the defendant in calculating profits, particularly if the uncertainty is due to the defendant's inadequate record-keeping or failure to produce documentary evidence."  Chloe, 2009 WL 2956827, at *5 (internal quotation marks omitted); accord Project Strategies Corp. v. National Communications Corp., 948 F. Supp. 218, 222 (E.D.N.Y. 1996) ("Unless the defendants produce reliable evidence of deductions to which they would be entitled, we should presume the strongest against them.").

When a party fails to attend an inquest and does not provide any submissions regarding the extent of his or her liability, the party waives the right to challenge the amount of damages claimed by the plaintiff.  See Trustees of Unite Here National Health Fund v. New Age Intimates, Inc., No. 07 CV 2892, 2008 WL 3833841, at *5 (E.D.N.Y. Aug. 14, 2008).  However, even after a party defaults, an

award of damages must be grounded in evidentiary support, "such as detailed affidavits or documentary evidence." <u>Trustees of Plumbers Local Union No. 1 Welfare Fund v. Manhattan Plumbing Corp.</u>, No. 08 CV 3036, 2009 WL 5821676, at *4 (E.D.N.Y. Oct. 8, 2009); <u>accord</u> <u>LaBarbera v. Modern Contintenal Construction Co.</u>, No. 07 CV 2051, 2008 WL 1909216, at *2 (E.D.N.Y. April 30, 2008) ("While the default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." (internal quotation marks omitted)); <u>Daniel Weintraub & Associates</u>, 2007 WL 4125453, at *3; <u>Pavia</u>, 2005 WL 4655383, at *3. "A court cannot rely on an unsupported statement of damages by plaintiff to determine the amount of damages due." <u>Perishable Food Industry Pension Fund v. American Banana Co.</u>, No. 01 Civ. 1922, 2003 WL 21542316, at *3 (S.D.N.Y. July 1, 2003).

### 1.   Attempts to License Jennifer Gucci's Name

Gucci has shown that Mr. Litwak received the following amounts of money through his efforts to license Jennifer Gucci's name.[5] First, he received at least $84,000 from investors in Jenny Gucci Coffee and Gelato, Inc., consisting of $50,000 from one investor (Plaintiff's Proposed Findings of Fact and Conclusions of Law Concerning an Accounting of Defendants' Profits and an Award of

---

[5] Although I often refer to the funds received by Mr. Litwak as "profits," I recognize that he likely invested some of the funds he received in the ventures for which they were provided.  Mr. Litwak, however, has not provided any specific information about how much money constituted pure profit as opposed to costs and other expenses, and therefore I will not make any deductions for these investments.

Punitive Damages Against Defendant Litwak ("Pl. Findings") at 6, ¶ 8; Trial Transcript dated June 29, 2009 ("Trial Tr.") at 193), and a $4,000 payment from Robert Nabasny to Mr. Litwak's associate, Danny Lee,[6] for five-percent of Lee's interest in the company (Pl. Findings at 6, ¶ 9; Deposition of Robert J. Nabasny dated Dec. 8, 2009 ("Nabasny Dep.") at 30-32; General Agreement dated Aug. 10, 2007, attached as Exh. 6 to Nabasny Dep.), and $30,000 paid by another investor to Mr. Litwak.  (Pl. Findings at 6-7, ¶¶ 10, 12; Litwak Dep. I at 18-19).[7]

In addition, Mr. Lee testified that Mr. Nabasny -- on behalf of a company he formed with Mr. Lee called Segreto By Jen Gucci LLC -- gave Mr. Litwak $10,000 in order to acquire the worldwide license to use Jennifer Gucci's name on intimate apparel products. (Pl. Findings at 9-10, ¶¶ 26, 28; Nabasny Dep. at 22-23, 27-29; License Agreement, attached as Exh. 5 to Nabasny Dep.; Deposition of Danny Lee dated Dec. 7, 2009 ("Lee Dep.") at 70-71).  Mr. Lee further reported that he received about $5,000 of that $10,000 as

---

[6] At his deposition, Mr. Litwak explained that Mr. Lee was "an acquaintance or a friend" who worked "under [his] auspices." (Deposition of Edward Litwak dated Jan. 21, 2010 ("Litwak Dep. I") at 46).   Mr. Litwak said that Mr. Lee's actions regarding the licensing ventures at issue in this case were within his authority as Mr. Litwak's agent "other than what money [Mr. Lee] may have taken that [Mr. Litwak] didn't know about."  (Litwak Dep. I at 47). Mr. Litwak further testified that he and Mr. Lee lacked a system to keep track of the payments received by Mr. Lee, but that they split proceeds equally.  (Litwak Dep. I at 47-48).

[7] Mr. Litwak provided Jennifer Gucci with $10,000 from these investments.  (Deposition of Jennifer Gucci dated Jan. 20, 2010 ("Jennifer Dep.") at 15; Litwak Dep. I at 18).   Because, as I discuss below, Mr. Litwak and Jennifer Gucci should be held jointly and severally liable, there is no need to distinguish between monies earned by Mr. Litwak and those earned by Ms. Gucci.

a finder's fee.   (Lee Dep. at 71).   Mr. Litwak testified that
"Danny Lee did [the Segreto] deal," that Mr. Lee received either
$5,000 or $7,000, and that Mr. Litwak should have been given half
of any amount garnered by Mr. Lee.   (Litwak Dep. I at 25-27).   In
view of the unreliability of Mr. Litwak's previous testimony in
this case, which I described in my Feb. 2009 Order, I credit Mr.
Lee's testimony and find that Mr. Litwak received $5,000 in profit
in connection with Segreto.

Moreover, Mr. Nabasny, along with his brothers Richard and
David Nabasny, provided $10,000 for the right to use Jennifer
Gucci's name in connection with costume jewelry for a company
called Serenata, LLC.   (Pl. Findings at 10, ¶¶ 29-30; Nabasny Dep.
at 13-17; Lee Dep. at 69-70).   Mr. Lee testified that he was given
a portion of this amount, but he was not sure how much of it.   (Lee
Dep. at 70).   Mr. Litwak must shoulder the burden of showing how
much should be deducted from the amount he received and he has not
indicated how much Mr. Lee was allotted.   As a result, I attribute
all of the $10,000 in profit to Mr. Litwak.

Next, Gucci contends that in early 2007, Mr. Litwak received
$10,000 from Avi Cohen, the president and owner of the companies
Veratex, Inc. and Collezione di Casa, Inc., for a license to use
Jennifer Gucci's name on bedding products.   (Pl. Findings at 7-8,
¶¶ 14-16; Litwak Dep. I at 8-9).   During his deposition, Mr. Litwak
stated that Veratex, Inc. gave Martin Simone, who served as Mr.
Litwak's counsel for a time, "either 5- or $10,000" as a
contribution towards Mr. Litwak's legal fees in this matter.

16

(Litwak Dep. I at 8-9; Deposition of Martin Simone dated Dec. 9, 2009 ("Simone Dep.") at 19).  Resolving any doubts against Mr. Litwak, it is appropriate to assign the $10,000 to him.  See Chloe, 2009 WL 2956827, at *5.[8]

Furthermore, Mr. Litwak received a $10,000 payment from Joseph Balistreri as a result of discussions regarding licensing Jennifer Gucci's name to be used in connection with water products.  (Pl. Findings at 8, ¶¶ 17-18; Feb. 2009 Order at 4-7; Litwak Dep. I at 15-16).  Mr. Litwak gave $5,000 of this money to Mr. Simone for legal fees and the other $5,000 to Jennifer Gucci.  (Pl. Findings at 8, ¶ 19; Feb. 2009 Order at 7 n.4; Litwak Dep. I at 16; Jennifer Dep. at 14).  And, on February 25, 2007, a company called Proportion Fit provided Mr. Litwak with $5,000 in return for a license to use Jennifer Gucci's name in connection with hosiery products.  (Pl. Findings at 8-9, ¶¶ 20-22; Witness Statement of Brian L. Jaffe dated June 13, 2008, ¶¶ 2, 5, 7).  Mr. Litwak testified that Mr. Lee received half of this amount.  (Litwak Dep. I at 10).

Finally, in February 2007, Mr. Litwak was paid $2,500 by John Macaluso for an interest in two wine ventures –– one involving Jennifer Gucci and the other involving Gemma Gucci.  (Pl. Findings at 9, ¶ 24; Deposition of John Macaluso dated Dec. 8, 2010 ("Macaluso Dep.") at 35-37; General Contract ("Wine Contract"), attached as Exh. 18 to Lee Dep.; Litwak Dep. I at 23-24).  Gucci

---

[8] Mr. Litwak related that he provided Jennifer Gucci with "[w]hatever her expense money was" out of the funds that he received from Veratex.  (Litwak Dep. I at 9).

asserts that 50 percent of that amount, or $1,250, should be attributed to the venture involving Jennifer Gucci and the other $1,250 to that involving Gemma Gucci.  (Pl. Findings at 9, ¶ 24; 13-14, ¶¶ 47-48).  This is an appropriate apportionment based on Mr. Macaluso's testimony in which he reports that his payment was for "both" wine ventures, and based on the language of the contract that memorialized the payment, which states that Mr. Lee agreed to receive $2,500 in exchange for "5% [] of his stock in Gemma Gucci Wines and 5% [] in the new Jennifer Gucci Wines" to Mr. Macaluso. (Macaluso Dep. at 35; Wine Contract).

Based on the figures above, the plaintiff has shown that Mr. Litwak and Jennifer Gucci received a total of $122,750 from licensing Jennifer Gucci's name.

2.   Attempts to License Gemma Gucci's Name

In December 2003, Mr. Litwak provided a company called Gemma Gucci Gourmet Foods, Inc., which was owned by Mr. Macaluso, with a license to use Gemma Gucci's name in connection with food products including ice cream.  (Findings at 23, ¶ 59).  Mr. Macaluso made an initial payment of $5,000[9] on November 20, 2003, and then royalty payments of $3,100 and $1,900 on March 16, 2005, $10,000 on May 11, 2006, $25,000 on October 9, 2006, $1,000 on January 9, 2007, $2,000

---

[9] Mr. Macaluso first testified that he "believed" the initial payment amounted to $10,000, but his recollection appeared to change once he was presented with a receipt form acknowledging that $5,000 in cash had been paid for "ice cream llc."  (Macaluso Dep. at 18-19, 31-32).

on January 26, 2007, and $7,500 on July 10, 2007.[10] (Macaluso Dep. at 31-32, 33-35; Note dated Nov. 20, 2003, attached as part of Exh. 4 to Lee Dep.; Checks dated March 16, 2005, May 11, 2006, and Oct. 9, 2006, attached as part of Exh. 4 to Lee Dep.; Checks dated March 16, 2005, Jan. 9, 2007, Jan. 26, 2007, and July 10, 2007, attached as part of Exh. 3 to Lee Dep.). Some of these checks were written to Mr. Lee, but Mr. Macaluso said that he understood that money that he provided to Mr. Lee was forwarded to Mr. Litwak. (Macaluso Dep. at 24-25). Mr. Lee reported that he believed Mr. Macaluso gave Mr. Litwak $10,000 for this venture and that Mr. Lee received between $3,500 and $5,000 of this money. (Lee Dep. at 42). Because Mr. Litwak carries the burden of proving that funds given to Mr. Lee should be deducted from his profits and because he has not submitted anything to show how much Mr. Lee received, I will deduct the lower amount -- $3,500 -- from Mr. Litwak's profits from this venture. Thus, Mr. Macaluso's payments to Mr. Litwak relating to Gemma Gucci Gourmet Foods totaled $52,000.

De Riera, another company owned by Mr. Macaluso, made a series of payments to Mr. Litwak for use of Gemma Gucci's name on handbags and small leather goods. (Findings at 22, ¶ 56; Macaluso Dep. at 9-10). These payments included royalty payments of $7,500 on September 22, 2005 and $5,000 on October 19, 2005, for a total of $12,500.[11] (Check dated Sept. 22, 2005, attached as part of Exh.

---

[10] The check dated October 9, 2006 was written by Oneida Robyn, Mr. Macaluso's mother. (Macaluso Dep. at 33-34; Lee Dep. at 121-22).

[11] The check dated September 22, 2005 was written by Ms. Robyn.

4 to Lee Dep.; Check dated Oct. 19, 2005, attached as part of Exh. 3 to Lee Dep.). Mr. Litwak reported that he and Mr. Lee split the money received from Mr. Macaluso equally (Litwak Dep. I at 32),[12] and I will accordingly deduct from Mr. Litwak's profits half of the amount received in connection with De Riera. Therefore, $6,250 in profit will be attributed to Mr. Litwak for this venture.[13]

Furthermore, Mr. Litwak earned funds as a result of the use of Gemma Gucci's name in connection with wine. First, in February 2004, a Utah company called Renaissance Corporation ("Renaissance") provided Mr. Litwak with $5,000 for such a license. (Pl. Findings at 12-13, ¶¶ 40-41; Witness Statement of Richard Gazlay, dated June 17, 2008 ("Gazlay Stmt."), ¶ 4; Declaration of Edward Litwak dated June 16, 2008 ("Litwak Decl."), ¶ 30; Lee Dep. at 91-92). Mr. Lee says that because of his friendship with the owner of Renaissance, he is "positive" that he received a portion of the $5,000. (Lee Dep. at 91-92). However, because Mr. Litwak has not shown how much Mr. Lee received, all of the $5,000 will be attributed to Mr. Litwak.

---

[12] Mr. Lee testified that he was provided a "percentage" of "follow-up royalties" for the license, but that he did not recall what the percentage was. (Lee Dep. at 42-45, 50).

[13] The plaintiff states that the payments in connection with Gemma Gucci Gourmet Foods amounted to $30,500 and that those for De Riera amounted to $37,500, for a sum of $68,000. (Pl. Findings at 12, ¶¶ 37, 39). The discrepancy between that calculation and mine is the result of the fact that the canceled checks that document these payments do not make it totally clear for which license certain royalty payments were made. Neither does Mr. Macaluso's deposition testimony. Nonetheless, the plaintiff and I both calculate that the total amount paid for these licenses, without the deduction for money earned by Mr. Lee, is $68,000.

Mr. Litwak apparently terminated the license to Renaissance in April 2005 and issued a second license the following September to Gemma Gucci Wines, Inc. ("GGW"), a Nevada corporation in which Mr. Litwak, Mr. Lee, and Richard Gazlay were partners. (Pl. Findings at 13, ¶¶ 41-42; Gazlay Stmt., ¶¶ 4-5; Lee Dep. at 94; Litwak Decl., ¶ 30). A woman named Mary Brand invested $50,000 in GGW. (Pl. Findings at 13, ¶¶ 43, 45; Deposition of Mary Brand dated Dec. 7, 2009 ("Brand Dep.") at 23; Litwak Dep. I at 17, 35-36; Lee Dep. at 98-99, 133; Letter of Ed Litwak dated Jan. 6, 2006 ("Litwak Letter"), attached as Exh. 2 to Brand Dep.; Letter of Ed Litwak dated Feb. 14, 2006, attached as Exh. 12 to Lee Dep.). Mr. Litwak testified that he received $25,000 of the $50,000 that Ms. Brand invested.[14] (Litwak Dep. I at 17-18). In addition, as explained above, Mr. Macaluso paid $1,250 to acquire an interest in GGW. (Pl. Findings at 13, ¶ 47). Finally, Martin Simone contributed $25,000 for a 10 percent interest in the company. (Pl. Findings at 13, ¶ 46; Simone Dep. at 10-12, 18; Checks dated March 30, 2006, May 12, 2006, and an indecipherable date, attached as Exh. 9 to Lee Dep.; Lee Dep. at 89-90, 95; Litwak Dep. I at 38). Mr. Simone's records contain checks amounting to $24,800, but he testified that it was agreed that he would pay $25,000 and thus, he surmised that he "must have given [Mr. Lee $200] in cash." (Simone Dep. at 11). However, Mr. Lee stated that he "[didn't] recall [Mr. Litwak]

---

[14] Although he does not confirm that Mr. Litwak received $25,000 -- as opposed to $50,000 -- from Ms. Brand's investment, Mr. Lee does not contradict Mr. Litwak's statement, and I accept it as true. (Lee Dep. at 98-99, 133-34).

getting any of that money," which Mr. Litwak confirms (Lee Dep. at 90, 95-96; Litwak Dep. I at 38), and therefore I will not count it as part as Mr. Litwak's profits.

Moreover, before investing in GGW, Ms. Brand had contributed $5,000 for an interest in a wine sales company that also used Gemma Gucci's name. (Pl. Findings at 13, ¶¶ 43-44; Brand Dep. at 10-11, 21, 23). She provided this money to Mr. Lee, with the understanding that it would be sent on to Mr. Litwak and "split according[] to their agreement." (Brand Dep. at 11, 19). Since there is little evidence of their arrangement and, in fact, Mr. Lee testified that it was oral and "loose" (Lee Dep. at 29-31), the full $5,000 will be attributed to Mr. Litwak. Accordingly, Gucci has shown that Mr. Litwak received $36,250 for the use of Gemma Gucci's name in connection with wine products.[15]

In 2006, Mr. Litwak formed Gemma Gucci Coffee and Gelato Company, Inc. ("Gemma Gucci Coffee"), and designated himself as its president and treasurer. (Pl. Findings at 14, ¶ 49; Trial Tr. at 143-44). Ms. Brand, who was listed as secretary of the company on its corporate record, paid $40,000 for an interest in the company and $7,500 for an option to acquire the rights to distribute the company's products in Japan and other countries. (Pl. Findings at

---

[15] Gucci lists this amount as $85,000. (Pl. Findings at 14, ¶ 48). However, based on the numbers submitted by the plaintiff, it seems as though Gucci's proposed total should have been $86,250 as the plaintiff appears to have omitted the $1,250 contributed by Mr. Macaluso. Working from $86,250, a new total of $36,250 seems correct because it accounts for the $50,000 that I deducted in consideration of Mr. Lee's profits -- $25,00 of the $50,000 that Ms. Brand invested and $25,000 that Mr. Simone invested.

14, ¶¶ 50-51; Litwak Letter; Brand Dep. at 12-13, 24-25; Lee Dep. at 77-78). Mr. Lee also paid $7,500 in order to split this option with Ms. Brand. (Pl. Findings at 14, ¶ 51; Brand Dep. at 24-25; Lee Dep. at 78-79). Additionally, Mr. Litwak received a check in the amount of $10,000 from a man named Wilfredo, whom Ms. Brand introduced to Mr. Litwak and who expressed interest in opening a Gemma Gucci coffee shop. (Pl. Findings at 14, ¶ 52; Brand Dep. at 52-53).

By November 2006, David Barna and Chad Thompson had given Mr. Litwak $15,000 in exchange for the exclusive right to open coffee and gelato shops under the Gemma Gucci name in Ohio. (Pl. Findings at 6, ¶ 10, 15, ¶ 55; E-mail of Martin Simone dated Nov. 9, 2006, attached as Exh. 2 to Simone Dep.; Deposition of David Barna dated Dec. 18, 2009 at 22-27; Letter of David Barna dated Dec. 27, 2005, attached as Exh. 7 to Lee Dep.). Mr. Lee estimates that he received $10,000 of this amount as a finder's fee. (Lee Dep. at 84-86). In addition, in February 2006, Cleveland residents Richard Viccarone and Jimmy Gallo paid Mr. Lee $10,000 for a joint five-percent ownership interest in Gemma Gucci Coffee; Mr. Lee testified that it is likely that he split this money with Mr. Litwak and thus I will attribute $5,000 to Mr. Litwak.[16] (Pl. Findings at 15, ¶ 56; Contract dated Feb. 10, 2006, attached as Exh. 8 to Lee Dep.; Lee Dep. at 86-87). And around April 2008, a group of Ohio investors,

---

[16] Mr. Litwak denies receiving any of the money from Mr. Barna and Mr. Viccarone and denies selling them any shares. (Litwak Dep. at 19-20, 40). However, given Mr. Litwak's demonstrated untrustworthiness during this litigation, I credit Mr. Lee's testimony over that of Mr. Litwak.

including Mr. Thompson and Mr. Gallo, contributed $20,000 towards Gemma Gucci's legal fees to protect their interest in the Gemma Gucci coffee license.  (Pl. Findings at 15, ¶ 57; Simone Dep. at 42-45).  In sum, Mr. Litwak and Gemma Gucci received $95,000 from his work related to this coffee venture.[17]

Finally, Ms. Brand paid $5,000 to Mr. Lee -- with the understanding that the full amount would be provided to Mr. Litwak -- to receive a 20 percent interest in an entity licensed to distribute jewelry under Gemma Gucci's name.  (Pl. Findings at 15, ¶ 59; Brand Dep. at 18-19; Litwak Letter).

Therefore, the plaintiff has shown that Mr. Litwak, together with Gemma Gucci, received a total of $194,500 in connection with his activities licensing Gemma Gucci's name.

### 3.  Italia Designs, LLC

Gucci notes that a proposed operating agreement for a company called Italia Designs, LLC was produced during discovery.  (Pl. Findings at 16, ¶ 60).  Mr. Macaluso and Mr. Lee, who both invested in the company, relate that its purpose was to manufacture and distribute jewelry, but they cannot remember whether Jennifer Gucci's or Gemma Gucci's name was to be used.  (Lee Dep. at 61; Macaluso Dep. at 40).  However, the company raised $25,000, which included $5,000 from Mr. Litwak himself.[18]  (Pl. Findings at 16, ¶

---

[17]  The plaintiff reports this number as $110,000, which includes the $15,000 I subtracted to account for funds that Mr. Lee received.  (Pl. Findings at 15, ¶ 58).

[18]  Mr. Lee testified that $25,000 "is a little high" and the amount paid may have been closer to $15,000.  (Lee Dep. at 62-66). However, Mr. Litwak has not provided documentation that shows that

61; Initial Members and Capital Contributions, attached as Exh. B to []Draft Operating Agreement for Italia Designs LLC, attached as part of Exh. 6 to Lee Dep.).  Mr. Litwak reported that he had no involvement in Italia Designs (Litwak Dep. at 42), but his testimony is undermined by Mr. Lee's.  (Lee Dep. at 62-67).  Mr. Lee stated that he "probably got" $7,500, perhaps as much as $10,000, for work related to Italia Designs, while the rest went to Mr. Litwak.  (Lee Dep. at 66-67).  As I did above, I will deduct the lesser amount that Mr. Lee proposed -- $7,500 -- from the funds that Mr. Litwak received -- $20,000.  Therefore, Mr. Litwak should be deemed to have received $12,500 for his work with Italia Designs.

Because those involved in the venture are unaware of which defendant's name was to be licensed, the plaintiff proposes that the funds received for this venture be divided equally among the profits attributed to licensing for Jennifer Gucci and for Gemma Gucci.  (Pl. Findings at 16, ¶ 61). This proposal is reasonable. (Litwak Dep. at 42).  Accordingly, I will add $6,250 each to the profits assigned for the licensing activities relating to Jennifer Gucci and Gemma Gucci.

    4.  <u>Deductions</u>

On March 8, 2010, Mr. Litwak was deposed after producing documents reflecting expenses that he believed should be deducted from any damages award.  Subsequently, at the inquest, he

---

he did not earn the $25,000 initial investment that is memorialized on the company's Draft Operating Agreement.

acknowledged that of the 33 documents that he produced for the deposition, 32 concerned his efforts to create a film involving Jennifer Gucci, which are irrelevant to this lawsuit.[19] (Transcript dated March 12, 2010 ("Inquest Tr.") at 27). The one exception is an invoice indicating that Mr. Litwak spent $107.35 on accommodations while seeking out a potential location for a Jennifer Gucci coffee shop in Grand Rapids, Michigan. (Pl. Findings at 17, ¶ 63; Litwak Dep. II at 13-15; Invoice dated September 11, 2004, attached as Exh. 1 to Litwak Dep. II; Inquest Tr. at 27-28). Thus, as the plaintiff concedes, $107.35 should be deducted from any damages award resulting from the licensing of Jennifer Gucci's name.

### 5.  Total Profits

On the basis of the calculations above, the following profits were obtained by the defendants as a result of their trademark infringement:

---

[19] At his deposition, Mr. Litwak was unable to recall the significance of some of the expense receipts he had produced. For instance, with regard to a receipt for a room at the Kimberly Hotel in New York, he stated that "the reason [he] went to New York was either film or somebody wanted to talk about licensing." (Telephonic Deposition of Edward Litwak dated March 8, 2010 ("Litwak Dep. II") at 24, 26). And when it came to costs for a telephone call made from a London hotel, he said, "I have no idea what the phone call was." (Litwak Dep. II at 23). Although it is possible that these receipts involve expenses linked to Mr. Litwak's work licensing the Gucci defendants' names, because there is no proof of this, Mr. Litwak has not met his burden. See 15 U.S.C. § 1117(a). Furthermore, in view of the entirety of Mr. Litwak's testimony, it is unlikely that these expenditures related to licensing, as it seems clear that Mr. Litwak's focus during this period was on promoting Jennifer Gucci's film.

| ATTEMPTS TO LICENSE JENNIFER GUCCI'S NAME | |
|---|---|
| **VENTURE** | **PROFIT** |
| Jenny Gucci Coffee and Gelato | $84,000 |
| Segreto By Jen Gucci LLC | $5,000 |
| Serenata, LLC | $10,000 |
| Bedding Products | $10,000 |
| Water Products | $10,000 |
| Hosiery Products | $2,500 |
| Wine | $1,250 |
| Italia Designs | $6,250 |
| **VENTURE** | **DEDUCTIONS** |
| Jenny Gucci Coffee and Gelato | ($107.35) |
| | |
| **TOTAL** | **$128,892.65**[20] |

---

[20] Gucci lists the amount before deductions as $136,250.00, which is $7,250 more than my total. (Pl. Findings at 17, ¶ 64). This difference is explained by my deduction of money provided to Mr. Lee -- $11,250 -- and by the calculation errors in the plaintiff's findings. By my calculations, the plaintiffs report $136,250, but the total profits alleged in their findings add up to $140,250. (Pl. Findings at 5-10, ¶¶ 5-30; 16, ¶¶ 60-61, 62).

| ATTEMPTS TO LICENSE GEMMA GUCCI'S NAME | |
|---|---|
| VENTURE | PROFIT |
| Gemma Gucci Gourmet Foods | $52,000 |
| De Riera | $6,250 |
| Wine Products | $36,250 |
| Gemma Gucci Coffee | $95,000 |
| Jewelry | $5,000 |
| Italia Designs | $6,250 |
| | |
| **TOTAL** | **$200,750** |

B.   <u>Trebling of Profits</u>

Focusing on Judge Berman's finding that the defendants acted willfully and with bad faith, Gucci requests that any damages awarded be trebled.  (Pl. Findings at 22, ¶¶ 7-8, 23, ¶¶ 10-11).  Under the Lanham Act, "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."  15 U.S.C. § 1117(a).[21]  The statute further provides that

_____

[21] Section 1117(a) also allows the court to "enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  Some courts have viewed this statement as barring the trebling of an award of profits since Section 1117(a) allows for an "award up to three times the plaintiff's 'actual damages' only." <u>Nutting v. RAM Southwest, Inc.</u>, 69 Fed. Appx. 454, 458 (Fed. Cir. 2003); <u>accord</u> <u>Thompson v. Haynes</u>, 305 F.3d 1369, 1380 (Fed. Cir. 2002) ("As for profits, [] the court is not authorized to award up to three times the amount proved.  For profits, the court is constrained to award the amount proved, subject only to an adjustment, up or down, where the recovery would be otherwise unjust."); <u>Bowmar Instrument Corp. v. Continental Microsystems,</u>

"[s]uch sum in either of the above circumstances shall constitute compensation and not a penalty." Id.

Courts disagree on the interpretation of the phrase "shall constitute compensation and not a penalty." 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:91 (4th ed. 2010). The heart of the dispute lies in whether a court may invoke its discretionary power to increase damages "not only to adjust for difficulties in proving [the] amount [of damages], but also to deter in egregious cases of infringement." Id. As the plaintiff notes, many courts have increased an award of profits in recognition of a defendant's willfulness. Id.; see, e.g., Medline Industries, Inc. v. 9121-3140 Quebec, Inc., No. 1:09-cv-301, 2010 WL 840196, at *7 (D.N.H. March 5, 2010) (enhancing award of defendants' profits by 50 percent after noting that infringement was willful and that plaintiff's reputation was harmed and its goodwill had suffered); Rain Bird Corp. v. Taylor, 665 F. Supp. 2d 1258, 1272 (N.D. Fla 2009) (tripling profits awarded in view of "intentional infringement and the actual consumer confusion it caused"); Shakey's USA, Inc. v. Tutto's Pizza Corp., No. 1:09-Cv-

_____

Inc., 497 F. Supp. 947, 961 (S.D.N.Y. 1980) ("Treble damages cannot be awarded in the absence of an evidentiary basis for actual damages."). However, the Second Circuit has affirmed an award of trebled profits, explaining that "it is apparent from the face of the statute that the court in formulating its award has as much discretion as to the defendant's profits as it has over the plaintiff's damages. The only difference is that the statute places no precisely stated ceiling over the amount of the defendant's profits which may be included in the award." Deering, Milliken & Co. v. Gilbert, 269 F.2d 191, 194 (2d Cir. 1959); accord U.S.A. Famous Original Ray's Licensing Corp. v. Tisi's Pizza and Pasta Inc., No. 09 Civ. 5517, 2009 WL 5178023, at *1 n.1 (S.D.N.Y. Dec. 31, 2009).

0093, 2009 WL 3211027, at *6 (E.D. Cal. Sept. 30, 2009) (awarding treble damages in light of willful infringement); <u>Shell Trademark Management BV & Motiva Enterprises, LLC v. Ray Thomas Petroleum Co.</u>, No. 3:07 cv 163, 2009 WL 2105933, at *4-5 (W.D.N.C. July 13, 2009) (trebling award of profits and noting that "[g]enerally, district courts have exercised their authority to treble the damages award and increase the profits award to a trebled amount in cases involving intentional, knowing, deliberate, or willful infringement"); <u>Mitchell International, Inc. v. Gonzalez</u>, No. Civ. 04-2299, 2006 WL 2226052, at *13 (D.P.R. Aug. 2, 2006) (awarding trebled damages because of "all the defendants have incurred in wanton and willful conduct and in total disregard[] for [the plaintiff's] rights in illegally using its trademark to associate their businesses with this product"). However, even in the face of a finding of willful infringement, other courts have refused to increase an award absent a conclusion that the initial determination of profits is inadequate. <u>See, e.g.</u>, <u>United Phosphorus, Ltd. v. Midland Fumigant, Inc.</u>, Nos. Civ. A. 91-2133-GTV, Civ. A. 95-2267-GTV, 1997 WL 756602, at *2 (D. Kan Dec. 1, 1997) (denying request to treble jury award because the plaintiff had "never argued that the jury's compensatory damage award . . . is inadequate. [It] simply contends that [the defendant's] unlawful actions were willful and warrant additional sanctions"); <u>Material Supply International, Inc. v. Sunmatch Industrial Co.</u>, No. Civ. A. 94-1184, 1997 WL 243223, at *8 (D.D.C. May 7, 1997) ("Although the jury verdict found that [the defendant]

willfully infringed [the plaintiff's] trademark the court will not enhance the jury's award . . . . The jury's verdict sufficiently compensated [the plaintiff] for the harm caused by [the defendant's] conduct and any enhancement of such award would serve only to penalize [the defendant] and not to further compensate [the plaintiff].") ; Project Strategies Corp. v. National Communications Corp., 948 F. Supp. 218, 222-23 (E.D.N.Y. 1996) (even though defendants acted in bad faith and with willfulness, refusing to treble damages because any increase would be punitive); Veryfine Products, Inc. v. Colón Brothers, Inc., 799 F. Supp. 240, 260 (D.P.R. 1992) (despite defendant's willfulness, declining to enhance award of profits and damages because the amount "is adequate to secure the return of profits to [the plaintiff], to prevent the unjust enrichment of [the defendant], and to deter future infringement").

The Second Circuit Court of Appeals has not shed much light on this question. In Deering, it found that the trial court had not abused its discretion when it trebled the defendant's profits "[e]specially in view of the deliberate and fraudulent nature of the infringement." 269 F.2d at 194. Later, in Getty Petroleum Corp. v. Bartco Petroleum Corp., after finding that the Lanham Act did not allow for "an additional award of punitive damages for willful infringement of a registered trademark," the court wrote,

> So long as its purpose is to compensate a plaintiff for its actual injuries -- even though the award is designed to deter wrongful conduct -- the Lanham Act remains remedial. . . . To the extent that deterrence of willful infringement is needed, the statutorily provided remedies of [§ 1117(a)] are sufficient: a district court is

empowered to enhance a monetary recovery of damages or profits . . . .

858 F.2d 103, 113 (2d Cir. 1988) ("Getty I"). And, citing Deering, the court further noted that "enhancing the monetary recovery of damages or profits may serve to deter willful infringement." Id. at 115.

Like those in other circuits, lower courts in this circuit are not in accord on whether an enhancement of profits is tenable merely on the basis of a defendant's willfulness. Compare Ramada Franchise Systems, Inc. v. Boychuk, 283 F. Supp. 2d 777, 791 (N.D.N.Y. 2003) (interpreting Getty I to find that "the enhancement provision was inserted into Section 1117 because of the difficulty of proving actual damages" and refusing to treble damages because "there is no evidence that the $66,713.27 awarded to [the plaintiff] as actual damages is in any way inadequate as compensation for the infringement"), and Braun, Inc. v. Optiva Corp., No. 98 Civ. 4070, 2000 WL 1234590, at *3 (S.D.N.Y. Aug. 31, 2000) ("[E]nhanced damages awarded solely for purposes of deterrence are an impermissible penalty."), with New York Racing Association, Inc. v. Stroup News Agency Corp., 920 F. Supp. 295, 301 (N.D.N.Y. 1996) (treble profits awarded to account for "intangible benefits [the defendant] received as a result of its deliberate, flagrant, and mulish violation of [the plaintiff's] mark"), and Mobius Management Systems, Inc. v. Fourth Dimension Software, Inc., 880 F. Supp. 1005, 1025-26 (S.D.N.Y. 1994) (trebling damages "to compensate the plaintiff for harm that is

difficult to quantify, namely the loss of its goodwill with [a potential customer], and to provide some deterrence for future violations by [the defendant]").

Here, Gucci makes no argument that the profits that it requests inadequately compensate it for the damage that it has suffered and "has offered no non-punitive reasons for the enhancement." See Ramada Franchise Systems, 283 F. Supp. 2d at 791. It seeks an enhancement solely based on "the overwhelming evidence of bad faith[] and the need for deterrence." (Pl. Findings at 23, ¶ 11). Since the profits awarded to the plaintiff adequately compensate it for the defendants' trademark violation, an increase in any award would serve only as a penalty and is therefore unnecessary as well as not clearly within the Court's authority.

C.   Joint and Several Liability

Although, under familiar principles of tort liability, co-infringers can be held jointly and severally liable for damages suffered by the plaintiff as a result of the infringement, a defendant typically is not liable for the profit gained by another. Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 472 (2d Cir. 1985); Sammons v. Colonial Press, 126 F.2d 341, 345-48 (2d Cir. 1942); Softel, Inc. v. Dragon Medical and Scientific Communications, Ltd., No. 87 Civ. 0167, 1995 WL 606307, at *1 (S.D.N.Y. Oct. 16, 1995).[22]

_____

[22] While these cases arise under the Copyright Act, courts sometimes rely on cases under that Act for guidance in interpreting monetary recovery under the Lanham Act. 5 McCarthy § 30:58; see also Lyons Partnership, L.P. v. D & L Amusement & Entertainment, Inc., No. 07 CV 3322, 2010 WL 1257898, at *10 (E.D.N.Y. March 25,

Such a rule is based on the notion "that the infringer has gotten something which it is unconscionable for him to keep; and hence it logically follows that the infringer is accountable only for the profits he received, not for the profits which may have been received by a co-infringer." Sammons, 126 F.2d at 345; cf. Gillette Co. v. Wilkinson Sword, Inc., 795 F. Supp 662, 664 (S.D.N.Y. 1992) (explaining rationale while holding defendants jointly and severally liable for one defendant's profits), vacated on other grounds, No. 89 Civ. 3586, 1992 WL 12000396 (S.D.N.Y. Oct. 28, 1992). However, "[e]xceptions to this general rule may be appropriate [] where the infringement was not innocent or where the defendants engaged in a partnership, joint venture, or similar enterprise." Abeshouse, 754 F.2d at 472 (internal quotation marks omitted). In this case, the defendants easily fall within the first category as Judge Berman found that their infringement was willful and also that they acted in bad faith. (Findings at 26, ¶ 4; 35, ¶ 34; 38, ¶ 39; 40-42, ¶¶ 48-49).

In her submissions, Gemma Gucci does not contest the amount of money that Mr. Litwak received through licensing her name. Instead -- as she did at the inquest -- she challenges the legitimacy of Judge Berman's findings regarding her participation in Mr. Litwak's

---

2010) ("In the absence of any guidelines for determining the appropriate award for willful trademark infringement, courts have looked for guidance to the better developed case law for willful copyright infringement."); Guishan, Inc. v. Faith Ice, Inc., No. 08 CV 2407, 2009 WL 6305735, at *11 (E.D.N.Y. Sept. 2, 2009), rejected in part on other grounds, No. 08 CV 2407, 2010 WL 1223574 (E.D.N.Y. March 22, 2010) ("In cases of trademark or copyright infringement, responsibility for attorney's fees and costs can be joint and several.").

scheme.  For instance, she emphatically argues that Judge Berman's finding of bad faith was "contrary to the actual evidence" produced at trial and asserts that his Findings allow for me to conclude that she has not acted in bad faith.  (Defendant Gemma Gucci's Proposed Findings of Fact and Conclusions of Law ("Gemma Findings"), ¶¶ 4-6).

To the extent that Gemma Gucci takes issue with Judge Berman's Findings, such concerns are not within my province.  I am bound by the district judge's conclusions and am assigned the limited task of recommending the scope of the damages to be awarded to the plaintiff.  On that subject, Gemma Gucci attests that "she has obtained absolutely no money and no benefits from any infringing use of her name undertaken by Litwak.  Nor did [she] obtain money or any benefit from the unauthorized actions of Litwak and others in the knowing attempts to capitalize on Plaintiff's mark."  (Gemma Findings, ¶¶ 47, 57-59).

While Ms. Gucci's allegations may be true, they do not excuse her from joint and several liability under Abeshouse's first exception because Judge Berman has already determined that she was "not innocent."  See Aferiat v. Grossman, No. 96 Civ. 1774, 1998 WL 99797, at *11 (S.D.N.Y. March 4, 1998) ("In a willful infringement case . . ., copyright damages may be awarded for profits derived by any infringer under a theory of joint liability."); " Softel, 1995 WL 606307, at *1 (holding defendants jointly and severally liable in a copyright case under the "not innocent" exception); Bull HN Information Systems, Inc. v. American Express Bank Ltd., No. 88

Civ. 2103, 1990 WL 48098, at *3 (S.D.N.Y. April 16, 1990) (holding co-infringers jointly liable under both Abeshouse exceptions); but see 6 William F. Patry, Patry on Copyright § 22:148 (2010) (deeming Softel an outlier and criticizing it because purpose of awarding profits -- "to disgorge ill-gotten gains" -- "is not served by being held responsible for another's ill-gotten gains no matter how perniciously obtained"). Therefore, Jennifer Gucci and Mr. Litwak should be held jointly and severally liable for the profits that they each garnered while licensing Jennifer Gucci's name, and Gemma Gucci should be held jointly and severally liable for the profits that Mr. Litwak garnered while licensing her name.

Additionally, it is likely that the defendants meet Abeshouse's second exception -- that they "engaged in a partnership, joint venture, or similar enterprise." 754 F.2d at 472 (internal quotation marks omitted). Gemma Gucci asserts that she does not fall within this exception because (1) "[s]he made no representations to Gucci or any non-parties indicating consent or knowledge of Litwak's unauthorized licensing activities regarding her name, and tried to stop such activities when they came to her attention," (2) because "neither Gucci nor non-parties [who invested in Mr. Litwak's projects] reasonably relied on any statements, communications or conduct of Gemma Gucci indicating Litwak or non-party Lee had authority to license her name, or that they were acting with Gemma Gucci's consent," and (3) because "[t]here is an absolute absence of any evidence of a written agreement or writings reviewed by any parties or non-parties with

respect to Gemma Gucci's awareness or consent to the use of her name." (Gemma Findings, ¶¶ 8, 48, 62-64). But despite these contentions, Judge Berman found that Mr. Litwak acted as both Jennifer Gucci's and Gemma Gucci's licensing agent (Findings at 6, ¶ 5; 13-14, ¶¶ 26, 27, 29). Thus, joint and several liability is appropriate.[23]

Gemma Gucci also argues that the plaintiff is not entitled to recoup any profits from her for equitable reasons. (Gemma Findings, ¶¶ 48, 60). As support for this contention, she states that: (1) Judge Berman's issuance of a permanent injunction severely restricting the use of her name is a "sufficient remedy;" (2) Gemma Gucci "had no role in effectuating the unauthorized licensing activities of Litwak;" (3) "Plaintiff has known for years of licensing activities with respect to Gemma Gucci's name, and done nothing;" (4) in the action in Germany, Gucci allowed Gemma Gucci to license her name in a particular manner; and (5) she has not received anything from the other defendants or non-parties from the licensing of her name. (Gemma Findings, ¶ 60). Again, this is

_____

[23] The cases cited by Gemma Gucci to contest joint and several liability are not on point. Mattel, Inc. v. Robarb's, Inc., No. 00 Civ. 4866, 2001 WL 913894, at *8 (S.D.N.Y. Aug. 14, 2001), addresses the personal liability of a corporate officer; Basketball Marketing Co. v. FX Digital Media, Inc., No. Civ.A. 04-1733, 2006 WL 616284, at *6 (E.D. Pa. March 10, 2006), focuses on joint and several liability of a contributory infringer; and Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 173 (S.D.N.Y. 1998), discusses a claim of conspiracy under New York law. Finally, in light of Judge Berman's findings that Mr. Litwak was Gemma Gucci's agent, Fendi Adele S.R.L. v. Filene's Basement, Inc., 696 F. Supp. 2d 368, 385-86 (S.D.N.Y. 2010), simply lends additional support for holding Ms. Gucci jointly and severally liable.

not the appropriate forum for Ms. Gucci to contest Judge Berman's Findings, and, under those Findings, she is not entitled to equitable relief. In fact, Judge Berman noted that his decision not to award punitive damages against Gemma Gucci was a "close call." (Findings at 56, ¶ 84).

In sum, Jennifer Gucci and Mr. Litwak should be held jointly and severally liable for $128,892.65, the amount that they earned by licensing Jennifer Gucci's name. Likewise, Gemma Gucci and Mr. Litwak should be held jointly and severally liable for $200,750, the amount that Mr. Litwak received through his efforts in licensing Gemma Gucci's name.

D.   Punitive Damages Against Mr. Litwak

Judge Berman found that Gucci was entitled to punitive damages against Mr. Litwak for his violations of New York law "because, among other things, (i) Litwak masterminded the licensing schemes which the Court determined were unlawful; (ii) Litwak knew of the USPTO rejections; (iii) Litwak tried to instigate a revenge lawsuit against Gucci by Macaluso; (iv) Litwak was held in contempt of the TRO; and (v) Litwak had knowledge of and[] appears to have been included in, the injunction in Gucci Shops." (Findings at 55, ¶¶ 82-83). Citing this defendant's "knowing and reckless disregard" for its trademark rights, his "repeated and deliberate disobedience of numerous orders of this Court," and his indication in his deposition testimony that he plans to pursue opportunities to exploit Jennifer Gucci's name in the future, Gucci seeks $750,000 in punitive damages from Mr. Litwak. (Pl. Findings at 28-29, ¶¶

38

21, 23 (internal quotation marks omitted)).  To come to this
figure, the plaintiff considered "the needless amounts Gucci was
forced to spend in attorneys' fees and costs in connection with the
additional discovery and motion practice caused by Litwak's
misconduct in discovery, and his failure to comply with this
Court's orders," which it claims to total $360,485, as well as the
funds Litwak received from his licensing activities, which it had
calculated at $415,392.  (Pl. Findings at 29, ¶ 23).  It then
doubled the approximate average of these amounts to arrive at the
figure of $750,000.

"Although there is no mathematical formula to compute punitive
damages, such an award must bear a reasonable relationship to a
plaintiff's injury and defendant's malicious intent."  Getty
Petroleum Corp. v. Island Transportation Corp., 862 F.2d 10, 14 (2d
Cir. 1988) ("Getty II").  The award must rationally relate to the
purpose of these damages, to punish the defendant and deter future
misconduct.  Tse v. UBS Financial Services, Inc., 568 F. Supp. 2d
274, 310-11 (S.D.N.Y. 2008).  "Because the object of punitive
damages is to punish the defendant, it is appropriate for the trier
of fact to consider the defendant's financial circumstances in
determining the amount of punitive damages."  Softel, 891 F. Supp.
at 945; see also Patterson v. Balsamico, 440 F.3d 104, 122 (2d Cir.
2006) ("The award of punitive damages against [the defendant] is
excessive in light of his personal financial situation."); Smith v.
Lightning Bolt Productions, Inc., 861 F.2d 363, 373 (2d Cir. 1988)
("[P]unitive damages should be fixed in an amount that would warn

39

the defendant and others not to engage in similar conduct but [] the amount assessed should not be so high as to result in financial ruin to the defendant so assessed."); Getty II, 862 F.2d at 15.

The remedial damages awarded in this case total $329,642.65. Additionally, at the inquest, Mr. Litwak testified that he has $7,600 in assets and $12,155,932 in liabilities. (Financials of Ed Litwak as of March 12, 2010; Inquest Tr. at 29). This representation is uncontested but also unsupported by any substantial documentation or independent evaluation.

In view of these factors as well as Mr. Litwak's reprehensible conduct both in licensing Jennifer Gucci's and Gemma Gucci's names and in this litigation, I recommend that the plaintiff be awarded $325,000 in punitive damages against Mr. Litwak, an amount that will effectively double the judgment against him and will serve as a substantial penalty given his limited financial means and substantial debts. See Getty II, 862 F.2d at 12-14 (reducing punitive damages award from $1 million to $250,000 when compensatory damages equaled $43,255); Altadis U.S.A., Inc. v. Monte Cristi de Tabacos, No. 96 Civ. 4209, 2001 U.S. Dist. LEXIS 6892, at *21 (S.D.N.Y. May 17, 2001) (in trademark infringement case, awarding $348,704.54 in doubled profits, $250,000 in statutory damages, and $250,000 in punitive damages); Pelonis USA, Ltd. v. Del-Rain Corp., No. 94 CV 587S, 2000 U.S. Dist. LEXIS 15279, at *114-16 (W.D.N.Y. Sept. 5, 2000) (in trademark infringement case, awarding $2,880,000 in enhanced remedial damages and $100,000 in punitive damages).

E.   Attorneys' Fees

Gucci seeks $1,753,471.50[24] in fees and $141,284.64 in costs for the work done by its counsel, the law firm Arnold & Porter LLP ("Arnold & Porter").[25]   (Ederer Decl., Exh. B; Memorandum of Law in Support of Plaintiff's Application for Recovery of its Attorneys' Fees and Litigation-Related Expenses ("Pl. Memo") at 22).   The fee application consists of the following elements:

_____

[24]   The plaintiff lists this number as $1,756,009.63. (Declaration of Louis S. Ederer dated April 12, 2010 ("Ederer Decl."), Exh. B).  However, as shown in the chart below, the sum of the fees attributed to each attorney and non-professional is $1,753,471.50.   I cannot account for the $2,538.13 difference, but speculate that it may be explained by Gucci's failure to include in this application the fees attributed to the work of paralegal Louis Champagne, whose omission is described in the next footnote.

[25]  The plaintiff does not request reimbursement for all of the attorneys, paralegals, and support staff who worked on this matter. It explains that "[t]he total amount billed by [the omitted] individuals accounted for less than 1% of the total amount billed to Gucci during this action." (Ederer Decl., ¶ 15 n.3).  Gucci did convey a desire to be reimbursed for the hours of Louis Champagne, a paralegal.  (Ederer Decl., ¶¶ 15, 33).  However, although his work is mentioned in the time records submitted by the plaintiff, Gucci does not appear to account for his hours in its final calculation of the award it seeks.  (Ederer Decl., Exhs. A & B).

Additionally, plaintiff's counsel note that the amount of fees sought has already been reduced by $64,762.87 in order to ensure they reflect the firm's "best business judgment as to the value" of their work.  (Ederer Decl., ¶ 14 & n.2).

| ATTORNEY | HOURS | RATE[26] | AMOUNT |
|---|---|---|---|
| Louis Ederer | 613.5 | $705–$795 | $458,356.00 |
| John Maltbie | 1648.2 | $485–$605 | $903,299.00 |
| Alan Veronick | 488.3 | $375–$525 | $210,660.00 |
| Matthew Salzmann | 149.6 | $375–$525 | $63,275.50 |
| Melanie Hanson-Sartoris | 121.5 | $440–$525 | $53,978.50 |
|  |  |  |  |
| PARALEGAL/CLERK | HOURS | RATE | AMOUNT |
| Anthony Boccanfuso | 29.5 | $355–$395 | $10,722.50 |
| Ed McCarthy | 167 | $215–$235 | $36,569.00 |
| Kelly Moore | 63.6 | $260–$265 | $16,611.00 |
|  |  |  |  |
| Total | 3,281.2 |  | $1,753,471.50 |

(Ederer Decl., ¶¶ 20, 23, 26, 29, 32, 33 & Exh. B).  The costs requested include expenses for the initial filing fee; electronic legal research; electronic discovery; deposition and court transcripts; travel; procuring evidence; copying, faxing, and making phone calls; investigation; service of process; and postage. (Ederer Decl., ¶ 45 & Exh. D).

Gemma Gucci, the only defendant to submit papers opposing the plaintiff's fee request, contests it on a number of grounds. First, as she did when she objected to the plaintiff's request for damages, although this time even more explicitly, Gemma Gucci deems Judge Berman's determination that she acted in bad faith

---

[26] The rate that Arnold & Porter charged for the work of each of these persons increased annually.  (Ederer Decl., ¶ 34 n.4). The rates listed set forth the range of their hourly billing rates over the course of this litigation.

"mistaken." (Memorandum of Law in Opposition to Gucci's Motion for Attorneys' Fees as to Defendant Gemma Gucci ("Gemma Memo.") at 16-17). She next asserts that she should not be held jointly and severally liable with Mr. Litwak because he exceeded the scope of his authority when he licensed her name. (Gemma Memo. at 18). Finally, she contends that any award against her should be reduced by half because only two of the four Gucci Trademarks at issue "could possibly relate" to her name. (Gemma Memo. at 20). As explained above, these arguments are meritless in light of Judge Berman's findings, which may not now be questioned.

Gemma Gucci further argues that (1) because Gucci pursued this action initially against a total of 13 defendants and later against seven, she should be responsible for a small portion of the fees and expenses; (2) the amount Gucci is requesting from her is "per se unreasonable" because it pursued the litigation despite knowing that it would not be able to recover from her; (3) she should not be held responsible for fees and costs incurred from July 2008 through February 27, 2009 because they related solely to Mr. Litwak's behavior; and (4) she should not be liable for fees incurred after Judge Berman's decision was issued. (Gemma Memo. at 17-23, 25). Gemma Gucci further challenges the magnitude of the plaintiff's fee application on the grounds that Gucci over-staffed and over-litigated the action and employed block billing. (Gemma Memo. at 23-25).

    1.   Legal Framework

Under the Lanham Act, the court may award "reasonable attorney

fees to the prevailing party" in "exceptional cases." 15 U.S.C. § 1117(a). Because "Defendants' acts of infringement involved violating [the] TRO and were otherwise in bad faith," Judge Berman deemed this case exceptional. (Findings at 56, ¶ 86). In determining what constitutes a reasonable fee, courts have traditionally begun with a calculation of the "lodestar": the number of hours reasonably expended on the case multiplied by the appropriate hourly rate for each provider of legal services. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); GAKM Resources LLC v. Jaylyn Sales Inc., No. 08 Civ. 6030, 2009 WL 2150891, at *7 (S.D.N.Y. July 20, 2009). In calculating the lodestar, "the district court should exclude excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999). And, while a fee award may deviate from the lodestar in "extraordinary circumstances," there is a "strong presumption" that the lodestar figure is reasonable. Perdue v. Kenny A. ex rel. Winn, __ U.S. __, 130 S. Ct. 1662, 1669, 1673, 1675 (2010).

In Kenny A., the Supreme Court recently reaffirmed the value of the lodestar method:

> Although the lodestar method is not perfect, it has several important virtues. First, in accordance with our understanding of the aim of fee-shifting statutes, the lodestar looks to the prevailing market rates in the relevant community. Developed after the practice of hourly billing had become widespread, the lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case. Second, the lodestar

44

> method is readily administrable, and . . . objective, and
> thus cabins the discretion of trial judges, permits
> meaningful judicial review, and produces reasonably
> predictable results.

Id. at __, 130 S. Ct. at 1672 (internal quotation marks, citations, and emphasis omitted).  Previously, in Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany, the Second Circuit had sought to abandon use of the term "lodestar." 522 F.3d 182, 190 (2d Cir. 2008).  Still, the court utilized a market-oriented approach to establishing a reasonable fee, id., just as the Supreme Court did in Kenny A.  Both courts reasoned that a wide range of factors should initially be considered in determining the number of compensable hours and the appropriate hourly rate to calculate the lodestar or presumptively reasonable fee.  See Kenny A., __ U.S. at __, 130 S. Ct. at 1673 (observing that lodestar incorporates most factors relevant to reasonable fee); Arbor Hill, 522 F.3d at 190 (directing that court should "bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate").

In cases where a defendant does not oppose a fee application, the court still must evaluate its reasonableness.  See Fleurentin v. McDowell, No. 05 CV 4274, 2009 WL 2969686, at *11-14 (E.D.N.Y. Sept. 16, 2009) (assessing and reducing fee request in case of defaulting defendants); GAKM Resources LLC, 2009 WL 2150891, at *7-10 (same in trademark case); Century 21 Real Estate, LLC v. Raritan Bay Realty, Ltd., No. 07 CV 1455, 2008 WL 4190955, at *9-12 (E.D.N.Y. Sept. 3, 2008) (same in trademark case).

2.  <u>Reasonable Hourly Rates</u>

The party seeking fees bears the burden of producing evidence that its requested hourly rates "are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." <u>Blum v. Stenson</u>, 465 U.S. 886, 895 n.11 (1984).  Absent exceptional circumstances, the relevant geographic market is the district in which the case is litigated.  <u>See</u> <u>Blum</u>, 465 U.S. at 895; <u>Simmons v. New York City Transit Authority</u>, 575 F.3d 170, 174-75 (2d Cir. 2009); <u>Arbor Hill</u>, 522 F.3d at 191.

In attempting to determine the prevailing market rate for legal services, a court may consider a number of factors, including those set forth in <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714, 717-19 (5th Cir. 1974).  <u>Arbor Hill</u>, 522 F.3d at 190; <u>Fleurentin</u>, 2009 WL 2969686, at *11-12; <u>GAKM Resources LLC</u>, 2009 WL 2150891, at *7.  In <u>Johnson</u>, the Fifth Circuit recommended that courts look at, among other things: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the attorney's customary hourly rate; (5) the amount involved in the case and the results obtained; (6) the experience, reputation, and ability of the attorneys; and (7) awards in similar cases. <u>Johnson</u>, 488 F.2d at 717-19.  Additionally, a court should consider that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." <u>Arbor Hill</u>, 522 F.3d at 190; <u>see</u> <u>Century 21 Real Estate</u>, 2008 WL 4190955, at *10.

46

a.   Experience of Counsel

_____The plaintiff was represented throughout this litigation by Arnold & Porter, and Louis Ederer was the senior partner assigned to the case.  (Ederer Decl., ¶¶ 1, 15-16).  Having graduated from Columbia Law School in 1978, Mr. Ederer has been practicing law for 32 years with a focus on intellectual property litigation.  (Ederer Decl., ¶¶ 16-17).  From 1992 to 1998, he was a senior partner at the New York intellectual property law firm Cowan, Liebowitz and Latman, and from 1998 to 2003, he was a senior partner and head of the Litigation Department at Gursky & Ederer LLP.  (Ederer Decl., ¶ 17).  Before joining Arnold & Porter, Mr. Ederer ran the Intellectual Property Department at the New York office of Torys LLP.  (Ederer Decl., ¶ 17).  During his career, Mr. Ederer has tried several intellectual property cases and has also lectured on intellectual property issues before many bar and industry associations.  (Ederer Decl., ¶¶ 17-18).  Gucci requests an hourly rate for Mr. Ederer's work of $705 for work performed in 2007, $750 for that performed in 2008, $770 for that performed in 2009, and $795 for that performed in 2010.  (Ederer Decl., ¶ 34 n.4 & Exh. B).

The hours expended by John Maltbie, a senior associate in Arnold & Porter's Intellectual Property and Litigation Departments, far exceeded those of any of the other attorneys working on the case.  (Ederer Decl., ¶ 21 & Exh. B).  Mr. Maltbie received his law degree from Brooklyn Law School in 1996 and has been working with Mr. Ederer on intellectual property cases since 2000.  (Ederer

Decl., ¶ 21).  Gucci was charged $485 an hour for Mr. Maltie's work in 2007, $540 in 2008, $565 in 2009, and $605 in 2010.  (Ederer Decl., ¶ 34 n.4 & Exh. B).

Alan Veronick is a 2000 graduate of University of Pittsburgh Law School and has been working with Mr. Ederer on intellectual property matters since September of 2001.  (Ederer Decl., ¶ 24).  A 2004 graduate of Rutgers University School of Law, Matthew Salzmann is an associate in Arnold & Porter's Intellectual Property and Litigation Departments.  (Ederer Decl., ¶ 27).  "For the past several years," he has assisted Mr. Ederer in several intellectual property cases.  (Ederer Decl., ¶ 27).  With regard to both Mr. Veronick and Mr. Salzmann, the plaintiff asks for a rate of $375 per hour for work completed in 2007, $435 per hour for work completed in 2008, $470 per hour for work completed in 2009, and $525 per hour for work completed in 2010.  (Ederer Decl., ¶ 34 n.4 & Exh. B).

Melanie Hanson-Sartoris, a former litigation associate at Arnold & Porter, received her law degree from UCLA School of Law in 2001.  (Ederer Decl., ¶ 30).  Gucci reports that "[t]hroughout her career, Ms. Hanson-Sartoris has had experience working on intellectual related matters, including actions for trademark infringement."  (Ederer Decl., ¶ 30).  The plaintiff requests an hourly rate of $440 for her work in 2007 and $525 for that in 2008.  (Ederer Decl., ¶ 34 n.4 & Exh. B).

Finally, Gucci seeks reimbursement for the work of two paralegals as well as Arnold & Porter's managing clerk, Anthony

Boccanfuso.  For Mr. Boccanfuso, it requests $355 per hour for his work in 2007, $385 per hour for 2008, and $395 per hour for 2009. (Ederer Decl., ¶ 33 & Exh. B).  With respect to the time expended by paralegal Ed McCarthy, Gucci requests $215 for each hour he worked in 2007, $230 for those in 2008, and $235 for those in 2009. (Ederer Decl., ¶ 33 & Exh. B).  And for paralegal Kelly Moore's contributions to the case, the plaintiff seeks an hourly rate of $260 for 2008 and $265 for 2009.  (Ederer Decl., ¶ 33 & Exh. B).

b.   <u>Prevailing Rates in the Community</u>

Gucci attests that the rates it seeks are commensurate with those commanded by peer firms in New York City.  (Ederer Decl., ¶ 35).  As proof, it submits a survey from December 2008 published in <u>The National Law Journal</u> ("NLJ") showing the range of hourly billing rates at the nation's 250 largest law firms.    (Ederer Decl., ¶ 35 & Exh. C).  At the nine New York firms included in the survey, partners' hourly rates are $675-$785 at the first firm, $350-$850 at the second, $335-$850 at the third, $625-$875 at the fourth, $430-$850 at the fifth, $450-$925 at the sixth, $665-$995 at the seventh, $695-$895 at the eighth, and $550-$1,260 at the ninth.  (Ederer Decl., Exh. C).  For associates, these firms charge between $290-$575, $175-$450, $175-$525, $270-$600, $255-$520, $260-$500, $395-$630, $255-$650, and $160-$920, respectively. (Ederer Decl., Exh. C). Courts have relied on data from the NLJ survey in the past, <u>see, e.g.,</u> <u>In re Agent Orange Product Liability Litigation</u>, 818 F.2d 226, 231 (2d Cir. 1987); <u>Phoenix Four, Inc. v. Strategic Resources Corp.</u>, No. 05 Civ. 4837, 2006 U.S. Dist. LEXIS

52402, at *6-7 (S.D.N.Y. Aug. 1, 2006); Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 741 F. Supp. 84, 86 n.2 (S.D.N.Y. 1990), and it provides a helpful way to gauge whether the hourly rates sought here are within the general range of those charged in this district.  Although on the upper end of the spectrum, the rates charged by Arnold & Porter do pass that test.

However, the usefulness of this data is limited for it does not take into account the rates billed for attorneys in a specific area of practice -- in this case, intellectual property.  In addition, although law firms typically assign hourly rates based on an attorney's years of experience, the NLJ survey sheds no light on how this is done at the firms mentioned, making it impossible to determine whether Arnold & Porter's assignments are in line with other firms'.

Thus, the fees for attorneys with similar levels of experience that have been awarded in recent trademark and copyright cases serve as a better guide.  The hourly rates approved in such cases vary quite a bit.  See Therapy Products, Inc. v. Bissoon, No. 07 Civ. 8696, 2010 WL 2404317, at *5 (S.D.N.Y. March 31, 2010) (in trademark case, awarding $750 per hour for senior counsel, $490 to $580 per hour for litigation principal, $295 per hour for second-year associate, $430 per hour for same attorney as fourth-year associate, and $170 to $200 per hour for paralegals); Union of Orthodox Jewish Congregations of America v. American Food & Beverage Inc., No. 09 Civ. 8800, 2010 WL 199671, at *5 (S.D.N.Y. Jan. 12, 2010) (approving attorneys' fees request of $735 per hour

for a partner, $400 per hour for an associate, and $275 per hour for another associate in trademark infringement litigation); Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Management, Inc., No. 04 CV 2293, 2009 WL 5185808, at *5 (E.D.N.Y. Dec. 23, 2009) (awarding $425-450 an hour for partner with 44 years of intellectual property experience, $325-420 for partner with 21 years of such experience, $350-420 for partner with 23 years of legal experience, $300-325 for associate with six years of intellectual property experience, and $85-90 for paralegals); GAKM Resources LLC, 2009 WL 2150891, at *8 (approving $650 per hour for partner with almost 20 years of experience, $600 for counsel with 16 years and partner with almost 30 years experience, $525 for partner with 10 years experience, and $195 for "experienced paralegal specializing in intellectual property litigation"); M. Lady, LLC v. AJI, Inc., No. 06 Civ. 0194, 2009 WL 1150279, at *7 (S.D.N.Y. April 29, 2009) (approving rate of $350 to $375 an hour for partner in copyright infringement case); Diplomatic Man, Inc. v. Nike, Inc., No. 08 Civ. 139, 2009 WL 935674, at *5-6 (S.D.N.Y. April 7, 2009) (awarding defendant in copyright litigation fees ranging from $155 for the hourly work of a paralegal and $470 for that of a partner from one law firm to $200 for the hourly work of a paralegal and $650 for that of a partner from another law firm); Lucky Brand Dungarees, Inc. v. Ally Apparel Resources, LLC, No. 05 Civ. 6757, 2009 WL 466136, at *2, *5-6 (S.D.N.Y. Feb. 25, 2009) (in trademark case, after commenting that "defendants fail to offer much insight into most of their attorneys' experience and

qualifications," awarding $435 and $550 per hour for partners, $200, $320, and $365 per hour for associates, $205, $220, and $235 per hour for paralegals, and $50 per hour for clerk and managing clerk); Entral Group International, LLC v. Sun Sports Bar Inc., No. 05 CV 4836, 2007 WL 2891419, at *10 (E.D.N.Y. Sept. 28, 2007) (in copyright infringement action, finding hourly rates of $560 for partner, $340 and $360 for associates, and $138 for paralegal to be reasonable). Therefore, while the rates requested here are on the high end of the spectrum, they are not out-of-step with approved rates in other cases.

c.   Complexity of the Case

The parties debate the complexity of this matter. The plaintiff contends that "[t]his case was that much more challenging in light of the Court's decision in [Gucci Shops] . . . . " (Ederer Decl., ¶ 3; Pl. Memo. at 9-10; Reply Memorandum of Law in Further Support of Plaintiff's Application for Recovery of its Attorneys' Fees and Litigation-Related Expenses ("Pl. Reply") at 15-16). It also asserts that "the issue of whether an individual is entitled to use a famous surname, and to what extent, has never been simple for any court, and is largely fact-dependent." (Pl. Reply at 15). And finally, it notes that its desire to have the Court enter a broad and permanent injunction restricting Jennifer Gucci and Gemma Gucci from commercially exploiting their surnames added to the case's difficulty as such injunctions are "rare." (Pl. Memo. at 9-10).

Although it is fair to say that Gucci Shops provided an

additional hurdle for the plaintiff, this hurdle did not drastically increase the difficulty of litigating the matter. It is rare for any case, even a fairly straightforward one, not to pose some sort of challenge. Likewise, that a case is "largely fact-dependent," or that securing an injunction poses an uphill battle, does not create a level of difficulty warranting higher hourly fees for counsel.

Gemma Gucci rightly points out that the legal issues presented in this action were relatively straightforward. (Gemma Memo. at 3, 6). She notes that Gucci maintained that it was ready for trial early in the action and that, at a pretrial conference, counsel for the plaintiff told Judge Berman that "[t]here's not an enormous record in this case . . . . There were depositions taken, there's documents produced, and that's it." (Rosenthal Decl., ¶¶ 7, 9, 11 (citing Transcript dated April 29, 2008 at 9)). Moreover, as Gemma Gucci explains, in opposing both motions to withdraw by defense counsel, the plaintiff insisted that it was ready for trial and would be prejudiced by additional delay.

Further, Judge Berman maintained that, at least in comparison to another case that he tried, this matter was not particularly complicated and would lead to a "quick" trial. (June 2008 Tr. at 2, 7). In view of this, Judge Berman also ordered that direct testimony at trial be given by affidavit and that the cross-examination of each witness be restricted to 30 minutes, with 15 minutes allotted for redirect. (Transcript dated April 29, 2008 at 6; Transcript dated June 27, 2008 at 5; Rosenthal Decl., ¶ 14).

The plaintiff argues more convincingly that litigating this case was burdensome since it "had to fight for every inch of discovery . . . , and had to uncover the most incriminating evidence against Defendants on its own . . . ." (Pl. Memo. at 10; Pl. Reply at 15; Ederer Decl., ¶¶ 4-5). However, while there is no question that the defendants -- Jennifer Gucci and Mr. Litwak, specifically -- created unnecessary and frustrating barriers to Gucci's receipt of discovery, this fact does not justify compensating counsel at a higher rate. Rather, as Judge Berman reasoned (Findings at 56-57, ¶ 86-88), it further legitimizes the award of attorneys' fees and costs in this matter and is reflected in the number of compensable hours.

### d.   The Client's Agreement to Pay

The plaintiff points out that it has paid or agreed to pay to Arnold & Porter all of the fees that it now seeks from the defendants.  (Pl. Memo. at 12; Ederer Decl., ¶ 13).  It contends that the willingness of Gucci, a sophisticated client, to pay these fees serves as evidence that the rates were appropriate.  While by no means per se evidence that the rates are reasonable, the fact that Gucci paid the fees requested is "surely of some significance," Telenor Mobile Communications AS v. Storm LLC, No. 07 Civ. 6929, 2009 WL 585968, at *2 (S.D.N.Y. March 9, 2009), and will be taken into account in determining rates.  See Diplomatic Man, Inc., 2009 WL 935674, at *6 ("[T]he fact that Nike, a highly sophisticated business client, has paid these bills, presumably after careful review by its general counsel or other senior

business executives, is prima facie evidence of the reasonableness of the amount as a whole (beyond just the reasonableness of the hourly rates charged), since Nike could not have assumed that it would be reimbursed in full, or even in part."); Yurman Designs, Inc. v. PAJ, Inc., 125 F. Supp. 2d 54, 58 (S.D.N.Y. 2000) ("[T]he rates sought by this application are the rates charged the client. [the plaintiff] is a sophisticated and significant participant in the jewelry business. Its acceptance of the rates charged is in itself substantial evidence of their reasonableness.").

       e.   Managing Clerk and Paralegals

The plaintiff seeks compensation of between $355 and $395 per hour for the work of Mr. Buccanfuso, Arnold & Porter's managing clerk. It also requests between $215 and $265 an hour for the work of two paralegals who participated in this case. Parties are rarely awarded more than $200 per hour for the efforts of their paralegals, and they often receive much less, particularly when information about the paralegals' background is not provided. See, e.g., Coe v. Town of Blooming Grove, No. 06 Civ. 8149, 2010 WL 2131654, at *8 (S.D.N.Y. May 18, 2010) (noting that courts in this district award between $50 and $150 per hour for paralegal time and finding $50 appropriate when "background information" about the paralegal is not provided); Imbeault v. Rick's Cabaret International Inc., No. 08 Civ. 5458, 2009 WL 2482134, at *5 (S.D.N.Y. Aug. 13, 2009) (awarding $80 per hour for "undocumented paralegals"). Additionally, parties are typically reimbursed at a rate of $50 per hour for clerical work. Lucky Brand Dungarees,

Inc., 2009 WL 466136, at *6; see also Rahman v. Smith & Wollensky Restaurant Group, Inc., No. 06 Civ. 6198, 2009 WL 72441, at *8 (S.D.N.Y. Jan. 7, 2009).

Here, Gucci provides no explanation for why it requests up to $265 an hour for paralegal time. And a review of the time sheets submitted by Gucci (the "Time Sheets") indicates that the two paralegals at issue, Mr. McCarthy and Ms. Moore, almost exclusively dealt with the management and organization of exhibits for depositions and trials. While not clerical per se, such tasks do not warrant fees that could easily be charged for attorneys. Therefore, the plaintiff shall be compensated at an hourly rate of $100 for the work of these paralegals.

Further, Gucci fails to justify why Mr. Buccanfuso's hourly work should be compensated at a rate on par with that billed for attorneys. Cf. Therapy Products, Inc., 2010 WL 2404317, at *5 (awarding $285 per hour for "Litigation Case Manager" who oversaw work of paralegals and helped gather evidence). The Time Sheets appear to indicate that, with one exception, Mr. Buccanfuso's tasks did not require the skills of a lawyer: although he conducted 30 minutes of "Research re. Appellate Jurisdiction" in September 2009, his primary responsibility seems to have been coordinating service of process. (September 2009 Time Sheets, attached as part of Exh. A to Ederer Decl., at 2). Although performing legal research indicates that Mr. Buccanfuso has legal skills, it does not justify the rates requested for the bulk of his work. Therefore, the plaintiff will be reimbursed at an hourly rate of $200 for Mr.

Buccanfuso's contributions to the litigation.  See <u>ATC Healthcare Services, Inc. v. Personnel Solutions, Inc.</u>, No. 01 CV 762, 2007 WL 1893205, at *4 (E.D.N.Y. June 29, 2007) (awarding $80 per hour for work of managing clerk).

f.  <u>Rates Awarded</u>

Based on all of these factors, reasonable hourly rates are as follows:

Louis Ederer - $700[27]

John Maltbie - $500

Alan Veronick - $400

Matthew Salzmann - $400

Melanie Hanson-Sartoris - $400

Anthony Boccanfuso - $200

Ed McCarthy - $100

Kelly Moore - $100

Although Gucci requests rates that increase each year, courts awarding attorneys' fees generally apply current rather than historical rates in order to compensate for the delay in payment. See <u>Missouri v. Jenkins</u>, 491 U.S. 274, 283-84 (1989); <u>LeBlanc-Sternberg v. Fletcher</u>, 143 F.3d 748, 764 (2d Cir. 1998).  Such a

---

[27] This rate is unquestionably on the high end of those awarded in intellectually property cases in this district, but, as shown above, it is not an outlier.  See <u>Therapy Products, Inc.</u>, 2010 WL 2404317, at *5 ($750 per hour for senior counsel at "nationally renowned intellectual property law firm"); <u>Union of Orthodox Jewish Congregations of America</u>, 2010 WL 199671, at *5 ($735 per hour for partner); <u>GAKM Resources LLC</u>, 2009 WL 2150891, at *8 ($650 per hour for partner); <u>Diplomatic Man, Inc.</u>, 2009 WL 935674, at *5-6 ($650 per hour for partner).  It is justified by Mr. Ederer's extensive experience and the fact that Gucci, a sophisticated client, was willing to pay an even higher rate for his services.

practice is more vital in civil rights cases when the prevailing party's attorneys have likely received no compensation, rather than in a case like this one where the plaintiff has already paid most of its attorneys' fees.  However, Gucci's ability to recoup these fees has been delayed, so calculating the award at current rates is justified.

      3.  <u>Compensable Work</u>

        a.  <u>Other Defendants</u>

Noting that "[t]here is no indication that Gemma Gucci had anything to do with" the Corporate Defendants, Ms. Gucci insists that any fee award be divided among all the defendants against which the plaintiff litigated and not simply the Individual Defendants.  (Gemma Memo. at 18-19, 22).  She thus requests that she only be responsible for one-thirteenth of the fees incurred before June 23, 2008, the date on which the Settling Defendants settled, since up until that point there were 13 defendants in the case.  (Gemma Memo. at 19).  Likewise, she asks that the fees incurred after that date be divided by seven to account for every defendant who remained in the litigation.  (Gemma Memo. at 22).

Gemma Gucci's proposal is inappropriate.  The plaintiff's pursuit of its claims against the Corporate Defendants furthered those against the Individual Defendants, and thus it is inaccurate to state that Gemma Gucci did not "ha[ve] anything to do with" these companies.  The companies whom Gucci sued were those to whom the Individual Defendants licensed their names; they were intimately linked to the Individual Defendants and so were the

claims against them.  For instance, although the plaintiff entered into a settlement agreement with Veratex, it used information from this defendant to support its request for damages here.  However, there is no reason that the Individual Defendants should be held responsible for the work that Gucci did in order to secure settlements with Louisville Bedding and the Settling Defendants. In addition, although Judge Berman noted that the plaintiff never moved for a default judgment against the Defaulting Defendants, Arnold & Porter's Time Sheets indicate that the attorneys expended time preparing to do so.  Again, the Individual Defendants should not be required to compensate Gucci for these hours.

Parsing out what time should be deducted on these bases is difficult, however, because plaintiff's counsel engaged in block billing, meaning that they list several activities in one time entry.  This practice "impedes the court's efforts to evaluate the reasonableness of any of the listed activities." Soler v. G & U, Inc., 801 F. Supp. 1056, 1061 (S.D.N.Y. 1992).  But, although block billing can make it more difficult to determine precisely how much time was spent on each task, it does not warrant a reduction in fees "as long as all of the work recorded in one entry is compensable." See Ursa Minor Ltd. v. Aon Financial Products, Inc., No. 00 Civ. 2474, 2001 WL 1842042, at *6 (S.D.N.Y. May 30, 2001). When confronted with a time entry that has been block billed and that includes non-compensable time, a court must "presume[] that the bulk of the time was devoted to non-compensable work." Id.  In this case, the work performed on the successful settlements and

potential default judgments is not compensable, and any time entry that includes a mention of one of these tasks must not be included in a fee award.  Accordingly, the defendants will not be liable for the following hours:

| HOURS WORKED ON SETTLEMENT WITH LOUISVILLE BEDDING AND THE SETTLING DEFENDANTS | | |
| DATE | EDERER | MALTBIE | VERONICK |
| --- | --- | --- | --- |
| 8/6/2007 | 1.5 | 5.3 | |
| 8/7/2007 | 1.5 | | |
| 8/8/2007 | 2.0 | 1.8 | |
| 8/9/2007 | | 4.3 | |
| 8/10/2007 | 0.4 | 0.5 | |
| 8/13/2007 | 1.0 | 3.8 | |
| 8/14/2007 | 0.7 | 2.5 | |
| 8/15/2007 | 0.3 | 1.3 | |
| 8/16/2007 | | 3.3 | |
| 8/21/2007 | | 2.8 | |
| 1/9/2008 | 1.5 | | |
| 3/7/2008 | 0.5 | 0.8 | |
| 3/14/2008 | | 8.3 | |
| 3/18/2008 | | 5.5 | |
| 3/19/2008 | | 9.3 | |
| 3/21/2008 | 2.0 | | |
| 3/23/2008 | 4.0 | | |
| 3/24/2008 | 3.0 | | 6.8 |
| 3/25/2008 | | | 3.8 |
| 3/26/2008 | | 1.3 | 1.4 |
| 4/8/2008 | | 1.3 | |
| 4/11/1008 | | 0.3 | |

| | | | |
|---|---|---|---|
| 4/15/2008 | | 1.5 | 2.9 |
| 5/5/2008 | | 1.3 | |
| 5/7/2008 | | 0.2[28] | |
| 5/12/2008 | | 0.8 | |
| 5/13/2008 | | 3.5[29] | |
| 5/14/2008 | | 1.3 | |
| 5/15/2008 | | 2.8 | |
| 5/20/2008 | 0.8 | 3.3 | 1.4 |
| 5/21/2008 | | 4.3 | |
| 5/22/2008 | | 3.8 | 2.1 |
| 5/23/2008 | | 2.8 | 0.7 |
| 5/27/2008 | | 2.3 | |
| 5/28/2008 | 0.6 | 3.3 | |
| 5/29/2008 | | 2.8 | |
| 5/30/2008 | | 0.8 | |
| 6/2/2008 | | 0.8 | |
| 6/3/2008 | | 1.8 | |
| 6/4/2008 | | 2.8 | 4.3 |
| 6/5/2008 | | 3.3 | 2.7 |
| 6/8/2008 | | 2.3 | |
| 6/9/2008 | 1.5 | 6.5 | |
| 6/11/2008 | | 7.5 | |

---

[28] Mr. Maltbie's time entry for this date, which is block billed, is 0.5 hours.  However, Mr. Ederer's entry from the same date makes it clear that Mr. Maltbie spent 0.3 hours meeting with Mr. Ederer and the other 0.2 hours focusing on the settlement with Veratex.

[29] Mr. Maltbie worked on both the settlement with Veratex and the "draft default papers" during this block of time.  I have made sure not to double count the entry by attributing these hours to the settlement only.

| 6/12/2008 | | 10.3 | |
| 6/18/2008 | | 7.5 | |
| | | | |
| **TOTAL HOURS** | **21.3** | **130.0** | **26.1** |

| HOURS WORKED ON UNFILED DEFAULT JUDGMENTS AGAINST THE DEFAULTING DEFENDANTS | | | | |
|---|---|---|---|---|
| **DATE** | **EDERER** | **MALTBIE** | **VERONICK** | **BUCCANFUSCO** |
| 1/15/2008 | | 1.8 | | |
| 1/17/2008 | 0.3 | | | |
| 2/1/2008 | | | | 1.5 |
| 2/4/2008 | | | | 1.0 |
| 2/6/2008 | | 1.3 | | 1.0 |
| 5/13/2008 | | | 5.1 | |
| | | | | |
| **TOTAL HOURS** | **0.3** | **3.1** | **5.1** | **3.5** |

(Time Sheets, attached as Exh. A to Ederer Decl.)

> b.   Division Among the Individual Defendants

The plaintiff has suggested a method to divide its fees among the three Individual Defendants.  First, it asks that Jennifer Gucci and Mr. Litwak be held jointly and severally liable for fees that Gucci incurred at the outset of the litigation, from June 2007 through September 2007, before Gemma Gucci was a named defendant. (Pl. Memo. at 20).   Next, it requests that Mr. Litwak be individually liable for the fees it expended "to compel Litwak to participate in the discovery process, to comply with the Federal Rules applicable to discovery, and to comply with this Court's

prior discovery orders." (Pl. Memo. at 22). Accordingly, Gucci attributes all of its expenses from July 2008 through January 2009 to Mr. Litwak. (Pl. Memo. at 22; Ederer Decl., Exh. B). Finally, the plaintiff asks that the rest of the fees be split into two equal parts and that Jennifer Gucci and Mr. Litwak be held jointly and severally liable for one part while Gemma Gucci and Mr. Litwak are held jointly and severally liable for the other. (Pl. Memo. at 21).

Gemma Gucci argues that Gucci is barred from recovery because the Time Sheets do not indicate how its attorneys' work relates to each of the defendants and are vague. (Gemma Memo. at 13-14, 24-25). However, contrary to her contention, the Time Sheets are clear about the nature of the tasks performed and to which defendant they relate. Frequently, tasks are assignable to multiple defendants. Therefore, making the Individual Defendants jointly and severally liable for attorneys' fees during the periods of time during which Arnold and Porter worked on the case against them is appropriate.

It is difficult to determine the date on which Gemma Gucci should become responsible for Gucci's expenses. Although the Amended Complaint, which added her name, was not filed until October 2, 2007, and she was not served until January 11, 2008 (Affidavit of Service dated Jan. 14, 2008), plaintiff's counsel worked on aspects of the case relating to Gemma Gucci before then. For instance, they began drafting the Amended Complaint and discussing Gemma Gucci's infringement of the Gucci Trademarks in

63

September 2007.  (September 2007 Time Sheets, attached as part of Exh. A to Ederer Decl., at 15, 18) .  Additionally, work that plaintiff's counsel did during the initial stages of the litigation -- on the TRO, for example -- likely aided its case against Gemma Gucci.

However, because of Jennifer Gucci's resistance during discovery, Gucci's attorneys invested more of the time spent after October 2007 on pursuing the claims against her than those against Gemma Gucci.  With these factors in mind, making Gemma Gucci responsible for a portion of fees incurred beginning October 1, 2007, as the plaintiff suggests, is reasonable.  Accordingly, with the exception of the fees solely attributed to compelling discovery from Mr. Litwak, Gemma Gucci will be held jointly and severally liable with Mr. Litwak for half of the fees incurred by Gucci after October 1, 2007 and Jennifer Gucci will be held jointly and severally liable with Mr. Litwak for the other half.[30]

Gucci's request that Mr. Litwak be held solely responsible for fees incurred from July 2008 through January 2009 is also appropriate.  As noted above, having found Mr. Litwak in contempt

---

[30] Gemma Gucci asserts that the Court should use its equitable discretion to bar the plaintiff from recovering from her any fees that were incurred after the bench trial in this case.  (Gemma Memo. at 22-23).  She contends that "Gucci cannot claim that any of its litigation activities post-dating Judge Berman's Decision and Order relate to conduct of Gemma Gucci."  (Gemma Memo. at 22-23).  Ms. Gucci's suggestion is belied by the first portion of this opinion in which I hold Ms. Gucci jointly and severally liable for $200,750 in damages.  It was the work of the plaintiff's attorneys subsequent to the bench trial that allowed for this determination of damages, and therefore there is no question that holding Gemma Gucci liable for part of the expenses incurred during this time is just.

in February 2009, I ordered that he reimburse "Gucci for the
attorneys' fees and costs incurred in connection with discovery
necessitated by his failure to abide by the TRO's discovery
provisions."   (Feb. 2009 Order at 15).   The plaintiff has
attributed all of its expenses from July 2008 through January 2009
to this category and asks that only Mr. Litwak be held liable for
them.   A review of the Time Sheets reveals that this proposal is
appropriate, as Gucci's counsel devoted most of its time during
these months to discovery issues involving Mr. Litwak.   Because it
would have been to its advantage to single out time entries that do
not exclusively involve Mr. Litwak and requested that Jennifer
Gucci and Gemma Gucci be held jointly and severally liable with him
for the fees reflected in those entries, I will not question its
decision not to do so.

Time sheets from February 2009 and March 2009 also include
some entries relating to the contempt motion.   These hours should
not be attributed to Jennifer Gucci and Gemma Gucci.   Therefore,
Mr. Litwak also shall be individually responsible for the following
hours:

| DATE | EDERER | MALTBIE[31] |
|---|---|---|
| 2/2/2009 | | 4.3 |
| 2/3/2009 | 1.5 | 4.8 |
| 2/4/2009 | 1.0 | 6.8 |
| 2/20/2009 | 0.8 | 1.0 |
| 2/24/2009 | 0.6 | 1.8 |
| 3/16/2009 | | 4.3 |
| | | |
| **TOTAL HOURS** | 3.9 | 23.0 |

(February 2009 Time Sheets, attached as part of Exh. A to Ederer Decl., at 10-11; March 2009 Time Sheets, attached as part of Exh. A to Ederer Decl., at 2).

   c.   Over-Staffing

   Gemma Gucci maintains that the plaintiff over-staffed this "relatively straightforward trademark matter" by utilizing five lawyers and four legal assistants who engaged in "multiple unnecessary reviews of deposition transcripts, digests of those transcripts, and multiple reviews of correspondence with the Court." (Gemma Memo. at 23-24). Given the nature of the claims

---

[31] The plaintiff's use of block billing becomes troublesome here. Two of Mr. Maltbie's time entries -- those from February 3, 2009 and February 4, 2009 -- list tasks relating to both the contempt motion and other matters. (Feb. 2009 Time Sheets at 10). In this case, the tasks described are all compensable. But, if I were to attribute the fees from these time entries to the overall litigation rather than the contempt motion, the plaintiff would receive an advantage because Jennifer Gucci and Gemma Gucci would be held jointly and severally liable with Mr. Litwak for them, instead of Mr. Litwak being liable for them on his own. Thus, following the rationale of Ursa Minor, in which the court disadvantaged the plaintiffs because of their use of block billing, see 2001 WL 1842042, at *6, I will attribute Mr. Maltbie's time entries from these dates to the contempt motion.

involved as well as the type of discovery produced, Gemma Gucci's concern is valid.  The case did not involve complicated issues nor did it produce massive amounts of electronic documents to review. The numbers of attorneys involved, therefore, was unreasonable; too many lawyers were involved in too many projects.  For instance, on September 11, 2007, at least three attorneys -- Ms. Hanson-Sartoris, Mr. Veronick, and Mr. Maltbie -- reviewed the same set of documents produced by Mr. Litwak and Jennifer Gucci.[32]  (Sept. 2007 Time Sheets at 15).  Similarly, on October 12, 2007, three attorneys -- Mr. Ederer, Mr. Maltbie, and Mr. Veronick -- attended Jennifer Gucci's deposition.  (October 2007 Time Sheets, attached as part of Exh. A to Ederer Decl., at 17).  And, these same three attorneys each had a hand in opposing HOM's motion to withdraw. (November 2008 Time Sheets, attached as part of Exh. A to Ederer Decl., at 4).  For each of these tasks, the participation of two attorneys seems sufficient.

Furthermore, the over-staffing of the case "ensured that (1) unnecessary time was spent so that each attorney acquainted himself or herself with the facts and the issues; and (2) unnecessary time was spent in communication with the other attorneys on the matter." Concrete Flotation Systems, Inc. v. Tadco Construction Corp., No. 07 CV 319, 2010 WL 2539771, at *6 (E.D.N.Y. March 15, 2010); see also American Camping Association v. Camp Shane, No. 06 Civ. 0176,

---

[32] It is possible that Mr. Ederer also reviewed these documents since part of his time entry from this date includes "review documents and begin preparing for depositions."  (Sept. 2007 Time Sheets at 15).

2006 WL 1982770, at *3 (S.D.N.Y. June 16, 2006); Daiwa Special Asset Corp. v. Desnick, No. 00 Civ. 3856, 2002 WL 31767817, at *3 (S.D.N.Y. Dec. 3, 2002).

In this action, it would be impractical to identify specific time entries that should be eliminated. Fortunately,

> a district court is not required to "set forth item-by-item findings concerning what may be countless objections to individual billing items." Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994). Rather, . . . a court may use a percentage deduction "'as a practical means of trimming fat from a fee application.'" McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006) (quoting New York State Association for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983)).

Reiter v. Metropolitan Transportation Authority, No. 01 Civ. 2762, 2007 WL 2775144, at *13 (S.D.N.Y. Sept. 25, 2007). Therefore, because of the over-staffing of this action, an across-the-board reduction of 15 percent of the award of attorneys' fees is warranted. See Concrete Flotation Systems, 2010 WL 2539771, at *8 (reducing award by 25 percent to account for over-staffing and "excessive number of hours worked"); North American Karaoke-Works Trade Association, Inc. v. Entral Group International, LLC, No. 06 Civ. 5158, 2010 WL 2143661, at *18 (S.D.N.Y. Feb. 24, 2010), rejected in unrelated part, 2010 WL 2158294 (S.D.N.Y. May 27, 2010) (making across-the-board reduction of 30 percent because some hours billed were "excessive, unnecessary or insufficiently described"); Heisman Trophy Trust v. Smack Apparel Co., 665 F. Supp. 2d 420, 425 (S.D.N.Y. 2009) (reducing hourly rates by 10 percent because of "relatively uncomplicated nature of the case" and "excessive amount of time spent on" a motion); Rozell v. Ross-Holst, 576 F. Supp. 2d

527, 541 (S.D.N.Y. 2008) (applying 15 percent reduction due to instances of excessiveness as well as "disproportionate amount" billed by more senior counsel as opposed to junior associates); Daiwa Special Asset Corp., 2002 WL 31767817, at *5 (halving requested award of fees and costs because of "duplication of attorney efforts, the overstaffing of meetings and depositions, and the inefficient allocation of human resources").

    4.   The Lodestar

Based on the reasons set forth above, the defendants shall be responsible for the following attorneys' fees:

| JENNIFER GUCCI AND MR. LITWAK, JOINTLY AND SEVERALLY | | | | | | | |
|---|---|---|---|---|---|---|---|
| MONTH | EDERER | MALTBIE | VERONICK | SALZMANN | HANSON-SARTORIS | BUCCAN-FUSCO | McCARTHY |
| June 07 | 1.4 | | | | | | |
| July 07 | 23.5 | 33.2 | 22.6 | 1.2 | | 14.0 | |
| Aug. 07 | 15.8[33] | 17.5[34] | 9.1 | 0.3 | 0.8 | 5.0 | |
| Sept. 07 | 58.6 | 20.7 | 58.4 | 15.4 | 63.9 | 1.0 | 69.4 |
| | | | | | | | |
| TOTAL HOURS | 99.3 | 71.4 | 90.1 | 16.9 | 64.7 | 20.0 | 69.4 |
| HOURLY RATE | $700 | $500 | $400 | $400 | $400 | $200 | $100 |

---

[33] This number results from subtracting the 7.4 hours that Mr. Ederer spent working on settlement issues from the total number of hours he worked that month, 23.2.

[34] This number results from subtracting the 25.6 hours that Mr. Maltbie spent working on settlement issues from the total number of hours he worked that month, 43.1.

| TOTAL PER ATTY | $69,510 | $35,700 | $36,040 | $6,760 | $25,880 | $4,000 | $6,940 |
|---|---|---|---|---|---|---|---|
| TOTAL | $184,830.00 | | | | | | |
| MINUS 15% | ($27,724.50) | | | | | | |
| LODESTAR | **$157,105.50** | | | | | | |

| ALL INDIVIDUAL DEFENDANTS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MONTH | EDERER | MALTBIE | VERONICK | SALZMANN | HANSON-SARTORIS | BUCCAN-FUSCO | McCARTHY | MOORE |
| Oct. 07 | 24.0 | 42.4 | 17.0 | 22.9 | 23.1 | 1.5 | 31.9 | |
| Nov. 07 | 19.1 | 32.6 | 1.9 | 9.6 | 27.6 | | 21.5 | |
| Dec. 07 | 10.5 | 41.4 | 1.7 | 6.4 | | 0.5 | | |
| Jan. 08 | 23.5[35] | 40.1[36] | 1.2 | | 1.1 | 1.0 | | |
| Feb. 08 | 6.9 | 17.9[37] | | | 3.3 | 0.0[38] | 22.9 | |

---

[35] This number results from subtracting the 1.5 hours that Mr. Ederer spent working on settlement issues and the 0.3 hours he spent working on default judgments from the total number of hours he worked that month, 25.3.

[36] This number results from subtracting the 1.8 hours that Mr. Maltbie spent working on default judgments from the total number of hours he worked that month, 41.9.

[37] This number results from subtracting the 1.3 hours that Mr. Maltbie spent working on default judgments from the total number of hours he worked that month, 19.2.

[38] The entirety of the 3.5 hours that Mr. Buccanfusco spent working on the case during this month was devoted to seeking default judgments.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| March 08 | 13.3[39] | 57.4[40] | 39.6[41] | | 1.7 | 0.5 | 16.4 | 10.2 |
| April 08 | 8.1 | 9.8[42] | 10.4[43] | | | | | |
| May 08 | 3.0[44] | 1.4[45] | 37.0[46] | 11.0 | | | | |

[39] This number results from subtracting the 9.5 hours that Mr. Ederer spent working on settlement issues from the total number of hours he worked that month, 22.8.

[40] This number results from subtracting the 25.2 hours that Mr. Maltbie spent working on settlement issues from the total number of hours he worked that month, 82.6.

[41] This number results from subtracting the 12 hours that Mr. Veronick spent working on settlement issues from the total number of hours he worked that month, 51.6.

[42] This number results from subtracting the 3.1 hours that Mr. Maltbie spent working on settlement issues from the total number of hours he worked that month, 12.9.

[43] This number results from subtracting the 2.9 hours that Mr. Veronick spent working on settlement issues from the total number of hours he worked that month, 13.3.

[44] This number results from subtracting the 1.4 hours that Mr. Ederer spent working on settlement issues from the total number of hours he worked that month, 4.4.

[45] This number results from subtracting the 33.3 hours that Mr. Maltbie spent working on settlement issues from the total number of hours he worked that month, 34.7.

[46] This number results from subtracting the 4.2 hours that Mr. Veronick spent working on settlement issues and the 5.1 hours that he spent on default judgments from the total number of hours he worked that month, 46.3.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| June 08 | 60.0[47] | 104.7[48] | 96.5[49] | 12.9 | | | | 18.5 |
| Feb.[50] 09 | 7.1[51] | 16.8[52] | | | | | | |
| March 09 | 7.0 | 20.5[53] | | 0.7 | | | | 1.0 |
| Apr. 09 | 4.9 | 13.3 | | | | | | |
| May 09 | 6.4 | 15.9 | | | | | | |
| June 09 | 105.1 | 157.5 | 41.2 | 6.2 | | | | 14.0 |
| July 09 | 57.3 | 63.8 | 15.2 | 0.8 | | | | |
| Aug. 09 | 6.0 | 30.9 | 3.7 | 1.1 | | 0.5 | | |
| Sept. 09 | 10.9 | 57.9 | 9.7 | | | 2.0 | | |

[47] This number results from subtracting the 1.5 hours that Mr. Ederer spent working on settlement issues from the total number of hours he worked that month, 61.5.

[48] This number results from subtracting the 42.8 hours that Mr. Maltbie spent working on settlement issues from the total number of hours he worked that month, 147.5.

[49] This number results from subtracting the seven hours that Mr. Veronick spent working on settlement issues from the total number of hours he worked that month, 103.5.

[50] The hours attributed to Mr. Ederer and Mr. Maltbie from February 2009 and March 2009 have been reduced to account for those relating to the contempt motion, for which Mr. Litwak is solely liable.

[51] This number results from subtracting the 3.9 hours that Mr. Ederer spent working on the contempt motion from the total number of hours he worked that month, 11.

[52] This number results from subtracting the 18.7 hours that Mr. Maltbie spent working on the contempt motion from the total number of hours he worked that month, 35.5.

[53] This number results from subtracting the 4.3 hours that Mr. Maltbie spent working on the contempt motion from the total number of hours he worked that month, 24.8.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Oct. 09 | 7.3 | 27.9 | 1.0 | 0.6 | | | | |
| Nov. 09 | 5.0 | 32.0 | 1.5 | 2.8 | | | | |
| Dec. 09 | 7.4 | 115.4 | 2.2 | | | | 0.2 | |
| Jan. 10 | 2.4 | 40.3 | 1.8 | | | | | |
| Feb. 10 | 1.6 | 38.2 | 0.8 | | | | | |
| March 10 | 4.5 | 64.2 | 22.7 | 3.0 | | | | |
| | | | | | | | | |
| **TOTAL HOURS** | 401.3 | 1042.3 | 305.1 | 78 | 56.8 | 6 | 92.9 | 43.7 |
| **HOURLY RATE** | $700 | $500 | $400 | $400 | $400 | $200 | $100 | $100 |
| **TOTAL PER ATTY** | $280,910 | $521,150 | $122,040 | $31,200 | $22,720 | $1200 | $9,290 | $4,370 |
| **TOTAL** | $992,880.00 | | | | | | | |
| **MINUS 15%** | ($148,932.00) | | | | | | | |
| **LODESTAR** | $843,948.00 | | | | | | | |
| **50% OF LODESTAR** | **$421,974.00** | | | | | | | |

| MR. LITWAK, INDIVIDIUALLY | | | | | | |
|---|---|---|---|---|---|---|
| **MONTH** | **EDERER** | **MALTBIE** | **VERONICK** | **SALZMANN** | **McCARTHY** | **MOORE** |
| July 08 | 11.8 | 72.8 | 3.0 | 18.2 | 1.3 | 19.9 |
| Aug. 08 | 7.0 | 23.6 | 5.1 | 0.7 | | |
| Sept. 08 | 4.0 | 23.4 | 0.4 | | | |
| Oct. 08 | 3.3 | 21.0 | 1.5 | | | |
| Nov. 08 | 19.3 | 72.4 | 39.9 | | | |
| Dec. 08 | 17.2 | 110.8 | 11.8 | 11.5 | 3.4 | |
| Jan. 09 | 24.8 | 54.4 | 0.2 | 24.3 | | |

73

| | | | | | |
|---|---|---|---|---|---|
| Feb. 09 & March 09[54] | 3.9 | 23.0 | | | | |
| | | | | | | |
| **TOTAL HOURS** | 91.3 | 401.4 | 61.9 | 54.7 | 4.7 | 19.9 |
| **HOURLY RATE** | $700 | $500 | $400 | $400 | $100 | $100 |
| **TOTAL PER ATTY** | $63,910 | $200,700 | $24,760 | $21,880 | $470 | $1,990 |
| **TOTAL** | $313,710.00 | | | | | |
| **MINUS 15%** | ($47,056.50) | | | | | |
| **LODESTAR** | **$266,653.50** | | | | | |

While a court may enhance or diminish the lodestar amount in issuing a final award, it may do so only in exceptional circumstances and only based on factors not already subsumed in the lodestar calculation. Kenny A., __ U.S. at __, 130 S. Ct. at 1673. This is not a case that warrants deviating from the presumptively reasonable fee. Thus, I recommend a fee award in which Jennifer Gucci and Mr. Litwak are held jointly and severally liable for $579,079.50, Gemma Gucci and Mr. Litwak are held jointly and severally liable for $421,974.00, and Mr. Litwak is individually liable for $266,653.50.

 F. Costs

  The plaintiff has requested reimbursement for costs as follows:

---

  [54] The hours listed in this row correspond to those that Gucci's lawyers worked on the contempt motion in February 2009 and March 2009.

| Category | Cost |
|---|---|
| Filing Fees | $350.00 |
| Electronic Research Expenses | $13,009.38 |
| Travel Expenses for Counsel | $14,975.57 |
| Travel Expenses for Witnesses | $16,922.31 |
| Photocopying, Facsimile, and Telephone Expenses | $29,033.48 |
| Courier Expenses | $2,416.27 |
| Evidentiary-Related Expenses | $2,011.83 |
| Investigator and Process Server Fees | $3,902.18 |
| Deposition and Court Transcripts | $36,339.23 |
| Electronic Discovery Expenses - Litwak | $12,634.83 |
| Electronic Discovery Expenses - Jennifer Gucci | $9,689.56 |
| | |
| **Total** | **$141,284.64** |

(Ederer Decl., ¶ 45 & Exh. D).  It asks that the Individual Defendants be held liable for these costs in the same manner as it asked that they be responsible for the attorneys' fees.  In other words, Gucci requests that Jennifer Gucci and Mr. Litwak be held jointly and severally liable for costs incurred prior to October 2007, or $19,711.69, that Mr. Litwak be held individually liable for costs incurred in getting him to comply with his discovery obligations, or $35,988.30, and that the rest of the costs -- $85,584.65 -- be divided in half, with Jennifer Gucci and Mr. Litwak jointly and severally liable for one half while Gemma Gucci and Mr. Litwak are jointly and severally liable for the other. (Ederer Decl., ¶¶ 48-51 & Exh. B).

The plaintiff's attorneys have failed to provide any documentation regarding the costs expended in the litigation. For instance, plaintiff's counsel frequently requests reimbursement for "Westlaw research" but "has submitted no receipts or records concerning the rate that Westlaw charges or the number of hours of electronic research performed." Goldberg v. Blue Ridge Farms, Inc., No. 04 CV 5098, 2005 WL 1796116, at *6 (E.D.N.Y. July 26, 2005). Similarly, when it comes to charges like "duplicating," "outside duplicating," and "color copies," it is impossible to tell the number of copies made and the rate per copy.[55]

The invoices that plaintiff's attorneys did provide also contain charges for services that lack explanation. In November 2007, for example, plaintiff's counsel paid Bishop International $2,343.93 in "professional fees" and in April 2008, they spent $2,158.20 for "professional services rendered re. Trademarks" from Jennison & Shultz, P.C. (November 2007 Time Sheets, attached as part of Exh. A to Ederer Decl., at 18; April 2008 Time Sheets, attached as part of Exh. A to Ederer Decl., at 4). Moreover, in addition to billing for "original" depositions and transcripts, the plaintiff, without explanation, requests reimbursement -- in large amounts -- for "copies" of these documents. (June 2008 Time Sheets, attached as part of Exh. A to Ederer Decl., at 9; September 2008 Time Sheets, attached as part of Exh. A to Ederer Decl., at

---

[55] It is unlikely that Gucci's attorneys will be able to provide a receipt for in-house services such as photocopying. However, they can provide information about how much this service costs per copy.

10).

Not all of the plaintiff's attorneys' costs are shrouded in mystery. For instance, charges for conference call services are self-explanatory and appear to coincide with the notations in the Time Sheets indicating calls with the court or opposing counsel. And the amount and payment of the court's filing fee need not be documented. See Disabled Patriots of America, Inc. v. Niagara Group Hotels, LLC, 688 F. Supp. 2d 216, 228 (W.D.N.Y. 2010) (taking judicial notice of filing fee). However, I am disinclined to parse through the records to single out such entries, particularly when plaintiff's counsel have provided no guidance. Therefore, Gucci's request for costs is denied without prejudice to the plaintiff renewing the application with appropriate documentation and explanations that allow the Court to evaluate the reasonableness of the charges. See Disabled Patriots of America, 688 F. Supp. 2d at 228-29 (refusing to award costs when they were both undocumented and "suspect"); Tatum v. City of New York, No. 06 Civ. 4290, 2010 WL 334975, at *12 (S.D.N.Y. Jan. 28, 2010) ("Expenses not supported by documentation will not be considered."); I.L.G.W.U. National Retirement Fund v. ESI Group, Inc., No. 92 Civ. 0597, 2003 WL 135797, at *4 (S.D.N.Y. Jan. 17, 2003) ("Plaintiffs, however, failed to submit any bills or receipts for the expenses. Such a failure can be fatal to a request for expenses."); Rotella v. Board of Education, No. 01 CV 0434, 2002 WL 59106, at *5 (E.D.N.Y. Jan. 17, 2002) (only awarding documented costs); Tanzini v. Marine Midland Bank, N.A., 978 F. Supp. 70, 85 (N.D.N.Y. 1997) (refusing

to award expenses for computer research "in the absence of an hour/rate showing by plaintiff" and reducing other expenses due to a lack of documentation).

Conclusion

For the reasons set forth above, I recommend that judgment be entered awarding the plaintiff the following:

1. $128,892.65 in damages and $579,079.50 in attorneys' fees, for which Jennifer Gucci and Mr. Litwak are held jointly and severally liable;

2. $200,750.00 in damages and $421,974.00 in attorneys' fees, for which Gemma Gucci and Mr. Litwak are held jointly and severally liable; and

3. $325,000.00 in punitive damages and $266,653.50 in attorneys' fees, for which Mr. Litwak is individually liable.

I also recommend that Gucci's requests for an award of costs associated with this litigation be denied without prejudice to the plaintiff renewing the motion and providing the proper documentation and explanation regarding the costs.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, Room 650, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York, 10007.  Failure to file timely objections will preclude

appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          September 7, 2010

Louis S. Ederer, Esq.
John Maltbie, Esq.
Alan Veronic, Esq.
Arnold & Porter, LLP
399 Park Avenue
New York, New York 10017

Kevin J. Harrington, Esq.
John T.A. Rosenthal, Esq.
Harrington, Ocko & Monk
81 Main Street - Suite 215
White Plains, New York 10601

Edward Litwak
126868 Via Latina
Del Mar, CA 92014

Jennifer Gucci
La Solana de Nagueles
La Minosas 9,
269000 Marbella, SPAIN

79